No. 21-2325

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| ST. ANTHONY HOSPITAL, | ) Appeal from the United States |
| Plaintiff-Appellant, | ) District Court for the |
| | ) Northern District of Illinois, |
| v. | ) Eastern Division |
| | ) |
| THERESA EAGLESON, in her official | ) |
| capacity as Director of the Illinois Department | ) |
| of Healthcare and Family Services, | ) No. 20-cv-02561 |
| Defendant-Appellee, | ) |
| | ) |
| and | ) |
| | ) |
| MERIDIAN HEALTH PLAN OF ILLINOIS, | ) |
| INC., *et al.*, | ) The Honorable |
| | ) Steven C. Seeger, |
| Intervening Defendants-Appellees | ) Judge Presiding. |

**DEFENDANT THERESA EAGLESON'S CIRCUIT RULE 54 STATEMENT**

Defendant-appellee Theresa Eagleson, Director of the Illinois Department of Healthcare and Family Services ("HFS"), by her counsel, Illinois Attorney General Kwame Raoul and Assistant Attorney General Richard S. Huszagh, respectfully submits this Circuit Rule 54 Statement regarding further action by the court following the Supreme Court's decision in in *Health & Hospital Corp. of Marion County v. Talevski*, 143 S. Ct. 1444 (2023), and its June 20, 2023 order in this matter, 143 S. Ct. 2634.

*Talevski* clarified that section 1396u-2(f) of the Medicaid Act, 42 U.S.C. § 1396u-2(f), is not privately enforceable under section 1983 as plaintiff St. Anthony Hospital claims. That is so for two reasons: section u-2(f) does not satisfy the first step of *Talevski*'s test — which adopts the principles set forth in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), not *Blessing v. Freestone*, 520 U.S. 329 (1997) — to

determine whether a Spending Clause statute presumptively creates a section 1983-enforceable right. And on *Talevski*'s second step, recognizing such a right would be inconsistent with Congress's intent that the comprehensive enforcement scheme based on contract rights that section u-2(f) expressly adopts be the exclusive means to enforce the duty of managed care organizations ("MCOs") to pay Medicaid providers on a timely basis. Accordingly, the court should affirm the district court's decision dismissing St. Anthony's section 1983 claim under section u-2(f). In the alternative, the court should order supplemental briefing and argument regarding *Talevski*'s impact on this case.

## Background

In traditional Medicaid fee-for-service programs, States pay health care providers directly for services to eligible individuals, and section 1396a(a)(37)(A) of the Medicaid Act requires each State's Medicaid plan to contain claims payment procedures which ensure that the State pays 90 percent of practitioners' "clean claims" (for which all necessary information to process the claim is provided) within 30 days, and 99 percent of such claims within 90 days. 42 U.S.C. § 1396a(a)(37)(A). In 1997, Congress authorized state Medicaid plans to include managed-care programs, which operate through a two-tier system of contracts — with separate contracts between States and MCOs, and between MCOs and providers — in which the MCOs enroll eligible individuals and are responsible for paying providers. Pub. L. No. 105-33, §§ 4701 *et seq.*; *see Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 137 (2d Cir. 2014). Section u-2(f) states that States must include a clause in their contracts with MCOs (the "Timely Payment Clause") pursuant to which MCOs commit to pay providers for covered services "on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) . . . , unless the

health care provider and [MCO] agree to an alternate payment schedule." 42 U.S.C. § 1396u-2(f).

St. Anthony's complaint alleged that section u-2(f) does not just give States a contractual right to enforce the Timely Payment Clause under their contracts with MCOs, but also (i) imposes on States a statutory duty to ensure that MCOs comply with the Timely Payment Clause's payment schedule, and (ii) gives providers a private right, enforceable under section 1983, to have States fulfill that duty. The district court disagreed with St. Anthony's interpretation of section u-2(f) and dismissed this claim. *St. Anthony Hospital v. Eagleson*, 548 F. Supp. 3d 721, 733-37, 739 (N.D. Ill. 2021). Over a dissent, this court reversed and held that section u-2(f) gives Medicaid providers a section 1983-enforceable right to require States "to try to ensure that the MCOs actually pay providers in accord with the 30/90 pay schedule, . . . at least to address systemic failures to provide timely . . . payments." *St. Anthony Hosp. v. Eagleson*, 40 F.4th 492, 502 (7th Cir. 2022); *see also id.* at 510.

The majority opinion reasoned that satisfying *Blessing*'s three-factor standard was sufficient to create a presumptive private right to enforce a federal Spending Clause statute. It stated: "If these three [*Blessing*] factors are satisfied, the right is presumptively enforceable under section 1983." *Id.* at 503 (cleaned up); *see also id.* at 504; *id.* at 514 ("Since section 1396u-2(f) satisfies the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983."). Applying those factors, the majority determined that reading section u-2(f) to impose a statutory duty on States to ensure that MCOs pay providers in accordance with the Timely Payment Clause was "more coherent" than HFS's interpretation, under which section u-2(f) simply gives States a contractual right to enforce the Timely Payment Clause in light of the particular circumstances presented, because, the

3

majority reasoned, that statutory duty would more effectively achieve Congress's goal to have providers timely paid, and it aligns with a State's oversight and enforcement authority under other provisions of the Medicaid Act. *Id.* at 509-10. The majority also determined that Congress did not exclude section 1983 enforcement of the private right it found in section u-2(f) because, from a provider's perspective, federal court enforcement of that right would be "superior" to the contract rights expressly anticipated by section u-2(f) for purposes of achieving Congress's goal to have MCOs pay providers on a timely basis. *Id.* at 514-15.

HFS filed a petition for rehearing *en banc*, which this court denied, also over a dissent. Docs. 68, 79. HFS then filed a petition for certiorari. The Supreme Court granted the petition, vacated this court's judgment, and remanded the case to this court for further consideration in light of *Talevski*. 143 S. Ct. 2634. This court then directed the parties to file Circuit Rule 54 statements regarding the action the court should take on remand. Doc. 84.

## Discussion

Each step of *Talevski*'s analysis supports affirmance of the district court's judgment against St. Anthony on its section 1983 claim under section u-2(f). At a minimum, this court should order new briefing and argument.

**I.     Under *Talevski*, Section u-2(f) Does Not Establish a Private Right, with Explicit and Unambiguous Rights-Creating Language, that is Presumptively Enforceable under Section 1983.**

Section u-2(f) does not satisfy *Talevski*'s first step, and thus does not presumptively create a private right enforceable under section 1983. In that step, a court must apply the standards established in *Gonzaga* and determine, using "traditional tools of statutory construction, . . . whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs," using

4

"'rights-creating,' individual-centric language." *Talevski*, 143 S. Ct. at 1446 (quoting *Gonzaga*, 536 U.S. at 283, 285-86, 287); *see also id.* at 1455. This test "sets a demanding bar" and "significant hurdle" for concluding that a Spending Clause statute is presumptively enforceable under section 1983. *Id.* at 1455, 1457; *see also id.* at 1463 (Barrett, J. concurring) ("As the Court explains, § 1983 actions are the exception — not the rule — for violations of Spending Clause statutes."). Here, however, the court's vacated opinion departs from this analysis, which confirms that section u-2(f) does not satisfy *Talevski*'s first step.

> **A.    The court's vacated opinion incorrectly applied *Blessing*'s three-factor standard, which no longer controls.**

The court's opinion is inconsistent with *Talevski* because it applied the three-factor *Blessing* standard to hold that section u-2(f) presumptively confers on Medicaid providers a section 1983-enforceable right. 40 F.4th at 503, 504, 514. *Talevski* expressly held that "*Gonzaga* sets forth" the first step of the applicable analysis, 143 S. Ct. at 1457, and it did not even mention *Blessing* when discussing that first step, *id.* at 1457-59. Justice Barrett, joined by the Chief Justice, likewise stated that "our decision in *Gonzaga* establishes the standard for analyzing whether Spending Clause statutes give rise to individual rights." *Id.* at 1463. Justice Alito, joined by Justice Thomas, approved the Court's step-one analysis (while disagreeing on step two), stating that under *Gonzaga* "there is no room for 'a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not,'" and that *Gonzaga* "reject[ed] the standard articulated in *Blessing*." *Id.* at 1484 (quoting *Gonzaga*, 536 U.S. at 286). But the majority opinion applied *Blessing*, not *Gonzaga*. 40 F.4th at 503, 504, 514. That alone was error.

5

> **B.  Section u-2(f) does not unambiguously confer a private right to enforce the duty alleged by St. Anthony, using explicit rights-creating language.**

Under *Talevski* and *Gonzaga*, section u-2(f) does not create a private right that is presumptively enforceable under section 1983. *Talevski* directs courts to apply "traditional tools of statutory construction" to determine whether a particular Spending Clause statute "*unambiguously* confer[s] individual federal rights," using "rights-creating, individual-centric language with an unmistakable focus on the benefited class." 143 S. Ct. at 1455, 1457 (emphasis in original) (cleaned up) (citing *Gonzaga*, 536 U.S. at 280). The Court's opinion in *Gonzaga*, which *Talevski* adopted, *id.* at 1457, reinforces this point. Quoting *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1984), *Gonzaga* held that when Congress enacts Spending Clause legislation in which it wishes to impose specific duties on States and create private rights to enforce those duties, it must "speak with a clear voice" and "do so unambiguously." 536 U.S. at 17 (quoting *Pennhurst*, 451 U.S. at 17). *Gonzaga* then held that to create such rights, the relevant statute must contain "explicit rights-creating terms," *id.* at 284, and that such "'rights-creating' language [is] critical to showing the requisite congressional intent to create new rights," *id.* at 287.

*Talevski* and *Gonzaga* demonstrate the kind of statutory language that is necessary to meet this strict standard, which section u-2(f) does not contain. *Talevski* explained that each provision of the Federal Nursing Home Reform Act on which the plaintiff relied expressly referred to specific "rights" of nursing home residents — to be free from unnecessary restraints, and to be discharged or transferred only upon fulfillment of specified conditions — that nursing homes had to respect. 143 S. Ct. at 1455-56. The Court added that this language left no doubt about *who* owed residents the statutory duty that corresponded to these express

6

rights. *Id.* at 1458 ("these two provisions also establish who must comply with these statutory rights (namely, the Medicaid-participant nursing homes)"); *see also id.* at 1485 (Alito, J., dissenting in part) ("Both of these provisions explicitly use the term 'rights' to describe discrete and concrete duties that a defined party ('nursing facility') owes to a particular individual ('each resident').").

Indeed, as Justice Barrett noted in her concurring opinion, in only two other cases after *Pennhurst* — *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U. S. 418 (1987), and *Wilder v. Virginia Hospital Ass'n*, 496 U. S. 498 (1990) — did the Court find the *Gonzaga* standard satisfied. *See Talevski*, 143 S. Ct. at 1464 (Barrett, J., concurring); *Gonzaga*, 536 U.S. at 280. *Gonzaga* explained the critical nature of the statutory language in those cases. For the statute at issue in *Wright*, the Court said that "[t]he key to our inquiry was that Congress spoke in terms that could not be clearer . . . and conferred entitlements sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*." *Gonzaga*, 536 U.S. at 280 (cleaned up). And in *Wilder*, the Court found a private right because the statute "required States to pay an objective monetary entitlement to individual health care providers." *Id.* (cleaned up).

Thus, as *Talevski* and *Gonzaga* make clear, every Spending Clause statute that the Supreme Court has held presumptively created private rights either expressly said that the class of persons to which the plaintiffs belonged had specific "rights" against the State or other recipient of federal funds, or explicitly imposed on them a specific duty owed to individual members of that class. Section u-2(f) does neither. It does not expressly state that providers have "rights" against a State. Nor does section u-2(f) explicitly impose on States the specific duty to providers that St. Anthony alleges. To the contrary, the text of section u-2(f) states only that States

have a duty to include the Timely Payment Clause in their contracts with MCOs, thereby giving States contractual rights against MCOs, enforceable under well-established contract law principles. *Cf. New York v. United States*, 505 U.S. 144, 172 (1992) (upholding exercise of Spending Clause authority where "[t]he conditions imposed are unambiguous" and "the Act informs the States exactly what they must do") (citing *Pennhurst*, 451 U.S. at 17).

Section u-2(f)'s failure to satisfy *Talevski*'s first-step analysis is confirmed by the requirement that this step, under the *Gonzaga* standard, apply "traditional tools of statutory construction." 143 S. Ct. at 1457. Those tools are well established. A court must "begin with the text" of the statutory provision at issue, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), and "presume that Congress says in a statute what it means and means in a statute what it says there," *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (cleaned up). Conversely, a court "may not replace the actual text with speculation as to Congress' intent," *Castro-Huerta*, 142 S. Ct. at 2496 (cleaned up), "engraft on a statute additions which [it] think[s] the legislature logically might or should have made," *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1867 n.11 (2019), "rewrite a statute because [the court] might deem its effects susceptible of improvement," *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 398 (1984), or "assume that *whatever* furthers the statute's primary objective must be the law," *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (emphasis in original). And a court may find a statute unambiguous only if no other meaning is "plausible." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419 (2005).

Applying these interpretative tools shows that section u-2(f) neither unambiguously imposes on States the duty that St. Anthony attributes to it, which is a

8

necessary predicate for the private right it claims, *see Gonzaga*, 536 U.S. at 279-80; *Pennhurst*, 451 U.S. at 17, nor unambiguously gives providers a private right to enforce that duty. At the very least, HFS's view that section u-2(f) gives States a contractual right enforce the Timely Payment Clause in their contacts with MCOs, but not a statutory duty to "ensure" that MCOs abide by that contractual commitment, is "plausible," thereby precluding section u-2(f) from unambiguously, but silently, establishing that additional duty. *Graham Cnty. Soil & Water Conservation Dist.*, 545 U.S. at 419.

Indeed, giving providers and States contractual rights to require MCOs to pay providers on a timely basis is not simply a "plausible" interpretation of section u-2(f); it adopts a well-recognized means for Congress to implement a specific objective. There is nothing unusual about Congress pursuing a particular policy by mandating specific provisions in certain contracts, with the rights arising under those provisions governed by state-law contract principles, typically adjudicated in state court. *See Jackson Transit Auth. v. Loc. Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 20-23, 29 & nn.12, 13 (1982); *Nieto-Santos v. Fletcher Farms*, 743 F.2d 638, 640–41 (9th Cir. 1984). And the fact that the contractual right that section u-2(f) gives States might not guarantee that MCOs will always meet the contractually prescribed payment schedule does not allow a court to rewrite what Congress enacted to better achieve that goal. *See Rodriguez*, 480 U.S. at 526; *see also Talevski*, 143 S. Ct. at 1454 ("We implement Congress's choices rather than remake them.").

The significance of section u-2(f)'s textual silence concerning the duty the majority opinion attributed to is compounded by the fact that other Medicaid Act provisions, including several provisions in section 1396u-2, which governs Medicaid managed-care programs, do expressly impose specific duties on States. *See St.*

*Anthony Hosp.*, 40 F.4th at 521 & n.3 (Brennan, J. dissenting) (listing provisions expressly establishing state duties); *see also Jama v. Immigr. & Customs Enforcement*, 543 U.S. 335, 341 (2005). And because the other provisions of the Medicaid Act relating to a State's oversight of MCOs, including the provision expressly giving a State discretion over whether to terminate an MCO for breaching its contract, 42 U.S.C. § 1396u-2(e)(4), are perfectly consistent with Congress's choice to give States contractual rights against MCOs concerning their payments to providers,[1] it cannot be said that, under "traditional tools of statutory construction," those provisions demonstrate that section u-2(f) means what it does not say and "unambiguously" establishes that States owe providers a duty to ensure that MCOs pay providers in accordance with the Timely Payment Clause in the MCOs' state contracts. *Talevski*, 143 S. Ct. at 1450, 1455, 1457.

Thus, the situation here, in which States have a contractual right to enforce the Timely Payment Clause against an MCO, is similar to the situation in *Gonzaga*, where the plaintiffs' interests were "two steps removed" from the statutory obligation imposed on States. 536 U.S. at 287. States have a statutory duty to include the Timely Payment Clause in their contracts with MCOs, giving the States the right to enforce the MCOs' contractual commitment to pay providers on a timely basis, as HFS has done. *St. Anthony Hosp.*, 40 F.4th at 514. But providers are only indirect beneficiaries of States' contractual rights against MCOs, not persons to

---

[1] Unlike termination of an MCO's contract, which § 1396u-2(e)(4) authorizes if the MCO has failed to meet the requirements of the Medicaid Act "or" the requirements of its "contract" with a State, 42 U.S.C. § 1396u-2(e)(4), the "intermediate sanctions" that a State must impose on an MCO under § 1396u-2(e)(3) apply only to an MCO's repeated failure to meet the requirements of section u-2(f) and § 1396b(m), which impose multiple duties on MCOs regarding the provision of medical assistance to enrolled individuals, but none regarding payments to providers, 42 U.S.C. §§ 1396u-2(e)(3), § 1396b(m).

whom the State owes a statutory duty, much less an unambiguous statutory duty.

In support of its decision, the panel majority nonetheless concluded that section u-2(f) has a "focus . . . on the individual provider," rather than merely imposing an "aggregate" duty on States, because the Timely Payment Clause mandated by section u-2(f) allows "provider-specific exemptions from the 30/90 pay schedule" under which a provider and MCO may agree to an alternate payment schedule. 40 F.4th at 506-07. But this is no different from the individual consent exception to schools' privacy obligations under the statute at issue in *Gonzaga*, which the Court held was insufficient to confer individual rights. 536 U.S. at 288-89 & n.6.

Of course, section u-2(f) is intended to benefit Medicaid providers by requiring MCOs to pay them on a timely basis, either under the default schedule referred to in the Timely Payment Clause, or under an "alternate payment schedule" negotiated by the provider and MCO. 42 U.S.C. § 1396u-2(f). But that is not enough to conclude that section u-2(f) unambiguously imposes on *States* a statutory duty to *providers* to ensure the MCOs' compliance with that payment schedule, or that section u-2(f) unambiguously gives providers a right to enforce such a duty. *See Gonzaga*, 536 U.S. at 274 ("it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [section 1983]") (emphasis in original). And without such an unambiguously expressed duty owed by States to providers, they cannot have an unambiguously conferred right against States to enforce that duty.

The need to respect *Gonzaga*'s clear statement rule for finding state duties and private rights in Spending Clause legislation is particularly acute in light of the unusual nature of the claimed right under section u-2(f), which is not merely to have a State take certain action toward the plaintiff claiming that right, but to give the plaintiff the right to force the State to take enforcement action against someone else.

11

Private parties generally lack standing to seek government enforcement of the law against other persons. *United States v. Texas*, 143 S. Ct. 1964, 1968 (2023). Given separation-of-powers principles, courts are also very reluctant to interpret statutes to allow private control over discretionary enforcement decisions by public officials. *See*, *e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). Thus, especially in light of the additional federalism concerns present when Congress exercises its Spending Clause authority, *see Gonzaga*, 536 U.S. at 286 & n.5, *Pennhurst*, 451 U.S. at 17, nothing less than an absolutely clear statement can create the extraordinary duty and private right that St. Anthony ascribes to section u-2(f). The text of section u-2(f), however, does not come close to satisfying that strict standard.

II. **A Section 1983-Enforceable Right by Providers to Require States to Ensure Timely Payments by MCOs Is Inconsistent with the Enforcement Scheme, Based on Contract Rights, that Congress Expressly Established in Section u-2(f).**

Even if section u-2(f) could be read to unambiguously give providers the right that St. Anthony attributes to it, the presumption that it is enforceable under section 1983 is rebutted because such enforcement would be inconsistent with the contract-based enforcement scheme that section u-2(f) expressly establishes. Enforcement of a Spending Clause statute under section 1983 is excluded, *Talevski* held, where the statute, examined using "ordinary interpretive tools," shows that "Congress intended that statute's remedial scheme to be the exclusive avenue through which a plaintiff may assert his claims." *Id.* at 1460 (cleaned up). Thus, the Court explained, the controlling question "is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983, such that a court must infer that Congress did not intend to make available the § 1983 remedy for these newly created rights." *Id.* at 1459 (cleaned up); *see also id.* at 1459 (noting that

12

the Court has used different terms and concepts, including "incompatible," "inconsistent," and "thwart," to describe this "discordance") (cleaned up).

Evidence signifying an intent to exclude section 1983 enforcement, *Talevski* further held, includes "an express private judicial right of action." *Id.* at 1460. That was illustrated, the Court explained, by its decisions finding such an intent for statutes that included a "statute-specific right of action [that] offered fewer benefits than those available under § 1983," so that recognizing private rights enforceable under section 1983 would have "given plaintiffs access to tangible benefits as remedies that were unavailable under the statutes." *Id.* at 1461 (cleaned up). For example, the Court noted, in *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005), it held that "§ 1983's operation would have 'distorted' the pertinent other statute's remedial scheme." *Talevski*, 143 S. Ct. at 1460 (quoting *Rancho Palos Verdes*, 544 U.S. at 127) (cleaned up)). That was the case in *Rancho Palos Verdes* because, among other things, a section 1983 action, unlike the remedy provided in the statute, would give the plaintiff a right to attorney's fees in the context of "a complex and novel statutory scheme." 544 U.S. at 122-23.

Justice Barrett, concurring, agreed that "the presence of an 'express private judicial right of action' typically demonstrates that a §1983 suit is not also available." *Id.* at 1464 (quoting majority opinion, 143 S. Ct. at 1460). She added that "an actual clash — one private judicial remedy against another, more expansive remedy — is not required to find that a statute forecloses recourse to § 1983," and that a variety of circumstances can indicate Congress's intent not to make statutory rights enforceable under section 1983." *Id.* Indicia of such an intent, she observed, include "enforcement provisions" that "confer authority to sue . . . on government officials," "a centralized review mechanism that would be undermined by piecemeal litigation,"

13

and "the overall comprehensiveness of the statute's enforcement scheme." *Id*.

This court's vacated opinion did not align with these principles. Instead, it focused on whether, from a provider's perspective, section 1983 enforcement would be "superior" to contract-based enforcement. 40 F.4th at 514-15. But *Talevski* explained that the existence of a less comprehensive private remedy is a reason *not* to find an intent to allow enforcement under section 1983. 143 S. Ct. at 1460; *id*. at 1464 (Barrett, J., concurring). And allowing such enforcement would seriously interfere with the scheme of contract-based enforcement that Congress did establish under section u-2(f), which, under *Talevski*, further shows Congress's intent to exclude section 1983 enforcement.

### A. The court's vacated opinion incorrectly relied on the supposed superiority of section 1983 enforcement over contract enforcement.

The court's opinion conflicts with *Talevski* because it relied on the supposed superiority of section 1983 enforcement over the contract rights that section u-2(f) expressly contemplates. By its terms, Section u-2(f) provides for two sets of contract rights — by providers, under their contracts with MCOs, and by States, under their separate contracts with MCOs — to enforce MCOs' duty to pay providers on a timely basis. *See St. Anthony Hosp.*, 40 F.4th at 508. The obvious reason for mandating such contract provisions is to have the rights and remedies under them governed by contract law. *See Jackson Transit*, 457 U.S. 15, 20-23, 29 & nn.12, 13. But the majority opinion held that Congress did not intend these rights to be exclusive, thus excluding section 1983 enforcement, because they are not "superior" to enforcement under section 1983. 40 F.4th at 515. That holding is unsound under *Talevski*.

Addressing providers' contract right to obtain timely payment by MCOs, the majority opinion concluded that this right would be ineffective, as a practical matter,

14

because it would require "a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations." *Id.* at 514-15. Thus, the majority stated, "[i]t's not immediately obvious that this dispute-resolution system would even be manageable, let alone superior to a systemic solution implemented by HFS" by court order under section 1983. *Id.* at 515. Separately commenting on States' rights under the Timely Payment Clause in their contracts with MCOs, the majority, while noting that HFS had successfully asserted that right against an MCO when its payments were significantly delayed, *id.* at 514, characterized those rights as a mere "paper requirement" and "formality of contract language," *id.* at 510.

The perceived superiority of section 1983 enforcement over contract-based enforcement is neither a basis to find that section u-2(f) creates the right alleged by St. Anthony, nor a valid reason to hold that Congress intended to allow section 1983 enforcement. As *Talevski* held, the Court has rejected the notion that Congress intended to allow section 1983 enforcement because it would be more convenient, or allow additional remedies, than the enforcement scheme that Congress expressly contemplated. 143 S. Ct. at 1460; *id.* at 1464 (Barrett, J., concurring); *see also Rancho Palos Verdes*, 544 U.S. at 121 ("the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not"). Section u-2(f) authorizes providers and States to enforce their respective contractual rights to have MCOs make timely payments, and section 1983 enforcement cannot be added to those rights simply because a provider might

find the relief it offers, including attorney's fees, more attractive or expedient. *See Rancho Palos Verdes*, 544 U.S. at 122-23.[2]

### B. Section 1983 enforcement would interfere with the contract-based enforcement scheme that section u-2(f) establishes.

Under *Talevski*, section u-2(f) does not authorize section 1983 enforcement for the additional reason that such enforcement would seriously interfere with, and distort, the regime of contract-based enforcement of MCOs' obligations to pay providers on a timely basis. As noted, Congress sometimes chooses to implement a policy by mandating certain contract provisions that are governed by state contract law and normally adjudicated in state court. *See, e.g., Jackson Transit*, 457 U.S. at 20-23, 29 & nn.12, 13. And under general contract principles, a breach by one party (here, an MCO) gives the other party (the provider or the State) the right, not the duty, to seek enforcement. *United States v. Blankenship*, 382 F.3d 1110, 1134 (11th Cir. 2004); *see Shutte v. Thompson*, 82 U.S. 151, 159 (1872) ("A party may waive any provision, either of a contract or of a statute, intended for his benefit."); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 175 (7th Cir. 1996) (similar). But layering section 1983 enforcement over such contract-based enforcement would seriously disrupt the application of those contract rights under a State's contract with an MCO and under a provider's contract with an MCO.

---

[2] Even on its own terms, the majority's analysis — which assumes that a provider's claim for breach of an MCO's contractual timely payment obligation cannot be asserted in a single action, and instead must be asserted by means of "claim-by-claim adjudication . . . across many thousands of claims, all in their own arbitrations," 40 F.4th at 515 — is unsound. Any proceeding by a provider against an MCO for failing to meet its timely payment obligation necessarily involves the *percentage* of Medicaid claims that the MCO pays within a specified time (*e.g.*, 30 or 90 days), and thus cannot logically be based on an MCO's payment of a *single* Medicaid claim. Nor does any legal principle limit arbitrations or court actions for breach of contract to a single breach.

16

A State's right to enforce the Timely Payment Clause in its contract with an MCO necessarily gives the State discretion to determine, based on the circumstances presented, whether to seek enforcement, and how to do so. The exercise of that discretion is illustrated in this case by HFS's decision to impose a "corrective action plan" on the MCO operated by Cook County, under the terms of their contract, resulting in major improvements in the timeliness of its Medicaid payments to providers. *See St. Anthony Hosp.*, 40 F.4th at 514. But giving providers a right to force States to ensure timely payments by MCOs would eliminate that discretion, and thus defeat a central aspect of the enforcement scheme based on contract rights that Congress specifically established. *Cf. Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (where statute specifically gave government discretion, Court would not read into it a mandatory duty "through an unspoken inference in conflict with" that discretion).

The situation here thus resembles the one in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981), in which the statute "confer[ed] authority to sue . . . both on government officials and private citizens." 453 U.S. at 13. There, as Justice Barrett noted in *Talevski*, the statute gave "government officials" the "authority to sue." 143 S. Ct. at 1464 (cleaned up). Such enforcement authority by the government includes discretion about whether to take action in a particular situation. *See Heckler*, 470 U.S. at 831-32. A State's authority to enforce the Timely Payment Clause in its contract with an MCO is no different, for it likewise gives the State discretion to decide when, and how, to act against an MCO. But giving providers the ability, under section 1983, to force a State to take such action would negate that discretion, and thus displace and disrupt the contract-based

17

enforcement scheme that section u-2(f) establishes.[3]

The private right that the majority opinion attributed to section u-2(f) would also seriously interfere with the enforcement of contract rights between providers and MCOs that Congress expressly contemplated. Any section 1983 claim by a provider against a State under section u-2(f) would depend on proof that the MCO breached the timely payment provision in its contract with the provider. In addition, the provider's section 1983 action demanding that the State be ordered to force the MCO to accelerate its payments would have to include the MCO as a necessary party. *See* Fed. R. Civ. P. 19(a)(1)(B); *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 478-79 (7th Cir. 1996); *see also N. Ind. R. Co. v. Mich. Cent. R. Co.*, 56 U.S. 233, 245-46 (1853); *McCluer v. Super Maid Cook-Ware Corp.*, 62 F.2d 426, 429 (10th Cir. 1932). The result (unless the MCO admitted breaching its contract with the provider) would be to require a federal court, as part of its adjudication of the provider's section u-2(f) claim, to adjudicate the breach-of-contract claim between the provider and MCO, involving potentially hundreds of sub-disputes over whether specific claims were "clean," whether the services were eligible for payment (*e.g.*, with any necessary prior authorization), and whether the MCO paid the amount due under its contract. Further, if, as is common in this field (including for all but one of the MCOs in Illinois' managed-care program), the contracts between providers and

---

[3] In connection with its holding that States have liability under section u-2(f) only for a "systemic" failure by MCOs to pay providers on a timely basis, the majority commented that "HFS itself seems to be able to tell the difference between minor problems and systemic ones," as reflected in the "Corrective Action Plan" it imposed on Cook County. 40 F.4th at 514. But that observation simply highlights the problem with recognizing a section 1983-enforceable right by providers to enforce the duty that section u-2(f) allegedly imposes on States. That right would supplant a State's discretion over when and how to enforce the Timely Payment Clause in its contract an MCO and replace it with the different view of providers, and federal courts, about when an MCO's payment delays are systemic.

MCOs contain a binding arbitration clause, the district court could not resolve the provider's section u-2(f) claim in derogation of the MCO's arbitration rights. *See Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984); *Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983). In this way, too, section 1983 enforcement would disrupt, and thus be incompatible with, the enforcement scheme based on contract rights that Congress specifically contemplated.

## Conclusion

For the foregoing reasons, the court should affirm the district court's judgment dismissing St. Anthony's section 1983 claim under section u-2(f). In the alternative, the court should, at a minimum, order supplemental briefing and argument on that claim.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

/s/ *Richard S. Huszagh*
**RICHARD S. HUSZAGH**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2587
(773) 590-7076 (cell)
richard.huszagh@ilag.gov

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorney for Defendant-Appellee

September 5, 2023

19

**Certificate of Filing and Service**

I Defendant Theresa Eagleson's Circuit Rule 54 hereby certify that on September 5, 2023, I electronically filed the foregoing <u>Defendant Theresa Eagleson's Circuit Rule 54 Statement</u> with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will effect service on other participants in the case, all of whom are registered CM/ECF users.

<u>   /s/  *Richard S. Huszagh*   </u>