No. 21-2325

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| ST. ANTHONY HOSPITAL, | ) | Appeal from the United States |
| | ) | District Court for the Northern |
| Plaintiff-Appellant, | ) | District of Illinois, Eastern Division |
| | ) | |
| v. | ) | |
| | ) | |
| THERESA EAGLESON, in her | ) | No. 20-cv-02561 |
| official capacity as Director of the | ) | |
| Illinois Department of Healthcare | ) | |
| and Family Services, | ) | The Honorable |
| | ) | Steven C. Seeger, |
| Defendant-Appellee. | ) | Judge Presiding. |

**SUPPLEMENTAL BRIEF OF DEFENDANT-APPELLEE**

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

RICHARD S. HUSZAGH
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2587
richard.huszagh@ilag.gov

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ............................................................................................ 1

SUMMARY OF ARGUMENT ......................................................................... 3

ARGUMENT ................................................................................................... 4

I.    *Talevski* defined the standards for establishing statutory duties and private rights in federal Spending Clause legislation. .......................................... 4

II.    Section 1396u-2(f) does not unambiguously confer on individual Medicaid providers a private right to require States to enforce the Timely Payment Clause in their contracts with MCOs. ..................................... 6

    A.    Section 1396u-2(f) does not presumptively give Medicaid providers an individual right, with unambiguous rights-creating language, to require States to enforce the Timely Payment Clause in their contracts with MCOs. ....................................................................... 7

        1.    *Talevski*'s first step is governed by *Gonzaga*, not *Blessing*. ............... 7

        2.    Supreme Court precedent shows what constitutes clear rights-creating language. ........................................................... 12

        3.    Section 1396u-2(f) does not unambiguously give Medicaid providers an individual right to require States to enforce the Timely Payment Clause in their contracts with MCOs. .............. 14

            a.    The text of section 1396u-2(f) itself does not unambiguously give providers a private right to have States enforce the Timely Payment Clause. ............................................................. 16

            b.    The Medicaid Act's related provisions do not unambiguously show that section 1396u-2(f) gives providers an individual right to require States to enforce the Timely Payment Clause in their contracts with MCOs. ........................................... 18

                i.    Under Talevski, St. Anthony's interpretation of section 1396u-2(f) must be the only plausible one. ........... 19

ii. The Medicaid Act's provisions besides Section 1396u-2(f) do not unambiguously show that it gives providers an individual right to require States to enforce the Timely Payment Clause in their contracts with MCOs................. 21

iii. Any uncertainty arising from the Medicaid Act's ancillary provisions should be resolved against St. Anthony's interpretation of section 1396u-2(f)................................... 28

c. The perceived relative effectiveness of contract-based and section 1983 enforcement of the Timely Payment Clause does not satisfy Talevski's clear statement rule........................ 30

B. A statutory right by individual Medicaid providers to require States to enforce the Timely Payment Clause against MCOs is inconsistent with the enforcement scheme, based on contract rights, that Congress expressly established in section 1396u-2(f)............................... 36

1. The court's vacated opinion incorrectly relied on the supposed superiority of section 1983 enforcement over contract enforcement. ......................................................... 38

2. Section 1983 enforcement would interfere with the contract-based enforcement scheme that section 1396u-2(f) expressly establishes. ......................................................... 40

CONCLUSION ............................................................................................. 45

CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE AND TYPE STYLE REQUIREMENTS

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ............................................................................ 15

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
   563 U.S. 110 (2011) .............................................................................. 2

*Badaracco v. Comm'r of Internal Revenue*,
   464 U.S. 386 (1984) ............................................................... 15, 31, 33

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) ................................................... 28, 33, 40

*Blessing v. Freestone*,
   520 U. S. 329 (1997) ........................................................... 5, 8-11, 10

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020) ........................................................................ 34

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*,
   331 U.S. 519 (1947) ............................................................................. 27

*Chase Bank USA, N.A. v. McCoy*,
   562 U.S. 195 (2011) ............................................................................. 20

*Cummings v. Premier Rehab Keller*,
   596 U.S. 212 (2022) ............................................................................... 4

*Dubin v. United States*,
   599 U.S. 110 (2023) ............................................................................. 27

*Empire Healthchoice Assur., Inc. v. McVeigh*,
   547 U.S. 677 (2006) ............................................................................... 2

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ............................................................................. 35

*Ex parte Young*,
   209 U.S. 123 (1908) ............................................................................. 29

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ........................................................................... 19

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) ....................................................................*passim*

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    545 U.S. 409 (2005) ................................................................... 16, 19

*Health & Hospital Corp. of Marion County v. Talevski*,
    599 U.S. 166 (2023) .....................................................................*passim*

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................. 29, 41

*Honeycutt v. United States*,
    581 U.S. 443 (2017) .................................................................. 28, 33

*IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*,
    220 N.E.3d 646 (N.Y. 2023) .............................................................. 2

*Jackson Transit Auth. v. Loc. Div. 1285, Amalgamated
    Transit Union, AFL-CIO-CLC*,
    457 U.S. 15 (1982) .................................................................... 2, 31

*Khan v. United States*,
    548 F.3d 549 (7th Cir. 2008) .................................................. 16, 19-20

*Martin v. Hunter's Lessee*,
    14 U.S. 304 (1816) .......................................................................... 32

*Maryland Psychiatric Soc., Inc. v. Wasserman*,
    102 F.3d 717 (4th Cir. 1996) ........................................................... 34

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ............................................................................ 41

*Murphy v. Smith*,
    583 U.S. 220 (2018) ........................................................................ 19

*N. Ind. R. Co. v. Mich. Cent. R. Co.*,
    56 U.S. 233 (1853) .......................................................................... 42

*New York v. United States*,
    505 U.S. 144 (1992) ....................................................................... 13

*O'Gilvie v. United States*,
    519 U.S. 79 (1996) ......................................................................... 26

*Oklahoma v. Castro-Huerta*,
    142 S. Ct. 2486 (2022) ............................................................. 15, 30

*Patriotic Veterans, Inc. v. Indiana*,
    736 F.3d 1041 (7th Cir. 2013) ........................................................ 15

*Pennhurst State School & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ........................................ 4, 6, 10, 13, 14, 20, 31, 34,

*Pereira v. Sessions*,
    138 S. Ct. 2105 (2018) ................................................................... 28

*Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) ........................................................... 37, 39, 40

*Rao v. Rao*,
    718 F.2d 219 (7th Cir. 1983) .......................................................... 43

*Return Mail, Inc. v. United States Postal Serv.*,
    139 S. Ct. 1853 (2019) ......................................................... 15, 30, 33

*Rodriguez v. United States*,
    480 U.S. 522 (1987) ............................................................. 15, 31, 35

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019) ..................................................................... 15

*Seminole Tribe of Fla. v. State of Fla.*,
    11 F.3d 1016 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996) .................................. 30

*Shutte v. Thompson*,
    82 U.S. 151 (1872) ........................................................................... 2

*Sladek v. Bell Sys. Mgmt. Pension Plan*,
    880 F.2d 972 (7th Cir. 1989) .......................................................... 42

*Southland Corp. v. Keating*,
    465 U.S. 1 (1984) ........................................................................... 43

*St. Anthony Hosp. v. Eagleson,*
    40 F.4th 492 (7th Cir. 2022)....................................................................*passim*

*Talevski v. Health & Hosp. Corp. of Marion Cnty.,*
    6 F.4th 713 (7th Cir. 2021)................................................................ 10

*United States ex rel. Hall v. Tribal Dev. Corp.,*
    100 F.3d 476 (7th Cir. 1996) .............................................................. 42

*United States v. Blankenship,*
    382 F.3d 1110 (11th Cir. 2004) ............................................................ 2

*United States v. Nordic Vill. Inc.,*
    503 U.S. 30 (1992) ................................................................................ 19

*Warger v. Shauers,*
    574 U.S. 40 (2014) ................................................................................ 19

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .............................................................................. 21

*Wilder v. Virginia Hospital Ass'n,*
    496 U. S. 498 (1990) ..................................................................... 13, 14

*Wright v. Roanoke Redevelopment & Housing Auth.,*
    479 U. S. 418 (1987) ..................................................................... 13, 14

## Statutes, and Regulations

42 U.S.C. § 1983 ......................................................................*passim*

42 U.S.C. § 1396a(a)(37)(A) ................................................ 16, 17, 21

42 U.S.C. § 1396b(m)(2)(A)(iv)(II) ............................................... 25

42 U.S.C. § 1396r(c)(1)(A)(ii) .................................................. 12, 13

42 U.S.C. § 1396u-2(c)(2)(A)(1) .............................................. 24, 25

42 U.S.C. § 1396u-2(e)(3) ........................................................ 22, 23

42 U.S.C. § 1396u-2(e)(4) ........................................................ 23, 32

42 U.S.C. § 1396u-2(e)(1)(A)(i) ............................................... 23, 24

42 U.S.C. § 1396u-2(f) .............................................................................*passim*

42 U.S.C. § 1396u-2(a)(5)(B)(4) ....................................................... 24

42 U.S.C. § 1396u-2 (d)(1)(A)(ii) ...................................................... 24

42 U.S.C. § 1396u-2(e)(1)(A)(i) ......................................................... 24

42 U.S.C. § 1396u-2(h)(4)(D) ............................................................ 24

42 U.S.C. § 1396u-2(h)(2)(B) ............................................................ 26

42 C.F.R. § 447.46 ............................................................................. 35

**Rules**

Fed. R. Civ. P. 19(a)(1)(B) ................................................................ 42

**Other Authorities:**

6A, C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* (3d ed.) § 1582 ............................ 42

*Black's Law Dictionary* (11th ed. 2019) ....................................... 27

*Cambridge Dictionary* .................................................................... 27

*Webster's New World College Dictionary* (4th ed.)........................ 31

## INTRODUCTION

Defendant Theresa Eagleson, Director of the Illinois Department of Healthcare and Family Services ("HFS"), respectfully submits this supplemental brief pursuant to the court's October 16, 2023 order on remand from the Supreme Court's June 20, 2023 order in this case.  This brief addresses only plaintiff St. Anthony Hospital's section 1983 claim under section 1396u-2(f) of the Medicaid Act, 42 U.S.C. § 1396u-2(f), which the district court dismissed.  As described below, the court should affirm that judgment because section 1396u-2(f) manifests Congress's intent to rely on a system of contractual rights, not statutory rights, to govern managed care organization ("MCO") payments to providers.

The central question in this case is *who* controls enforcement of the contract provision — the "Timely Payment Clause" — that section 1396u-2(f) requires States to include in their contracts with MCOs in managed care programs authorized by section 1396u-2 of the Medicaid Act.  That question asks whether section 1396u-2(f) gives control over enforcement of the Timely Payment Clause to States, or instead to federal courts at the demand of health care providers.  The panel majority's vacated opinion held that this control belongs to federal courts and providers, and that section 1396u-2(f) gives St. Anthony the right to seek "a court order to require Illinois to enforce the MCOs' contractual obligations" under the Timely Payment Clause.  40 F.4th at 501.  With the benefit of the Supreme Court's subsequent decision in *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023), this court should now reach the opposite conclusion.

1

Congress often implements federal policy by mandating certain terms in specific types of contracts, as opposed to creating statutory duties. *See Jackson Transit Auth. v. Loc. Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 20-23, 29 & nn.12, 13 (1982); *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690, 693-99 (2006); *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 114-15, 118-19 & n.4 (2011). When it does so, the rights created by those contracts are just that — rights, not duties. *See United States v. Blankenship*, 382 F.3d 1110, 1134 (11th Cir. 2004); *see also Shutte v. Thompson*, 82 U.S. 151, 159 (1872) ("A party may waive any provision, either of a contract or of a statute, intended for his benefit."); *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 653 (N.Y. 2023) ("a right is not a duty"). That is the approach Congress followed under section 1396u-2(f), giving States a contractual right, not a statutory duty, to enforce the Timely Payment Clause in their contracts with MCOs. Consistent with that approach, section 1396u-2(f) does not confer on individual Medicaid providers a section 1983-enforceable private right to require States to enforce the Timely Payment Clause against an MCO that breaches it.

## SUMMARY OF ARGUMENT

The district court correctly dismissed St. Anthony's section 1983 claim under section 1396u-2(f) because section 1396u-2(f) does not give individual providers a private right to have States enforce the Timely Payment Clause against an MCO that breaches it by not paying providers on a timely basis. Whether section 1396u-2(f) creates such individual private rights is governed by the two-step test announced in *Talevski*. Section 1396u-2(f) satisfies neither step.

First, section 1396u-2(f) does not presumptively create a private right for individual Medicaid providers to require a State enforce the Timely Payment Clause against an MCO. It does not contain "clear 'rights-creating language'" that "*unambiguously* confer[s] individual federal rights" on individual providers to require States to enforce the Timely Payment Clause against an MCO that breaches it. *Talevski*, 599 U.S. at 180, 186 (cleaned up; emphasis in original).

Second, even if section 1396u-2(f) satisfied the first step of the *Talevski* analysis, Congress evidenced an intention to exclude section 1983 enforcement by establishing a comprehensive enforcement scheme, based on private contract rights, to enforce MCOs' obligation to pay providers on a timely basis. The statutory right that St. Anthony claims is incompatible with that contract-based scheme. Among other things, it would interfere with that scheme by negating the contractual discretion that section 1396u-2(f) gives States to enforce the Timely Payment Clause in their contracts with MCOs depending on the specific circumstances surrounding an MCO's breach of that Clause.

**ARGUMENT**

In light of the Supreme Court's decision in *Talevski*, the district court's judgment dismissing St. Anthony's section 1983 claim under section 1396u-2(f) should be affirmed.

## I.   *Talevski* defined the standards for establishing statutory duties and private rights in federal Spending Clause legislation.

Statutes passed under Congress's Spending Clause authority generally do not create rights enforceable by private parties under section 1983. *Talevski*, 599 U.S. at 180, 183; *Gonzaga*, 536 U.S. at 280.  If such a statute does include a condition imposing a specific duty on a State, which it must do "unambiguously," *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)), "'"the typical remedy for state noncompliance . . . is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."'"  *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 280, in turn quoting *Pennhurst,* 451 U.S. at 28); *see also id.* at 177-78 (citing *Cummings v. Premier Rehab Keller*, 596 U.S. 212, 219 (2022), and *Pennhurst*, 451 U.S. at 17).[1]

---

[1]  Absent a condition in the statute unambiguously imposing the alleged duty, even the federal government cannot exercise that power. *Pennhurst*, 451 U.S. at 17; *see also Gonzaga*, 536 U.S. at 280.  Thus, as the Supreme Court reasoned in *Cummings*:

> Recipients cannot "knowingly accept" the deal with the Federal Government unless they "would clearly understand . . . the *obligations*" that would come along with doing so. . . .  "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17.

596 U.S. at 219 (citations omitted; emphasis added).

In *Talevski*, the Supreme Court announced a two-step test to determine if a Spending Clause statute creates private rights that are enforceable under section 1983. 599 U.S. at 180, 183-84, 186-88. The standard for the first step, the Court explained, is "set[] forth" in *Gonzaga* and "sets a demanding bar: Statutory provisions must *unambiguously* confer individual federal rights." 599 U.S. at 180 (citing *Gonzaga*, 536 U.S. at 280; emphasis in original). "Courts must employ traditional tools of statutory construction to assess whether Congress has unambiguously conferred individual rights upon a class of beneficiaries to which the plaintiff belongs." *Id.* at 183 (cleaned up). As *Gonzaga* explained, "rights-creating language [is] critical to showing the requisite congressional intent to create new rights." 536 U.S. at 287 (cleaned up); *see also Talevski*, 599 U.S. at 183 (statutory provisions at issue created section 1983-enforceable rights because they "use clear 'rights-creating language'") (cleaned up); *id.* at 186 (Barrett, J. concurring); *Gonzaga*, 536 at 284 (statute must contain "explicit rights-creating terms"). If strict standard is satisfied, a presumption arises that the statute creates private rights enforceable under section 1983. *Talevski*, 599 U.S. at 186.

Critically, *Gonzaga* made clear that passing the three-factor test described in *Blessing v. Freestone*, 520 U.S. 329 (1997), is not sufficient to satisfy this first-step test, and "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." 536 U.S. at 290. Reinforcing the point, *Gonzaga* held that "unless Congress 'speaks with a clear voice,' and manifests an 'unambiguous' intent to create individually enforceable rights, federal funding

5

provisions provide no basis for private enforcement by § 1983." 536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 17) (cleaned up). The language necessary to meet this "stringent standard" is illustrated by the few post-*Pennhurst* Supreme Court decisions, including *Talevski*, that found a congressional intent to confer individual private rights. *Talevski*, 599 U.S. at 184-85. In each of these cases (discussed below), the statute either expressly stated that a defined class of persons had individual "rights," or unambiguously stated that the State owed a specific duty directly to each individual in the class. *See infra* at 13-14.

At the second step of the *Talevski* analysis, the presumption that a Spending Clause statute confers individual rights on private parties is overcome if the statute establishes an alternative remedial scheme that "Congress intended . . . to be the exclusive avenue through which a plaintiff may assert his claims*." Id.* at 187 (cleaned up). The controlling question, also answered using "ordinary interpretive tools," "is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983, such that a court must infer that Congress did not intend to make available the § 1983 remedy for these newly created rights." *Id.* at 187 (cleaned up).

## II. Section 1396u-2(f) does not unambiguously confer on individual Medicaid providers a private right to require States to enforce the Timely Payment Clause in their contracts with MCOs.

St. Anthony's section 1983 claim under section 1396u-2(f) fails both steps of the *Talevski* analysis. At the outset, it is important to clarify that the "right" in dispute here is not a provider's right to timely payment by an MCO, which a provider

can enforce directly against an MCO under their contract. It is a provider's claimed statutory right against a State to seek a court order requiring the State to enforce the Timely Payment Clause in its contract with an MCO. Section 1396u-2(f) does not presumptively give providers that right, using "clear rights-creating language" that "unambiguously" confers on individual providers a right to enforce it. *Talevski*, 599 U.S. at 186 (cleaned up); *see Gonzaga*, 536 U.S. at 280, 282, 283. It does not even satisfy the threshold condition of unambiguously imposing on States a duty to individual providers to enforce the Timely Payment Clause against an MCO that fails to pay providers on a timely basis. *See supra* at 4, n.1. In any event, Congress ruled out such individual private rights enforceable under section 1983 by establishing a comprehensive enforcement scheme, based on contract rights and duties, that is inconsistent with the individual statutory right that St. Anthony claims.

### A. Section 1396u-2(f) does not presumptively give Medicaid providers an individual right, with unambiguous rights-creating language, to require States to enforce the Timely Payment Clause in their contracts with MCOs.

Section 1396u-2(f) does not satisfy *Talevski*'s first step, and thus does not presumptively create a private right enforceable under section 1983. At *Talevski*'s first step, a court must apply the test established in *Gonzaga*, not *Blessing*'s three-factor standard. *Talevski*, 599 U.S. at 183; *see also Gonzaga*, 536 U.S. at 282-84, 287. Section 1396u-2(f) does not satisfy that test, and St. Anthony's attempt to establish a private right thus fails.

### 1. *Talevski*'s first step is governed by *Gonzaga*, not *Blessing*.

This court's vacated opinion repeatedly stated that section 1396u-2(f) created a

presumptive right to enforcement under section 1983 because it satisfied *Blessing*'s three-factor standard.  40 F.4th at 503, 504, 514.[2]  A fresh first-step analysis is therefore required because *Talevski* expressly held that "*Gonzaga* sets forth" the test to determine whether a statute presumptively confers private rights enforceable under section 1983, 599 U.S. at 183, and *Gonzaga* makes clear that *Blessing*'s three-factor standard is not sufficient to confer such rights, 536 U.S. at 282-86, 290.

St. Anthony argues that *Blessing*'s three-factor analysis still controls because *Talevski* did not "overrule" *Blessing*, and that the court should reaffirm its vacated decision on this issue because it correctly applied the *Blessing* analysis.  Doc. 92 at 4-6.  This argument misreads *Talevski* and presents a false choice between formally "overruling" *Blessing* and reaffirming its three-factor analysis without qualification.

*Talevski* made clear that "*Gonzaga* sets forth" the standard "for ascertaining unambiguous conferral" of a private right, and it did not mention *Blessing* when describing and applying that first step.  599 U.S. at 183.  Justice Barrett, joined by the Chief Justice, confirmed that "*Gonzaga* establishes the standard for analyzing whether Spending Clause statutes give rise to individual rights."  *Id.* at 193.  Thus, *Talevski* eliminated any arguable doubt about whether *Gonzaga*, not *Blessing*, controls.

---

[2] The majority opinion stated that "[i]f these three [*Blessing*] factors are satisfied, the right is presumptively enforceable under section 1983," 40 F.4th at 503 (cleaned up); "[w]e agree with Saint Anthony that section 1396u-2(f) grants providers a right to timely payment from the MCOs that the State must safeguard because the right satisfies all three *Blessing* factors," *id.* at 504; and "[s]ince section 1396u-2(f) satisfies the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983," *id.* at 514.

For its part, *Gonzaga* plainly departed from the first-step standard set forth in *Blessing*. *Gonzaga* did not declare all of *Blessing*'s analysis irrelevant, but it revised the three-factor test set forth in *Blessing* for determining when a Spending Clause statute confers private rights. 536 U.S. at 282-86. It pointed out that *Blessing*'s three-factor description of the test for finding a private right inaccurately "suggest[ed] that something less than an unambiguously conferred right is enforceable by § 1983," and contributed to "confusion" on the issue. 536 U.S. at 282-83. *Gonzaga* then explicitly, and repeatedly, held that the applicable test is not satisfied simply by meeting *the Blessing* factors. *Id.* at 283-87, 290.

The key difference between *Gonzaga* and *Blessing* — which St. Anthony attempts to obscure but is critical here — is that *Gonzaga* held that Spending Clause legislation creates privately enforceable rights under section 1983 only if it "manifests an unambiguous intent to create individually enforceable rights," using "explicit rights-creating terms." 536 U.S. at 273-74, 284 (cleaned up); *see also Talevski*, 599 U.S at 172, 180, 183-86. As described below, section 1396u-2(f) does not satisfy that test. *See infra* at 14-36.

In an alternative attempt to avoid the clear import of *Talevski* and *Gonzaga*, St. Anthony argues that *Gonzaga* combined *Blessing*'s first two factors without adding anything substantive to them. Doc. 92 at 8. According to St. Anthony, *Blessing*'s second factor already required a "clear right," which is no different from what *Gonzaga* demands. *Id.* at 6, 8. This characterization of *Blessing* and *Gonzaga* is equally mistaken. *Blessing* never referred to a "clear right." As *Gonzaga*

explained, *Blessing*'s first factor focused on whether Congress "intended that the provision in question *benefit* the plaintiff," but "§ 1983 provides a remedy only for the deprivation of '*rights*' . . . secured by the Federal Constitution and laws,'" so "it is *rights*, not the broader or vaguer '*benefits*' or 'interests,' that may be enforced thereunder."  536 U.S. at 283 (emphasis added).

*Blessing*'s second factor also does not embrace a "clear right" requirement. It simply required that "the right assertedly protected by the statute is not so '*vague and amorphous*' that its enforcement would strain judicial competence." 520 U.S. at 340-41 (emphasis added).  That is not the same as requiring, as *Gonzaga* held, that the statute contain "explicit rights-creating terms" and "manifest[] an 'unambiguous' intent to create individually enforceable rights."  536 U.S. at 273-74, 284 (quoting *Pennhurst*, 451 U.S. at 17.); *see also Talevski*, 599 U.S. at 183 (question is "whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs," using "'rights-creating,' individual-centric language").[3]

Nor can this court conclude, as St. Anthony contends, Doc. 92 at 6-10, that the panel majority's application of the *Blessing* factors effectively satisfies *Talevski's* first step.  On the first *Blessing* factor, the majority examined whether section 1396u-2(f) was "intended . . . to benefit providers."  40 F.4th at 505.  As noted, however,

---

[3]  Without citing *Gonzaga*, the majority on one occasion mentioned the need for "rights-creating language," but then immediately stated that the "*Blessing* factors" determine whether a statute has such language.  40 F.4th at 504 (quoting *Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 720 (7th Cir. 2021)).

*Gonzaga*, which *Talevski* reaffirmed, held that "benefits" are not enough, and Spending Clause statutes must instead explicitly confer individual "rights."  536 U.S. at 283.

Addressing the second *Blessing* factor, the majority found that the claimed right by providers to enforce States' alleged duty to ensure timely MCO payments to them was "not so vague and amorphous that its enforcement would strain judicial competence."  40 F.4th at 508 (cleaned up).  Again, however, finding that a statute is not "vague and amorphous" is not the same as finding that it "unambiguously" manifests an intent to create individual private rights.

Finally, on the third *Blessing* factor, the majority held that the "more coherent" reading of section 1396u-2(f) is that it imposes a mandatory obligation on States to enforce the Timely Payment Clause in the event of systemic failures by MCOs to pay providers in accordance with the Clause.  40 F.4th at 510.  This, again, is a departure from *Talevski*.  *Talevski* held that courts must apply traditional tools of statutory construction — which require them to apply the plain meaning of statutory language without adding terms Congress did not enact, and to find a statute's text to be unambiguous only if it has a single plausible meaning — to determine whether a statute unambiguously gives individual providers a private right to enforce that duty, not to choose a "more coherent reading."

Accordingly, the court must now examine whether section 1396u-2(f) meets *Talevski*'s first-step test.  That examination, applying traditional tools of statutory construction, shows that section 1396u-2(f) is at least plausibly read to gives States a

discretionary contractual right, not a statutory duty, to enforce the Timely Payment Clause in their contracts with MCOs, and is likewise plausibly read not to give individual providers a private right to require States to enforce the Timely Payment Clause against an MCO that breaches it. Thus, section 1396u-2(f) does not create an unambiguous individual right in Medicaid providers to seek a court order under section 1983 requiring States to enforce the Timely Payment Clause against an MCO that does not make timely payments to providers.

### 2. Supreme Court precedent shows what constitutes clear rights-creating language.

*Talevski* and *Gonzaga* do not just articulate the applicable first-step standard in the abstract; they also give it concrete definition by explaining what specific statutory language meets it. In *Talevski*, the Supreme Court explained that each provision of the statute relied on by the plaintiffs in that case, the Federal Nursing Home Reform Act ("FNHRA"), expressly referred to, and detailed, specific "rights" of individual nursing home residents — to be free from unnecessary restraints, and to be discharged or transferred only upon fulfillment of specified conditions — that nursing homes had to observe. 599 U.S. at 184-86. The unnecessary-restraint provision, the Court pointed out, "requires nursing homes to 'protect and promote . . . *[t]he right* to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat *the resident*'s medical symptoms.'" 599 U.S. at 184 (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii); emphasis in original). And the provision's exceptions, the Court noted, "further sustain the focus on individual residents," stating, for example, that "nursing homes may use

12

restraints "to ensure the physical safety *of the resident or other residents*.'"  *Id.* at 184 (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)(I)–(II); emphasis in original).  Thus, each FNRHA provision that the plaintiffs relied on expressly gave nursing home residents specific rights based on explicit statutory duties that nursing homes owed to each resident.

*Talevski* added that the statutory language also left no doubt about *who* owed residents the statutory duty that corresponded to these express rights.  *Id.* at 185 ("these two provisions also establish who it is that must respect and honor these statutory rights (namely, the Medicaid-participant nursing homes)"); *cf. New York v. United States*, 505 U.S. 144, 172 (1992) (upholding exercise of Spending Clause authority where "[t]he conditions imposed are unambiguous" and "the Act informs the States exactly what they must do") (citing *Pennhurst*, 451 U.S. at 17).  The statute therefore met the requirement that it contain "clear 'rights-creating language.'"  *Talevksi*, 599 U.S. at 186.

Justice Barrett's concurring opinion in *Talevski* elaborated that the statutory language necessary to satisfy *Gonzaga*'s first-step standard is also illustrated by the Court's only two other cases after *Pennhurst* — *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987), and *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990) — where it found that standard satisfied.  *See Talevski*, 599 U.S. at 194 (Barrett, J., concurring).  And *Gonzaga* itself explained the critical nature of the statutory language in each case.  *See* 536 U.S. at 280-81.

The statute at issue in *Wright* set a rent ceiling for low-income tenants in public housing measured as a percentage of their income. *Wright*, 479 U.S. at 420. *Gonzaga* emphasized that "the provision unambiguously conferred 'a mandatory benefit focusing on the *individual family* and its income,'" and it explained that "[t]he key to our inquiry was that Congress spoke in terms that 'could not be clearer' . . . and conferred entitlements sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*." 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430, 432; emphasis added). And in *Wilder*, *Gonzaga* explained, the Court found a private right because the statute "required States to pay an 'objective' monetary entitlement to *individual* health care providers." *Id.* at 280 (quoting *Wilder*, 496 U.S. at 522-23; emphasis added).

Thus, as *Talevski* and *Gonzaga* make clear, every post-*Pennhurst* Spending Clause statute that the Supreme Court held presumptively created private rights expressly said that the class of persons to which the plaintiffs belonged had specific "rights" against the State or other government recipient of federal funds, explicitly imposed on these recipients of federal funds a specific duty owed to individual members of that class, or both. Section 1396u-2(f) does neither.

> **3.  Section 1396u-2(f) does not unambiguously give Medicaid providers an individual right to require States to enforce the Timely Payment Clause in their contracts with MCOs.**

Under the foregoing principles, section 1396u-2(f) does not clear *Talevski*'s "demanding bar" or meet *Gonzaga*'s "stringent standard" for finding that a Spending Clause statute presumptively creates individual rights enforceable under

section 1983. *Talevski*, 599 U.S. at 180, 186. As noted, *Talevski* directs courts to apply "traditional tools of statutory construction" to determine whether a particular Spending Clause statute "*unambiguously* confer[s] individual federal rights," using "rights-creating, individual-centric language with an unmistakable focus on the benefited class." 599 U.S. at 180, 183 (citing *Gonzaga*, 536 U.S. at 280; cleaned up; emphasis in original).

Those tools are well established. Courts must "begin with the text" of the statutory provision at issue. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("As always, we start with the specific statutory language in dispute."). They must also "presume that Congress says in a statute what it means and means in a statute what it says there." *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (cleaned up); *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1047 (7th Cir. 2013). Conversely, a court "may not replace the actual text with speculation as to Congress' intent," *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (cleaned up); "engraft on a statute additions which [it] think[s] the legislature logically might or should have made," *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1867 n.11 (2019); "rewrite a statute because [the court] might deem its effects susceptible of improvement," *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 398 (1984); or "assume that *whatever* furthers the statute's primary objective must be the law," *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) (emphasis in original); *see Talevski*, 599 U.S. at 178 ("We implement Congress's choices rather

than remake them."). In addition, to be unambiguous, a statute must have only one "plausible" interpretation. *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419, n.2 (2005); *Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008).

Examined in accordance with those principles, section 1396u-2(f) is at the very least plausibly interpreted *not* to give individual Medicaid providers section 1983-enforceable private rights to require a State to enforce the Timely Payment Clause in its contract with an MCO if the MCO breaches it.[4]

> ### a. The text of section 1396u-2(f) itself does not unambiguously give providers a private right to have States enforce the Timely Payment Clause.

The majority opinion rightly did not find that the text of section 1396u-2(f) *itself* unambiguously obliges States to enforce the Timely Payment Clause in their contracts with MCOs or unambiguously gives individual providers a right to seek a court order directing a State to enforce that claimed obligation if an MCO breaches the Clause. Section 1396u-2(f)'s text does not clearly state, or even state at all, that providers have any "rights" against a State. Nor does it clearly state that States have an obligation to individual providers to enforce the Timely Payment Clause against an MCO that does not pay providers on a timely basis. To the contrary, the text of section 1396u-2(f) states only that States' contracts with MCOs must include the

---

[4] HFS does not abandon, as St. Anthony asserts, *see* Doc. 92 at 12-13, HFS's related argument that the Timely Payment Clause does not unambiguously impose the default 30-day/90-day payment schedule for MCO payments to hospitals, as opposed to "practitioners" covered by section 1396a(a)(37)(A). *See* Doc. 44 at 30-34.

Timely Payment Clause, thereby giving States contractual rights against MCOs, enforceable under well-established contract law principles.[5]  That does not satisfy *Talevski*'s first step.

St. Anthony faults HFS for stating that section 1396u-2(f) manifests a "textual silence" regarding the supposed duty by States to enforce the Timely Payment Clause in the event of an MCO breach.  Doc. 92 at 12.  Relatedly, St. Anthony argues that the majority opinion provides a "detailed analysis of Section u-2(f)'s text," which HFS ignores.  *Id.* at 7, 11.  St. Anthony is wrong.  While the majority opinion quoted section 1396u-2(f)'s text, it never identified any portion of that text that contains rights-creating language that directly declares such a duty or the supposed private right by individual providers to enforce it.  Nor could it, because those words are not there.

Nevertheless, St. Anthony criticizes HFS for supposedly ignoring the "plain meaning" of section 1396u-2(f)'s text and the majority's description of it, stating:

> According to the Original Ruling, "[t]he text requires MCOs to contract that they '<u>shall make payment to health care *providers* . . . on a timely basis</u>." 40 F.4th at 505 (underscoring added).  The underscored language is the first and most important element of the statute.

---

[5] Section 1396u-2(f) states:

> A contract . . . with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract . . . on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule . . . .

42 U.S.C. § 1396u-2(f).

Doc. 92 at 12 (emphasis in original).  But this language hardly supports St. Anthony's position.  HFS does not dispute that section 1396u-2(f) requires an MCO's *contract* with a State to require the *MCO* to pay providers on a timely basis.  That clearly means that *MCOs* owe States a *contractual duty* to make timely payments to providers, and that States have a *contractual right* to enforce that duty.  It does not say that *States* owe providers a *statutory duty* to enforce the Timely Payment Clause against an MCO that breaches it.

The relevant issue is not *whether* MCOs have an obligation to pay providers on a timely basis,  It is what *means* section 1396u-2(f) contemplates for enforcing that obligation.  And section 1396u-2(f)'s text clearly contemplates *contract rights*, by States and providers alike, to do so.  If Congress had wanted to create a *statutory* duty to have MCOs pay providers on a timely basis, the most logical way to do so would have been to impose that duty directly on MCOs, not by the circuitous route of requiring States to force them MCOs to do so.  But Congress did not create either statutory duty.  Thus, the text of section 1396u-2(f) itself, which provides for only contract rights and remedies, does not meet *Talevski*'s rigorous step-one standard.

### b. Medicaid Act provisions other than section 1396u-2(f) do not establish that it unambiguously creates the state duties and private rights that St. Anthony claims.

As St. Anthony emphasizes, the majority opinion's interpretation of section 1396u-2(f) relied heavily on provisions of the Medicaid Act other than section 1396u-2(f), along with inferences the majority drew about what Congress intended by enacting them.  40 F.4th at 509-10.  But those other provisions fall short of meeting

*Talevski*'s requirement that Congress employ "clear rights-creating language" that "unambiguously" confers on individual providers a private right — here, the right to have States enforce the Timely Payment Clause against a delinquent MCO. *Talevski*, 599 U.S. at 180, 186 (cleaned up).

> ### i. Under *Talevski*, St. Anthony's interpretation of section 1396u-2(f) must be the only plausible one.

St. Anthony disputes that, to satisfy *Talevski*'s step one standard, its inter-
pretation of section 1396u-2(f) must be the only "plausible" one.  Doc. 92 at 16-17.
Without offering an alternative definition of statutory "ambiguity" or any supporting
authority, St. Anthony appears to argue that section 1396u-2(f) creates private
enforcement rights even if it can be plausibly read *not* to create such rights, or *not*
to require States to enforce the Timely Payment Clause against delinquent MCOs.  *Id.*
The reason for St. Anthony's concern is obvious.  But it is firmly settled that a
statute is ambiguous if it is susceptible to more than one "plausible" interpretation.
*Graham Cnty.*, 545 U.S. at 419 n.2 ("Section 3731(b)(1) is ambiguous because its text,
literally read, admits of two plausible interpretations."); *see Warger v. Shauers*, 574
U.S. 40, 50 (2014) ("the canon of constitutional avoidance . . . is a tool for choosing
between competing plausible interpretations" and "has no application in the absence
of . . . ambiguity") (cleaned up); *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 37
(1992) ("plausible" alternative readings of statute prevented it from being
"'unambiguous'"); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567
(2005) (declining to consider legislative history where statute was unambiguous
because party's proposed reading of statute's text was not plausible); *Khan*, 548 F.3d

19

at 556 ("When there are two plausible but different interpretations of statutory language, there is ambiguity."); *see also Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 207 (2011) (finding regulation ambiguous because both proposed interpretations "are plausible").

Thus, no watered-down standard can satisfy the requirement that a Spending Clause statute declare private individual rights and corresponding governmental duties "unambiguously," *Talevski*, 599 U.S. at 172, 180, 183; *Gonzaga*, 536 U.S. at 283, and with a "clear voice," *Gonzaga*, 536 U.S. at 273-74, 280; *see Pennhurst*, 451 U.S at 17. And if a statute is ambiguous, it cannot be said to unambiguously confer an individual right, as *Talevski*'s first step requires.

Supreme Court precedent establishes that this strict standard is reinforced by two principles relating to the courts' role in interpreting and applying federal Spending Clause statutes. First, because Congress has the power to make federal law under the Spending Clause, separation-of-powers principles counsel against finding private rights in less-than-clear statutory pronouncements. *Gonzaga*, 536 U.S. at 286; *see Talevski*, 599 U.S. at 183. Second, because Spending Clause statutes implicate important federal-state relations, they may not be read to limit state authority unless Congress "make[s] its intention to do so *unmistakably clear* in the language of the statute." *Gonzaga*, 536 U.S. at 286 (cleaned up; emphasis added).

ii.  **The Medicaid Act's related provisions do not unambiguously show that section 1396u-2(f) gives providers an individual right to require States to enforce the Timely Payment Clause in their contracts with MCOs.**

The Medicaid Act's provisions other than section 1396u-2(f) do not satisfy *Talevski*'s clear statement rule by providing a broader statutory context that makes St. Anthony's interpretation of section 1396u-2(f) the only plausible one.  If St. Anthony had to identify where in the Medicaid Act it contains "clear rights-creating language" "unambiguously" supporting that interpretation, *Talevski*, 599 U.S. at 180, 183, 186 (cleaned up), it could not do so — either in section 1396u-2(f) itself, or elsewhere in the Act. [6]

Relying, nonetheless, on the Medicaid Act's ancillary provisions, St. Anthony asserts that HFS "ignores" the majority opinion's discussion of them, Doc. 92 at 12, 14; fails to explain why the Medicaid Act's "monitoring and reporting" provisions are "consistent with its view" that section 1396u-2(f) gave it a contractual right, not a statutory duty, to enforce the Timely Payment Clause in its contracts with MCOs, *id.*

---

[6]  Not surprisingly, St. Anthony has abandoned its original theory that the Timely Payment Clause's reference to section 1396a(a)(37)(A)'s "procedures" — specifying the types of *claims* ("clean claims"), *providers* ("practitioners [in] individual or group practices or . . . shared health facilities"), and *time frame* for States' direct payments in a traditional Medicaid fee-for-service program (90% within 30 days, 99% within 90 days), 42 U.S.C. § 1396a(a)(37)(A) — imposes on States a statutory duty to require MCOs to comply with that schedule.  *See* Doc. 53 at 8.  Congress cannot possibly have chosen such an oblique and obscure reference in the definition of an *MCO*'s *contractual obligations* to a State as the means to impose such far-reaching *statutory duties* on *States*, much less be deemed to have done so unambiguously.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

at 15; and "does not explain what is wrong with" the majority's conclusion that "the more coherent view" of States' "monitoring and data-gathering duties" is that these duties "evidence Congress' intent that HFS has the duty to do something with the data" if it shows "that MCOs are not complying with the Timely Payment Provision," *id.* at 16.

To the contrary, HFS's Rule 54 statement addressed these issues, if not in the degree of detail appropriate for full briefing (which the statement requested, and the court granted). Explaining why the majority opinion was inconsistent with *Talevski*'s first step, HFS stated that "provisions of the Medicaid Act relating to a State's oversight of MCOs . . . are perfectly consistent with Congress's choice to give States contractual rights against MCOs concerning their payments to providers," and that, accordingly, "it cannot be said that . . . those provisions demonstrate that section u-2(f) means what it does not say and 'unambiguously' establishes that States owe providers a duty to ensure that MCOs pay providers in accordance with the Timely Payment Clause in the MCOs' state contracts. *Talevski*, 143 S. Ct. at 1450, 1455, 1457." Doc. 87 at 10 (footnote omitted). HFS also explained, in particular, that section 1396u-2(e)(3), discussed below, does not require States to take any action against an MCO if it violates the Timely Payment Clause — or even apply to that situation. *Id.* at 10 n.1. Tellingly, St. Anthony itself makes no effort to explain why that is not a correct, or at least plausible, interpretation of section 1396u-2(f) and the Medicaid Act read as a whole — namely, that States' oversight powers are "*perfectly consistent* with Congress's choice to give States contractual rights against MCOs

22

concerning their payments to providers." *Id.* at 10.

Initially, it is worth noting that no one disputes that section 1396u-2(e)(4), which authorizes a State to terminate an MCO's contract if the MCO breaches the contract, expressly gives States discretion about whether to do so.  42 U.S.C. § 1396u-2(e)(4).  That is, of course, consistent with a congressional intent to give States discretionary contractual rights against MCOs with respect to the MCOs' contractual obligations to make timely payments to providers.

Section 1396u-2(e)(3), which relates to "intermediate sanctions" against an MCO, is not to the contrary.  And in light of what HFS's Rule 54 statement said about this provision, Doc. 87 at 10 n.1, it is significant that St. Anthony avoids mentioning it, despite the critical part of the majority's opinion holding that it requires a State to impose intermediate sanctions "if an MCO has 'repeatedly failed to meet the requirements' *of its contract* with the State."  40 F.4th at 510 (quoting 42 U.S.C. § 1396u-2(e)(3); emphasis added).  But that is not what section 1396u-2(e)(3) says.  Section 1396u-2 subjects participating MCOs to various defined statutory duties, and also to contractual duties under their contracts with a State.  Section 1396u-2(e) tracks this distinction, specifying certain sanctions against an MCO that are allowed or required for violating identified statutory duties or contractual duties, respectively.[7]  And HFS explained that section 1396u-2(e)(3) requires intermediate

---

[7]  For example, section 1396u-2(e)(4) states that a State may terminate the contract of an MCO that "has failed to meet the requirements of this part *or a contract* under section 1396b(m)."  42 U.S.C. § 1396u-2(e)(4) (emphasis added).  Section 1396u-2(e)(1)(A) lists specific situations in which a State may impose intermediate sanctions against an MCO,

sanctions only for an MCO's violations of its *statutory* duties — "the requirements of section 1396b(m) of this title and this section" — not any *contractual* obligations under the Timely Payment Clause in the MCO's contract with a State. Doc. 87 at 10 n.1. St. Anthony neither disputes this point nor acknowledges its significance, eliminating the *only* Medicaid Act provision the majority identified as requiring a State to take enforcement action against an MCO for breaching the Timely Payment Clause in its contract.

The majority opinion's reliance on section 1396u-2(c)(2)(A)(1), 40 F.4th at 509, which St. Anthony also invokes, Doc. 92 at 22, is likewise misplaced. That provision requires a State's contract with an MCO to provide for an annual "external independent review . . . of the quality outcomes and timeliness of, and access to, the *items and services* for which the organization is responsible under the contract." 42 U.S.C. § 1396u-2(c)(2)(A)(i) (emphasis added). The majority stated that this examination includes a review of the "'timeliness' of MCO . . . *payments*." 40 F.4th at 509 (emphasis added). But this section does not say that such a review shall examine MCO "payments." And the Medicaid Act, including in section 1396u-2, consistently uses the term "items and services" to refer to *medical* supplies and services provided to enrolled individuals. *See*, *e.g.*, 42 U.S.C. §§ 1396u-2(a)(5)(B)(4), 1396u-2 (d)(1)(A)(ii), 1396u-2(e)(1)(A)(i); 1396u-2(h)(4)(D).

---

including where the MCO "fails substantially to provide medically necessary items and services that are required (under law *or under such organization's contract with the State*) to be provided to an enrollee covered under the contract." 42 U.S.C. § 1396u-2(e)(1)(A)(i) (emphasis added).

In any event, even if section 1396u-2(c)(2)(A)(1) did require external audits of the timeliness of MCO payments to providers, that still would not mandate St. Anthony's interpretation of section 1396u-2(f) to require States to enforce the Timely Payment Clause against MCOs that breach it.  Instead, it would give States information relevant to determining whether, and to what extent, an MCO was complying with the Timely Payment Clause, and thus whether they should exercise their discretion to enforce the Clause.

Section 1396b(m)(2)(A)(iv), on which the majority opinion also relied, 40 F.4th at 509, likewise fails to support the conclusion that section 1396u-2(f) impliedly obliges States to enforce the Timely Payment Clause against an MCO that fails to pay providers on a timely basis.  That provision specifies that the federal government may not pay a State for medical assistance provided by an MCO unless its contract with the State provides that the State "shall have the right to audit and inspect" the MCO's "books and records . . . that pertain . . . to services performed or determinations of amounts payable under the contract."  42 U.S.C. § 1396b(m)(2)(A)(iv)(II). Again, the information a State may obtain by exercising its "right" to conduct such an audit can help it evaluate the MCO's "determinations of amounts payable" under its contract, thereby facilitating a decision about whether the State should exercise its discretion to enforce the Timely Payment Clause in its contract with an MCO. But nothing about a State's ability to obtain such information conflicts with, or is inconsistent with, the notion that section 1396u-2(f) gives States a discretionary contractual right to enforce the Timely Payment Clause.

25

St. Anthony, like the panel majority, also attaches significance to section 1396u-2(h)(2)(B) of the Medicaid Act, which was enacted a dozen years after section 1396u-2(f), governs managed-care programs for Indian health care providers, and requires a State's contract with an MCO to condition payment to the MCO on its "*agree[ment]* to make prompt payment" to such providers, "consistent with rule for prompt payment of providers under section 1396u-2(f) of this title."  42 U.S.C. § 1396u-2(h)(2)(B) (emphasis added).  St. Anthony suggests that this reference somehow shows Congress's intent, when it enacted section 1396u-2(f) a dozen years earlier, to require a State to enforce the Timely Payment Clause in its contract with an MCO that breaches it.  Doc. 92 at 13 (citing *St. Anthony Hosp.*, 40 F.4th at 506).  This later enactment does no such thing.  Even if it were relevant to determining what an earlier Congress meant, *but see O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute"), this provision, like section 1396u-2(f), defines the terms of an *MCO's contractual agreement* to pay providers, and its shorthand reference to section 1396u-2(f)'s "rule for prompt payment of providers" simply refers to the contract terms that section 1396u-2(f) specifies for such MCO payments.  In any event, it cannot take precedence over section 1396u-2(f)'s own text for purposes of determining its meaning.

St. Anthony also emphasizes that HFS's Rule 54 statement did not address the majority opinion's reference to the section heading of the 1997 law that added section 1396u-2(f):  "Assuring Timeliness of Provider Payments."  Doc. 92 at 13.

According to the majority, that heading "signals that Congress intended section 1396u-2(f) to assure, i.e., to guarantee, timely payment to providers."  40 F.4th at 505-06 (quoting Public Law 105-33, § 4708(c)).  In fact, the heading merely refers to the *agreement by MCOs* to pay providers on a timely basis, not to a *statutory duty by States* to guarantee such payments.  The term "assurance" is defined as "a promise," *Cambridge Dictionary*, and "[s]omething that gives confidence," *Black's Law Dictionary* (11th ed. 2019).  Indeed, section 1396u-2(h)(2), on which St. Anthony also relies, uses the heading "Assurance of payment to Indian health care providers for provision of covered services" to refer to an *MCO*'s contractual "*agree[ment]*" to promptly pay Indian health care providers.  42 U.S.C. § 1396u-2(h(2) (emphasis added).  In any event, a section heading "will not . . . 'override the plain words' of a statute," *Dubin v. United States*, 599 U.S. 110, 121 (2023), and instead can assist only "for the resolution of a doubt," *id.* at 121 (cleaned up), or "ambiguity," *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947).  And if section 1396u-2(f)'s text were ambiguous, the court would have to reject St. Anthony's proposed interpretation.

In short, to the extent that the Medicaid Act's provisions other than section 1396u-2(f) are relevant to determining if section 1396u-2(f) confers a private right, these provisions give States a valuable tool to decide whether to exercise their contractual discretion to enforce the Timely Payment Clause.  They are, therefore, not in conflict with, but fully consistent with, Congress's intent to give States that contractual right, not a statutory duty, to enforce the Timely Payment Clause in

27

their contracts with MCOs.[8]  Consequently, those provisions do not individually or collectively "manifest[] an 'unambiguous' intent" by Congress, using "explicit rights-creating terms," "to create individually enforceable rights" by providers to require States to enforce the Timely Payment Clause in their contracts with MCOs if an MCO breaches it.  *Gonzaga*, 536 U.S. at 280, 284; see *Talevski*, 599 U.S. at 180, 183.

### iii. Any uncertainty arising from the Medicaid Act's ancillary provisions should be resolved against St. Anthony's interpretation of section 1396u-2(f).

Even if the Medicaid Act's provisions besides section 1396u-2(f) could create any uncertainty about whether section 1396u-2(f) satisfies *Talevski*'s clear statement rule for showing private rights, that uncertainty should be resolved against such an interpretation for two significant reasons.  First, that interpretation would conflict with section 1396u-2(f)'s express grant to States of a contractual right, and corresponding contractual discretion, to enforce the Timely Payment Clause against an MCO.  Such an interpretation offends the principle that a statute should be read, if possible, not to contradict itself or negate what it otherwise provides.  *Honeycutt v. United States*, 581 U.S. 443, 454 (2017) ("[T]he Court cannot construe a statute in a way that negates its plain text."); *see also Biden v. Texas*, 142 S. Ct. 2528, 2533, 2541 (2022) (where statute specifically gave government discretion, Court would not read

---

[8]  That conclusion is reinforced by virtually identical language, adopted in the same legislative enactment that added section 1396u-2(f), that governs Medicare contracts between the federal government and private entities that operate like MCOs.  Pub. L. 105-33, Title IV, § 4001, now codified at 42 U.S.C.A. § 1395w-27(f)(1), (2); *see Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018).  That language, along with related provisions, makes clear that if the entity fails to comply with its contractual agreement to pay providers in a timely basis, the government has discretion over whether to take any action, and what action to take.

into it a mandatory duty "through an unspoken inference in conflict with" that discretion). This court recently applied that very principle in *Roberts v. Federal Housing Finance Agency*, 889 F.3d 397 (7th Cir. 2018), stating: "[S]ection 4617(b)(2)(D) [of the Housing and Economic Recovery Act] cannot *require* the Agency to 'preserve and conserve' the companies' assets as a conservator, or else it would conflict with the discretionary grant of the same authority in section 4617(b)(2)(B) or render it superfluous." *Id.* at 404 (emphasis in original). The same situation is presented here, where St. Anthony argues that section 1396u-2(f) impliedly *requires* States to take action for which the statute expressly gives States a contract right that is discretionary.

Second, the unusual nature of the right that St. Anthony attributes to section 1396u-2(f) — in which a private party may have a federal court review state executive officials' decision *not* to exercise their enforcement authority against *other persons* — would be in serious tension with well-established separation-of-powers and federalism principles. Effectuating the historic deference given to executive officials' discretionary decisions regarding the exercise of their enforcement authority, statutes are presumed not to grant judicial review of decisions *not* to pursue enforcement action. *See*, *e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). That concern is accentuated regarding claims that federal courts should review such decisions by state officials. *See Gonzaga*, 536 U.S. at 286. Further, the *Ex parte Young* exception to state sovereign immunity does not permit federal courts to control the exercise of state officials' discretion. *Ex parte Young*, 209 U.S. 123, 158

29

(1908); *Seminole Tribe of Fla. v. State of Fla.*, 11 F.3d 1016, 1028-29 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996). Yet that is effectively what St. Anthony says section 1396u-2(f) gives federal courts the power to do, at the behest of private Medicaid providers: assume control over States' discretion about whether, when, and how to exercise their rights against MCOs under the Timely Payment Clause. Informed by these concerns, the court should instead avoid that interpretation unless the Medicaid Act clearly compels it. But the Act does not compel that interpretation, or even fairly support it.

> ### c. The perceived relative effectiveness of contract-based and section 1983 enforcement of the Timely Payment Clause does not satisfy *Talevski*'s clear statement rule.

The majority opinion also conflicts with *Talevski*'s clear statement rule by basing its interpretation of section 1396u-2(f) on the supposed inadequacy of a State's contract rights, compared to section 1983 enforcement by providers, to implement Congress's goal to have MCOs make timely payments to providers. *Talevski* held that "[c]ourts must apply traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs.'" *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 283, 285-86). Those tools, as noted, establish that a court "may not replace the actual text with speculation as to Congress' intent," *Castro-Huerta*, 142 S. Ct. at 2496 (cleaned up); "engraft on a statute additions which [it] think[s] the legislature logically might or should have made," *Return Mail*, 139 S. Ct. at 1867 n.11; "rewrite a statute because [the court] might deem its effects susceptible of

improvement," *Badaracco*, 464 U.S. at 398; or "assume that *whatever* furthers the statute's primary objective must be the law," *Rodriguez*, 480 U.S. at 526 (emphasis in original). As the Supreme Court explained in *Rodriguez*, "no legislation pursues its purposes at all costs," and "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice*." Id.* at 525-26; *see Talevski*, 599 U.S. at 178 ("We implement Congress's choices rather than remake them.").

The majority opinion departed from these principles when it assessed the comparative effectiveness of contract-based and section 1983 enforcement of the Timely Payment Clause and concluded that a state official "would not reasonably have concluded that Congress intended" section 1396u-2(f) to "be only a proverbial paper tiger." 40 F.4th at 511; *see id.* at 509, 510 (describing HFS's interpretation of the Timely Payment Clause as mandating "only a 'paper' requirement" and requiring "merely the formality of contract language"); *see also Webster's New World College Dictionary* (4th ed.) (defining "paper tiger" as "a person, nation, etc. that seems to pose a threat but is actually ineffective or powerless"). St. Anthony argues that this conclusion "accurately followed *Pennhurst* and its progeny to find that HFS's alternative interpretation "conflicts" with the statutory scheme," even though the majority "did not use the specific words 'unambiguous' or 'plausible.'" Doc. 92 at 18. Quite the contrary. The majority improperly deemed a State's contract right under the Timely Payment Clause to be ineffective, and then relied on that view to exclude the possibility that section 1396u-2(f) relies on contract rights to implement

MCOs' duty to pay providers on a timely basis.  40 F.4th at 509-10.

Even if that view were correct, it would not meet *Talevski*'s step-one standard requiring "clear 'rights-creating language'" that "*unambiguously* confer[s] individual federal rights" on private parties.  599 U.S. at 180, 186 (emphasis in original).  But there is, in fact, a middle option that the majority improperly rejected, under which the Timely Payment Clause gives States a significant contract right, in addition to providers' rights to enforce their own contracts with MCOs, to enforce the Timely Payment Clause, and even terminate an MCO's contract for breaching that Clause. *See* 42 U.S.C. § 1396u-2(e)(4).  That power, while committed to a State's discretion, is no "paper tiger."

Of course, it can be argued that such discretion is insufficient to guarantee that MCOs will always pay providers on a timely basis, and that a State could abuse its discretion by doing nothing in face of egregious circumstances.  But "[i]t is always a doubtful course, to argue against the use or existence of a power, from the possibility of its abuse."  *Martin v. Hunter's Lessee*, 14 U.S. 304, 344–45 (1816).

Neither St. Anthony nor the majority opinion contend that section 1396u-2(f) requires States to achieve the impossible feat of preventing MCOs from ever failing to meet the Timely Payment Clause's payment schedule.  The majority's answer to this problem was to limit a State's statutory duty to responding to situations in which "MCOs systematically are not paying providers on a timely basis."  40 F.4th at 510; *see id.* at 512, 514-15, 519.  But that qualification is nowhere found in section 1396u-2(f)'s text, and a court cannot simply add it to produce what it considers to be a more

workable policy.  *Return Mail*, 139 S. Ct. at 1867 n.11; *Badaracco*, 464 U.S. at 398.
Thus, the relevant concern — again involving the question of *who* controls
enforcement of the Timely Payment Clause — is what a State does when an MCO
breaches the Clause, either to a minor degree or more seriously.  And in light of the
range of possible departures from the Timely Payment Clause's payment schedule,
from minor to pervasive, it makes sense to give contractual enforcement discretion to
a States, which is well suited to evaluate all relevant considerations about whether,
when, and how to enforce the Timely Payment Clause.

In addition, reading section 1396u-2(f) to oblige States, by implication, to
enforce the Timely Payment Clause if an MCO breaches it would contradict what
section 1396u-2(f) provides expressly.  Section 1396u-2(f) explicitly gives States a
contractual right, under the Timely Payment Clause, to require MCOs to pay
providers on a timely basis.  This contractual right gives States discretion over
enforcement of the Timely Payment Clause.  Yet St. Anthony's interpretation of
section 1396u-2(f) would contradict and negate that discretion, and thus conflict with
a central aspect of the enforcement scheme based on contract rights that Congress
specifically established.  *See Honeycutt*, 581 U.S. at 454 (2017); *see also Biden v.
Texas*, 142 S. Ct. at 2541; *Roberts*, 889 F.3d at 404.

*Gonzaga* also holds that, even at the first-step inquiry, an alternative
enforcement "mechanism" in a Spending Clause statute, even if not "sufficiently
comprehensive," can undercut a claim that the statute unambiguously creates
private rights enforceable under section 1983.  536 U.S. at 289-90 & n.8 (cleaned up).

33

Given section 1396u-2(f)'s express adoption of contract-based rights to enforce MCOs' contractual obligation to pay providers on a timely basis, that consideration applies here and further undermines St. Anthony's claim that section 1396u-2(f) gives providers an unambiguous private right to require States to enforce the Timely Payment Clause.

Thus, especially given the plain meaning of section 1396u-2(f)'s own text, all state officials, or even a substantial number of them, cannot be assumed to read into section 1396u-2(f) a duty it does not express, even if that duty might represent a better policy. "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1749 (2020); *see Talevski*, 599 U.S. at 178 ("We implement Congress's choices rather than remake them."). *Talevski*'s stringent standard is not met by hypothesizing what a state official would think Congress might have meant by what it did not say. *See Pennhurst*, 451 U.S. at 17-18 ("in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly"); *Maryland Psychiatric Soc., Inc. v. Wasserman*, 102 F.3d 717, 720 (4th Cir. 1996) ("If Congress intended states to pay the 37.5% exclusion for outpatient psychiatric services for QMBs, it certainly did not say so explicitly, clearly, and unambiguously.").

Based on what section 1396u-2(f) actually says, as well as commonly understood contract principles, a reasonable state official could, and would, assume

that if an MCO breached the Timely Payment Clause in its contract, that breach, depending on its severity and duration, might warrant action by the State to secure compliance. That assumption, which recognizes the discretionary nature of contract enforcement by a party that holds the contract right, is particularly reasonable because the regulation implementing section 1396u-2(f), while reaffirming a State's obligation to include the Timely Payment Clause in its contracts with MCOs, says nothing about a duty by States to enforce that Clause if an MCO breaches it. *See* 42 C.F.R. § 447.46; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (describing deference to agency regulations).

At bottom, how to implement the policy of having MCOs make timely payments to providers, and how effectively to do so, represent quintessentially legislative choices on which courts may not substitute their own policy views. *See*, *e.g.*, *Talevski*, 599 U.S. at 178. The fact that the contractual right that section u-2(f) gives States might not guarantee that MCOs will always meet the contractually prescribed payment schedule does not allow a court to rewrite what Congress enacted to provide what the court believes would better achieve that goal. *See Rodriguez*, 480 U.S. at 526. Accordingly, even if there were a valid basis to conclude that discretionary contract enforcement of the Timely Payment Clause by States, in addition to providers' own rights to enforce their contracts with MCOs, is deficient compared to the statutory duty that St. Anthony says section 1396u-2(f) imposes, that still would not justify finding that section 1396u-2(f) unambiguously imposes on States a statutory duty that its express terms do not state.

In sum, the court cannot fairly conclude that section 1396u-2(f) does not plausibly mean what it expressly says and instead unambiguously means what it does not say. Section u-2(f) therefore fails at *Talevski*'s first step, and the district court's judgment dismissing St. Anthony's section 1983 claim under section 1396u-2(f) should be affirmed.

**B.    A statutory right by individual Medicaid providers to require States to enforce the Timely Payment Clause against MCOs is inconsistent with the enforcement scheme, based on contract rights, that Congress expressly established in section 1396u-2(f).**

Even if section 1396u-2(f) could be read to unambiguously give Medicaid providers the individual private right that St. Anthony attributes to it, the presumption that this right is enforceable under section 1983 is rebutted because such enforcement would be inconsistent with the contract-based enforcement scheme that section 1396u-2(f) expressly establishes. Enforcement of a Spending Clause statute under section 1983 is excluded, *Talevski* held, where the statute, examined using "ordinary interpretive tools," shows that "Congress intended that statute's remedial scheme to be the exclusive avenue through which a plaintiff may assert his claims." 599 U.S. at 189 (cleaned up). The controlling question "is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983, such that a court must infer that Congress did not intend to make available the § 1983 remedy for these newly created rights." *Id.* at 187 (cleaned up); *see also id.* at 187 (noting that the Court has used different terms and concepts, including "incompatible," "inconsistent," and "thwart," to describe this "discordance") (cleaned up).

Evidence signifying an intent to exclude section 1983 enforcement, *Talevski* further held, includes "an express private judicial right of action." *Id.* at 188. That was illustrated, the Court explained, by its decisions finding such an intent in statutes that included a "statute-specific right of action [that] offered fewer benefits than those available under § 1983," so that recognizing private rights enforceable under section 1983 would have "given plaintiffs access to tangible benefits as remedies that were unavailable under the statutes." *Id.* at 1461 (cleaned up). For example, the Court noted, in *Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), it held that "§ 1983's operation would have 'distorted' the pertinent other statute's remedial scheme." *Talevski*, 599 U.S. at 170 (quoting *Rancho Palos Verdes*, 544 U.S. at 127) (cleaned up)). That was the case in *Rancho Palos Verdes* because, among other things, a section 1983 action, unlike the remedy provided in the statute, would have given the plaintiff a right to attorney's fees in the context of "a complex and novel statutory scheme." 544 U.S. at 122-23.

Justice Barrett, concurring in *Talevski*, agreed that "the presence of an 'express private judicial right of action' typically demonstrates that a § 1983 suit is not also available." 599 U.S. at 194 (quoting majority opinion, 599 U.S. at 188). She added that "an actual clash — one private judicial remedy against another, more expansive remedy — is not required to find that a statute forecloses recourse to § 1983," and that a variety of circumstances can indicate Congress's intent not to make statutory rights enforce-able under section 1983*." Id.* Indicia of such an intent, she observed, include "enforcement provisions" that "confer authority to sue

37

. . . on government officials," "a centralized review mechanism that would be undermined by piecemeal litigation," and "the overall comprehensiveness of the statute's enforcement scheme." *Id.*

This court's vacated opinion does not align with these principles announced in *Talevski*. Instead, it focused on whether, from a provider's perspective, section 1983 enforcement would have advantages over contract-based enforcement. 40 F.4th at 514-15. But *Talevski* explained that the existence of a less comprehensive private remedy is a reason *not* to find an intent to allow enforcement under section 1983. 599 U.S. at 189; *id.* at 194-95 (Barrett, J., concurring). And allowing such enforcement would seriously interfere with the contract-based enforcement framework that Congress did establish under section 1396u-2(f), which, under *Talevski*, shows Congress's intent to exclude section 1983 enforcement.

> **1.    The court's vacated opinion incorrectly relied on the supposed superiority of section 1983 enforcement over contract enforcement.**

The vacated opinion conflicts with *Talevski* because it relied on the supposed superiority of section 1983 enforcement over the contract rights that section 1396u-2(f) expressly contemplates. By its terms, section 1396u-2(f) provides for two sets of contract rights — by providers, under their contracts with MCOs, and by States, under their separate contracts with MCOs — to enforce MCOs' duty to pay providers on a timely basis. 42 U.S.C. § 1396u-2(f); *see St. Anthony Hosp.*, 40 F.4th at 508. The obvious reason for mandating such contract provisions is to have the rights and remedies under them governed by contract law. *See Jackson Transit*, 457 U.S. 15,

20-23, 29 & nn.12, 13.  But the majority held that Congress did not intend these rights to be exclusive, thus excluding section 1983 enforcement, because they are not obviously "superior" to enforcement under section 1983.  40 F.4th at 515.  That holding is unsound under *Talevski*.

The majority characterized both providers' own contract rights against MCOs and States' contract rights under the Timely Payment Clause as starkly inferior "to a systemic solution" imposed by a State under court order.  40 F.4th at 510, 515.[9]  But the perceived superiority of section 1983 enforcement over contract-based enforcement is neither a basis to find that section 1396u-2(f) presumptively creates the right alleged by St. Anthony, see *supra* at 37, nor a valid reason to hold that Congress intended to allow section 1983 enforcement.  As *Talevski* held, the Supreme Court has directly rejected the notion that Congress intended to allow section 1983 enforcement because it would allow additional remedies or be more convenient than the enforcement scheme that Congress expressly contemplated.  599 U.S. at 189; *id.* at 194-95 (Barrett, J., concurring); *see also Rancho Palos Verdes*, 544 U.S. at 121

---

[9] A significant premise for this conclusion was the majority's assumption that providers could not effectively enforce their own contracts with an MCO if it failed to make payments on a timely basis.  40 F.4th at 515.  According to the majority, "[a]rbitration provisions in those contracts would likely require arbitration for each individual claim in dispute," resulting in "a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations," which could "easily involve many thousands of individual claims each year" and would not "vindicate the provider's right to prompt payment."  *Id.*  That premise is unsound.  Nothing prevents a breach of contract action, whether in court or before an arbitrator, from including multiple breaches of the same contract.  Indeed, any claim by a provider relating to an MCO's alleged violation of its duty to pay a certain percentage of claims within a specified time (e.g., 90% in 30 days) would necessarily encompass multiple Medicaid claims, not a single Medicaid claim, which by itself could not violate that percentage requirement.

39

("the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not"). Section 1396u-2(f) authorizes providers and States to enforce their respective contract rights to have MCOs make timely payments, and section 1983 enforcement cannot be added to those rights simply because a provider might find the relief it offers, including attorney's fees, more attractive or expedient. *See Rancho Palos Verdes*, 544 U.S. at 122-23.

### 2. Section 1983 enforcement would interfere with the contract-based enforcement scheme that section 1396u-2(f) expressly establishes.

Under *Talevski*, section 1396u-2(f) does not authorize private section 1983 enforcement for the additional reason that it would disrupt, and thus be inconsistent with, the contract-based system that section 1396u-2(f) expressly establishes for enforcing MCOs' obligations to pay providers on a timely basis. Layering section 1983 enforcement over such contract-based enforcement would seriously interfere with the application of those contract rights under a State's contract with an MCO, which give States discretion to determine, based on the particular circumstances presented, whether to seek enforcement, and how to do so. Giving providers a right to seek a federal court order forcing States to ensure timely payments by MCOs would negate that discretion, and thus defeat a central aspect of the contract-based enforcement scheme that Congress specifically established. *See Biden v. Texas*, 142 S. Ct. at 2541 (where statute specifically gave government discretion, Court would

not read into it a mandatory duty "through an unspoken inference in conflict with" that discretion); *Roberts*, 889 F.3d at 404.

The situation here thus resembles the one in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981), where the relevant statute "confer[ed] authority to sue . . . both on government officials and private citizens."  There, as Justice Barrett noted in *Talevski*, the statute gave "government officials" the "authority to sue."  599 U.S. at 195 (cleaned up).  Such enforcement authority by the government includes broad discretion about whether to take action in a particular situation.  *See Heckler*, 470 U.S. at 831-32.  A State's authority to enforce the Timely Payment Clause in its contract with an MCO is no different, for it likewise gives the State discretion to decide when, and how, to act against an MCO.  But giving providers the ability, under section 1983, to force a State to take such action would negate that discretion, and thus displace and disrupt the contract-based enforcement scheme that section 1396u-2(f) establishes.

It is no answer to say, as St. Anthony does, that States will retain some discretion over what *remedy* is appropriate if a federal court first finds that the State has liability because it failed to prevent, or act forcefully enough against, an MCO's systemic failure to make timely payments.  Doc. 92 at 21-22.  States will lose all the discretion that contract law gives them over whether and when to enforce the Timely Payment Clause against an MCO that fails to pay providers on time.  They will also lose their ultimate contract-based discretion over how to enforce the Timely Payment Clause in such a situation.  Negating a State's contractual discretion in this way is

clearly inconsistent with the comprehensive, contract-based enforcement scheme that Congress expressly established under section 1396u-2(f) for securing compliance with MCOs' duty to pay providers on a timely basis.

The private right that the majority attributed to section 1396u-2(f) would also seriously interfere with the contract-based enforcement mechanism to resolve payment-related disputes between providers and MCOs under their own contracts, as Congress also expressly contemplated in section 1396u-2(f). Any section 1983 claim by a provider against a State under section 1396u-2(f) would depend on proof that the MCO breached the timely payment provision in its contract with the provider. In addition, the provider's section 1983 action demanding that the State be ordered to force the MCO to accelerate its payments would have to include the MCO as a required party. *See* Fed. R. Civ. P. 19(a)(1)(B); *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 478-79 (7th Cir. 1996); *Sladek v. Bell Sys. Mgmt. Pension Plan*, 880 F.2d 972, 979-80 (7th Cir. 1989); *see also N. Ind. R. Co. v. Mich. Cent. R. Co.*, 56 U.S. 233, 245-46 (1853).[10] The provider then would likely have to join any underlying claims it had against the MCO, including claims under the contract between them, to avoid being later barred from asserting those claims under preclusion principles. *See* 6A, C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* (3d ed.) § 1582, text accompanying n.23. And although the provider's statutory claim against the State and its contract claim against the MCO would have some distinct elements,

---

[10] St. Anthony mistakenly asserts that HFS never raised this issue before. Doc. 92 at 24. It did. Doc. 44 at 29.

they would also share a common core of essential elements relating to whether the MCO was paying the provider on time (in turn raising potential disputes about whether disputed claims were "clean," whether the services were covered by the MCO's plan, whether the provider obtained any prior authorization required by the plan, and when the claim was paid or denied).

A further complicating factor would arise if, as is common in the industry, the contracts between providers and MCOs contain a binding arbitration clause, for in that case the district court could not resolve the provider's section 1396u-2(f) claim in derogation of an MCO's arbitration rights, including any dispute over whether the MCO complied with the payment terms in its contract with the provider. *See Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984); *Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983). In this way, too, section 1983 enforcement of section 1396u-2(f) by a provider against a State would collide with, and thus be incompatible with, the contract-based enforcement mechanism for resolving payment disputes between providers and MCOs.[11]

St. Anthony contends that such arbitration proceedings would be limited to disputes over individual Medicaid claims and would not encompass payment disputes between providers and MCOs "at the system level." Doc. 92 at 23. But it is highly unlikely that an arbitration agreement between a provider and MCO would apply

---

[11] St. Anthony notes that a provider's section 1983 claim against a State would not be precluded by an arbitration agreement between them. Doc. 92 at 23. HFS has never suggested the contrary. But that does not eliminate the procedural obstacle arising from arbitration agreements between providers and MCOs.

only to individual Medicaid claims and carve out broader payment disputes under their contract.  And if the arbitration clause did cover such broader disputes, arbitration would have to take precedence before the provider could obtain (if at all) systemic relief against an MCO indirectly through relief against a State in a section 1983 action in federal court.[12]

*     *     *

In sum, St. Anthony's section 1983 claim under section 1396u-2(f) fails each step of the *Talevski/Gonzaga* analysis, and for this reason the district court's judgment dismissing that claim should be affirmed.

---

[12]  St. Anthony argues that a provider's section 1983 claim against a State would not be precluded by an arbitration agreement between them.  Doc. 92 at 23.  HFS has never suggested the contrary.  But that does not eliminate the procedural obstacle arising from arbitration agreements between providers and MCOs.

**CONCLUSION**

Under the principles announced in *Talevski*, the district court's judgment dismissing St. Anthony's section 1983 claim under section 1396u-2(f) of the Medicaid Act should be affirmed.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>December 12, 2023</td><td>KWAME RAOUL<br>Attorney General<br>State of Illinois</td></tr>
<tr><td></td><td>JANE ELINOR NOTZ<br>Solicitor General</td></tr>
<tr><td>/s/ Richard S. Huszagh<br>RICHARD S. HUSZAGH<br>Assistant Attorney General<br>100 West Randolph Street<br>12th Floor<br>Chicago, Illinois 60601<br>(312) 814-2587<br>richard.huszagh@ilag.gov</td><td>100 West Randolph Street<br>12th Floor<br>Chicago, Illinois 60601<br>(312) 814-3312<br><br>Attorneys for Defendant-Appellee</td></tr>
</table>

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook BT font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(A) in that the brief is  11,889  words.


   /s/ Richard S. Huszagh

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 12, 2023, I electronically filed the foregoing Supplemental Brief Of Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will effect service on other participants in the case, all of whom are registered CM/ECF users.


    /s/ *Richard S. Huszagh*