No. 21-2325

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

SAINT ANTHONY HOSPITAL,
*Plaintiff-Appellant*,

v.

THERESA EAGLESON, in her official capacity as Director of the
Illinois Department of Healthcare and Family Services,
*Defendant-Appellee.*

---

On Remand from the Supreme Court of the United States

---

**SAINT ANTHONY HOSPITAL'S SUPPLEMENTAL REPLY BRIEF**

---

Michael L. Shakman
Edward W. Feldman
William J. Katt
Mary Eileen Cunniff Wells
MILLER SHAKMAN LEVINE & FELDMAN LLP
30 West Monroe, Suite 1900
Chicago, Illinois 60603
Tel: (312) 263-3700
mlshak@aol.com
efeldman@millershakman.com
wkatt@millershakman.com
mwells@millershakman.com

*Counsel for Saint Anthony Hospital*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................. ii

I.   The Original Ruling Applied the Same Rule as *Talevski* to Find that
     Section u-2(f) Unambiguously Creates an Individual Right to Sue ................. 1

     a.   *Section u-2(f) and its cross-reference to Section 1396a(a)(37)(A)'s
          30-90 day requirement.* ............................................................. 2

     b.   *"Assuring Timeliness of Provider Payments."* ........................................ 7

     c.   *Section u-2(f) in the 2009 Act.* .................................................... 9

     d.   *The "alternate payment schedule provision."* ...................................... 10

     e.   *Provisions for State Oversight.* .................................................. 11

II.  Individual Enforcement Under § 1983 Is Not "Incompatible" with any
     Statutory Enforcement Scheme ...................................................... 12

Conclusion ........................................................................... 16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Blessing v. Freestone,*
    520 U.S. 329 (1997) ........................................................................... 1, 2

*Dubin v. United States,*
    599 U.S. 110 (2023) ............................................................................... 9

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002) ...................................................................... 1, 2, 10

*Health and Hosp. Corp. of Marion Cty. v. Talevski,*
    599 U.S. 166 (2023) ..................................................................... *passim*

*Martin v. Hunter's Lessee,*
    14 U.S. 304 (1816) ................................................................................ 6

*O.B. v. Norwood,*
    838 F.3d 837 (7th Cir. 2016) ............................................................. 15

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) .................................................................................. 8

*Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ............................................................................ 14

*Saint Anthony Hosp. v. Eagleson,*
    40 F.4th 492 (7th Cir. 2022) ........................................................ *passim*

*Wilder v. Virginia Hosp. Ass'n,*
    496 U.S. 498 (1990) ........................................................................ 8, 9

*Wright v. Roanoke Redevelopment and Housing Auth.,*
    479 U.S. 418 (1987) ........................................................................ 8, 9

**Statutes**

42 U.S.C. § 1396a(a)(37)(A) .................................................................... 2, 3
42 U.S.C. § 1396u-2(f) ....................................................................... *passim*
42 U.S.C. § 1983 ............................................................................... *passim*

Most of HFS's and the MCOs' supplemental briefs rehash prior arguments. Saint Anthony Hospital addresses only new arguments, except as necessary to set the stage for discussing what is newly argued.[1]

\* \* \* \* \*

HFS's two central arguments (which the MCOs join) are wrong. The Original Ruling correctly applied the rule that the Timely Payment Provision of 42 U.S.C. § 1396u-2(f) must be clear and unambiguous to permit 42 U.S.C. § 1983 enforcement. It found that they are. *Health and Hospital Corporation of Marion County v. Talevski,* 599 U.S. 166 (2023), did not change the requirement or the result.

The Original Ruling also correctly applied the long-standing presumption that there is a private right to sue under § 1983 for violations of such unambiguous statutory obligations unless such a suit is incompatible with a comprehensive enforcement scheme found in the statute. It found no incompatibility, and none exists, comprehensive or otherwise. *Talevski* did not change that requirement or the result.

## I.    The Original Ruling Applied the Same Rule as *Talevski* to Find that Section u-2(f) Unambiguously Creates an Individual Right to Sue.

Saint Anthony's Supplemental Brief (Dkt. 92 at 7-8) pointed out that the third *Blessing v. Freestone,* 520 U.S. 329 (1997), requirement as applied by the Original Ruling is the same as the *Gonzaga-Talevski* formulation. The Original Ruling described the third *Blessing* standard as requiring that "the statute must

---

[1]     This brief uses the same terms and abbreviations used in Saint Anthony's Statement (Dkt. 89) and Supplemental Brief (Dkt. 92). Unless indicated otherwise, italics have been added to quoted material.

unambiguously impose a binding obligation on the States." *Saint Anthony Hosp. v. Eagleson,* 40 F.4th 492, 503 (7th Cir. 2022). It added that:

> Congress must have "*intended to create a federal right*," and "the statute 'must be phrased in terms of the persons benefited' with an '*unmistakable focus* on the benefited class.'"

*Id.* at 502-03 (cleaned up) (italics in original).

Yet HFS argues "[n]or can this court conclude . . . that the panel majority's application of the *Blessing* factors effectively satisfies *Talevski's* first step." Dkt. 99 at 10-11. HFS never explains how the above-quoted formulation in the Original Ruling differs from *Talevski's*, which was that the statute must be "'phrased in terms of the persons benefited' and contain[] 'rights-creating,' individual-centric language with an unmistakable focus on the benefited class." *Talevski,* 599 U.S. at 183 (quoting *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284, 287 (2002)). There is no substantive difference.

Saint Anthony's Supplemental Brief discussed each of the provisions that the Original Ruling analyzed in finding that Congress intended providers to be able to sue to enforce timely payment. Dkt. 92 at 11-16. HFS misreads most and ignores one entirely.

    a.    *Section u-2(f) and its cross-reference to Section 1396a(a)(37)(A)'s 30-90 day requirement.* The Original Ruling focused on the language of Section u-2(f) requiring "payment to health care *providers* . . . on a timely basis" and the incorporation by reference to 42 U.S.C. § 1396a(a)(37)(A) ("Section (a)(37)") as providing the 30-90 day requirement. 40 F.4th at 505 (italics in original). HFS argues that the two sections can be "plausibly read to give[] States a discretionary

contractual right, not a statutory duty, to enforce the Timely Payment Clause in their contracts with MCOs . . . ." Dkt. 99 at 11-12. But if HFS were correct the Section would have said that the States "shall contract with MCOs to provide timely payment to the extent the State deems it advisable," or something similar. There is no such language in Section u-2(f), although that is the meaning HFS assigns it. HFS's reading is implausible.

But not only implausible. HFS's reading leads to an absurd result that Congress surely did not intend. Section (a)(37), the source of the 30-90 day requirement, is key. There is no dispute that provision has applied and still applies directly to HFS when it pays Medicaid providers itself, outside the MCO arrangements. There is also no dispute that HFS's prompt payment duty under Section (a)(37) is mandatory when it is direct payor, and HFS has no discretion about whether or not to comply. Yet its argument now is that when Congress commanded HFS to include the identical obligation in contracts with MCOs, it meant to demote HFS's Section (a)(37) obligation into a mere option, and that HFS could shed the prompt payment requirement by outsourcing and then deciding later whether to enforce it or even to ignore it. Even more implausibly, HFS repeatedly characterizes this as its "right," that Congress's intent in Section u-2(f) was to bestow a "right" to HFS to decide whether to enforce the prompt payment obligation. *See, e.g.*, Dkt. 99 at 11-13 (what HFS calls its "discretionary contract right"); *id.* at 11-12 (Section u-2(f) "giv[es] States a contractual right, not a statutory duty"); *id.* at 31 ("a State's contract

right under the Timely Payment Clause"). Thus, HFS argues that *it*, not providers, is the intended beneficiary of the prompt payment provision.

That is statutory alchemy. Nothing in the statutory scheme suggests that Congress intended via Section u-2(f) to degrade the prompt payment obligation in any way. Nothing suggests that Congress meant to grant new rights and privileges to States and diminish the rights of providers to timely payments. To the contrary, one assumption underlying the authorization of MCO involvement in paying claims is that private parties might be *more* efficient than government, not less, and that they should be *better* at paying on time. Whether or not that view of the world is empirically correct in all circumstances is debatable (as the allegations in this case suggest). But it is implausible to conclude that when Congress enacted a law to assure prompt payment of providers it somehow intended to make only States the beneficiary of the prompt payment requirement, and to require States to do no more than include prompt payment language in contracts with MCOs.

HFS argues that "[t]he relevant issue is not *whether* MCOs have an obligation to pay providers on a timely basis[.] It is what *means* section 1396u-2(f) contemplates for enforcing that obligation." Dkt. 99 at 18 (italics in original). This is a new twist, conceding for the first time "an obligation to pay providers on a timely basis[.]" *Id.* HFS's argument for Congress's intent rests on the false premise that because Congress directed States to include contract provisions in their contracts that means that it did not intend any other means of enforcement. That Congress meant to impose a contractual obligation on MCOs does not mean that it meant to divest HFS

of its obligations, as if the HFS-MCO contract were a quitclaim deed transferring HFS's prompt payment duties to the MCOs. Statutory routes to ensuring prompt payment do not have to be exclusive.

HFS is wrong for other reasons: HFS has an actual duty to enforce the right that it now seems to concede Congress created. Because Section u-2(f) creates a right to timely payment, as discussed in Section II below, once the right exists it is presumptively enforceable unless enforcement is incompatible with a comprehensive enforcement scheme. Throughout its brief, HFS muddles the "clear right" analysis of *Talevski* with its separate enforcement analysis. Right out of the starting gate, it contends that the "central question in this case is *who* controls enforcement of the contract provision." Dkt. 99 at 1 (italics in original). Not so. Consistent with prior law and the Original Ruling, *Talevski* prescribes a two-step analysis, looking first at right and next at enforcement: is there unambiguous rights-creating language? If so, there is a right to sue under § 1983 unless Congress intended a comprehensive enforcement scheme. HFS instead argues in essence, that its enforcement discretion means that providers have no statutory rights. As discussed in Section II below, HFS is wrong that its *ad-hoc* discretion, about which the statute is completely silent, is such a comprehensive "scheme." But HFS is also wrong that the enforcement analysis determines the existence of providers' clear right to prompt payment.

Moreover, HFS disregards the Original Ruling's conclusion that "the timely payment rule is more than a paper requirement"—it is a "right . . . honored in real life." 40 F.4th at 510. Not one word or comma in *Talevski* calls that conclusion into

question, and the fact that HFS relies on an 1816 case to defend its toothless-tiger position highlights its weakness, not merely because of its antiquity, but because the principle it cites the case for undermines its position. Dkt. 99 at 32 (citing *Martin v. Hunter's Lessee*, 14 U.S. 304, 344-45 (1816)). *Martin* concerned a land dispute that the Supreme Court had resolved, but the highest court of Virginia refused to obey the mandate, claiming that the Supreme Court's jurisdiction over it had been unconstitutional. Unsurprisingly, the Court was miffed at this challenge to its authority, and reversed, holding that state courts must obey Supreme Court reversals of their rulings. In so doing, it rejected Virginia's argument that it had no such power because the power could theoretically be abused, stating as follows (HFS quotes the first sentence and omits the second, which we italicize): "It is always a doubtful course, to argue against the use or existence of a power, from the possibility of its abuse. *It is still more difficult, by such an argument, to ingraft upon a general power a restriction which is not to be found in the terms in which it is given.*" 14 U.S. at 344-45. If this statement has any relevance to this case, it does not support HFS's position that its contractual discretion somehow entitles it to ignore egregious violations of the prompt payment requirement. Rather, the quote, especially the second sentence, supports Saint Anthony's argument: the holding in the Original Ruling, that the theoretical possibility that a federal court might inappropriately enforce the prompt payment requirement, does not mean that the court has no power to act at all. In other words, *Martin* is a federalism case upholding the authority of federal courts to enforce federal

law against a recalcitrant State, not a case insulating state agencies from enforcement of federal duties.

Another fundamental flaw in HFS's argument (as before) is that it confuses means and ends. Saint Anthony's claim, upheld in the Original Ruling, is that the statutory goal that Congress intended was for providers to get paid on time, and that it viewed the HFS-MCO contract as merely one means to that end, but not the only one. HFS's argument, in essence, is that Congress's only means and ends were the HFS-MCO contract, and that Congress left the ultimate prompt payment of providers optional with HFS, in the exercise of its unmentioned and unfettered discretion. Again, nothing in *Talevski* alters the holding in the Original Ruling that such a reading cannot be squared with the statutory language. Congress's overarching objective was for providers to get paid on time, not for HFS to enter into contracts saying that.

HFS is also wrong because § 1983 enforcement by providers is not incompatible with State discretionary enforcement such that the two cannot coexist. We discuss that in Section II below.

b.     *"Assuring Timeliness of Provider Payments."* The Original Ruling read this language in the heading to Section u-2(f) as evidence that Congress "intended section 1396u-2(f) to assure, i.e., to guarantee, timely payment to providers." 40 F.4th at 505-06. HFS argues that the language "merely refers to the *agreement by MCOs* to pay providers on a timely basis, not to a *statutory duty by States* to guarantee such payments." Dkt. 99 at 27 (italics in original). Once again, HFS edits clear statutory

language to its liking. If HFS were correct, Congress would have entitled the section "Assuring Contract Provisions in Contracts with MCOs," or something similar. By rewriting the statute, HFS violates the rules it sets forth in its string cite, Dkt. 99 at 15-16, that it should not, for example, "engraft on a statute additions" it likes.

HFS also rewrites Supreme Court caselaw in its discussion of the two post-*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), opinions preceding *Talevski* that found individual rights to sue under § 1983 for violations of federal statutes. Dkt. 99 at 13-14 (citing *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418 (1987), and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990)). HFS argues that the takeaway from these cases is that the statutes at issue must use the word "rights" or "explicitly impose[ ] on those recipients of federal funds a specific duty owed to individual members of that class." *Id.* at 14. The second part of that assertion concedes the game. As the Original Ruling correctly held, Section u-2(f) *does* impose a specific duty to individual providers. Indeed, this case is at least as strong as *Wright* and *Wilder*, neither one of which involved a statute using the word "rights."

*Wright* involved a provision of the Federal Housing Act that capped public housing rents at 30% of family income: "A family shall pay as rent for a dwelling unit assisted under this chapter . . . the highest of the following amounts . . . : (1) 30 per centum of the family's monthly adjusted income[.]" 479 U.S. at 420 n.2. The Court found this language to be clearly rights-creating. It imposed a mandatory statutory cap that imbued individual tenants with a clear right. Similarly, the prompt payment

provision imposes a mandatory deadline that imbues individual providers with a clear right. *Wright* also rejected arguments much like those asserted by HFS concerning enforcement, holding that HUD's ability to enforce and the option of tenants bringing state court suits against landlords did not preclude § 1983 enforcement. *Id.* at 429.

*Wilder* also did not use the term "rights." Like this case, it concerned government duties owed to medical providers to determine and apply reasonable reimbursement rates. The Court held: "The Boren Amendment is cast in mandatory rather than precatory terms: the state plan 'must' 'provide for payment . . . of hospital[s]' according to rates the State finds are reasonable and adequate." 496 U.S. at 512. This language is less precise than the prompt payment provision. In short, HFS's reliance on *Wright* and *Wilder* backfires.

HFS's citation to *Dubin v. United States,* 599 U.S. 110, 121 (2023), about the irrelevance of titles to sections of statutes, is inaccurate. HFS should have quoted this statement from *Dubin,* which is on point: "a title is especially valuable [where] it reinforces what the text's nouns and verbs independently suggest." *Id.* at 121 (cleaned up). Just so. Here, the relevant noun is "providers," and the central verb is "shall" in the phrase "shall make payment . . . on a timely basis." The title, "Assuring Timeliness of Provider Payments" reinforces both subject and predicate of the statutory command.

c.     *Section u-2(f) in the 2009 Act*. The Original Ruling noted that in 2009 Congress referred to Section u-2(f), enacted twelve years earlier, as the "rule for

prompt payment of providers" when it legislated concerning Indian healthcare. 40 F.4th at 506. HFS again rewrites Congress's words, repeating its mantra that "this provision, like section 1396u-2(f), defines the terms of an *MCO's contractual agreement* to pay providers" and "simply refers to the contract terms." Dkt. 99 at 26 (italics in original). But, again, Congress referred to Section u-2(f) in the 2009 Act as stating the "rule for prompt payment of providers," not "the rule for contract terms for MCOs"—as HFS would have it.

        d.     *The "alternate payment schedule provision."* The Original Ruling focused on the fact that Section u-2(f) provides that the 30-90 day payment requirement applies "unless the health care provider and the [Managed Care] organization agree to an alternate payment schedule." 40 F.4th at 507. The Original Ruling correctly stated that this reflects a "focus . . . on the individual provider." *Id.* It discussed the provision at length, and distinguished it from the requirement of aggregate compliance that led the Court in *Gonzaga* to conclude that Congress did not intend to create individual rights for students to challenge university privacy standards. HFS cannot square this provision with its arguments that Section u-2(f) merely states the required terms of the contract between the State and the MCOs or that the State need only look at overall, aggregate MCO performance in evaluating compliance with the Timely Payment Provision. Rather, the provision confirms that a provider's right to timely payment is an individual right that a *provider* can choose to change. HFS's Supplemental Brief omits any discussion of this provision or its implications, only quoting it in a footnote. Dkt. 99 at 17 n.5.

e.    *Provisions for State Oversight*. The Original Ruling discussed provisions of the Medicaid Act imposing reporting obligations on the States, and describing actions that the States can take in case of MCO non-compliance. It concluded that the "more coherent" reading of the reporting and enforcement sections is that Congress intended in the case of systemic non-payment that "the State would have an obligation to act under section 1396u-2(f) to secure providers' rights." 40 F. 4th at 510. HFS argues that the reporting and oversight provisions do not themselves impose enforcement obligations on the States or require the States to take any action. Dkt. 99 at 22-23. It also argues that the Original Ruling misreads certain of the provisions in various respects. *Id.* at 23-25.

But the Original Ruling did not say that these provisions alone generate an individual right to enforce timely payment. It said that the "more coherent" reason for Congress imposing reporting duties and granting enforcement options to States is because they "*support* the conclusion that Congress intended for states to try to ensure that the right to timely payment in section 1396u-2(f) is honored in real life." 40 F. 4th at 510. The key word is "support."

HFS never addresses this conclusion. Instead, it misreads the Original Ruling as basing the right to sue on the reporting and enforcement provisions. HFS dives into the minutia of reporting requirements and possible remedies. Dkt. 99 at 25. This focus misses the point of the provisions—if all that Congress intended was that the States include a contract term on timely payment, why provide for detailed reporting

11

and why describe the alternative sanctions that the States could impose? The Original Ruling answered that question:

> The more coherent reading of the statute as a whole is that Congress intended the State to engage in these reporting and oversight responsibilities, and if it becomes evident that MCOs are systematically not paying providers on a timely basis, then the State would have an obligation to act under section 1396u-2(f) to secure providers' rights. These mandatory oversight responsibilities would make little sense if that were not the case. The provision's mandatory language, coupled with the additional oversight and reporting responsibilities, supports the reading that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in practice.

40 F.4th at 510.

HFS chides the Original Ruling for applying this "coherent" reading, Dkt. 99 at 11, converting the Ruling's mention of coherence into an admission of statutory ambiguity. As the Original Ruling held, the various oversight provisions buttress the plain language of Section u-2(f). The statutory scheme is internally consistent, i.e., coherent.

## II. Individual Enforcement Under § 1983 Is Not "Incompatible" with any Statutory Enforcement Scheme.

While HFS refers repeatedly to "the contract-based enforcement scheme that section 1396u-2(f) expressly establishes," Dkt. 99 at 36, that "scheme" is a phantom that HFS never actually describes because, well, Congress never mentioned it. It does not exist. HFS simply asserts, early and often, that its contracts with MCOs require timely payment, and that it has unbounded discretion whether to seek to enforce that provision. Dkt. 99 at 3, 12, 23, 25, 27-30, 33, 35, 40-41. An assertion that it has a contract with MCOs that it might, or might not, choose to enforce, is not a

"comprehensive enforcement scheme" of the sort required to negate relief under § 1983. Rather, it merely recites a basic principle of contract law and argues that Corbin, not Congress, should control.

*Talevski* explained that Congress knows how to create a "comprehensive enforcement scheme" to preclude suit under § 1983. One way is to say so directly, expressly stating that any right it created shall not be enforced under § 1983. 599 U.S. at 186. That is express preclusion. "Absent such a sign, a defendant must show that Congress issued the same command implicitly, by creating *a comprehensive enforcement scheme* that is incompatible with individual enforcement under § 1983." *Id.* at 186 (cleaned up). That is implicit preclusion. The Original Ruling noted that implicit preclusion is "a difficult showing" for a defendant to make. 40 F.4th at 414. *Talevksi* did not change that. Indeed, by assigning the burden to the "defendant" to show that the enforcement scheme is both "comprehensive" in its own right *and* "incompatible" with § 1983 claims, *Talevski* confirmed that the showing is "difficult."

The hallmark of implicit preclusion "is incompatibility between enforcement under § 1983 and the enforcement scheme that Congress has enacted." *Talevski,* 599 U.S. at 187. The defendant must be able to "point[] to a comprehensive scheme" in the statute that is incompatible with individual enforcement:

> [Section] 1983 can play its textually prescribed role as a vehicle for enforcing those [statutory] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not "incompatible" with Congress's handiwork.

*Id.* at 188-89.

HFS does not come close to showing explicit or implicit preclusion. The first part is obvious and undisputed. As the Original Ruling noted, "HFS has not identified any express language in the Medicaid Act foreclosing private rights enforcement." 40 F.4th at 514.

HFS's failure to show implicit preclusion is also clear. Even now, HFS cannot explain how its contractual discretion to enforce, or not, timely payment constitutes a "comprehensive scheme," let alone one that is "incompatible" with § 1983 enforcement. Indeed, it's an enforcement whim, not an enforcement scheme, let alone a "comprehensive" one.

The closest HFS comes to addressing any possible inconsistency is not close at all. It cites *Rancho Palos Verdes v. Abrams,* 544 U.S. 113 (2005), and suggests that case found inconsistency because a claim under § 1983 would have given a plaintiff "a right to attorney's fees." Dkt. 99 at 37. But *Rancho Palos Verdes* involved much more. In *Talevski*, the Supreme Court described what was necessary to show a comprehensive scheme under *Rancho Palos Verdes* and prior cases:

> Each such statute [evidencing a comprehensive enforcement scheme] required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme before suing under its dedicated right of action. And each statute-specific right of action offered fewer benefits than those available under § 1983. Thus, in all three cases, § 1983's operation would have thwarted Congress's scheme coming and going: It would have circumvented the statutes' presuit procedures, and would have also given plaintiffs access to tangible benefits as remedies that were unavailable under the statutes.

599 U.S. at 189-90 (cleaned up).

14

None of those factors applies here. There is no statutory provision that requires "plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme." There are no "statute-specific" rights to sue that offer "fewer benefits than those available under § 1983." And suits under § 1983 "circumvent" no statutory procedure because there is no "statutory scheme" of any sort—only an open-ended discretion on the part of HFS to seek to enforce, or not, timely payments to providers.

Rather than address these missing elements, HFS erects and attacks a *faux* Original Ruling. It rewrites the Court's decision. That ruling, HFS says, found a right to sue under § 1983 because doing so provided more advantages to providers and was superior to discretionary enforcement by HFS, as if the Court was choosing its druthers. Dkt. 99 at 38. It would be more "convenient," "attractive or expedient." Dkt. 99 at 39-40. That was not, of course, the reasoning of the Original Ruling. *See* Saint Anthony's Supplemental Brief, Dkt. 92 at 25-26.

HFS also argues that permitting suit under § 1983 would "negate [its] discretion" and that "giving providers the ability . . . to force a State to take such action would negate that discretion . . ." Dkt. 99 at 40-41. But as the Original Ruling found, the Hospital's right to sue does not mean that HFS has no discretion for *how* to address the problem—the right simply means that HFS cannot *mis*use that discretion by doing nothing to address serious and ongoing violations of federal law. Finding guidance in the Court's prior decision in *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), the Original Ruling held that HFS must "do something" to address the

15

problem, and that HFS should and will have the opportunity to be a voice in determining what the "something" should be. 40 F.4th at 511-13.

HFS further claims that any § 1983 claim would require "proof that the MCO breached the timely payment provision in its contract with the provider" and the MCOs would have to be parties. Dkt. 99 at 42. According to HFS, the district court cannot resolve the Hospital's claims against it without trenching on the MCOs' rights to arbitrate disputes with providers. *Id*. at 43. The MCOs make much the same arguments: Any relief in the district court will supposedly require the trial of thousands of individual provider-MCO claims; Saint Anthony can only obtain relief against HFS by proving violations of the timely payment provisions by individual MCOs; and district court litigation would expose MCOs to "conflicting obligations or findings because it would allow different tribunals to conduct duplicative discovery, make potentially conflicting findings regarding the same set of facts, and impose potentially conflicting and inconsistent remedies based on those overlapping facts." Dkt. 97 at 4-6. That the MCOs embrace the *status quo*, in which HFS does nothing to police their disclosure and payment failures, is not surprising. Their claims are wrong for reasons discussed in Saint Anthony's Supplemental Brief, Dkt. 92 at 22-25.

## Conclusion

The Court should reinstate the substance of the Original Ruling, remand this case to the district court for further proceedings with regard to timely payment consistent with the Original Ruling, and reaffirm that the district court should address the Due Process claim now pending there as a result of that aspect of the

Original Ruling that was not the subject of the Petition for Certiorari or part of this supplemental briefing.

Dated: December 29, 2023                    Respectfully submitted,

                                            SAINT ANTHONY HOSPITAL

                                            By: */s/ Michael L. Shakman*

                                            *One of its attorneys*

                                            Michael L. Shakman
                                            Edward W. Feldman
                                            William J. Katt
                                            Mary Eileen Cunniff Wells
                                            MILLER SHAKMAN LEVINE & FELDMAN LLP
                                            30 West Monroe, Suite 1900
                                            Chicago, Illinois 60603
                                            Tel: (312) 263-3700
                                            mlshak@aol.com
                                            efeldman@millershakman.com
                                            wkatt@millershakman.com
                                            mwells@millershakman.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 4,449 words. This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

December 29, 2023                    */s/ Michael L. Shakman*
                                            *One of the attorneys for Plaintiff-Appellant*
                                            *Saint Anthony Hospital*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on December 29, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

December 29, 2023

*/s/ Michael L. Shakman*
*One of the attorneys for Plaintiff-Appellant*
*Saint Anthony Hospital*