In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2325

SAINT ANTHONY HOSPITAL,

*Plaintiff-Appellant,*

*v.*

ELIZABETH M. WHITEHORN, in her official capacity
as Director of the Illinois Department of
Healthcare and Family Services,

*Defendant-Appellee,*\*

*and*

MERIDIAN HEALTH PLAN OF ILLINOIS, INC., et al.,

*Intervening Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
On Remand from the Supreme Court of the United States.
No. 1:20-cv-02561 — **Steven C. Seeger**, *Judge.*

———————————

SUBMITTED DECEMBER 29, 2023 — DECIDED APRIL 25, 2024

———————————

---

\* We have substituted the new director as the named defendant pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Before WOOD, HAMILTON, and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. We first addressed this appeal in 2022, when we reversed in part the district court's dismissal of the case and remanded for further proceedings. *Saint Anthony Hospital v. Eagleson*, 40 F.4th 492 (7th Cir. 2022). Defendant petitioned for a writ of certiorari. The Supreme Court held the case while it considered *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023), which presented similar issues concerning the use of 42 U.S.C. § 1983 to enforce certain provisions in the Federal Nursing Home Reform Act amendments to the Medicaid Act. After deciding *Talevski*, the Court granted defendant's petition in this case, vacated our earlier decision, and remanded for reconsideration in light of *Talevski*. 143 S. Ct. 2634 (2023) (mem.). Such a "GVR" order calls for further thought, but it does not necessarily imply that the lower court's previous result should be changed. E.g., *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019); see generally *Lawrence v. Chater*, 516 U.S. 163, 166–70 (1996) (per curiam) (discussing GVR practices). Upon remand, the parties submitted statements of position and we ordered further briefing. We have taken a fresh look at the appeal in light of *Talevski*. We again reverse the dismissal of plaintiff's central claim and remand for further proceedings.

By way of introduction, in recent years, Illinois moved its Medicaid program from a fee-for-service model, where a state agency pays providers' medical bills, to one dominated by managed care, where the state pays private insurers to pay medical bills for Medicaid patients. Most patients of plaintiff Saint Anthony Hospital are covered by Medicaid, so Saint Anthony depends on full, timely Medicaid payments to keep its doors open and provide care to patients. Saint Anthony

says it is now in a dire financial state. Over four years from 2015 to 2019, it lost roughly 98% of its cash reserves, allegedly because managed-care organizations (MCOs) repeatedly and systematically delayed and reduced payments it was owed for treating patients covered by Medicaid managed care.

Saint Anthony contends in this lawsuit that Illinois officials owe it a duty under the federal Medicaid Act to act to push MCOs to make timely and full payments. In a thoughtful opinion, the district court dismissed the suit for failure to state a claim for relief. *Saint Anthony Hospital v. Eagleson*, 548 F. Supp. 3d 721 (N.D. Ill. 2021). We continue to see the case differently, however, especially at the pleadings stage. Under the standards of *Talevski* and related precedents, Saint Anthony has alleged a viable claim for relief under 42 U.S.C. § 1396u-2(f) and may seek injunctive relief under 42 U.S.C. § 1983 against the state official who administers the Medicaid program in Illinois. We appreciate the potential magnitude of the case and the challenges it may present. Like the district judge, we can imagine forms of judicial relief that would be hard to justify. We can also imagine some poor ways to handle this case going forward in the district court. But we should not decide this case by assuming that the worst-case scenarios are inevitable.

The State has tools available to remedy systemic slow and short payment problems—problems alleged to be so serious that they threaten the viability of a major hospital and perhaps even of the managed-care Medicaid program as administered in Illinois. If Saint Anthony can prove its claims, the chief state official could be ordered to use some of those tools to remedy systemic problems that threaten this literally vital

health care program. We therefore again reverse in part the dismissal of the case and remand for further proceedings.

I.  *Factual and Procedural Background*

In reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in Saint Anthony's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We are not vouching for the truth of Saint Anthony's account of the facts at this point. Rather, because the defense moved to dismiss on the pleadings, it chose to accept for now the truth of Saint Anthony's factual allegations.

A.  *The Illinois Medicaid Program*

The federal Medicaid Act established a cooperative arrangement between the federal government and states to provide medical services to poor residents. 42 U.S.C. § 1396 et seq.; *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 380 (7th Cir. 2020); see also *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 541–42 (2012). By agreeing to participate in Medicaid, a state receives financial assistance to help administer the program in exchange for complying with detailed statutory and regulatory requirements. *Bria Health Services*, 950 F.3d at 380. Those requirements are found in the Medicaid Act itself (Title XIX of the Social Security Act) and in Department of Health and Human Services (HHS) regulations. See *id.* at 380, 382; *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 771 (7th Cir. 2021).

Before discussing the relevant statutory requirements at issue here, it is important to understand how the Illinois Department of Healthcare and Family Services (HFS)

administers the State's Medicaid program. There are two major ways for states to pay providers for services provided to patients covered by Medicaid: fee for service and managed care. In a fee-for-service program, the state pays providers directly based on a set fee for a particular service. See 42 U.S.C. § 1396a(a)(30)(A); Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40989, 40989 (June 14, 2002). Under a managed-care program, by contrast, HFS contracts with MCOs (which are private health insurance companies) to deliver Medicaid health benefits to beneficiaries. See 42 U.S.C. § 1396u-2; see also 42 U.S.C. § 1396b(m); 42 C.F.R. § 438 (2020). The state typically pays the MCO a flat fee per patient per month. The MCO then pays providers for services actually provided to covered Medicaid patients. *Bria Health Services*, 950 F.3d at 381, citing 305 ILCS 5/5-30.1; see also 42 U.S.C. §§ 1396u-2, 1396b(m). Like insurance companies, MCOs are generally entitled to keep as profits the difference between the money they receive from the state and the amounts they pay providers for care of covered patients.

In recent years, Illinois has changed from fee-for-service to a system dominated by managed care. Illinois introduced managed care in its Medicaid program in 2006. In 2010, the State spent just $251 million on managed care. By 2019, that number had grown to $12.73 billion. In the meantime, the number of MCOs in Illinois has fallen from twelve to seven.

Federal law establishes requirements for timely Medicaid payments to health care providers. When a state pays claims directly, it must pay 90% of so-called "clean claims" within 30 days and 99% within 90 days. See 42 U.S.C. § 1396a(a)(37)(A). (A "clean claim" is one for which the payor has all

information needed to determine the proper payments. *Id.*)
When a state relies on MCOs to pay providers, federal law
requires that the state's contract with an MCO contain a pro-
vision that requires the same 30/90 pay schedule for MCO re-
imbursements to providers. 42 U.S.C. § 1396u-2(f). (MCOs
and providers can opt for a different pay schedule, but Saint
Anthony has not agreed to a different schedule with any
MCOs.) The focus of this case is the payment schedule provi-
sion, section 1396u-2(f).[1]

B. *Plaintiff Saint Anthony Hospital*

Saint Anthony is a so-called "safety-net hospital" on the
southwest side of Chicago. It provides health care regardless
of patients' financial means. See 305 ILCS 5/5-5e.1. Most Saint
Anthony patients are on Medicaid. As the Illinois Medicaid
system has shifted from fee for service to managed care, the
hospital has become ever more dependent on timely
payments from MCOs. In recent years, according to Saint
Anthony, those payments have repeatedly arrived late, if they
arrived at all. As of February 2020, payments of at least $20
million were past due. The impact of late payments can be
dramatic. In 2015, Saint Anthony had more than $20 million
in cash on hand, which was enough to fund 72 days of

[1] In earlier stages of the case, Saint Anthony argued it was also entitled
to relief under a separate Medicaid statute requiring a participating state
to "provide that all individuals wishing to make application for medical
assistance under the plan shall have opportunity to do so, and that such
assistance shall be furnished with reasonable promptness to all eligible
individuals…." 42 U.S.C. § 1396a(a)(8). We explained in our original opin-
ion, however, why Saint Anthony is not entitled to relief under that clause.
40 F.4th at 515–16. That clause was not part of the Supreme Court's review,
and we say no more about it here.

operation. As the State increased its reliance on managed care, Saint Anthony saw its cash reserves dwindle. By 2019, Saint Anthony had less than $500,000 cash on hand, enough to cover just two days of operation. Saint Anthony's net revenue per patient also dropped more than 20%.

The MCO payments that eventually arrive are often for less than is owed. Making matters worse from Saint Anthony's perspective, the payment forms it receives from the MCOs lack the details needed to determine just what is being paid and what is not. The delays and lack of clarity benefit the MCOs: since the State pays the MCOs flat fees per patient and permits them to keep the funds they do not pay out to providers, MCOs have a powerful profit incentive to delay and underpay hospitals like Saint Anthony. This incentive under managed care is inherent and well-known. The need to control MCOs' behavior to protect providers and patients explains why Congress included section 1396u-2(f) in the statutes governing managed care under Medicaid.

Saint Anthony may not be alone in its experience. Mercyhealth is a regional health-care system and the largest Medicaid provider in Illinois outside of Cook County. Illustrating the potential gravity of the MCO payment problems, in April 2020, Mercyhealth announced it would stop accepting Medicaid patients covered by four of the seven MCOs in Illinois. Decl. of Kim Scaccia ¶ 6, Dkt. 50-1, Ex. 12. This was a drastic step showing the potential threat to the viability of the managed-care model for Medicaid. Mercyhealth said it took this step because those MCOs were delaying and underpaying it to the point that it was losing $30 million per year on Medicaid patients. See also David Jackson & Kira Leadholm, *Insurance Firms Reap Billions in Profits While Doctors Get Stiffed for*

*Serving the Poor*, Better Government Association (Nov. 8, 2021), https://www.bettergov.org/news/insurance-firms-reap-billions-in-profits-while-doctors-get-stiffed-for-serving-the-poor/ (last visited April 25, 2024).[2]

Faced with this dire financial situation, Saint Anthony had two paths to seek legal relief from what it sees as systemic defects in the Illinois Medicaid program. One path would be to sue MCOs individually for violating Saint Anthony's contractual rights to timely payment. Arbitration provisions in those contracts might well require arbitration for each individual claim in dispute. That path could easily involve many thousands of individual claims each year, though that is a matter for the district court to consider when it takes up the MCO intervenors' effort to force all or parts of this dispute into arbitration. This suit represents the second path, seeking a court order to require Illinois officials to devise systems that will ensure that they perform the statutorily required oversight of MCOs' payments to providers like Saint Anthony.

## C.  *Procedural History*

Saint Anthony filed a complaint under 42 U.S.C. § 1983 against the director of HFS in her official capacity. (We refer to the director here as HFS or the State.) Count I, the only one relevant at this point, alleges that HFS is violating the

---

[2] In evaluating a Rule 12(b)(6) motion, we may consider the Mercyhealth information submitted by plaintiff without converting the motion into one for summary judgment under Rule 12(d). The information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Mercyhealth also reportedly worked out a compromise with one MCO, Molina, under which it continued to care for Molina-covered Medicaid patients. Decl. of Kim Scaccia ¶ 9, Dkt. 50-1, Ex. 12.

Medicaid Act, including section 1396u-2(f), by failing to ensure that MCOs meet the timely payment requirements. Saint Anthony seeks injunctive relief directing HFS to require the MCOs to comply with the 30/90 payment rule, to use transparent remittance forms, and if necessary, to require the State to cancel a contract with an MCO that continues to fail to comply with the timely payment requirements.[3]

HFS moved to dismiss Saint Anthony's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Its chief argument was that none of the statutory provisions grant Saint Anthony any rights enforceable under section 1983, and that even if they did, the factual allegations failed to state a plausible claim for relief. The district court agreed and dismissed the case. 548 F. Supp. 3d 721 (N.D. Ill. 2021).

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint by adding a due process claim. HFS responded to Saint Anthony's request, arguing that the new claim would fail on the merits. The district court denied Saint Anthony the opportunity to file a reply to defend its proposed claim on the merits. Then, four days after granting the motion to dismiss, the district judge denied the motion to supplement because he thought it was futile and that the entire case should be concluded by granting the motion to dismiss.

---

[3] Saint Anthony also moved for a preliminary injunction. The district court granted limited discovery before suspending in part actions related to the preliminary injunction motion while it resolved a discovery dispute. The court then granted the motion to dismiss and denied the preliminary injunction motion as moot.

In the district court, four MCOs were granted leave to intervene as defendants. The MCOs asked the court to stay the lawsuit and compel arbitration. One MCO (Meridian) demanded arbitration with Saint Anthony, but that proceeding was stayed because Meridian had not followed the proper procedures to invoke arbitration. The district court later denied the MCOs' motions as moot after granting the motion to dismiss.

Saint Anthony appealed the district court's dismissal and the denial of the motion to supplement. We first address Saint Anthony's asserted right to timely payment under section 1396u-2(f). To evaluate Saint Anthony's claim, we address in Part II-A the standard for invoking section 1983 under Spending Clause statutes like the Medicaid Act. We consider in Part II-B the *Talevski* standard and then in Part II-C walk through each of the so-called *Blessing* factors. In Part II-D, we turn to whether Congress established an alternative remedial scheme incompatible with the application of section 1983. We conclude by addressing in Part III the district court's denial of plaintiff's motion to supplement its complaint and the question of arbitration, which the MCOs ask us to resolve before the district court has done so.

II.  *A Right to Timely Payments*

The central issue here is whether 42 U.S.C. § 1396u-2(f) grants a right to providers like Saint Anthony that is privately enforceable through section 1983. We conclude that the statute imposes on the State a duty to try to ensure that the MCOs actually pay providers in accord with the 30/90 pay schedule—not merely that the contracts between the MCOs and HFS include clauses that say as much on paper. Congress imposed this affirmative duty on the State for the benefit of

health care providers like plaintiff. Congress provided sufficiently clear signals that this is both a duty for the State and a right for providers. Saint Anthony thus has a right under section 1396u-2(f) that is enforceable under section 1983. The right entails having state officials address MCOs' systemic failures to provide timely and transparent payments.

A. *The Standard for Invoking Section 1983*

We again emphasize that we are reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We begin by accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in Saint Anthony's favor. *Iqbal*, 556 U.S. at 678.

The analysis for possible enforcement of federal statutory rights under section 1983 is familiar. "Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States … of any rights, privileges, or immunities secured by the Constitution and laws.'" *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012), quoting 42 U.S.C. § 1983. This language "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), and "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). "'Laws' means 'laws,' no less today than in the 1870s…." *Talevski*, 599 U.S. at 172.

Yet not all statutory benefits, requirements, or interests are enforceable under section 1983. The Medicaid Act is an exercise of Congress's power under the Spending Clause. *Talevski* reinforced earlier precedents allowing rights under Spending

Clause legislation to be enforced under section 1983 but set a "demanding bar" for reliance on section 1983: "Statutory provisions must *unambiguously* confer individual federal rights." 599 U.S. at 180, citing *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002). *Talevski* summarized the Court's approach for determining when a statutory provision enacted under the federal spending power creates a right, privilege, or immunity enforceable under section 1983:

> *Gonzaga* sets forth our established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. [536 U.S.] at 283, 285–286; see also *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S., at 283 (emphasis deleted). This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id*., at 286.

> We have held that the *Gonzaga* test is satisfied where the provision in question is "'phrased in terms of the persons benefited'" and contains "rights-creating," individual-centric language with an "'unmistakable focus on the benefited class.'" *Id*., at 284, 287 (emphasis

deleted). Conversely, we have rejected § 1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and "serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290.

*Talevski*, 599 U.S. at 183–84; accord, *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (plaintiff seeking redress for alleged violation of federal statute through a section 1983 action "must assert the violation of a federal *right*, not merely a violation of federal *law*"). It is not enough to fall "within the general zone of interest that the statute is intended to protect" to assert a right under section 1983. *Gonzaga*, 536 U.S. at 283. Congress must have "*intended to create a federal right*," *id.*, and "the statute 'must be phrased in terms of the persons benefited' with 'an *unmistakable focus* on the benefited class.'" *Planned Parenthood of Indiana*, 699 F.3d at 973, quoting *Gonzaga*, 536 U.S. at 284.

Without the later guidance from *Talevski*, we and the district court had framed our earlier analyses under the so-called *Blessing* factors, taken from *Blessing v. Freestone*. Before diving in further, we need to address the status of *Blessing* and its factors after *Talevski*. Defendants argue that *Talevski* effectively displaced or even overruled *Blessing*. As noted, *Talevski* wrote that "*Gonzaga* sets forth our established method for ascertaining unambiguous conferral" of statutory rights that can support relief under section 1983. 599 U.S. at 183. That passage appeared in *Talevski* as the Court began to evaluate whether the disputed Medicaid provisions conferred federal rights.

*Talevski* did not cite *Blessing* in that portion of the opinion, nor did it disapprove of *Blessing*.

We do not see a fundamental difference between the *Talevski*/*Gonzaga* standard for unambiguous conferral of rights enforceable under section 1983 and the first and third *Blessing* factors, which require an intended benefit for the plaintiff and a binding obligation on the states. 520 U.S. at 340–41. Or to be more precise, we do not see a difference that would change the outcome of this case. *Talevski* teaches that "courts must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283, 285–86.

Given the way this case has evolved and the Court's instruction to reconsider in light of *Talevski*, the most prudent course is to analyze the key statutory provisions first under the instructions of *Talevski*. We do so next in Part II-B. Then, at some risk of redundancy, in Part II-C, we analyze the question again using the *Blessing* factors. In Part II-D, we consider whether Congress established another remedial scheme incompatible with using section 1983 in disputes like this.

B.  *Applying the Talevski Standard*

We start with the text of section 1396u-2(f), the provision central to this appeal:

> Timeliness of payment; adequacy of payment for primary care services. A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care

> providers for items and services which are sub-
> ject to the contract and that are furnished to in-
> dividuals eligible for medical assistance under
> the State plan under this subchapter who are en-
> rolled with the organization on a timely basis
> consistent with the claims payment procedures
> described in section 1396a(a)(37)(A) of this title,
> unless the health care provider and the organi-
> zation agree to an alternate payment sched-
> ule….

Section 1396u-2(f) cross-references sections 1396b(m) and
1396a(a)(37)(A). Section 1396b(m) describes the State's con-
tract with an MCO. Section 1396a(a)(37)(A) declares that a

> State plan for medical assistance must …
>
> (37) provide for claims payment procedures which
>
> (A) ensure that 90 per centum of claims for pay-
> ment (for which no further written information or
> substantiation is required in order to make pay-
> ment) made for services covered under the plan
> and furnished by health care practitioners through
> individual or group practices or through shared
> health facilities are paid within 30 days of the date
> of receipt of such claims and that 99 per centum of
> such claims are paid within 90 days of the date of
> receipt of such claims….

§ 1396a(a)(37)(A). We agree with Saint Anthony that section
1396u-2(f) grants providers a right to State procedures that
will ensure timely payment from the MCOs.

1. *Statutory Text*

The State's strongest argument against plaintiff's reliance on section 1983 is that section 1396u-2(f) does not use the term "right" or an equivalent, and that the State has done its job by ensuring that plaintiff has contractual rights it can enforce directly against MCOs. The absence of the word "right" is not conclusive, however. As noted, both *Talevski* and *Gonzaga* teach that courts "must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Talevski*, 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283, 285–86.

To begin, providers like Saint Anthony are the intended beneficiaries of the prompt payment term in section 1396u-2(f). The text requires states to ensure that the state's contracts with MCOs "shall provide" that the MCOs "shall make payment to health care *providers* … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 821 (7th Cir. 2017) ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [state] plan for … nursing facility services'?" (second alteration and omission in original) (quoting 42 U.S.C. 1396a(a)(13)(A)).[4]

---

[4] In our original decision, we rejected the State's argument that the term "health care providers" includes practitioners but not hospitals. 40 F.4th at 505–06. The State has not pressed the point further on remand, so we do not address it further in this opinion.

Section 1396u-2(f) grants providers a right, not merely a generalized benefit. It is here that we disagree with the district court. In granting the motion to dismiss, the court invoked *Gonzaga*, asserting that providers received only "a generalized 'benefit'" from section 1396u-2(f), which "isn't good enough" to constitute a right enforceable under section 1983. *Saint Anthony Hospital*, 548 F. Supp. 3d at 734, quoting *Gonzaga*, 536 U.S. at 283. The district court concluded that section 1396u-2(f) "itself does not entitle providers to much of anything, and does not contain any 'explicit rights-creating terms.'" *Id.*, quoting *Gonzaga*, 536 U.S. at 284. For its part, the State seems to adopt something like Justice Holmes' theory of contract, under which one party is free to breach as long as it is willing to pay damages to the other party. The State is claiming an unfettered right to decide whether to assert its contractual rights against MCOs, leaving providers like Saint Anthony to fend for themselves as best they can in the face of systemic and disabling breaches by MCOs.

We read the statute differently, considering the statutory text and its context and history. We read the Medicaid Act in general and section 1396u-2(f) in particular as ensuring that providers like plaintiff have contractual rights against MCOs, but also federal rights to have state officials use the State's contractual rights and do their jobs by implementing procedures and systems to ensure that MCOs actually make the promised timely payments.

*Gonzaga* provides a useful contrast regarding rights-creating language. In *Gonzaga*, a former student sued the university and an employee under section 1983 for allegedly violating his rights under the Family Educational Rights and Privacy Act (FERPA). Part of the statutory language at issue

directed the Secretary of Education that "'[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice'" of permitting the release of education records without parents' written consent. *Gonzaga*, 536 U.S. at 287 (alteration in original), quoting 20 U.S.C. § 1232g(b)(1); see also § 1232g(b)(2). That prohibited activity is allegedly what occurred in the case.

The Supreme Court concluded that Congress did not grant an individual whose interests were violated under FERPA a right enforceable through section 1983. Because the statutory provisions did not have an individualized focus, they failed *Blessing* factor one: "[The] provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, as in *Blessing*, they have an 'aggregate' focus, they are not concerned with 'whether the needs of any particular person have been satisfied,' and they cannot 'give rise to individual rights.'" *Gonzaga*, 536 U.S. at 288 (internal citation omitted), quoting *Blessing*, 520 U.S. at 343–44. The Court also highlighted that the Secretary of Education could take away funds only if the university did not *substantially* comply with the statutory requirements. This fact contributed to the understanding that the focus was on systemwide performance rather than individual instances of improper disclosure. *Gonzaga*, 536 U.S. at 279, 281–82. Finally, since FERPA's provisions spoke only to the Secretary and directed him or her to withdraw funding from schools that had a "prohibited policy or practice," the Court determined that their focus was "two steps removed from the interests of individual students and parents." *Id*. at 287 (internal citation and quotation marks omitted). The provisions therefore failed to confer an individual right enforceable under section 1983.

The opposite is true here. Section 1396u-2(f) is concerned with whether the needs of particular persons and entities—providers like Saint Anthony—have been satisfied. The statutory text specifies that the State "shall provide" that MCOs "shall make payment to health care providers … on a timely basis." 42 U.S.C. § 1396u-2(f). The focus of section 1396u-2(f) is not "two steps removed" from the interest of providers. Its focus is directly on the interest Saint Anthony asserts here: ensuring that providers receive timely payment from MCOs. And the provision is not concerned only with whether MCOs in the aggregate pay providers on the 30/90 pay schedule, but whether *individual* providers are receiving the payments in the timeframe promised.

We see this in the provision's close attention to provider-specific exemptions from the 30/90 pay schedule. Section 1396u-2(f) says that its mandate applies "unless the health care provider and the organization agree to an alternate payment schedule." It establishes a personal right to timely payment, which all providers are entitled to insist upon. Cf. *Planned Parenthood of Indiana*, 699 F.3d at 974 (Medicaid state plan requirement permitting all eligible recipients to receive medical assistance from the provider of their choice established "a personal right to which all Medicaid patients are *entitled*" but, implicitly, need not accept (emphasis added)). Either way, the focus is on the individual provider. The focus is not on whether MCOs in the aggregate substantially comply with the timely payment requirement. Section 1396u-2(f) is thus not just a benchmark for aggregate performance.

That conclusion finds support in our precedents under other Medicaid provisions. Section 1396a(a)(10)(A) provides that "[a] State plan for medical assistance must … provide …

for making medical assistance available … to [] all [eligible] individuals." We have held that the provision confers private rights to individuals enforceable under section 1983. See *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993); accord, *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (reaffirming *Miller*'s rights analysis after *Blessing* and *Gonzaga*). In *Miller*, we found it significant that the State was *required* to provide medical assistance to all eligible individuals. 10 F.3d at 1319. The same is true here, but with respect to timely payments to providers.

### 2. *Context and History*

The context and history of section 1396u-2(f) support finding a right enforceable under section 1983. Context and history are standard tools in construing statutes, of course, and *Talevski* and *Gonzaga* instruct courts to use them in answering such questions about applying section 1983. 599 U.S. at 183; 536 U.S. at 283–86.

Under the original fee-for-service model of Medicaid reimbursement, the State is responsible for making prompt payments to providers at reasonable rates. The 30-day/90-percent schedule for payments by MCOs in section 1396u-2(f) is incorporated from section 1396a(a)(37)(A), which imposes that mandatory schedule on State payments in the fee-for-service system. The State has no discretion to avoid making payments on that schedule, and that provision grants enforceable rights to providers like Saint Anthony. A few years before Congress adopted section 1396u-2(f) for managed care systems, the Supreme Court had decided *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990). *Wilder* held that the Boren Amendment, which required States to pay Medicaid providers rates that were "reasonable and adequate

to meet the costs of an efficiently and economically operated facility," created rights enforceable under section 1983 with declaratory and injunctive relief to require state officials' compliance. *Id*. at 510, 524.

Congress later repealed the Boren Amendment, but the reasoning of *Wilder* extends to the statutory provision governing the timing of payments of those rates, the fee-for-service prompt payment rule of section 1396a(a)(37)(A). See, e.g., *Appalachian Regional Healthcare v. Coventry Health & Life Insurance Co.*, 970 F. Supp. 2d 687, 697–99 (E.D. Ky. 2013) (denying summary judgment for state officials in section 1983 case to enforce section 1396u-2(f)); accord, *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 211–12 (4th Cir. 2007) (following *Wilder* and allowing use of section 1983 to enforce another Medicaid payment requirement under fee-for-service model); *New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Services*, 722 F.3d 527, 539–43 (3d Cir. 2013) (allowing use of section 1983 to enforce another Medicaid payment requirement under managed care); *Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 157 (2d Cir. 2014) (same); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74–75 (1st Cir. 2005) (same).

Section 1396u-2(f) and the other statutory provisions that enabled the dramatic expansion of managed care use in state Medicaid programs were part of legislation enacted seven years after *Wilder*, in the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997). Managed-care provisions began with section 4701 of the Act. 111 Stat. at 489. Section 1396u-2(f) was part of section 4708(c) of the Act. 111 Stat. at 506. Given the timing, when Congress extended the prompt payment rules of section 1396a(a)(37)(A) to managed care in

section 1396u-2(f), providers like Saint Anthony already had a recognized right to prompt payments. Under *Wilder*, they could enforce that right under section 1983 with declaratory and injunctive relief. We are aware of no indication that Congress intended to cut back on those rights in 1997 when it enacted section 1396u-2(f) to extend the prompt payment rule to managed care.

*Talevski* shows that courts should pay attention to statutory context when addressing these questions. A good example was the treatment of the requirement in *Talevski* that a nursing home give a resident and his or her family advance notice that the home intends to discharge the resident. That statutory requirement is not phrased in terms of a "right" to such notice. The Court observed, however, that it is "[n]estled in a paragraph" with the heading "transfer and discharge *rights*." 599 U.S. at 184–85. The requirement for notice is also phrased in terms of the resident's welfare, health, and needs, lending further and ultimately sufficient weight to the conclusion that the notice requirement was enforceable under section 1983. *Id.* at 185.

The prompt payment rule for managed care at issue here has similar indications of enforceable rights. In the Balanced Budget Act of 1997, which adopted section 1396u-2(f) and so many other managed care provisions, section 4708(c) was entitled: "Assuring Timeliness of Provider Payments." 111 Stat. at 506. This language signaled that Congress intended section 1396u-2(f) to "assure," i.e., to guarantee, timely payment to providers. That language of assurance further supports recognizing a right enforceable under section 1983.

That understanding is also consistent with later congressional action. In 2009 Congress enacted 42 U.S.C. § 1396u-2(h)

as part of the American Recovery and Reinvestment Act of 2009. See Pub. L. No. 111-5, 123 Stat. 115, § 5006(d) (2009). That subsection established special rules for "Indian enrollees, Indian health care providers, and Indian managed care entities." 123 Stat. at 507. Relevant to our purposes, section 1396u-2(h)(2)(B) cross-references section 1396u-2(f) and describes it as the "rule for prompt payment of providers":

> (2)  Assurance of payment to Indian health care providers for provision of covered services
>
> Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:
>
> …
>
> (B)  Prompt payment
>
> To agree to make prompt payment (*consistent with rule for prompt payment of providers under section 1396u–2(f) of this title*) to Indian health care providers that are participating providers with respect to such entity….

42 U.S.C. § 1396u-2(h)(2)(B) (emphasis added).

We recognize that *Wilder* may lie close to the outer edge of the line for section 1983 cases under Spending Clause legislation. Nevertheless, the Court was invited in *Talevski* to overrule *Wilder* and chose not to do so. Recognizing section 1396u-2(f) as creating rights enforceable under section 1983 does not

push the logic of *Wilder* or *Talevski* itself any further than the Court has already taken it.

Section 1396u-2(f) gives providers like plaintiff a right to have state officials do their jobs by assuring that MCOs make timely payments. Section 1396u-2(f) mandates that the State's contracts with the MCOs require the MCOs to pay providers on the 30/90 pay schedule. The State, however, asserts that section 1396u-2(f) does not impose a duty on the State even to try to ensure that MCOs actually do what their contracts say. The State's theory is that the statute requires only that a provision in the paper contract specify the timely payment obligation. The State may then, at its unfettered discretion, try to ensure the MCOs' compliance—or not. If MCOs fail to pay providers according to the 30/90 pay schedule, no matter how blatantly and systematically, the State contends it is free to do nothing. It may choose to leave providers to do their best to try to enforce their own contractual rights. In HFS's view, nothing in section 1396u-2(f) requires the State itself to do anything more to ensure prompt payment. Put differently, if the contract between an MCO and the State contains a clause ensuring timely payment for providers on the 30/90 pay schedule, the State contends it has met its duty under section 1396u-2(f), regardless of actual performance.

We do not read section 1396u-2(f) as permitting such a hands-off approach. Nor would a reasonable state official deciding whether to accept federal Medicaid money have expected she could take that hands-off approach to MCO payments to providers. Again, when interpreting statutes for these purposes, *Talevski* and *Gonzaga* teach us to "employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights'"

enforceable under section 1983. *Talevski*, 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283, 285.

When interpreting statutes, often the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473, 486 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). We must read texts "in their context and with a view to their place in the overall statutory scheme." *Id.*, quoting *Brown & Williamson*, 529 U.S. at 133; see also *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And to the extent possible, we must "ensure that the statutory scheme is coherent and consistent." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008). That's what the Supreme Court did in both *Talevski*, finding several rights of patients under the Medicaid Act enforceable under section 1983, and in *Gonzaga*, rejecting such rights claims under FERPA.

Interpreting section 1396u-2(f) as only a "paper" requirement conflicts with these principles of statutory interpretation. HFS is correct that Congress intended MCOs to "assume day-to-day functions previously performed by States under a traditional fee-for-service model." Appellee HFS's Br. at 30. But Congress did not intend for MCOs to go unsupervised.

It has long been obvious to all that under the managed-care system of Medicaid, MCOs have a powerful incentive to delay payment to providers for as long as possible and ultimately to underpay to maximize their own profits. It's a classic agency problem: MCOs are expected to act in the

providers' interests, but their interests are not the same. Regarding timely payments, they are in direct conflict.

The Medicaid Act contains several provisions to counteract that problem in addition to section 1396u-2(f). They help inform our understanding of the particular provision in dispute here.

The Act imposes reporting and oversight responsibilities on states that opt for the managed care model. For example, section 1396b(m)(2)(A)(iv) requires a state's contract with an MCO to permit the state "to audit and inspect any books and records" of an MCO related to "services performed or determinations of amounts payable under the contract." Section 1396u-2(c)(2)(A)(i) further specifies that a state's contract with an MCO must "provide for an annual (as appropriate) external independent review" of the "timeliness" of MCO "services for which the organization is responsible," including payments. The Medicaid Act thus requires HFS to take steps to monitor MCO payment activities to gather performance data and to understand how the system is functioning.

The Act further specifies that a state must establish provisions for imposing "intermediate sanctions" against an MCO—short of cancelling an entire, major contract—that the state can use when an MCO underperforms. 42 U.S.C. § 1396u-2(e). The State can put an MCO on a performance plan, for example. As discovery in this case revealed, HFS has taken that step with CountyCare, an MCO, after CountyCare paid only 40% of claims within 30 days and only 62% of claims within 90 days. The CountyCare case turned up evidence of the agency problem in action. The State found that CountyCare's Medicaid money was improperly diverted

from the Medicaid program to pay other county government bills rather than health care providers.[5]

In such a case, where an MCO has "repeatedly failed to meet the requirements" of its contract with the State and the requirements in section 1396u-2, "the State shall (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2)." 42 U.S.C. § 1396u-2(e)(3). Subparagraph (B) details the appointment of temporary management to oversee the MCO. 42 U.S.C. § 1396u-2(e)(2). Subparagraph (C) permits individuals enrolled with the MCO to terminate enrollment without cause. *Id.*

Federal Medicaid regulations add to the State's responsibilities here. For instance, 42 C.F.R. § 438.66(a) (2016) provides: "The State agency must have in effect a monitoring system for all managed care programs." Section 438.66(b)(3) specifies that the State's monitoring system "must address all aspects of the managed care program, including the performance of each MCO … in … [c]laims management." It's hard to imagine a more central aspect of claims management than timely payments. Saint Anthony alleges here that HFS is failing even to collect the required data on the timeliness of MCO payments.

These responsibilities support the conclusion that Congress imposed on states a duty to ensure that the right to

---

[5] As with the information mentioned above in note 2 about Mercyhealth, we may also consider the CountyCare information in evaluating the Rule 12(b)(6) motion without converting the motion into one for summary judgment. The information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky*, 675 F.3d at 745 n.1.

timely payment in section 1396u-2(f) is honored in real life. The State argues here that Congress intended to leave the issue of real-life effectiveness to the unfettered discretion of state and federal oversight authorities. But Congress chose language that makes timely payment more than just a paper requirement that would allow state officials to put the terms in their MCO contracts and then forget about them, leaving providers to fend for themselves.

The more coherent reading of the statute as a whole is that Congress intended the State to engage in these reporting and oversight responsibilities, and, if it becomes evident that MCOs are systematically not paying providers on a timely basis, to impose on the State an obligation to act under section 1396u-2(f) to secure providers' rights. These mandatory oversight responsibilities would make little sense if that were not the case. The provision's mandatory language, coupled with the additional oversight and reporting responsibilities, supports the reading that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in reality. Section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, unmistakably "phrased in terms of the persons benefited." *Id.* at 284, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13 (1979).

C.  *The Blessing Factors*

The foregoing analysis under *Talevski* is sufficient to support our bottom-line decision here. We reach the same result by applying the so-called "*Blessing* factors," which both we and the district court used to frame our earlier opinions:

> We have traditionally looked at three factors
> when determining whether a particular statu-
> tory provision gives rise to a federal right. First,
> Congress must have intended that the provision
> in question benefit the plaintiff. Second, the
> plaintiff must demonstrate that the right assert-
> edly protected by the statute is not so vague and
> amorphous that its enforcement would strain
> judicial competence. Third, the statute must un-
> ambiguously impose a binding obligation on
> the States. In other words, the provision giving
> rise to the asserted right must be couched in
> mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–41 (internal citations and quotations omitted). Under *Blessing*, if these three elements are satisfied, "the right is presumptively enforceable under section 1983." *Talevski v. Health & Hospital Corp. of Marion County*, 6 F.4th 713, 720 (7th Cir. 2021), aff'd sub nom. *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023). A defendant may overcome this presumption by showing that Congress shut the door to private enforcement, a question we address below in Part II-D. See *Talevski*, 599 U.S. at 186–89, citing among other cases *Gonzaga*, 536 U.S. at 284, and n.4, and *Blessing*, 520 U.S. at 347–48.

As we explained in our original opinion, section 1396u-2(f) grants providers a right to timely payment from the MCOs that the State must safeguard because the right satisfies all three *Blessing* factors. 40 F.4th at 505–14. First, providers are the intended beneficiaries of section 1396u-2(f). Second, enforcing the 30-day/90-percent pay schedule would not strain judicial competence. Third, the statute unambiguously

imposes a binding obligation on the State. We address each point in turn.

### 1. *Factor One: Intended Beneficiaries*

The first *Blessing* factor asks whether Congress intended section 1396u-2(f) to benefit providers like Saint Anthony and whether it intended that benefit to be a *right*, as distinct from a generalized entitlement. Both answers are yes.

On these questions, the *Blessing* test is congruent with the test set forth in *Talevski* and *Gonzaga*. First, providers are the intended beneficiaries of section 1396u-2(f). The text requires MCOs to contract that they "shall make payment to health care *providers* … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care*, 866 F.3d at 821 ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [state] plan for … nursing facility services'?" (second alteration and omission in original) (quoting 42 U.S.C. § 1396a(a)(13)(A)).

In applying the first *Blessing* factor, we also conclude that section 1396u-2(f) grants providers a right, not merely a generalized benefit, for the reasons explained above at pages 17–28. We need not repeat that discussion here. At bottom, section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, unmistakably "phrased in terms of the persons benefited," *id.* at 284, quoting *Cannon*, 441 U.S. at 692 n.13, and satisfies *Blessing* factor one.

### 2. *Factor Two: Administration*

*Blessing* factor two requires a plaintiff to show that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. *Blessing*, 520 U.S. at 340–41. This factor is not expressly a part of the Supreme Court's approach in *Talevski* and *Gonzaga*, but it surely is implicit. We doubt the Court would approve a section 1983 remedy to enforce a right so vague and amorphous as to strain judicial competence.

The State does not appear to have contested in this appeal whether section 1396u-2(f) satisfies this standard, nor could it. Saint Anthony argues that the State has been violating its right to timely payment by failing to abide by section 1396u-2(f)'s statutory mandate of trying to ensure that the MCOs are paying providers in line with the 30-day/90-percent pay schedule. Determining whether payments met the 30/90 pay schedule is "administrable," "fully capable of judicial resolution," and "falls comfortably within the judiciary's core interpretative competence." *Planned Parenthood of Indiana*, 699 F.3d at 974.

### 3. *Factor Three: Obligation*

The third *Blessing* factor asks whether section 1396u-2(f) unambiguously imposes a binding obligation on HFS. This requires answering two subsidiary questions: (1) what is HFS's duty under the statute, and (2) is that duty mandatory?

In a typical private right dispute, the emphasis is on the second question. See, e.g., *BT Bourbonnais Care*, 866 F.3d at 822. Section 1396u-2(f) plainly contains mandatory language: "A [State] contract … with a medicaid managed care organization *shall* provide that the organization *shall* make payment

to health care providers … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). The double use of "shall" rebuts the notion that the State's obligation is anything less than mandatory. For the reasons we explained above at pages 17–28, section 1396u-2(f) satisfies the third *Blessing* factor.

### 4. *Counterarguments*

#### a. *An Ambiguous Contract?*

HFS counters that the duty imposed by section 1396u-2(f) is at the very least ambiguous. HFS relies on *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), which taught that Congress may impose conditions on grants of federal money only if it does so "unambiguously" and "with a clear voice." In HFS's view, if Congress wanted to impose the significant duty on states that Saint Anthony advocates, it should have done so more explicitly. Section 1396u-2(f) is not a clear statement, it's ambiguous, and therefore cannot carry the weight Saint Anthony gives it. So says HFS.

We think Congress spoke sufficiently clearly here. The clear-statement rule explains that "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Central School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), quoting *Pennhurst*, 451 U.S. at 17. *Talevski*, particularly the portion addressing pre-transfer notice rights, shows that courts can use ordinary tools of statutory construction to decide whether Congress was sufficiently clear. See 599 U.S. at 184–86. The Court has made similar points in applying similar clear statement rules. In authorizing a waiver of federal sovereign immunity, for example, "Congress need not 'make its clear statement in a single section' adopted at a single moment in time." *Department*

*of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 54 (2024), quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 76 (2000). "[W]hat matters is whether Congress has authorized a waiver of sovereign immunity that is 'clearly discernible' from the sum total of its work." *Id.* at 54–55, quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023).

To determine whether Congress spoke clearly to create rights in this case, "we must view [section 1396u-2(f) and the Medicaid Act] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds." *Murphy*, 548 U.S. at 296.

A reasonable state official planning to launch a managed-care program would have understood that the state would have to try to ensure that providers receive prompt payment from MCOs. Such an official would not reasonably have concluded that Congress intended that the "rule for prompt payment of providers" be only a proverbial paper tiger. See § 1396u-2(h)(2)(B) (describing section 1396u-2(f) as the "rule for prompt payment of providers"). That conclusion would conflict with the state's oversight and reporting obligations and its enforcement duties under the Medicaid Act.

### b.  *Remedies and State Discretion in Enforcement*

HFS also argues that section 1396u-2(f) cannot impose this duty on the State because it "would negate[] section 1396u-2(e)'s express grant to States of discretion to seek termination of an MCO's contract for violating section 1396u-2[f] or its contract with the State." Appellee HFS's Br. at 27. The

argument highlights a key issue in this appeal and one that helps explain our disagreement with the district court.

Saint Anthony requested several forms of relief in its complaint. One of those was canceling a contract with an MCO that fails to pay on time after State intervention. HFS argues that forcing it to cancel a contract with an MCO because it did not meet the 30/90 pay schedule would infringe on the State's discretion to decide when it will terminate such a contract, which is expressly preserved by the statute. See § 1396u-2(e)(4)(A) ("In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract…."). In HFS's view, that means section 1396u-2(f) cannot impose a duty on HFS to ensure providers receive timely payment because it might require HFS to take action that is expressly reserved to its discretion.

We are inclined to agree with HFS that a district court could not force the State to cancel a contract with an MCO. Canceling a contract with any one of the seven MCOs in Illinois might well cause a "massive disruption" to the State's Medicaid program. Appellee HFS's Br. at 28. HFS and only HFS has the discretion to decide when and why it will invite that type of disruption. Section 1396u-2(e)(4)(A) is clear on that point. See also 42 C.F.R. § 438.708 (when states can terminate an MCO contract) and § 438.730 (CMS can sanction an MCO by denying payment). To the extent that Saint Anthony requests such relief, we doubt the district court has authority to impose it, though we need not answer that question definitively at this stage, on the pleadings. Perhaps sufficiently egregious facts might convince us otherwise, but that

question about a worst-case scenario can be addressed if and when it actually arises and matters.

c. *The Scope of Judicial Remedies*

Continuing with the theme of assuming the worst, HFS also argues that reading this duty into section 1396u-2(f) would lead to the district court acting effectively as the Medicaid claims processor for the State. In the State's parade of horribles, that's the prize-winning float. Given the practical difficulties in judicial enforcement that would come with recognizing a duty here, HFS contends, such a duty could not be what Congress intended. We agree that any form of retail-level relief, i.e., requiring the district court to adjudicate issues at the claim-by-claim level, would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony. A process that required a district judge to micro-manage claims would be inappropriate here.

These two limits on remedies in a section 1983 action—not turning the district court into a claims processor and not cancelling an MCO contract—do not persuade us, however, that we should affirm dismissal and deny all relief on the theory that the State has no duty at all to ensure timely payment under section 1396u-2(f). As noted, HFS can take a number of other steps at the system level to address chronically late and/or short payments by MCOs. Those actions could include a variety of "intermediate sanctions" under section 1396u-2(e)(2). Those and other actions would neither force the State to cancel an MCO contract nor turn the district court into a claims processor. If Saint Anthony can prove its claims of systemic delay and/or underpayment, we are confident that the

district court could craft injunctive relief to require HFS to do *something* to take effective action.

We draw helpful guidance on these issues of potential equitable relief from *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016). There, we affirmed a preliminary injunction against the HFS director in a suit brought by Medicaid beneficiaries who sought to enforce sections of the Medicaid Act requiring the State to find nurses to provide home nursing for children enrolled in Medicaid. HFS argued in *O.B.* that it had no obligation to find nurses (or to act at all). *Id.* at 842. We rejected that argument:

> Certainly the defenses thus far advanced by HFS are weak. The primary defense is that nothing in the Medicaid statute "required [HFS] to ensure that Plaintiffs would receive medical care from nurses in their homes." But it was HFS that decided that home nursing was the proper treatment for O.B., the other named plaintiffs, and the other members of the class.

*Id.* at 840 (alteration in original).

We recognized in *O.B.* the difficulties state officials faced in providing the needed nurses. There was no guarantee that compliance with the injunction would solve the plaintiffs' problems. In affirming the preliminary injunction, though, we explained that the injunction "should be understood simply as a first cut: as insisting that the State do *something* rather than nothing to provide in-home nursing care for these children." *Id.* at 842; see also *id.* at 844 (Easterbrook, J., concurring) ("All a district court can do in a situation such as this is require [the State] to start trying."). If Saint Anthony can prove its

claims of systemic delay and/or underpayment, the same is true here.

The State decided to switch from a fee-for-service model where the State itself was responsible for making timely and adequate payments to providers, to a Medicaid program dominated by managed care. The State cannot now claim it has no obligation to ensure that Medicaid providers serving patients under that program receive timely payment. *O.B.* instructs that where HFS has a duty, a district court may order it to do something when that duty is not being met, at least as a first cut. *Id.* at 842. The court may then need to supervise the effects of the injunction and the State's response and adjust the court's orders as circumstance and equity may require. The district court should not let the perfect become the enemy of the good, nor should the possibility that a first cut at an injunction might not work sufficiently justify a denial of any relief at all.

To be clear, we are not suggesting that an injunction ordering the State officials literally to do only "something" would be sufficient. Federal Rule of Civil Procedure 65(d)(1)(C) requires an injunction to "describe in reasonable detail … the act or acts restrained or required." At the same time, we have often recognized that district courts have substantial equitable discretion in crafting injunctions so that they are both understandable by those enjoined and effective to accomplish their purposes. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384–85 (7th Cir. 2018); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012), citing *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). If Saint Anthony can prove systemic failures by MCOs to comply with the 30/90 payment schedule

with reasonably transparent payment information, we would expect the district court to explore with the parties what steps State officials could reasonably be expected to take to correct those systemic failures before framing an appropriate and effective injunction. And if such an injunction later needed to be modified based on experience, the district court would have ample power to do so at the request of a party or on its own motion.

*O.B.* also makes clear that a district court can craft injunctive relief within its equitable powers and discretion even in circumstances where some more drastic remedial measures may be off the table. See *O.B.*, 838 F.3d at 844 (Easterbrook, J., concurring) (identifying certain forms of relief that were off limits while also instructing the district judge to try different things and to "keep tabs on what is happening and adjust the injunction as appropriate" to secure relief for plaintiffs); accord, *Rizzo v. Goode*, 423 U.S. 362, 376–77 (1976) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (internal quotations and citation omitted)). Federal Rule of Civil Procedure 54(c) offers relevant guidance here, providing that any final judgment other than a default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

The converse is also true. If a complaint demands relief that is not available, the improper demand does not poison the well to defeat relief to which the party is otherwise entitled. If Saint Anthony succeeds on the merits of its claims, we believe the district court here will be able to craft a remedy to

push the State toward complying with its duty to provide for timely and transparent payments to Saint Anthony.

We recognize that part of the rationale for adopting the managed-care model was to ease the State's administrative burden. Measures that would force HFS to take a more aggressive oversight role could reduce some of the administrative benefits the State hoped to gain by the switch to managed care. As we have explained, however, the Medicaid Act permits states to shift major Medicaid duties to MCOs but does not allow States to wash their hands of effective oversight. On the contrary, the Medicaid Act in general, and section 1396u-2(f) in particular, show that Congress recognized the troubling financial incentives inherent in a managed-care system and the need for effective oversight of MCOs and their treatment of providers' claims for payment. Recall that the Act requires the State's contracts with MCOs to include audit and inspection of MCO books and records, as well as annual external reviews of payment timeliness. The Act also requires the State to have available intermediate sanctions, short of cancelling the entire contract, that can be deployed if an MCO underperforms.

Saint Anthony alleges here that HFS is falling far short on those oversight and monitoring duties. HFS cannot avoid those duties altogether on the theory that Saint Anthony also asked for certain remedies that might not be available in this section 1983 action. If the State cannot manage to carry out those oversight and monitoring duties, an effective remedy to enforce the requirements would honor the bargain struck when Illinois accepted funding for Medicaid in the first place.

If Saint Anthony can prove its allegations, we do not view the judicial choice as a binary either-or: either the district

court must prepare to take over day-to-day claims management, or no judicial relief is available at all. The case is difficult, but the judicial options are not so limited.

First, the Medicaid Act and the relevant contracts recognize that perfection is not required. That much is clear from the 30/90 pay schedule itself: pay 90% of clean claims within 30 days and 99% within 90 days.

Second, HFS itself seems to be able to tell the difference between minor problems and systemic ones, and there is reason to think it can identify systemic measures that can be effective without having HFS (let alone the district court) take over day-to-day claims management. As noted above, for example, HFS took action against CountyCare based on data showing that CountyCare "was not regularly meeting" the 30/90 pay schedule. Decl. of Robert Mendonsa ¶ 16, Dkt. 86-10. HFS investigated, demanded that CountyCare adopt a "Corrective Action Plan," and reported that a few months after adopting such a plan, CountyCare "significantly reduced the number of outstanding claims that [were] older than 90 days." *Id*. ¶¶ 17–21. We need not and should not adopt a mathematical definition of "systemic" failures at the pleadings stage. That problem can await further factual development. (To use a metaphor often used in the law, a person can *usually* tell the difference between being in mountains, in foothills, or on a plain even if there is not a sharp boundary between mountains, foothills, and plains.)

For these reasons, we conclude that section 1396u-2(f) satisfies the third *Blessing* factor because the State has a binding obligation to try to ensure prompt payment for providers from MCOs.

### D. *An Alternative Remedial System?*

Since section 1396u-2(f) satisfies the *Talevski* requirement of an unambiguous statutory right and the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983. *Talevski*, 599 U.S. at 186. The Medicaid Act includes no express prohibition on enforcement under section 1983. The State contends, however, that a section 1983 remedy is implicitly barred because it would be incompatible with remedies available under the Medicaid Act itself. As the Court in *Talevski* explained, the burden is on the defendant to make such a showing. 599 U.S. at 186; accord, *Gonzaga*, 536 U.S. at 284 n.4. This is a "difficult showing." *Blessing*, 520 U.S. at 346.

*Talevski* explained that in the three cases where the Court has found that more specific statutory and administrative remedial schemes were incompatible with section 1983, the statutes (a) had their own statute-specific private rights of action, (b) had specialized administrative procedures for those remedies, and (c) offered remedies more limited than those under section 1983. 599 U.S. at 189–90, citing *Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), *Smith v. Robinson*, 468 U.S. 992 (1984), and *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981). None of those features are present in this case. That fact weighs heavily against finding implicit incompatibility here.

Still, if the MCOs are failing to abide by the contractual terms, says HFS, Saint Anthony should just enforce its own contracts with them. And providers like Saint Anthony are in the best position to "enforce their right to timely payment directly under their contracts with MCOs." Appellee HFS's Br. at 29. As HFS sees the matter, there is no need to permit

section 1983 actions to achieve Congress's goal of enabling Medicaid providers to receive timely payment.

A contractual remedy may offer some prospect of relief to a provider like Saint Anthony. But HFS has not convinced us that Congress meant to leave providers on their own, or with only such help as state officials choose to provide. In other words, HFS has not shown that "allowing [section] 1983 actions to go forward in these circumstances 'would be inconsistent with'" a "carefully tailored [Congressional] scheme.'" *Blessing*, 520 U.S at 346, quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989); accord, *Talevski*, 599 U.S. at 190. Rather, Congress intended the State's entire Medicaid plan to ensure timely payment to providers. If, as Saint Anthony alleges, the plan has been failing to meet this requirement, repeatedly and systematically, we would not be surprised if provider-MCO arbitrations would do little to correct that problem on a systemic basis.

There is good reason to doubt that contractual remedies alone can vindicate the provider's right to prompt payment. Saint Anthony files many thousands of Medicaid claims each year. If most claims are not paid on time, Saint Anthony's option under the contract is to sue the MCO and/or to submit each claim for arbitration. Many other Medicaid providers across Illinois might need to do the same with each of the seven MCOs. That avenue represents a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations. It's not immediately obvious that this dispute-resolution system would even be manageable, let alone superior to a systemic solution implemented by HFS. At the very least, we are not persuaded that Congress, implicitly through the contractual model,

created "a comprehensive enforcement scheme that is incompatible with individual enforcement under [section 1983]." *Gonzaga*, 536 U.S. at 285 n.4, quoting *Blessing*, 520 U.S. at 341; accord, *Talevski*, 599 U.S. at 190–91.

To sum up on the central question, for all of these reasons, we conclude that section 1396u-2(f) satisfies *Talevski*, *Gonzaga*, and *Blessing* and confers on plaintiff a right enforceable under section 1983 to have state officials use their powers to assure timely payments by MCOs. Saint Anthony has plausibly alleged a violation of the right that could, if proven, support injunctive relief. We therefore reverse the district court's dismissal of this claim.

We emphasize again, as in our earlier decision, that we are deciding this case only on the pleadings. This is a hard case with high stakes for the State, for Medicaid providers, and especially for Medicaid patients. There is one genuine binary choice in this case: whether to affirm dismissal of Saint Anthony's claims under section 1983 for failure to state a claim—no matter how egregious and systemic the MCOs' slow payments, no matter how little the State has done to ensure timely payments, and no matter how devastating the effects of the delays on Saint Anthony and its patients. The stakes for Saint Anthony are measured in millions of dollars. Looking more broadly, managed care contracts under Medicaid—with their inherent incentives to slow payments to providers—now control more than half of all Medicaid spending, hundreds of billions of dollars a year. Millions of Americans depend on that system for their health care.

Accordingly, we recognize the potential magnitude of the case. We also recognize the challenges it may present to the district court. If it turns out that resolving this dispute would

actually require the district court to analyze each late claim, effectively taking on the role of the State's Medicaid claims processors, or that effective relief could come only by canceling a contract with an MCO, then we may face a different situation. But we do not know at this point what direction the course of this litigation will take.

We should not decide today whether Saint Anthony has alleged a viable claim by assuming only the worst-case litigation scenarios will materialize down the line. If Saint Anthony can support its factual allegations about systematically late and inadequate payments, we expect the district court has sufficiently broad and flexible equitable discretion to fashion effective relief. The corrective action plan that HFS demanded from CountyCare may provide a starting point, adaptable to the circumstances of different MCOs.

III. *Additional Issues*

We have two issues left to discuss: the district court's denial of Saint Anthony's motion to supplement its complaint, and a possible stay in favor of arbitration.

A.  *Plaintiff's Motion to Supplement the Complaint*

While the motion to dismiss was pending in the district court, Saint Anthony moved to supplement its complaint with a claim for deprivation of property without due process of law. Saint Anthony alleged HFS violated its due process rights in two ways, both related to payment transparency: (1) by failing to notify Saint Anthony of the amounts being paid for services provided to Medicaid beneficiaries in the fee-for-service program; and (2) by failing to require MCOs to provide such notice in the managed-care program. Four days

after the district court dismissed the existing complaint, the court denied Saint Anthony's motion to supplement.

As a preliminary matter, there is an academic question whether this request should be construed as a motion to supplement under Federal Rule of Civil Procedure 15(d) or a motion to amend under Rule 15(a). Saint Anthony's motion sought to add allegations concerning both post-complaint events (most appropriate as a 15(d) supplement) and some pre-complaint events that came to light in discovery (most appropriate under 15(a)). The distinction between 15(a) amendments and 15(d) supplements is not important here. District courts have essentially the same responsibilities and discretion to grant or deny motions under either subsection. See *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996) ("[T]he standard is the same."); see also 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (3d ed. Supp. 2023) (lack of formal distinction between the two is "of no consequence," and leave should be freely granted when doing so will promote economic and speedy disposition of entire controversy and will not cause undue delay or unfair prejudice to other parties).

Ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases). The decision to deny the plaintiff such an opportunity "will be reviewed rigorously on appeal." *Id.* "Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave

to amend after granting a motion to dismiss." *Id.* at 519–20, quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). Reasons for denying leave to amend include "futility, undue delay, prejudice, or bad faith." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 417 (7th Cir. 2019).

The district court used a procedure here that ran a high risk of error. Saint Anthony requested leave to add the due process claim after minimal discovery and before the court ruled on the pending motion to dismiss. The court entered a minute order recognizing that "Rule 15(a)(2) provides that the 'court should freely give leave when justice so requires.'" It then ordered HFS to respond, even permitting an oversized brief. HFS responded by arguing the merits of the due process claim, saying in essence that the proposed amendment or supplement would be futile.

Futility could be a good reason to deny the amendment or supplement, but then the district court took a wrong turn. It denied Saint Anthony an opportunity to file a reply defending the merits of its proposed due process claim. The court then denied Saint Anthony's motion on futility grounds. This unusual procedure thus denied Saint Anthony a fair opportunity to defend the merits of its supplemental claim—only to lose on the supposed lack of merit. That procedure amounted to an abuse of discretion.

Other aspects of the district court's decision on that motion also point toward reversal. For instance, Saint Anthony's request to supplement the complaint occurred early in the lawsuit. See *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018) ("The usual standard in civil cases is to allow defective pleadings to be corrected, *especially in early stages*, at

least where amendment would not be futile." (emphasis added)). The district court did not find bad faith by Saint Anthony or prejudice to HFS.

The district court denied the motion in part because it concluded the new claim would expand the scope and nature of the case, which the court thought was "otherwise over." We do not find this rationale persuasive, especially after we have concluded that the case is not otherwise over. The due process claim against the State pertains to the lack of transparency in the Medicaid remittances, based at least in part on new information produced in the limited discovery. Saint Anthony alleged problems with the remittances in its original complaint, as HFS acknowledges. The new claim added issues related to the fee-for-service aspects of Illinois Medicaid, but that fact alone was not reason enough to deny leave so early in the life of a case and before discovery was in full swing. Courts should not be surprised, and should not respond rigidly, when discovery in a complex case turns up evidence to support a new theory for relief or defense.

In addition, by denying the motion to amend or supplement, the district court put Saint Anthony at risk of serious and unfair prejudice. To the extent the district court might have thought that the due process claim should be presented in a separate lawsuit, Saint Anthony could face serious problems with claim preclusion. See *Arrigo v. Link*, 836 F.3d 787, 798–80 (7th Cir. 2016).[6]

---

[6] In *Arrigo*, the first district court denied plaintiff's motion to amend the complaint to add a related claim, and we affirmed. Then, when the plaintiff tried to bring the claim in a new action, the second district court dismissed it. We upheld that decision, asserting that "allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the

At this stage of the proceedings, the only arguable ground for denying Saint Anthony's request to supplement its complaint would have been futility on the merits. The district court did say that it "ha[d] doubts about the legal sufficiency of Saint Anthony's proposed new claim." As noted above, the denial of a plaintiff's first attempt at leave to amend or supplement "will be reviewed rigorously on appeal." *Runnion*, 786 F.3d at 519. Doubts on the merits do not show futility. See, e.g., *id.* at 519–20; *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success."). We thus reverse the denial of Saint Anthony's motion to supplement its complaint.

---

denial of the untimely amendment, which we upheld, was intended to avoid." 836 F.3d at 800. We also stressed that "[t]o rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend." *Id.* In that sense, by prohibiting the supplemental claim here, the district court might have also prevented Saint Anthony from bringing that claim in a future case, all without the opportunity for Saint Anthony to defend the merits of the claim. HFS argues that Saint Anthony's concerns are misplaced because the district court implied that Saint Anthony could bring its due process claim in a future action. It is true that a district court can expressly reserve a claim for future adjudication, see, e.g., *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015); 18 Wright & Miller § 4413, but such an exception requires the second court to conclude the first court adequately preserved the claim. One could understand why such assurances from HFS, including its post-argument letter promising to forgo a claim preclusion defense in a separate lawsuit, might provide Saint Anthony limited comfort, especially since the district court's stated rationale was based at least in part on a supposed lack of merit.

B. *Arbitration*

The remaining issue is whether we should stay the case in favor of arbitration, as the intervening MCOs have requested. A necessary aspect of Saint Anthony's claim against HFS is showing that the MCOs systematically miss the 30/90 pay schedule. The MCOs dispute that allegation, however. They argue that under the contracts, each allegedly late claim presents a factual dispute that must be resolved in arbitration before Saint Anthony's case against HFS can proceed on the merits.

The district court did not address this issue. We declined to address it in the first instance when this appeal was first before us, and we do so again now. Both HFS and the MCOs have their distinct obligations to ensure timely payment for providers. While factual issues related to the MCOs appear intertwined with Saint Anthony's claim against HFS, they do not foreclose Saint Anthony's section 1983 action. Faced with chronic late payments, Saint Anthony is entitled to seek relief against HFS as well as against the MCOs.

*         *         *

To sum up, Saint Anthony has alleged a viable right under 42 U.S.C. § 1396u-2(f) to have HFS act to try to ensure timely payments from MCOs, and that right is enforceable in this section 1983 action against the HFS director. We REVERSE the dismissal of Count One. We AFFIRM the dismissal of Count Two, which sought to use section 1983 to assert rights under section 1396a(a)(8). We REVERSE the denial of Saint Anthony's motion to supplement, we DECLINE to stay the proceedings in favor of arbitration, and we REMAND for proceedings consistent with this opinion.

BRENNAN, *Circuit Judge*, dissenting. The Supreme Court recently underscored when a private right of action is cognizable under 42 U.S.C. § 1983: a statute must contain explicit rights-creating, individual-centric language. *Health and Hosp. Corp. of Marion Cty. v. Talevski*, ___ U.S. ___, 143 S. Ct. 1444, 1457 (2023). The provision of the Medicaid Act at issue here, 42 U.S.C. § 1396u-2(f), contains no such language. Even more, conferring a privately enforceable right under this statute would conflict with and defeat the contractual enforcement scheme Congress created for state monitoring and sanction of managed care organizations. Medicaid's timely-payment provision does not enable Saint Anthony and other providers to sue Illinois to enforce it, so I respectfully dissent.

## I

Much of this case's relevant factual background has not changed since our court's last decision. *St. Anthony Hosp. v. Eagleson*, 40 F.4th 492 (7th Cir. 2022). Saint Anthony maintains that it has not received timely Medicaid payments from multiple managed care organizations (MCOs). Yet, the hospital wants to address this dispute outside the means set forth in its contracts with those MCOs. Saint Anthony continues to argue that it can sue Illinois under 42 U.S.C. § 1396u-2(f) and 42 U.S.C. § 1983, forcing the state to proactively ensure that MCOs issue timely payments to hospital providers.

This dispute returns to us, though, with the applicable rules emphasized. The Supreme Court granted Illinois's petition for a writ of certiorari, vacated this court's original judgment in this case, and remanded for our reconsideration in light of *Talevski*. *Eagleson v. St. Anthony Hospital*, 143 S. Ct. 2634, 2634 (2023).

In *Talevski*, the Court considered whether certain provisions of the Federal Nursing Home Reform Act (FNHRA) could be enforced via a private right of action under § 1983. Revisiting and explaining the requirements governing whether statutory provisions are enforceable under § 1983, the Court ruled that the two FNHRA provisions at issue "unambiguously create § 1983-enforceable rights." *Talevski* 143 S. Ct. at 1450. At the jump, the Court noted the particularly "demanding bar" that must be met: "Statutory provisions must *unambiguously* confer individual federal rights." *Id.* at 1455 (emphasis in original). And *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), "sets forth our established method for ascertaining unambiguous conferral." *Id.* at 1457. The Court then described the *Gonzaga* test.

Under *Gonzaga*, courts must use "traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Id.* (quoting *Gonzaga*, 536 U.S. at 283, 285–86). The statute in question must be "phrased in terms of the persons benefited and contain[] rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Id.* (quotations marks omitted). If a statute contains the requisite language to mount this "significant hurdle," the statute "secures § 1983-enforceable rights." *Id.* (cleaned up).

Applying this test, the Court in *Talevski* concluded that the provisions of FNHRA at issue contained unambiguous, rights-creating, individual-centric language. Those provisions—concerning unnecessary restraint of nursing home residents and predischarge notice—"reside in 42 U.S.C. § 1396r,

which expressly concerns requirements *relating to residents' rights.*" *Id.* (emphasis in original) (cleaned up).

The Court began with the unnecessary-restraint provision, which "requires nursing homes 'to protect and promote … [*t*]*he right* to be free from … any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat *the resident's* medical symptoms.'" *Id.* at 1458 (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(1)(A)). The exceptions within that provision contain additional language "sustain[ing] the focus on individual residents," including permissive use of restraints "to ensure the physical safety *of the resident or other residents*." *Id.* (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)(I)).

FNHRA's predischarge-notice provision, the Court noted, contains "more of the same." *Id.* That provision, included in a paragraph "concerning 'transfer and discharge *rights*,'" *id.* (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(2)), mandates that nursing homes "must not transfer or discharge [a] *resident*," prior to fulfillment of certain preconditions. 42 U.S.C. § 1396r(c)(2)(A) (emphasis added). Any exceptions to the predischarge-notice provision maintain the required "unmistakable focus on the benefited class" that *Gonzaga* demands. *Talevski*, 143 S. Ct. at 1457. For example, discharges or transfers of nursing home residents must be "necessary to meet *the resident's* welfare." *Id* at 1458. (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(2)(A)). Because "[t]he unnecessary-restraint and predischarge-notice provisions use clear 'rights-creating language,' speak 'in terms of the persons benefited,' and have an 'unmistakable focus on the benefited class,'" the Court concluded that those particular provisions

are presumptively enforceable under § 1983. *Id.* at 1458–59 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290).

But "[e]ven if a statutory provision unambiguously secures rights, a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *Id.* at 1459 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). Such an intention can be expressed (1) explicitly in the text of the statute creating the right, or (2) implicitly by showing that Congress "creat[ed] 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* (quoting *Rancho Palos Verdes*, 544 U.S. at 120). To determine whether Congress implicitly intended to prevent enforcement through § 1983, the relevant "question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983." *Id.* That is, do the statute's text and context evince congressional intent for "a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert his claims.'" *Id.* (emphasis in original) (citation omitted).

Applying these precepts, the Court in *Talevski* "discern[ed] no incompatibility between the FNHRA's remedial scheme and § 1983 enforcement of the rights that the unnecessary-restraint and predischarge-notice provisions unambiguously secure." *Id.* at 1460. This was because FNHRA "lacks any indicia of congressional intent to preclude § 1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent." *Id.* Rather, the Court deemed FNHRA unlike other statutes it had previously examined, which "required plaintiffs to comply with particular procedures and/or to exhaust particular administrative

remedies under the statute's enforcement scheme" before filing suit. *Id.* at 1461 (quotation marks omitted) (discussing *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981); *Rancho Palos Verdes*; and *Smith v. Robinson*, 468 U.S. 992 (1984)). "[I]n all three cases, § 1983's operation would have thwarted Congress's scheme … circumvented the statutes' presuit procedures, and would have also given plaintiffs access to tangible benefits as remedies that were unavailable under the statutes." *Id.* (quotation marks omitted).

The Court concluded, "the test that our precedents establish leads inexorably to the conclusion that the FNHRA secures the particular rights that Talevski invokes without otherwise signaling that enforcement of those rights via § 1983 is precluded as incompatible with the FNHRA's remedial scheme." *Id.* at 1462.[1]

## II

Applying this *Gonzaga* framework here, § 1396u-2(f) is not enforceable under § 1983. The text and context of the provision do not unambiguously confer an individually enforceable right. *See Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (holding that Congress must speak "unambiguously … with a clear voice" in Spending Clause

---

[1] The majority opinion in *Talevski* cites *Blessing v. Freestone*, 520 U.S. 329 (1997), only once, and without further discussion, for the proposition that some statutes will permit § 1983 enforcement alongside a detailed enforcement regime so long as they are not incompatible. 143 S. Ct. at 1460.

The only other mention of *Blessing* in *Talevski* is in a dissenting opinion, agreeing with the majority "that there is no room for 'a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not.'" *Id.* at 1484 (Alito, J., dissenting) (quoting *Gonzaga*, 536 U.S. at 286).

legislation—like the Medicaid Act—before imposing obligations on the states). Even if it did, such a right is inconsistent with the Medicaid Act's contractual enforcement scheme.

## A

Section 1396u-2(f), referred to as the timely-payment provision, governs contracts between states and MCOs. It states in relevant part:

> A contract under section 1396b(m) of this title with a Medicaid managed care organization shall provide that the organization shall make payment to health care providers … on a timely payment basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the healthcare provider and the organization agree to an alternate payment schedule … .

Section 1396a(a)(37)(A) provides a default payment schedule to be included in contracts between states and MCOs, requiring MCOs to furnish payment to providers for 90% of clean claims within 30 days and 99% of clean claims within 90 days.

Section 1396u-2(f) does not grant providers like Saint Anthony an individual enforcement right. Neither § 1396u-2(f) nor § 1396a(a)(37)(A) contains the clear, rights-creating language necessary to show that Congress "manifests an 'unambiguous' intent to confer individual rights" upon providers to pursue private enforcement of the timely-payment provision under § 1983. *Gonzaga*, 536 U.S. at 273–74 (quoting *Pennhurst*, 451 U.S. at 17).

Unlike the unnecessary-restraint and predischarge-notice provisions in *Talevski*, which expressly granted nursing home

residents specific rights, § 1396u-2(f) and § 1396a(a)(37)(A) do not mention rights. Nor does the timely-payment provision impose any duty on states (or grant providers a corresponding right) to guarantee that MCOs consistently make prompt payments. The provision requires only that a state's contract with an MCO contain language that payments will comply with either § 1396a(a)(37)(A)'s 30-day/90-day payment schedule or some agreed upon alternative.

Saint Anthony responds by citing to the only two Supreme Court cases since *Pennhurst* to hold that a Spending Clause statute confers a § 1983-enforceable right. *See Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987), and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990).

*Wright* addressed whether a rent ceiling statute for low-income housing appended by amendment to the Housing Act of 1937 was § 1983-enforceable. 479 U.S. at 419. The dispute arose when the Housing Authority allegedly overcharged for utilities, which the statute defined as part of a tenant's rent. *Id.* at 420–21. The relevant statute read, "[a] family shall pay as rent for a dwelling unit assisted under this chapter" amounts defined by statute. *Id.* at 420 n.2. As *Gonzaga* acknowledged, the Court held in *Wright* that the rent ceiling statute was enforceable under § 1983 because "Congress spoke in terms that 'could not be clearer' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights.'" 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 432). The Court also found persuasive the Housing Act's lack of procedure "by which tenants could complain to [Housing and Urban Development] about the alleged failures of [a public housing authority] to abide by [the Act's rent-ceiling provision]." *Wright*, 479 U.S. at 426.

In *Wilder*, the Court set out to answer whether the Boren Amendment to the Medicaid Act—a reimbursement provision—could be enforced by a private cause of action under § 1983. 496 U.S. at 501–02. As *Gonzaga* recognized, the Court in *Wilder* analogized the Boren Amendment to *Wright*'s rent-ceiling provision, as both "explicitly conferred specific monetary entitlements upon the plaintiffs." *Gonzaga*, 536 U.S. at 280. In addition, regulations requiring states to adopt an appeals procedure for individual providers to obtain review of reimbursement rates was not "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." *Wilder*, 496 U.S. at 522.

Saint Anthony argues that the statutes at issue in *Wright* and *Wilder*—which contain less precise language than § 1396u-2(f) and omit the term "rights" altogether—still conferred a § 1983-enforceable right. But *Wright* and *Wilder* predate *Gonzaga's* requirement that a statute must contain explicit "rights-creating" language to unambiguously confer a private cause of action under § 1983. *Gonzaga*, 536 U.S. at 284, 287. The two cases also predate the Court's "reject[ion of] attempts to infer enforceable rights from Spending Clause statutes." *Gonzaga*, 536 U.S. at 281; *see also Suter v. Artist M.*, 503 U.S. 347, 363 (1992) (holding that a provision in the Adoption Assistance and Child Welfare Act of 1980 is not § 1983-enforceable); *Rancho Palos Verdes*, 544 U.S. at 127 (holding that limitations on local zoning authority included in the Telecommunications Act of 1996 do not confer an individual enforcement right under § 1983). These more recent cases reaffirm that "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government

to terminate funds to the State." *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 28).

Without any rights-creating, individual-centric language in § 1396u-2(f), the majority opinion turns to three other provisions of the Medicaid Act, looking for an unambiguous conferral of a § 1983-enforceable right. But if other statutes are needed to show that the timely-payment provision is not ambiguous, how did Congress "unambiguously confer" the claimed individual right within "the provision in question?" *Talevski*, 143 S. Ct. at 1457. These three other provisions— § 1396u-2(c)(2)(A)(i), § 1396u-2(h)(2)(B), and § 1396b(m)(2)(A)(iv)—also do not extend as far as the majority option concludes.

The first, § 1396u-2(c)(2)(A)(i), requires certain language in state contracts with MCOs. The contracts must "provide for an annual … external independent review … of the quality of outcomes and timeliness of, and access to, the items and services for which the organization is responsible under the contract." 42 U.S.C. § 1396u-2(c)(A)(i). This says nothing about rights, much less anything about the focus of this suit: MCO payments to providers.[2]

The second, § 1396u-2(h)(2)(B), is a timely-payment provision that applies to contracts between states and MCOs concerning managed-care programs for Indian health care providers. It requires that MCOs "agree to make prompt

---

[2] An argument that "items and services" can be construed to mean payments is defeated by language elsewhere. That phrase refers to the medical services and supplies provided by providers to the individuals they treat. *See, e.g.*, 42 U.S.C. §§ 1396u-2(a)(5)(B)(4), 1396u-2(d)(1)(A)(ii), 1396u-2(e)(1)(A)(i), 1396u-2(h)(4)(D).

payment" to Indian health care providers "consistent with" § 1396u-2(f)'s rule for prompt payment. 42 U.S.C. § 1396u-2(h)(2)(B). So, it operates exactly as § 1396u-2(f), just in the Indian health care context. It requires contracts between states and MCOs to contain language dictating that MCO payments to providers will comply with the 30-day/90-day payment schedule or with some other agreed upon schedule.

The majority opinion also notes that this second statute, § 1396u-2(h)(2)(B), refers to § 1396u-2(f) as the "rule for prompt payment of providers." For my colleagues, such a title supports a conclusion that Congress intended § 1396u-2(f) to guarantee timely payment to providers by imposing a binding obligation on states to enforce MCO payment schedules. "But headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528 (1947). This title is especially unhelpful because it does not clarify whether § 1396u-2(f) is an administrative requirement that a managed contract included deadlines, or a rule that imposes a privately enforceable, managerial duty on states to guarantee all MCO payments are timely.[3] A passing reference in § 1396u-2(h)(2)(B) to the provision in dispute fails to alter the plain meaning of the text in § 1396u-2(f).

---

[3] The same critique applies to the majority opinion's reliance on the title of § 4708(c) of the Balanced Budget Act of 1997—"Assuring Timeliness of Provider Payments." Pub. L. No. 105-33, 111 Stat. 251, 506. In fact, reliance on section titles in the Balanced Budget Act may point towards a determination that § 1396u-2(f) is merely an administrative requirement. Section 4708 itself is entitled "Improved Administration." *Id.*

The third, § 1396b(m)(2)(A)(iv), mandates specific provisions in state contracts with MCOs. It requires these contracts to "provide[] that … the State … shall have the right to audit and inspect any books and records" of MCOs "pertain[ing] … to services performed or determinations of amounts payable under the contract." 42 U.S.C. § 1396b(m)(2)(A)(iv). This provision expressly mentions a "right." But it is *Illinois's* right—not any individual provider's—to audit and inspect MCO books and records. And as discussed below, this provision is more congruent with the Congressionally created, contract-based enforcement scheme through which states may monitor MCO compliance and sanction bad actors.

Relying on these three other Medicaid provisions proves too much. Granting states oversight of MCOs could serve several purposes, but one of them is not to legislatively require Illinois to enforce the prompt payment provision through anything other than the contractual enforcement mechanisms provided in the Medicaid Act. *See infra* II.B. Imposing reporting and oversight responsibilities does not show that Congress prescribes a privately enforceable duty on states to guarantee that healthcare providers are timely paid. None of these statutes contains any language meeting the requirements of *Gonzaga*.

The majority opinion also turns to circuit precedent interpreting another Medicaid statute, § 1396a(a)(10)(A). That provision requires state plans for medical assistance to "provide … for making medical assistance available … to [] all individuals" who meet certain eligibility requirements. Twice this court has concluded that that provision confers a right enforceable under § 1983. In *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir. 1993), this court held that Medicaid

recipients have a right of action to "challenge the reasonableness of a state's decision regarding the medical necessity of a life saving procedure." After *Blessing* and *Gonzaga*, the holding in *Miller* was reaffirmed in *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012).

But these precedents do not bear the weight the majority opinion would have them carry. Though *Bontrager* reaffirmed *Miller*, the *Blessing* test was top of mind. *See id.* ("Generally, we consider three factors to determine if a statute creates an enforceable right."). And *Miller* relied on *Wilder* and the same three factors that became the *Blessing* test. 10 F.3d at 1319–20. But we now know—not just generally, but after a vacate and remand of our previous decision in this same case—that *Gonzaga*'s text-rooted approach is to be applied to identify whether a statute grants a § 1983-enforceable right. *Talevski*, 143 S. Ct. at 1457. So, *Miller* and *Bontrager* do not help the hospital.

Rather than apply the *Gonzaga* test as explained in *Talevski*, Saint Anthony argues that (1) *Talevski* did not overrule *Blessing*, and (2) our court's original ruling, particularly its application of the *Blessing* factors to find an individually enforceable right in § 1396u-2(f), is consistent with *Talevski*.[4] The majority opinion agrees with the first proposition. And though it now supplies a *Gonzaga* analysis, the majority opinion accedes to the second by continuing to apply the *Blessing* factors.

---

[4] Saint Anthony now asserts in its Supplemental Reply Brief that this court's original decision "applied the same rule as *Talevski*." If that was correct, there would have been no need for a GVR.

Saint Anthony's first point is correct—*Talevski* does not say that *Blessing* is no longer good law.[5] But Saint Anthony's second assertion falters. Even if a marginalized *Blessing* survives, *Talevski* expressly and repeatedly looks to and applies *Gonzaga* and its principles—not *Blessing*—to decide whether a federal statute confers a § 1983-enforceable right. "*Gonzaga* sets forth our established method for ascertaining unambiguous conferral." *Talevski*, 143 S. Ct. at 1457. After *Talevski*, *Blessing* and its factors are severely diminished as a means to determine whether there is a privately enforceable right. In *Gonzaga* the Court named *Blessing* as an example of past Supreme Court opinions "suggest[ing] that something less than an unambiguously conferred right is enforceable by § 1983." 536 U.S. at 282. *Gonzaga* "reject[ed] the notion" that the law "permit[s] anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283; *see also id.* at 286 (addressing separation of powers concerns and stating, "we fail to see how relations between the branches are served by having courts apply a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not.").

Saint Anthony also characterizes *Talevski* and *Gonzaga* as "best understood as reformulating *Blessing* factors 1–2 into a single statement that captures the plaintiff benefit and clear

---

[5] Doubts exist about *Blessing*'s continued validity post-*Talevski*. *Fed. L. Enf't Officers Ass'n v. New Jersey*, 93 F.4th 122, 128–130, n.4 (3d Cir. 2024) (applying *Gonzaga* and holding that the Law Enforcement Officers Safety Act of 2004 confers an individually enforceable right to qualified retired law enforcement officers under § 1983, conducting *Blessing* analysis in a footnote, and noting that "recent Supreme Court authority casts doubt upon the continued application of the *Blessing* factors.").

right factors" and "clarifies that the *Blessing* standard requires the court to find that Congress granted a 'right' and not just a 'benefit.'" The majority opinion views the *Blessing* standard otherwise, as my colleagues "do not see a fundamental difference between the *Talevski*/*Gonzaga* standard … and the first and third *Blessing* factors." Regardless of what may survive of *Blessing*, neither the text nor context of §1396u-2(f) grants a § 1983-enforceable right.

The inquiry should end here. The timely-payment provision does not satisfy the *Gonzaga* requirements, reaffirmed in *Talevski*. Section 1396u-2(f)'s text does not contain "rights-creating, individual-centric language" from which to conclude that Congress unambiguously conferred a privately enforceable right under § 1983.

**B**

Even if the text of § 1396u-2(f) unambiguously secures rights actionable under § 1983, those rights would be incompatible with the comprehensive, contractual enforcement scheme of the Medicaid Act. That Act contains no express prohibition against enforcement of the timely-payment provision under § 1983. So, the relevant "question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983." *Talevski*, 143 S. Ct. at 1459. That is, do the statute's text and context evince congressional intent for "a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert his claims.'" *Id.* (emphasis in original) (citation omitted).

As noted above, Congress grounded the state-MCO relationship in contract. Under its Spending Clause power, Congress imposes many requirements that must be included in

state contracts with MCOs. Along with those requirements, Congress provides states with an enforcement mechanism that requires MCO compliance with those contracts. This mechanism gives states broad discretion in how they enforce the contractual obligations of MCOs.

The mechanism for this discretionary enforcement is § 1396u-2(e). It requires states to establish certain "intermediate sanctions" before entering into a contract with any MCO. 42 U.S.C. §§ 1396u-2(e)(1)(A), (e)(2)(A)–(E). A state "may impose" these sanctions when an MCO acts in a manner prohibited under the section 42 U.S.C. § 1396u-2(e)(1)(A)(i)–(v). And where an MCO fails to meet its contractual obligations, states "have the authority to terminate such contract[s]." 42 U.S.C. § 1396u-2(e)(4)(A).

For my colleagues, more is required than § 1396u-2(e)'s contractual enforcement mechanism to rebut the presumption that § 1396u-2(f) confers an enforceable right for prompt payment to providers. That is because, they posit, this mechanism lacks the characteristics that *Talevski* said show incompatibility with § 1983. Those characteristics are the inclusion of "statute-specific private rights of action," requiring compliance with particular administrative remedies before filing suit under that right of action, that "offered fewer benefits than those available under § 1983." *Talevski*, 143 S. Ct. at 1461 (citing *Rancho Palos Verdes*, 544 U.S. at 120–23; *Smith*, 468 U.S. at 1008–1013, and *Sea Clammers*, 453 U.S. at 6–7, 19–21). In those three cases, "§ 1983's operation would have thwarted Congress's scheme coming and going: It would have circumvented the statutes' presuit procedures, and would have also given plaintiffs access to tangible benefits as remedies that were unavailable under the statues." *Id.* (cleaned up).

But the Medicaid statutory scheme here includes these characteristics, and § 1983's operation here would thwart Congress's scheme. Section 1396u-2(f) enables a healthcare provider like Saint Anthony to privately enforce their contractual rights against MCOs directly through arbitration or litigation. Recall that Saint Anthony has a direct vehicle to press its arguments about nonpayment of claims. The hospital has contracts with MCOs, each of which contains a bargained-for arbitration clause. And even before the initiation of dispute resolution, either in the courts or before an arbitrator, a state has the Congressionally provided tools described above—intermediate sanctions and, if necessary, termination of its contract with an MCO. To *also* provide a § 1983-enforceable right would give providers a new benefit (a "systemic" remedy, as the majority opinion crafts it) that is not otherwise available.

The contractual enforcement mechanism provided to states cannot stand alongside the § 1983-enforceable right Saint Anthony divines for itself. Such a right would strip the discretion Congress has provided to Illinois to decide for itself when and how it will enforce an MCO's contractual obligation. To find a § 1983-enforceable right here would render the contractual scheme superfluous. *See Smith* 468 U.S. at 1011 (finding "it difficult to believe" that the [Education of the Handicapped Act's] comprehensive procedures and guarantees plus Congress's "express efforts" to give local and state agencies the primary responsibility to provide accommodations to handicapped children rendered a § 1983-enforceable right anything other than "superfluous"); *see also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012) ("If possible … every provision is to be given effect … None should needlessly be given an interpretation that causes it … to have no consequence").

## C

Finding a § 1983-enforceable right within the text of § 1396u-2(f) refuses to accept the burdens this holding will place on Illinois and the judiciary. Creating and conferring this individual right will turn trial courts into "de facto Medicaid claims processors for states," regardless of an attempt to limit the holding to systemic MCO noncompliance—a limit discussed nowhere in § 1396u-2(f) or surrounding provisions. *See St. Anthony Hosp. v. Eagleson*, 40 F.4th 492, 522 (7th Cir. 2022) (Brennan, J., dissenting), *cert. granted, judgment vacated sub nom. Eagleson v. St. Anthony Hosp.*, 143 S. Ct. 2634 (2023). Before even reaching the merits of a provider's § 1396u-2(f) claims, district courts will need to decide what is and what is not a "systemic" failure to provide timely payment to providers—without any statutory or judicial directive.

The majority opinion promises district courts that they will not need to "adjudicate issues at the claim-by-claim level"—a task my colleagues concede "would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony." But a district court cannot decide if an MCO has violated this new "systemic" standard if it does not examine claims for untimely payments on the merits. Whether the payment schedule even applies to a group of payment claims cannot be decided without evaluating the nature, timeliness, and merits of those claims, rendering district courts the new Medicaid claims processors for the states.

Moreover, without inspecting whether the individual claims are being paid on time, a district court has no metric by which to gauge the effectiveness of, or a state's compliance with, injunctions designed to ensure timely payment.

Pointing to *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), the majority opinion highlights that all the district court must require is that the State do "something." But my colleagues recognize that such a remedy is appropriate only "[i]f Saint Anthony can prove its claims of systemic delay and/or under-payment," which necessarily involves adjudicating the underlying claims on the merits.[6]

The majority opinion requires district courts to perform the arduous task of deciphering whether a healthcare provider has met an unclear standard. It is not shy about what success looks like here for Saint Anthony and future litigants: requiring states to "devise systems" to ensure MCO compliance. What those "systems" look like or how they operate is anybody's guess—Congress did not speak to them in the contract-based enforcement scheme it enshrined in statute. As a consequence, "day-to-day" functions and enforcement are returned to the states—the precise type of fee-for-service management that MCOs were designed to avoid.

\*      \*      \*

In sum, the majority opinion's interpretation of § 1396u-2(f) finds no support in the statute's text, contravenes other provisions of the Medicaid Act, and misapplies governing

---

[6] *O.B.* is distinguishable. There, the statutory text of 42 U.S.C. § 1396a(a)(10)(A) imposed a duty on the State to make "medical assistance" available, which this court determined included providing nurses for children. 838 F.3d at 842–43. Here, there is no textual mooring for this holding that states have a privately enforceable duty to ensure healthcare providers are timely paid in instances where MCOs are systemically delaying payments. *See also id.* at 843–44 (Easterbrook, J. concurring) (noting the district court's injunctive order requiring the states to do something to find nurses "does not supply *any* detail," and "[t]he Supreme Court has reversed injunctions that read like this one").

Supreme Court precedent. In those rare cases in which this court has recognized a private right of action under Medicaid, none has imposed a duty on states as broad in scope, ongoing in nature, and difficult to enforce as here.[7] Nor has any other federal circuit ever recognized a state's privately enforceable duty to guarantee timely payment under § 1396u-2(f). Jane Perkins, *Private Enforcement of the Medicaid Act Under Section 1983*, Nat'l. Health L. Program 5–7 (July 16, 2021), https://bit.ly/2XaCtDY. To find such a new and expansive duty under § 1396u-2(f) stretches that statute, doing so in the context of Spending Clause legislation where Congress must "unambiguously" confer an individual right.

## III

I also see no abuse of discretion in the district court's denial of Saint Anthony's motion to supplement its complaint under Federal Rule of Civil Procedure 15(d).

The relevant language of Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out

---

[7] *See, e.g., BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 824 (7th Cir. 2017) (holding that 42 U.S.C. § 1396a(a)(13)(A) creates a privately enforceable duty on states to provide a public process with notice and opportunity to comment as outlined in § 1396a(a)(13)(A)); *O.B.*, 838 F.3d at 842–43 (holding that provisions in the Medicaid Act impose a privately enforceable duty on states to take affirmative steps to locate and provide home nurses for children that the Illinois Department of Healthcare and Family Services have approved for home nursing); *Planned Parenthood of Ind., Inc. v. Comm'r of the Indiana State Dept. of Health*, 699 F.3d 962, 974 (7th Cir. 2012) (holding that 42 U.S.C. § 1396a(a)(23) creates a privately enforceable "right to receive reimbursable medical services from any qualified provider"); *Bontrager*, 697 F.3d at 607–08 (reaffirming *Miller*, 10 F.3d at 1318).

any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Supplemental complaints are meant to "bring[] the case up to date." 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1504 (3d ed.). Our review is for an abuse of discretion, which we find "only if no reasonable person would agree with the decision made by the trial court." *Lange v. City of Oconto*, 28 F.4th 825, 842 (7th Cir. 2022) (quoting *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013)).

Saint Anthony's supplemental complaint sought to do more than bring the case up to date. As discussed previously, *St. Anthony Hosp.*, 40 F.4th at 526–28 (Brennan, J., dissenting), the hospital asked to add an entirely new due process claim centered on the transparency of both the managed care program *and* Illinois's separate fee-for-service program. The latter program was not part of the original case, and this request was raised after the parties had engaged in expedited discovery. Saint Anthony, in its original complaint, had previously included an entire section challenging the lack of transparency in the MCOs' dealings with providers, and made no mention of the fee-for-service program.

The district court correctly described the state of the case: the addition of this claim would have required expeditions into "whole new frontiers of discovery," including Saint Anthony's claim involving the Medicaid fee-for-service program. "The court not only may but should consider … whether the claim could have been added earlier; and the burden on the defendant of having to meet it." *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996). The district court did that here. Given this case's already huge scope—the total value of the state's contracts with the seven MCOs is $63

billion, the largest single procurement in Illinois history—and its highly technical subject matter, reasonable persons could agree with its decision not to vastly expand the suit. *Lange*, 28 F.4th at 842. So, the district court did not abuse its discretion in denying Saint Anthony's desire to engage in this expedition.

For these reasons, I respectfully dissent.