No. 21-2325

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| ST. ANTHONY HOSPITAL, | ) | Appeal from the United States |
|     Plaintiff-Appellant, | ) | District Court for the |
| | ) | Northern District of Illinois, |
|   v. | ) | Eastern Division |
| | ) | |
| ELIZABETH M. WHITEHORN, in | ) | |
| her official capacity as Director of the | ) | |
| Illinois Department of Healthcare | ) | |
| and Family Services, | ) | No. 20-cv-02561 |
| | ) | |
|     Defendant-Appellee, | ) | |
| | ) | |
|   and | ) | |
| | ) | |
| MERIDIAN HEALTH PLAN OF | ) | The Honorable |
| ILLINOIS, INC., *et al.*, | ) | Steven C. Seeger, |
| | ) | Judge Presiding. |
|     Intervening Defendants-Appellees. | ) | |

**SEPARATE APPENDIX TO
PETITION FOR REHEARING OR REHEARING *EN BANC***

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**RICHARD S. HUSZAGH**
Assistant Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
(312) 814-2587 (office)
(773) 590-7076 (cell)
richard.huszagh@ilag.gov

115 S. LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for Defendant-Appellee

# Index to Separate Appendix

| Document | Pages |
|---|---|
| *St. Anthony Hospital v. Whitehorn*, ___ F.4th ___, 2024 WL 1792083 (7th Cir. 2024)<br><br>(Majority opinion A-1-35; Dissent A 35-50) | A 1-50 |
| *Eagleson v. St. Anthony Hospital*, ___ U.S. ___, 143 S. Ct. 2634 (2023) | A 51 |
| *St. Anthony Hospital v. Eagleson*, 48 F.4th 737 (7th Cir. 2022), *vacated sub nom Eagleson v. St. Anthony Hospital*, ___ U.S. ___, 143 S. Ct. 2634 (2023)<br><br>(Majority opinion A 52-53; Dissent A 53-57) | A 52-57 |
| *St. Anthony Hospital v. Eagleson*, 40 F.4th 492 (7th Cir. 2022), *vacated sub nom Eagleson v. St. Anthony Hospital*, ___ U.S. ___, 143 S. Ct. 2634 (2023)<br><br>(Majority opinion A 58-88; Dissent A 88-100) | A 58-100 |
| *St. Anthony Hospital v. Eagleson*, 548 F. Supp. 3d 721 (N.D. Ill. 2021), *rev'd sub nom St. Anthony Hospital v. Whitehorn*, ___ F.4th ___, 2024 WL 1792083 (7th Cir. 2024) | A 101-125 |
| 42 U.S.C. § 1396u-2 | A 126-152 |

Saint Anthony Hospital v. Whitehorn, ___ F.4th ___ (7th Cir. 2024)

2024 WL 1792083
Only the Westlaw citation is currently available.

United States Court of Appeals, Seventh Circuit.

SAINT ANTHONY HOSPITAL, Plaintiff-Appellant,

v.

Elizabeth M. WHITEHORN, in her official capacity as Director of the Illinois
Department of Healthcare and Family Services, Defendant-Appellee,[1]
and
Meridian Health Plan of Illinois, Inc., et al., Intervening Defendants-Appellees.

No. 21-2325
|
Submitted December 29, 2023
|
Decided April 25, 2024

Appeal from the United States District Court for the Northern District of Illinois,
Eastern Division. No. 1:20-cv-02561—**Steven Charles Seeger**, *Judge.*

Before Wood, Hamilton, and Brennan, Circuit Judges.

**Opinion**

Hamilton, Circuit Judge.

**\*1** We first addressed this appeal in 2022, when we reversed in part the district court's dismissal of the case and remanded for further proceedings. *Saint Anthony Hospital v. Eagleson*, 40 F.4th 492 (7th Cir. 2022). Defendant petitioned for a writ of certiorari. The Supreme Court held the case while it considered *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 143 S.Ct. 1444, 216 L.Ed.2d 183 (2023), which presented similar issues concerning the use of 42 U.S.C. § 1983 to enforce certain provisions in the Federal Nursing Home Reform Act amendments to the

---

\*  We have substituted the new director as the named defendant pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Medicaid Act. After deciding *Talevski*, the Court granted defendant's petition in this case, vacated our earlier decision, and remanded for reconsideration in light of *Talevski*. ––– U.S. ––––, 143 S. Ct. 2634, 216 L.Ed.2d 1222 (2023) (mem.). Such a "GVR" order calls for further thought, but it does not necessarily imply that the lower court's previous result should be changed. E.g., *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019); see generally *Lawrence v. Chater*, 516 U.S. 163, 166–70, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996) (per curiam) (discussing GVR practices). Upon remand, the parties submitted statements of position and we ordered further briefing. We have taken a fresh look at the appeal in light of *Talevski*. We again reverse the dismissal of plaintiff's central claim and remand for further proceedings.

By way of introduction, in recent years, Illinois moved its Medicaid program from a fee-for-service model, where a state agency pays providers' medical bills, to one dominated by managed care, where the state pays private insurers to pay medical bills for Medicaid patients. Most patients of plaintiff Saint Anthony Hospital are covered by Medicaid, so Saint Anthony depends on full, timely Medicaid payments to keep its doors open and provide care to patients. Saint Anthony says it is now in a dire financial state. Over four years from 2015 to 2019, it lost roughly 98% of its cash reserves, allegedly because managed-care organizations (MCOs) repeatedly and systematically delayed and reduced payments it was owed for treating patients covered by Medicaid managed care.

Saint Anthony contends in this lawsuit that Illinois officials owe it a duty under the federal Medicaid Act to act to push MCOs to make timely and full payments. In a thoughtful opinion, the district court dismissed the suit for failure to state a claim for relief. *Saint Anthony Hospital v. Eagleson*, 548 F. Supp. 3d 721 (N.D. Ill. 2021). We continue to see the case differently, however, especially at the pleadings stage. Under the standards of *Talevski* and related precedents, Saint Anthony has alleged a viable claim for relief under 42 U.S.C. § 1396u-2(f) and may seek injunctive relief under 42 U.S.C. § 1983 against the state official who administers the Medicaid program in Illinois. We appreciate the potential magnitude of the case and the challenges it may present. Like the district judge, we can imagine forms of judicial relief that would be hard to justify. We can also imagine some poor ways to handle this case going forward in the district court. But we should not decide this case by assuming that the worst-case scenarios are inevitable.

**\*2** The State has tools available to remedy systemic slow and short payment

**A 2**

problems—problems alleged to be so serious that they threaten the viability of a major hospital and perhaps even of the managed-care Medicaid program as administered in Illinois. If Saint Anthony can prove its claims, the chief state official could be ordered to use some of those tools to remedy systemic problems that threaten this literally vital health care program. We therefore again reverse in part the dismissal of the case and remand for further proceedings.

## I. *Factual and Procedural Background*

In reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in Saint Anthony's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We are not vouching for the truth of Saint Anthony's account of the facts at this point. Rather, because the defense moved to dismiss on the pleadings, it chose to accept for now the truth of Saint Anthony's factual allegations.

### A. *The Illinois Medicaid Program*

The federal Medicaid Act established a cooperative arrangement between the federal government and states to provide medical services to poor residents. 42 U.S.C. § 1396 et seq.; *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 380 (7th Cir. 2020); see also *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 541–42, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). By agreeing to participate in Medicaid, a state receives financial assistance to help administer the program in exchange for complying with detailed statutory and regulatory requirements. *Bria Health Services*, 950 F.3d at 380. Those requirements are found in the Medicaid Act itself (Title XIX of the Social Security Act) and in Department of Health and Human Services (HHS) regulations. See *id.* at 380, 382; *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 771 (7th Cir. 2021).

Before discussing the relevant statutory requirements at issue here, it is important to understand how the Illinois Department of Healthcare and Family Services (HFS) administers the State's Medicaid program. There are two major ways for states to pay providers for services provided to patients covered by Medicaid: fee for service and managed care. In a fee-for-service program, the state pays providers directly based on a set fee for a particular service. See 42 U.S.C. § 1396a(a)(30)(A); Medicaid Program;

Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40989, 40989 (June 14, 2002). Under a managed-care program, by contrast, HFS contracts with MCOs (which are private health insurance companies) to deliver Medicaid health benefits to beneficiaries. See 42 U.S.C. § 1396u-2; see also 42 U.S.C. § 1396b(m); 42 C.F.R. § 438 (2020). The state typically pays the MCO a flat fee per patient per month. The MCO then pays providers for services actually provided to covered Medicaid patients. *Bria Health Services*, 950 F.3d at 381, citing 305 ILCS 5/5-30.1; see also 42 U.S.C. §§ 1396u-2, 1396b(m). Like insurance companies, MCOs are generally entitled to keep as profits the difference between the money they receive from the state and the amounts they pay providers for care of covered patients.

In recent years, Illinois has changed from fee-for-service to a system dominated by managed care. Illinois introduced managed care in its Medicaid program in 2006. In 2010, the State spent just $251 million on managed care. By 2019, that number had grown to $12.73 billion. In the meantime, the number of MCOs in Illinois has fallen from twelve to seven.

**\*3** Federal law establishes requirements for timely Medicaid payments to health care providers. When a state pays claims directly, it must pay 90% of so-called "clean claims" within 30 days and 99% within 90 days. See 42 U.S.C. § 1396a(a)(37)(A). (A "clean claim" is one for which the payor has all information needed to determine the proper payments. *Id.*) When a state relies on MCOs to pay providers, federal law requires that the state's contract with an MCO contain a provision that requires the same 30/90 pay schedule for MCO reimbursements to providers. 42 U.S.C. § 1396u-2(f). (MCOs and providers can opt for a different pay schedule, but Saint Anthony has not agreed to a different schedule with any MCOs.) The focus of this case is the payment schedule provision, section 1396u-2(f).[1]

  B. *Plaintiff Saint Anthony Hospital*
Saint Anthony is a so-called "safety-net hospital" on the southwest side of Chicago. It

---

[1]  In earlier stages of the case, Saint Anthony argued it was also entitled to relief under a separate Medicaid statute requiring a participating state to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals...." 42 U.S.C. § 1396a(a)(8). We explained in our original opinion, however, why Saint Anthony is not entitled to relief under that clause. 40 F.4th at 515–16. That clause was not part of the Supreme Court's review, and we say no more about it here.

**A 4**

provides health care regardless of patients' financial means. See 305 ILCS 5/5-5e.1. Most Saint Anthony patients are on Medicaid. As the Illinois Medicaid system has shifted from fee for service to managed care, the hospital has become ever more dependent on timely payments from MCOs. In recent years, according to Saint Anthony, those payments have repeatedly arrived late, if they arrived at all. As of February 2020, payments of at least $20 million were past due. The impact of late payments can be dramatic. In 2015, Saint Anthony had more than $20 million in cash on hand, which was enough to fund 72 days of operation. As the State increased its reliance on managed care, Saint Anthony saw its cash reserves dwindle. By 2019, Saint Anthony had less than $500,000 cash on hand, enough to cover just two days of operation. Saint Anthony's net revenue per patient also dropped more than 20%.

The MCO payments that eventually arrive are often for less than is owed. Making matters worse from Saint Anthony's perspective, the payment forms it receives from the MCOs lack the details needed to determine just what is being paid and what is not. The delays and lack of clarity benefit the MCOs: since the State pays the MCOs flat fees per patient and permits them to keep the funds they do not pay out to providers, MCOs have a powerful profit incentive to delay and underpay hospitals like Saint Anthony. This incentive under managed care is inherent and well-known. The need to control MCOs' behavior to protect providers and patients explains why Congress included section 1396u-2(f) in the statutes governing managed care under Medicaid.

Saint Anthony may not be alone in its experience. Mercyhealth is a regional health-care system and the largest Medicaid provider in Illinois outside of Cook County. Illustrating the potential gravity of the MCO payment problems, in April 2020, Mercyhealth announced it would stop accepting Medicaid patients covered by four of the seven MCOs in Illinois. Decl. of Kim Scaccia ¶ 6, Dkt. 50-1, Ex. 12. This was a drastic step showing the potential threat to the viability of the managed-care model for Medicaid. Mercyhealth said it took this step because those MCOs were delaying and underpaying it to the point that it was losing $30 million per year on Medicaid patients. See also David Jackson & Kira Leadholm, *Insurance Firms Reap Billions in Profits While Doctors Get Stiffed for Serving the Poor*, Better Government Association (Nov. 8, 2021), https://www.bettergov.org/news/insurance-firms-reap-billions-in-profits-while-doctors-get-stiffed-for-serving-the-poor/ (last visited April

25, 2024). [2]

**\*4** Faced with this dire financial situation, Saint Anthony had two paths to seek legal relief from what it sees as systemic defects in the Illinois Medicaid program. One path would be to sue MCOs individually for violating Saint Anthony's contractual rights to timely payment. Arbitration provisions in those contracts might well require arbitration for each individual claim in dispute. That path could easily involve many thousands of individual claims each year, though that is a matter for the district court to consider when it takes up the MCO intervenors' effort to force all or parts of this dispute into arbitration. This suit represents the second path, seeking a court order to require Illinois officials to devise systems that will ensure that they perform the statutorily required oversight of MCOs' payments to providers like Saint Anthony.

   C. *Procedural History*

Saint Anthony filed a complaint under 42 U.S.C. § 1983 against the director of HFS in her official capacity. (We refer to the director here as HFS or the State.) Count I, the only one relevant at this point, alleges that HFS is violating the Medicaid Act, including section 1396u-2(f), by failing to ensure that MCOs meet the timely payment requirements. Saint Anthony seeks injunctive relief directing HFS to require the MCOs to comply with the 30/90 payment rule, to use transparent remittance forms, and if necessary, to require the State to cancel a contract with an MCO that continues to fail to comply with the timely payment requirements.[3]

HFS moved to dismiss Saint Anthony's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Its chief argument was that none of the statutory provisions grant Saint Anthony any rights enforceable under section 1983,

---

[2]   In evaluating a Rule 12(b)(6) motion, we may consider the Mercyhealth information submitted by plaintiff without converting the motion into one for summary judgment under Rule 12(d). The information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Mercyhealth also reportedly worked out a compromise with one MCO, Molina, under which it continued to care for Molina-covered Medicaid patients. Decl. of Kim Scaccia ¶ 9, Dkt. 50-1, Ex. 12.

[3]   Saint Anthony also moved for a preliminary injunction. The district court granted limited discovery before suspending in part actions related to the preliminary injunction motion while it resolved a discovery dispute. The court then granted the motion to dismiss and denied the preliminary injunction motion as moot.

and that even if they did, the factual allegations failed to state a plausible claim for relief. The district court agreed and dismissed the case. 548 F. Supp. 3d 721 (N.D. Ill. 2021).

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint by adding a due process claim. HFS responded to Saint Anthony's request, arguing that the new claim would fail on the merits. The district court denied Saint Anthony the opportunity to file a reply to defend its proposed claim on the merits. Then, four days after granting the motion to dismiss, the district judge denied the motion to supplement because he thought it was futile and that the entire case should be concluded by granting the motion to dismiss.

In the district court, four MCOs were granted leave to intervene as defendants. The MCOs asked the court to stay the lawsuit and compel arbitration. One MCO (Meridian) demanded arbitration with Saint Anthony, but that proceeding was stayed because Meridian had not followed the proper procedures to invoke arbitration. The district court later denied the MCOs' motions as moot after granting the motion to dismiss.

Saint Anthony appealed the district court's dismissal and the denial of the motion to supplement. We first address Saint Anthony's asserted right to timely payment under section 1396u-2(f). To evaluate Saint Anthony's claim, we address in Part II-A the standard for invoking section 1983 under Spending Clause statutes like the Medicaid Act. We consider in Part II-B the *Talevski* standard and then in Part II-C walk through each of the so-called *Blessing* factors. In Part II-D, we turn to whether Congress established an alternative remedial scheme incompatible with the application of section 1983. We conclude by addressing in Part III the district court's denial of plaintiff's motion to supplement its complaint and the question of arbitration, which the MCOs ask us to resolve before the district court has done so.

## II. *A Right to Timely Payments*

**\*5** The central issue here is whether 42 U.S.C. § 1396u-2(f) grants a right to providers like Saint Anthony that is privately enforceable through section 1983. We conclude that the statute imposes on the State a duty to try to ensure that the MCOs actually pay providers in accord with the 30/90 pay schedule—not merely that the contracts

between the MCOs and HFS include clauses that say as much on paper. Congress imposed this affirmative duty on the State for the benefit of health care providers like plaintiff. Congress provided sufficiently clear signals that this is both a duty for the State and a right for providers. Saint Anthony thus has a right under section 1396u-2(f) that is enforceable under section 1983. The right entails having state officials address MCOs' systemic failures to provide timely and transparent payments.

A. *The Standard for Invoking Section 1983*

We again emphasize that we are reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We begin by accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in Saint Anthony's favor. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

The analysis for possible enforcement of federal statutory rights under section 1983 is familiar. "Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States ... of any rights, privileges, or immunities secured by the Constitution and laws.' " *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012), quoting 42 U.S.C. § 1983. This language "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and "authorizes suits to en-force individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). " 'Laws' means 'laws,' no less today than in the 1870s...." *Talevski*, 599 U.S. at 172, 143 S.Ct. 1444.

Yet not all statutory benefits, requirements, or interests are enforceable under section 1983. The Medicaid Act is an exercise of Congress's power under the Spending Clause. *Talevski* reinforced earlier precedents allowing rights under Spending Clause legislation to be enforced under section 1983 but set a "demanding bar" for reliance on section 1983: "Statutory provisions must *unambiguously* confer individual federal rights." 599 U.S. at 180, 143 S.Ct. 1444, citing *Gonzaga University v. Doe*, 536 U.S. 273, 280, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). *Talevski* summarized the Court's approach for determining when a statutory provision enacted under the federal spending power creates a right, privilege, or immunity enforceable under section 1983:

**A 8**

*Gonzaga* sets forth our established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. [536 U.S.] at 283, 285–286 [122 S.Ct. 2268]; see also *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 [125 S.Ct. 1453, 161 L.Ed.2d 316] (2005). Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283 [122 S.Ct. 2268] (emphasis deleted). This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id.*, at 286 [122 S.Ct. 2268].

We have held that the *Gonzaga* test is satisfied where the provision in question is " 'phrased in terms of the persons benefited' " and contains "rights-creating," individual-centric language with an " 'unmistakable focus on the benefited class.' " *Id.*, at 284, 287 [122 S.Ct. 2268] (emphasis deleted). Conversely, we have rejected § 1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and "serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290 [122 S.Ct. 2268].

**\*6** *Talevski*, 599 U.S. at 183–84, 143 S.Ct. 1444; accord, *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (plaintiff seeking redress for alleged violation of federal statute through a section 1983 action "must assert the violation of a federal *right*, not merely a violation of federal *law*"). It is not enough to fall "within the general zone of interest that the statute is intended to protect" to assert a right under section 1983. *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268. Congress must have "*intended to create a federal right*," *id.*, and "the statute 'must be phrased in terms of the persons benefited' with 'an *unmistakable focus* on the benefited class.' " *Planned Parenthood of Indiana*, 699 F.3d at 973, quoting *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268.

Without the later guidance from *Talevski*, we and the district court had framed our earlier analyses under the so-called *Blessing* factors, taken from *Blessing v. Freestone*. Before diving in further, we need to address the status of *Blessing* and its factors after *Talevski*. Defendants argue that *Talevski* effectively displaced or even overruled *Blessing*. As noted, *Talevski* wrote that "*Gonzaga* sets forth our established method

**A 9**

for ascertaining unambiguous conferral" of statutory rights that can support relief under section 1983. 599 U.S. at 183, 143 S.Ct. 1444. That passage appeared in *Talevski* as the Court began to evaluate whether the disputed Medicaid provisions conferred federal rights. *Talevski* did not cite *Blessing* in that portion of the opinion, nor did it disapprove of *Blessing*.

We do not see a fundamental difference between the *Talevski/Gonzaga* standard for unambiguous conferral of rights enforceable under section 1983 and the first and third *Blessing* factors, which require an intended benefit for the plaintiff and a binding obligation on the states. 520 U.S. at 340–41, 117 S.Ct. 1353. Or to be more precise, we do not see a difference that would change the outcome of this case. *Talevski* teaches that "courts must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." 599 U.S. at 183, 143 S.Ct. 1444, quoting *Gonzaga*, 536 U.S. at 283, 285–86, 122 S.Ct. 2268.

Given the way this case has evolved and the Court's instruction to reconsider in light of *Talevski*, the most prudent course is to analyze the key statutory provisions first under the instructions of *Talevski*. We do so next in Part II-B. Then, at some risk of redundancy, in Part II-C, we analyze the question again using the *Blessing* factors. In Part II-D, we consider whether Congress established another remedial scheme incompatible with using section 1983 in disputes like this.

   B. *Applying the Talevski Standard*
We start with the text of section 1396u-2(f), the provision central to this appeal:

> Timeliness of payment; adequacy of payment for primary care services. A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule....

**A 10**

Section 1396u-2(f) cross-references sections 1396b(m) and 1396a(a)(37)(A). Section 1396b(m) describes the State's contract with an MCO. Section 1396a(a)(37)(A) declares that a

*7 State plan for medical assistance must ...

    (37) provide for claims payment procedures which

    (A) ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims....

§ 1396a(a)(37)(A). We agree with Saint Anthony that section 1396u-2(f) grants providers a right to State procedures that will ensure timely payment from the MCOs.

### 1. *Statutory Text*

The State's strongest argument against plaintiff's reliance on section 1983 is that section 1396u-2(f) does not use the term "right" or an equivalent, and that the State has done its job by ensuring that plaintiff has contractual rights it can enforce directly against MCOs. The absence of the word "right" is not conclusive, however. As noted, both *Talevski* and *Gonzaga* teach that courts "must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Talevski*, 599 U.S. at 183, 143 S.Ct. 1444, quoting *Gonzaga*, 536 U.S. at 283, 285–86, 122 S.Ct. 2268.

To begin, providers like Saint Anthony are the intended beneficiaries of the prompt payment term in section 1396u-2(f). The text requires states to ensure that the state's contracts with MCOs "shall provide" that the MCOs "shall make payment to health care *providers* ... on a timely basis...." 42 U.S.C. § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815,

821 (7th Cir. 2017) ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [state] plan for ... nursing facility services'?" (second alteration and omission in original) (quoting 42 U.S.C. 1396a(a)(13)(A)).[4]

Section 1396u-2(f) grants providers a right, not merely a generalized benefit. It is here that we disagree with the district court. In granting the motion to dismiss, the court invoked *Gonzaga*, asserting that providers received only "a generalized 'benefit' " from section 1396u-2(f), which "isn't good enough" to constitute a right enforceable under section 1983. *Saint Anthony Hospital*, 548 F. Supp. 3d at 734, quoting *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268. The district court concluded that section 1396u-2(f) "itself does not entitle providers to much of anything, and does not contain any 'explicit rights-creating terms.' " *Id.*, quoting *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268. For its part, the State seems to adopt something like Justice Holmes' theory of contract, under which one party is free to breach as long as it is willing to pay damages to the other party. The State is claiming an unfettered right to decide whether to assert its contractual rights against MCOs, leaving providers like Saint Anthony to fend for themselves as best they can in the face of systemic and disabling breaches by MCOs.

**\*8** We read the statute differently, considering the statutory text and its context and history. We read the Medicaid Act in general and section 1396u-2(f) in particular as ensuring that providers like plaintiff have contractual rights against MCOs, but also federal rights to have state officials use the State's contractual rights and do their jobs by implementing procedures and systems to ensure that MCOs actually make the promised timely payments.

*Gonzaga* provides a useful contrast regarding rights-creating language. In *Gonzaga*, a former student sued the university and an employee under section 1983 for allegedly violating his rights under the Family Educational Rights and Privacy Act (FERPA). Part of the statutory language at issue directed the Secretary of Education that " '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice' " of permitting the release of education records without parents' written consent. *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268 (alteration in

---

[4]  In our original decision, we rejected the State's argument that the term "health care providers" includes practitioners but not hospitals. 40 F.4th at 505–06. The State has not pressed the point further on remand, so we do not address it further in this opinion.

original), quoting 20 U.S.C. § 1232g(b)(1); see also § 1232g(b)(2). That prohibited activity is allegedly what occurred in the case.

The Supreme Court concluded that Congress did not grant an individual whose interests were violated under FERPA a right enforceable through section 1983. Because the statutory provisions did not have an individualized focus, they failed *Blessing* factor one: "[The] provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, as in *Blessing*, they have an 'aggregate' focus, they are not concerned with 'whether the needs of any particular person have been satisfied,' and they cannot 'give rise to individual rights.' " *Gonzaga*, 536 U.S. at 288, 122 S.Ct. 2268 (internal citation omitted), quoting *Blessing*, 520 U.S. at 343–44, 117 S.Ct. 1353. The Court also highlighted that the Secretary of Education could take away funds only if the university did not *substantially* comply with the statutory requirements. This fact contributed to the understanding that the focus was on systemwide performance rather than individual instances of improper disclosure. *Gonzaga*, 536 U.S. at 279, 281–82, 122 S.Ct. 2268. Finally, since FERPA's provisions spoke only to the Secretary and directed him or her to withdraw funding from schools that had a "prohibited policy or practice," the Court determined that their focus was "two steps removed from the interests of individual students and parents." *Id.* at 287, 122 S.Ct. 2268 (internal citation and quotation marks omitted). The provisions therefore failed to confer an individual right enforceable under section 1983.

The opposite is true here. Section 1396u-2(f) is concerned with whether the needs of particular persons and entities—providers like Saint Anthony—have been satisfied. The statutory text specifies that the State "shall provide" that MCOs "shall make payment to health care providers ... on a timely basis." 42 U.S.C. § 1396u-2(f). The focus of section 1396u-2(f) is not "two steps removed" from the interest of providers. Its focus is directly on the interest Saint Anthony asserts here: ensuring that providers receive timely payment from MCOs. And the provision is not concerned only with whether MCOs in the aggregate pay providers on the 30/90 pay schedule, but whether *individual* providers are receiving the payments in the timeframe promised.

We see this in the provision's close attention to provider-specific exemptions from the 30/90 pay schedule. Section 1396u-2(f) says that its mandate applies "unless the health care provider and the organization agree to an alternate payment schedule." It establishes a personal right to timely payment, which all providers are entitled to

insist upon. Cf. *Planned Parenthood of Indiana*, 699 F.3d at 974 (Medicaid state plan requirement permitting all eligible recipients to receive medical assistance from the provider of their choice established "a personal right to which all Medicaid patients are *entitled*" but, implicitly, need not accept (emphasis added)). Either way, the focus is on the individual provider. The focus is not on whether MCOs in the aggregate substantially comply with the timely payment requirement. Section 1396u-2(f) is thus not just a benchmark for aggregate performance.

**\*9** That conclusion finds support in our precedents under other Medicaid provisions. Section 1396a(a)(10)(A) provides that "[a] State plan for medical assistance must ... provide ... for making medical assistance available ... to [ ] all [eligible] individuals." We have held that the provision confers private rights to individuals enforceable under section 1983. See *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993); accord, *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (reaffirming *Miller*'s rights analysis after *Blessing* and *Gonzaga*). In *Miller*, we found it significant that the State was *required* to provide medical assistance to all eligible individuals. 10 F.3d at 1319. The same is true here, but with respect to timely payments to providers.

### 2. *Context and History*

The context and history of section 1396u-2(f) support finding a right enforceable under section 1983. Context and history are standard tools in construing statutes, of course, and *Talevski* and *Gonzaga* instruct courts to use them in answering such questions about applying section 1983. 599 U.S. at 183, 143 S.Ct. 1444; 536 U.S. at 283–86, 122 S.Ct. 2268.

Under the original fee-for-service model of Medicaid reimbursement, the State is responsible for making prompt payments to providers at reasonable rates. The 30-day/90-percent schedule for payments by MCOs in section 1396u-2(f) is incorporated from section 1396a(a)(37)(A), which imposes that mandatory schedule on State payments in the fee-for-service system. The State has no discretion to avoid making payments on that schedule, and that provision grants enforceable rights to providers like Saint Anthony. A few years before Congress adopted section 1396u-2(f) for managed care systems, the Supreme Court had decided *Wilder v. Virginia Hospital*

*Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). *Wilder* held that the Boren Amendment, which required States to pay Medicaid providers rates that were "reasonable and adequate to meet the costs of an efficiently and economically operated facility," created rights enforceable under section 1983 with declaratory and injunctive relief to require state officials' compliance. *Id.* at 510, 524, 110 S.Ct. 2510.

Congress later repealed the Boren Amendment, but the reasoning of *Wilder* extends to the statutory provision governing the timing of payments of those rates, the fee-for-service prompt payment rule of section 1396a(a)(37)(A). See, e.g., *Appalachian Regional Healthcare v. Coventry Health & Life Insurance Co.*, 970 F. Supp. 2d 687, 697–99 (E.D. Ky. 2013) (denying summary judgment for state officials in section 1983 case to enforce section 1396u-2(f)); accord, *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 211–12 (4th Cir. 2007) (following *Wilder* and allowing use of section 1983 to enforce another Medicaid payment requirement under fee-for-service model); *New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Services*, 722 F.3d 527, 539–43 (3d Cir. 2013) (allowing use of section 1983 to enforce another Medicaid payment requirement under managed care); *Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 157 (2d Cir. 2014) (same); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74–75 (1st Cir. 2005) (same).

Section 1396u-2(f) and the other statutory provisions that enabled the dramatic expansion of managed care use in state Medicaid programs were part of legislation enacted seven years after *Wilder*, in the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997). Managed-care provisions began with section 4701 of the Act. 111 Stat. at 489. Section 1396u-2(f) was part of section 4708(c) of the Act. 111 Stat. at 506. Given the timing, when Congress extended the prompt payment rules of section 1396a(a)(37)(A) to managed care in section 1396u-2(f), providers like Saint Anthony already had a recognized right to prompt payments. Under *Wilder*, they could enforce that right under section 1983 with declaratory and injunctive relief. We are aware of no indication that Congress intended to cut back on those rights in 1997 when it enacted section 1396u-2(f) to extend the prompt payment rule to managed care.

**\*10** *Talevski* shows that courts should pay attention to statutory context when addressing these questions. A good example was the treatment of the requirement in *Talevski* that a nursing home give a resident and his or her family advance notice that the home intends to discharge the resident. That statutory requirement is not phrased in terms of a "right" to such notice. The Court observed, however, that it is "[n]estled

*Saint Anthony Hospital v. Whitehorn,* ___ F.4th ___ (7th Cir. 2024)

in a paragraph" with the heading "transfer and discharge *rights*." 599 U.S. at 184–85, 143 S.Ct. 1444. The requirement for notice is also phrased in terms of the resident's welfare, health, and needs, lending further and ultimately sufficient weight to the conclusion that the notice requirement was enforceable under section 1983. *Id.* at 185, 143 S.Ct. 1444.

The prompt payment rule for managed care at issue here has similar indications of enforceable rights. In the Balanced Budget Act of 1997, which adopted section 1396u-2(f) and so many other managed care provisions, section 4708(c) was entitled: "Assuring Timeliness of Provider Payments." 111 Stat. at 506. This language signaled that Congress intended section 1396u-2(f) to "assure," i.e., to guarantee, timely payment to providers. That language of assurance further supports recognizing a right enforceable under section 1983.

That understanding is also consistent with later congressional action. In 2009 Congress enacted 42 U.S.C. § 1396u-2(h) as part of the American Recovery and Reinvestment Act of 2009. See Pub. L. No. 111-5, 123 Stat. 115, § 5006(d) (2009). That subsection established special rules for "Indian enrollees, Indian health care providers, and Indian managed care entities." 123 Stat. at 507. Relevant to our purposes, section 1396u-2(h)(2)(B) cross-references section 1396u-2(f) and describes it as the "rule for prompt payment of providers":

> (2) Assurance of payment to Indian health care providers for provision of covered services
>
> Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:
>
> ...
>
> (B) Prompt payment
>
> To agree to make prompt payment (*consistent with rule for prompt payment of providers under section 1396u–2(f) of this title*) to Indian health care providers that are participating providers with respect to such entity....

42 U.S.C. § 1396u-2(h)(2)(B) (emphasis added).

**A 16**

Saint Anthony Hospital v. Whitehorn, ___ F.4th ___ (7th Cir. 2024)

We recognize that *Wilder* may lie close to the outer edge of the line for section 1983 cases under Spending Clause legislation. Nevertheless, the Court was invited in *Talevski* to overrule *Wilder* and chose not to do so. Recognizing section 1396u-2(f) as creating rights enforceable under section 1983 does not push the logic of *Wilder* or *Talevski* itself any further than the Court has already taken it.

Section 1396u-2(f) gives providers like plaintiff a right to have state officials do their jobs by assuring that MCOs make timely payments. Section 1396u-2(f) mandates that the State's contracts with the MCOs require the MCOs to pay providers on the 30/90 pay schedule. The State, however, asserts that section 1396u-2(f) does not impose a duty on the State even to try to ensure that MCOs actually do what their contracts say. The State's theory is that the statute requires only that a provision in the paper contract specify the timely payment obligation. The State may then, at its unfettered discretion, try to ensure the MCOs' compliance—or not. If MCOs fail to pay providers according to the 30/90 pay schedule, no matter how blatantly and systematically, the State contends it is free to do nothing. It may choose to leave providers to do their best to try to enforce their own contractual rights. In HFS's view, nothing in section 1396u-2(f) requires the State itself to do anything more to ensure prompt payment. Put differently, if the contract between an MCO and the State contains a clause ensuring timely payment for providers on the 30/90 pay schedule, the State contends it has met its duty under section 1396u-2(f), regardless of actual performance.

**\*11** We do not read section 1396u-2(f) as permitting such a hands-off approach. Nor would a reasonable state official deciding whether to accept federal Medicaid money have expected she could take that hands-off approach to MCO payments to providers. Again, when interpreting statutes for these purposes, *Talevski* and *Gonzaga* teach us to "employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights'" enforceable under section 1983. *Talevski*, 599 U.S. at 183, 143 S.Ct. 1444, quoting *Gonzaga*, 536 U.S. at 283, 285, 122 S.Ct. 2268.

When interpreting statutes, often the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473, 486, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). We must read texts "in their context and with a view to their place in the overall

**A 17**

statutory scheme." *Id.*, quoting *Brown & Williamson*, 529 U.S. at 133, 120 S.Ct. 1291; see also *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And to the extent possible, we must "ensure that the statutory scheme is coherent and consistent." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). That's what the Supreme Court did in both *Talevski*, finding several rights of patients under the Medicaid Act enforceable under section 1983, and in *Gonzaga*, rejecting such rights claims under FERPA.

Interpreting section 1396u-2(f) as only a "paper" requirement conflicts with these principles of statutory interpretation. HFS is correct that Congress intended MCOs to "assume day-to-day functions previously performed by States under a traditional fee-for-service model." Appellee HFS's Br. at 30. But Congress did not intend for MCOs to go unsupervised.

It has long been obvious to all that under the managed-care system of Medicaid, MCOs have a powerful incentive to delay payment to providers for as long as possible and ultimately to underpay to maximize their own profits. It's a classic agency problem: MCOs are expected to act in the providers' interests, but their interests are not the same. Regarding timely payments, they are in direct conflict.

The Medicaid Act contains several provisions to counter-act that problem in addition to section 1396u-2(f). They help inform our understanding of the particular provision in dispute here.

The Act imposes reporting and oversight responsibilities on states that opt for the managed care model. For example, section 1396b(m)(2)(A)(iv) requires a state's contract with an MCO to permit the state "to audit and inspect any books and records" of an MCO related to "services performed or determinations of amounts payable under the contract." Section 1396u-2(c)(2)(A)(i) further specifies that a state's contract with an MCO must "provide for an annual (as appropriate) external independent review" of the "timeliness" of MCO "services for which the organization is responsible," including payments. The Medicaid Act thus requires HFS to take steps to monitor MCO payment activities to gather performance data and to understand how the system is functioning.

**A 18**

The Act further specifies that a state must establish provisions for imposing "intermediate sanctions" against an MCO—short of cancelling an entire, major contract—that the state can use when an MCO underperforms. 42 U.S.C. § 1396u-2(e). The State can put an MCO on a performance plan, for example. As discovery in this case revealed, HFS has taken that step with CountyCare, an MCO, after CountyCare paid only 40% of claims within 30 days and only 62% of claims within 90 days. The CountyCare case turned up evidence of the agency problem in action. The State found that CountyCare's Medicaid money was improperly diverted from the Medicaid program to pay other county government bills rather than health care providers.[5]

**\*12** In such a case, where an MCO has "repeatedly failed to meet the requirements" of its contract with the State and the requirements in section 1396u-2, "the State shall (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2)." 42 U.S.C. § 1396u-2(e)(3). Subparagraph (B) details the appointment of temporary management to oversee the MCO. 42 U.S.C. § 1396u-2(e)(2). Subparagraph (C) permits individuals enrolled with the MCO to terminate enrollment without cause. *Id.*

Federal Medicaid regulations add to the State's responsibilities here. For instance, 42 C.F.R. § 438.66(a) (2016) provides: "The State agency must have in effect a monitoring system for all managed care programs." Section 438.66(b)(3) specifies that the State's monitoring system "must address all aspects of the managed care program, including the performance of each MCO ... in ... [c]laims management." It's hard to imagine a more central aspect of claims management than timely payments. Saint Anthony alleges here that HFS is failing even to collect the required data on the timeliness of MCO payments.

These responsibilities support the conclusion that Congress imposed on states a duty to ensure that the right to timely payment in section 1396u-2(f) is honored in real life. The State argues here that Congress intended to leave the issue of real-life effectiveness to the unfettered discretion of state and federal oversight authorities. But Congress chose language that makes timely payment more than just a paper

---

[5]  As with the information mentioned above in note 2 about Mercyhealth, we may also consider the CountyCare information in evaluating the Rule 12(b)(6) motion without converting the motion into one for summary judgment. The information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky*, 675 F.3d at 745 n.1.

requirement that would allow state officials to put the terms in their MCO contracts and then forget about them, leaving providers to fend for themselves.

The more coherent reading of the statute as a whole is that Congress intended the State to engage in these reporting and oversight responsibilities, and, if it becomes evident that MCOs are systematically not paying providers on a timely basis, to impose on the State an obligation to act under section 1396u-2(f) to secure providers' rights. These mandatory oversight responsibilities would make little sense if that were not the case. The provision's mandatory language, coupled with the additional oversight and reporting responsibilities, supports the reading that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in reality. Section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268, unmistakably "phrased in terms of the persons benefited." *Id.* at 284, 122 S.Ct. 2268, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

    C. *The Blessing Factors*

The foregoing analysis under *Talevski* is sufficient to support our bottom-line decision here. We reach the same result by applying the so-called "*Blessing* factors," which both we and the district court used to frame our earlier opinions:

> We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

**\*13** *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353 (internal citations and quotations omitted). Under *Blessing*, if these three elements are satisfied, "the right is presumptively enforceable under section 1983." *Talevski v. Health & Hospital Corp.*

*of Marion County*, 6 F.4th 713, 720 (7th Cir. 2021), aff'd sub nom. *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 143 S.Ct. 1444, 216 L.Ed.2d 183 (2023). A defendant may overcome this presumption by showing that Congress shut the door to private enforcement, a question we address below in Part II-D. See *Talevski*, 599 U.S. at 186–89, 143 S.Ct. 1444, citing among other cases *Gonzaga*, 536 U.S. at 284, and n.4, 122 S.Ct. 2268, and *Blessing*, 520 U.S. at 347–48, 117 S.Ct. 1353.

As we explained in our original opinion, section 1396u-2(f) grants providers a right to timely payment from the MCOs that the State must safeguard because the right satisfies all three *Blessing* factors. 40 F.4th at 505–14. First, providers are the intended beneficiaries of section 1396u-2(f). Second, enforcing the 30-day/90-percent pay schedule would not strain judicial competence. Third, the statute unambiguously imposes a binding obligation on the State. We address each point in turn.

### 1. *Factor One: Intended Beneficiaries*

The first *Blessing* factor asks whether Congress intended section 1396u-2(f) to benefit providers like Saint Anthony and whether it intended that benefit to be a *right*, as distinct from a generalized entitlement. Both answers are yes.

On these questions, the *Blessing* test is congruent with the test set forth in *Talevski* and *Gonzaga*. First, providers are the intended beneficiaries of section 1396u-2(f). The text requires MCOs to contract that they "shall make payment to health care *providers* ... on a timely basis...." 42 U.S.C. § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care*, 866 F.3d at 821 ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [state] plan for ... nursing facility services'?" (second alteration and omission in original) (quoting 42 U.S.C. § 1396a(a)(13)(A)).

In applying the first *Blessing* factor, we also conclude that section 1396u-2(f) grants providers a right, not merely a generalized benefit, for the reasons explained above at pages 17–28. We need not repeat that discussion here. At bottom, section 1396u-2(f)

**A 21**

defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268, unmistakably "phrased in terms of the persons benefited," *id.* at 284, 122 S.Ct. 2268, quoting *Cannon*, 441 U.S. at 692 n.13, 99 S.Ct. 1946, and satisfies *Blessing* factor one.

### 2. *Factor Two: Administration*

*Blessing* factor two requires a plaintiff to show that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353. This factor is not expressly a part of the Supreme Court's approach in *Talevski* and *Gonzaga*, but it surely is implicit. We doubt the Court would approve a section 1983 remedy to enforce a right so vague and amorphous as to strain judicial competence.

The State does not appear to have contested in this appeal whether section 1396u-2(f) satisfies this standard, nor could it. Saint Anthony argues that the State has been violating its right to timely payment by failing to abide by section 1396u-2(f)'s statutory mandate of trying to ensure that the MCOs are paying providers in line with the 30-day/90-percent pay schedule. Determining whether payments met the 30/90 pay schedule is "administrable," "fully capable of judicial resolution," and "falls comfortably within the judiciary's core interpretative competence." *Planned Parenthood of Indiana*, 699 F.3d at 974.

### 3. *Factor Three: Obligation*

**\*14** The third *Blessing* factor asks whether section 1396u-2(f) unambiguously imposes a binding obligation on HFS. This requires answering two subsidiary questions: (1) what is HFS's duty under the statute, and (2) is that duty mandatory?

In a typical private right dispute, the emphasis is on the second question. See, e.g., *BT Bourbonnais Care*, 866 F.3d at 822. Section 1396u-2(f) plainly contains mandatory language: "A [State] contract ... with a medicaid managed care organization *shall* provide that the organization *shall* make payment to health care providers ... on a timely basis...." 42 U.S.C. § 1396u-2(f) (emphasis added). The double use of "shall" rebuts the notion that the State's obligation is anything less than mandatory. For the

**A 22**

reasons we explained above at pages −−−− − −−−−, section 1396u-2(f) satisfies the third *Blessing* factor.

#### 4. *Counterarguments*

##### a. *An Ambiguous Contract?*

HFS counters that the duty imposed by section 1396u-2(f) is at the very least ambiguous. HFS relies on *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which taught that Congress may impose conditions on grants of federal money only if it does so "unambiguously" and "with a clear voice." In HFS's view, if Congress wanted to impose the significant duty on states that Saint Anthony advocates, it should have done so more explicitly. Section 1396u-2(f) is not a clear statement, it's ambiguous, and therefore cannot carry the weight Saint Anthony gives it. So says HFS.

We think Congress spoke sufficiently clearly here. The clear-statement rule explains that "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.' " *Arlington Central School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006), quoting *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. *Talevski*, particularly the portion addressing pre-transfer notice rights, shows that courts can use ordinary tools of statutory construction to decide whether Congress was sufficiently clear. See 599 U.S. at 184−86, 143 S.Ct. 1444. The Court has made similar points in applying similar clear statement rules. In authorizing a waiver of federal sovereign immunity, for example, "Congress need not 'make its clear statement in a single section' adopted at a single moment in time." *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 54, 144 S.Ct. 457, 217 L.Ed.2d 361 (2024), quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 76, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). "[W]hat matters is whether Congress has authorized a waiver of sovereign immunity that is 'clearly discernible' from the sum total of its work." *Id.* at 54−55, 144 S.Ct. 457, quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388, 143 S.Ct. 1689, 216 L.Ed.2d 342 (2023).

**A 23**

To determine whether Congress spoke clearly to create rights in this case, "we must view [section 1396u-2(f) and the Medicaid Act] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds." *Murphy*, 548 U.S. at 296, 126 S.Ct. 2455.

A reasonable state official planning to launch a managed-care program would have understood that the state would have to try to ensure that providers receive prompt payment from MCOs. Such an official would not reasonably have concluded that Congress intended that the "rule for prompt payment of providers" be only a proverbial paper tiger. See § 1396u-2(h)(2)(B) (describing section 1396u-2(f) as the "rule for prompt payment of providers"). That conclusion would conflict with the state's oversight and reporting obligations and its enforcement duties under the Medicaid Act.

## b. *Remedies and State Discretion in Enforcement*

**\*15** HFS also argues that section 1396u-2(f) cannot impose this duty on the State because it "would negate[ ] section 1396u-2(e)'s express grant to States of discretion to seek termination of an MCO's contract for violating section 1396u-2[f] or its contract with the State." Appellee HFS's Br. at 27. The argument highlights a key issue in this appeal and one that helps explain our disagreement with the district court.

Saint Anthony requested several forms of relief in its complaint. One of those was canceling a contract with an MCO that fails to pay on time after State intervention. HFS argues that forcing it to cancel a contract with an MCO because it did not meet the 30/90 pay schedule would infringe on the State's discretion to decide when it will terminate such a contract, which is expressly preserved by the statute. See § 1396u-2(e)(4)(A) ("In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract...."). In HFS's view, that means section 1396u-2(f) cannot impose a duty on HFS to ensure providers receive timely payment because it might require HFS to take action that is expressly reserved to its discretion.

**A 24**

We are inclined to agree with HFS that a district court could not force the State to cancel a contract with an MCO. Canceling a contract with any one of the seven MCOs in Illinois might well cause a "massive disruption" to the State's Medicaid program. Appellee HFS's Br. at 28. HFS and only HFS has the discretion to decide when and why it will invite that type of disruption. Section 1396u-2(e)(4)(A) is clear on that point. See also 42 C.F.R. § 438.708 (when states can terminate an MCO contract) and § 438.730 (CMS can sanction an MCO by denying payment). To the extent that Saint Anthony requests such relief, we doubt the district court has authority to impose it, though we need not answer that question definitively at this stage, on the pleadings. Perhaps sufficiently egregious facts might convince us otherwise, but that question about a worst-case scenario can be addressed if and when it actually arises and matters.

### c. *The Scope of Judicial Remedies*

Continuing with the theme of assuming the worst, HFS also argues that reading this duty into section 1396u-2(f) would lead to the district court acting effectively as the Medicaid claims processor for the State. In the State's parade of horribles, that's the prize-winning float. Given the practical difficulties in judicial enforcement that would come with recognizing a duty here, HFS contends, such a duty could not be what Congress intended. We agree that any form of retail-level relief, i.e., requiring the district court to adjudicate issues at the claim-by-claim level, would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony. A process that required a district judge to micromanage claims would be inappropriate here.

These two limits on remedies in a section 1983 action—not turning the district court into a claims processor and not cancelling an MCO contract—do not persuade us, however, that we should affirm dismissal and deny all relief on the theory that the State has no duty at all to ensure timely payment under section 1396u-2(f). As noted, HFS can take a number of other steps at the system level to address chronically late and/or short payments by MCOs. Those actions could include a variety of "intermediate sanctions" under section 1396u-2(e)(2). Those and other actions would neither force the State to cancel an MCO contract nor turn the district court into a claims processor. If Saint Anthony can prove its claims of systemic delay and/or

**A 25**

underpayment, we are confident that the district court could craft injunctive relief to require HFS to do *something* to take effective action.

**\*16** We draw helpful guidance on these issues of potential equitable relief from *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016). There, we affirmed a preliminary injunction against the HFS director in a suit brought by Medicaid beneficiaries who sought to enforce sections of the Medicaid Act requiring the State to find nurses to provide home nursing for children enrolled in Medicaid. HFS argued in *O.B.* that it had no obligation to find nurses (or to act at all). *Id.* at 842. We rejected that argument:

> Certainly the defenses thus far advanced by HFS are weak. The primary defense is that nothing in the Medicaid statute "required [HFS] to ensure that Plaintiffs would receive medical care from nurses in their homes." But it was HFS that decided that home nursing was the proper treatment for O.B., the other named plaintiffs, and the other members of the class.

*Id.* at 840 (alteration in original).

We recognized in *O.B.* the difficulties state officials faced in providing the needed nurses. There was no guarantee that compliance with the injunction would solve the plaintiffs' problems. In affirming the preliminary injunction, though, we explained that the injunction "should be understood simply as a first cut: as insisting that the State do *something* rather than nothing to provide in-home nursing care for these children." *Id.* at 842; see also *id.* at 844 (Easterbrook, J., concurring) ("All a district court can do in a situation such as this is require [the State] to start trying."). If Saint Anthony can prove its claims of systemic delay and/or underpayment, the same is true here.

The State decided to switch from a fee-for-service model where the State itself was responsible for making timely and adequate payments to providers, to a Medicaid program dominated by managed care. The State cannot now claim it has no obligation to ensure that Medicaid providers serving patients under that program receive timely payment. *O.B.* instructs that where HFS has a duty, a district court may order it to do something when that duty is not being met, at least as a first cut. *Id.* at 842. The court may then need to supervise the effects of the injunction and the State's response and adjust the court's orders as circumstance and equity may require. The district court should not let the perfect become the enemy of the good, nor should the possibility

**A 26**

that a first cut at an injunction might not work sufficiently justify a denial of any relief at all.

To be clear, we are not suggesting that an injunction ordering the State officials literally to do only "something" would be sufficient. Federal Rule of Civil Procedure 65(d)(1)(C) requires an injunction to "describe in reasonable detail … the act or acts restrained or required." At the same time, we have often recognized that district courts have substantial equitable discretion in crafting injunctions so that they are both understandable by those enjoined and effective to accomplish their purposes. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384–85 (7th Cir. 2018); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012), citing *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). If Saint Anthony can prove systemic failures by MCOs to comply with the 30/90 payment schedule with reasonably transparent payment information, we would expect the district court to explore with the parties what steps State officials could reasonably be expected to take to correct those systemic failures before framing an appropriate and effective injunction. And if such an injunction later needed to be modified based on experience, the district court would have ample power to do so at the request of a party or on its own motion.

**\*17** *O.B.* also makes clear that a district court can craft injunctive relief within its equitable powers and discretion even in circumstances where some more drastic remedial measures may be off the table. See *O.B.*, 838 F.3d at 844 (Easterbrook, J., concurring) (identifying certain forms of relief that were off limits while also instructing the district judge to try different things and to "keep tabs on what is happening and adjust the injunction as appropriate" to secure relief for plaintiffs); accord, *Rizzo v. Goode*, 423 U.S. 362, 376–77, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (internal quotations and citation omitted)). Federal Rule of Civil Procedure 54(c) offers relevant guidance here, providing that any final judgment other than a default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

The converse is also true. If a complaint demands relief that is not available, the improper demand does not poison the well to defeat relief to which the party is otherwise entitled. If Saint Anthony succeeds on the merits of its claims, we believe

the district court here will be able to craft a remedy to push the State toward complying with its duty to provide for timely and transparent payments to Saint Anthony.

We recognize that part of the rationale for adopting the managed-care model was to ease the State's administrative burden. Measures that would force HFS to take a more aggressive oversight role could reduce some of the administrative benefits the State hoped to gain by the switch to managed care. As we have explained, however, the Medicaid Act permits states to shift major Medicaid duties to MCOs but does not allow States to wash their hands of effective oversight. On the contrary, the Medicaid Act in general, and section 1396u-2(f) in particular, show that Congress recognized the troubling financial incentives inherent in a managed-care system and the need for effective oversight of MCOs and their treatment of providers' claims for payment. Recall that the Act requires the State's contracts with MCOs to include audit and inspection of MCO books and records, as well as annual external reviews of payment timeliness. The Act also requires the State to have available intermediate sanctions, short of cancelling the entire contract, that can be deployed if an MCO underperforms.

Saint Anthony alleges here that HFS is falling far short on those oversight and monitoring duties. HFS cannot avoid those duties altogether on the theory that Saint Anthony also asked for certain remedies that might not be available in this section 1983 action. If the State cannot manage to carry out those oversight and monitoring duties, an effective remedy to enforce the requirements would honor the bargain struck when Illinois accepted funding for Medicaid in the first place.

If Saint Anthony can prove its allegations, we do not view the judicial choice as a binary either-or: either the district court must prepare to take over day-to-day claims management, or no judicial relief is available at all. The case is difficult, but the judicial options are not so limited.

First, the Medicaid Act and the relevant contracts recognize that perfection is not required. That much is clear from the 30/90 pay schedule itself: pay 90% of clean claims within 30 days and 99% within 90 days.

Second, HFS itself seems to be able to tell the difference between minor problems and systemic ones, and there is reason to think it can identify systemic measures that can be effective without having HFS (let alone the district court) take over day-to-day claims management. As noted above, for example, HFS took action against

**A 28**

CountyCare based on data showing that CountyCare "was not regularly meeting" the 30/90 pay schedule. Decl. of Robert Mendonsa ¶ 16, Dkt. 86-10. HFS investigated, demanded that CountyCare adopt a "Corrective Action Plan," and reported that a few months after adopting such a plan, CountyCare "significantly reduced the number of outstanding claims that [were] older than 90 days." *Id.* ¶¶ 17–21. We need not and should not adopt a mathematical definition of "systemic" failures at the pleadings stage. That problem can await further factual development. (To use a metaphor often used in the law, a person can *usually* tell the difference between being in mountains, in foothills, or on a plain even if there is not a sharp boundary between mountains, foothills, and plains.)

**\*18** For these reasons, we conclude that section 1396u-2(f) satisfies the third *Blessing* factor because the State has a binding obligation to try to ensure prompt payment for providers from MCOs.

D. *An Alternative Remedial System?*

Since section 1396u-2(f) satisfies the *Talevski* requirement of an unambiguous statutory right and the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983. *Talevski*, 599 U.S. at 186, 143 S.Ct. 1444. The Medicaid Act includes no express prohibition on enforcement under section 1983. The State contends, however, that a section 1983 remedy is implicitly barred because it would be incompatible with remedies available under the Medicaid Act itself. As the Court in *Talevski* explained, the burden is on the defendant to make such a showing. 599 U.S. at 186, 143 S.Ct. 1444; accord, *Gonzaga*, 536 U.S. at 284 n.4, 122 S.Ct. 2268. This is a "difficult showing." *Blessing*, 520 U.S. at 346, 117 S.Ct. 1353.

*Talevski* explained that in the three cases where the Court has found that more specific statutory and administrative remedial schemes were incompatible with section 1983, the statutes (a) had their own statute-specific private rights of action, (b) had specialized administrative procedures for those remedies, and (c) offered remedies more limited than those under section 1983. 599 U.S. at 189–90, 143 S.Ct. 1444, citing *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005), *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), and *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). None of those features are present in this case. That fact

**A 29**

weighs heavily against finding implicit incompatibility here.

Still, if the MCOs are failing to abide by the contractual terms, says HFS, Saint Anthony should just enforce its own contracts with them. And providers like Saint Anthony are in the best position to "enforce their right to timely payment directly under their contracts with MCOs." Appellee HFS's Br. at 29. As HFS sees the matter, there is no need to permit section 1983 actions to achieve Congress's goal of enabling Medicaid providers to receive timely payment.

A contractual remedy may offer some prospect of relief to a provider like Saint Anthony. But HFS has not convinced us that Congress meant to leave providers on their own, or with only such help as state officials choose to provide. In other words, HFS has not shown that "allowing [section] 1983 actions to go forward in these circumstances 'would be inconsistent with' " a "carefully tailored [Congressional] scheme.' " *Blessing*, 520 U.S. at 346, 117 S.Ct. 1353, quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); accord, *Talevski*, 599 U.S. at 190, 143 S.Ct. 1444. Rather, Congress intended the State's entire Medicaid plan to ensure timely payment to providers. If, as Saint Anthony alleges, the plan has been failing to meet this requirement, repeatedly and systematically, we would not be surprised if provider-MCO arbitrations would do little to correct that problem on a systemic basis.

There is good reason to doubt that contractual remedies alone can vindicate the provider's right to prompt payment. Saint Anthony files many thousands of Medicaid claims each year. If most claims are not paid on time, Saint Anthony's option under the contract is to sue the MCO and/or to submit each claim for arbitration. Many other Medicaid providers across Illinois might need to do the same with each of the seven MCOs. That avenue represents a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations. It's not immediately obvious that this dispute-resolution system would even be manageable, let alone superior to a systemic solution implemented by HFS. At the very least, we are not persuaded that Congress, implicitly through the contractual model, created "a comprehensive enforcement scheme that is incompatible with individual enforcement under [section 1983]." *Gonzaga*, 536 U.S. at 285 n.4, 122 S.Ct. 2268, quoting *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353; accord, *Talevski*, 599 U.S. at 190–91, 143 S.Ct. 1444.

**A 30**

**\*19** To sum up on the central question, for all of these reasons, we conclude that section 1396u-2(f) satisfies *Talevski, Gonzaga*, and *Blessing* and confers on plaintiff a right enforceable under section 1983 to have state officials use their powers to assure timely payments by MCOs. Saint Anthony has plausibly alleged a violation of the right that could, if proven, support injunctive relief. We therefore reverse the district court's dismissal of this claim.

We emphasize again, as in our earlier decision, that we are deciding this case only on the pleadings. This is a hard case with high stakes for the State, for Medicaid providers, and especially for Medicaid patients. There is one genuine binary choice in this case: whether to affirm dismissal of Saint Anthony's claims under section 1983 for failure to state a claim—no matter how egregious and systemic the MCOs' slow payments, no matter how little the State has done to ensure timely payments, and no matter how devastating the effects of the delays on Saint Anthony and its patients. The stakes for Saint Anthony are measured in millions of dollars. Looking more broadly, managed care contracts under Medicaid—with their inherent incentives to slow payments to providers—now control more than half of all Medicaid spending, hundreds of billions of dollars a year. Millions of Americans depend on that system for their health care.

Accordingly, we recognize the potential magnitude of the case. We also recognize the challenges it may present to the district court. If it turns out that resolving this dispute would actually require the district court to analyze each late claim, effectively taking on the role of the State's Medicaid claims processors, or that effective relief could come only by canceling a contract with an MCO, then we may face a different situation. But we do not know at this point what direction the course of this litigation will take.

We should not decide today whether Saint Anthony has alleged a viable claim by assuming only the worst-case litigation scenarios will materialize down the line. If Saint Anthony can support its factual allegations about systematically late and inadequate payments, we expect the district court has sufficiently broad and flexible equitable discretion to fashion effective relief. The corrective action plan that HFS demanded from CountyCare may provide a starting point, adaptable to the circumstances of different MCOs.

**A 31**

III. *Additional Issues*

We have two issues left to discuss: the district court's denial of Saint Anthony's motion to supplement its complaint, and a possible stay in favor of arbitration.

    A. *Plaintiff's Motion to Supplement the Complaint*

While the motion to dismiss was pending in the district court, Saint Anthony moved to supplement its complaint with a claim for deprivation of property without due process of law. Saint Anthony alleged HFS violated its due process rights in two ways, both related to payment transparency: (1) by failing to notify Saint Anthony of the amounts being paid for services provided to Medicaid beneficiaries in the fee-for-service program; and (2) by failing to require MCOs to provide such notice in the managed-care program. Four days after the district court dismissed the existing complaint, the court denied Saint Anthony's motion to supplement.

As a preliminary matter, there is an academic question whether this request should be construed as a motion to supplement under Federal Rule of Civil Procedure 15(d) or a motion to amend under Rule 15(a). Saint Anthony's motion sought to add allegations concerning both post-complaint events (most appropriate as a 15(d) supplement) and some pre-complaint events that came to light in discovery (most appropriate under 15(a)). The distinction between 15(a) amendments and 15(d) supplements is not important here. District courts have essentially the same responsibilities and discretion to grant or deny motions under either subsection. See *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996) ("[T]he standard is the same."); see also 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (3d ed. Supp. 2023) (lack of formal distinction between the two is "of no consequence," and leave should be freely granted when doing so will promote economic and speedy disposition of entire controversy and will not cause undue delay or unfair prejudice to other parties).

**\*20** Ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases). The decision to deny the plaintiff such an opportunity "will be reviewed rigorously on appeal." *Id.* "Unless it is *certain* from the face of the

**A 32**

complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Id.* at 519–20, quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). Reasons for denying leave to amend include "futility, undue delay, prejudice, or bad faith." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 417 (7th Cir. 2019).

The district court used a procedure here that ran a high risk of error. Saint Anthony requested leave to add the due process claim after minimal discovery and before the court ruled on the pending motion to dismiss. The court entered a minute order recognizing that "Rule 15(a)(2) provides that the 'court should freely give leave when justice so requires.' " It then ordered HFS to respond, even permitting an oversized brief. HFS responded by arguing the merits of the due process claim, saying in essence that the proposed amendment or supplement would be futile.

Futility could be a good reason to deny the amendment or supplement, but then the district court took a wrong turn. It denied Saint Anthony an opportunity to file a reply defending the merits of its proposed due process claim. The court then denied Saint Anthony's motion on futility grounds. This unusual procedure thus denied Saint Anthony a fair opportunity to defend the merits of its supplemental claim—only to lose on the supposed lack of merit. That procedure amounted to an abuse of discretion.

Other aspects of the district court's decision on that motion also point toward reversal. For instance, Saint Anthony's request to supplement the complaint occurred early in the lawsuit. See *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018) ("The usual standard in civil cases is to allow defective pleadings to be corrected, *especially in early stages*, at least where amendment would not be futile." (emphasis added)). The district court did not find bad faith by Saint Anthony or prejudice to HFS.

The district court denied the motion in part because it concluded the new claim would expand the scope and nature of the case, which the court thought was "otherwise over." We do not find this rationale persuasive, especially after we have concluded that the case is not otherwise over. The due process claim against the State pertains to the lack of transparency in the Medicaid remittances, based at least in part on new information produced in the limited discovery. Saint Anthony alleged problems with the remittances in its original complaint, as HFS acknowledges. The new claim added

**A 33**

issues related to the fee-for-service aspects of Illinois Medicaid, but that fact alone was not reason enough to deny leave so early in the life of a case and before discovery was in full swing. Courts should not be surprised, and should not respond rigidly, when discovery in a complex case turns up evidence to support a new theory for relief or defense.

In addition, by denying the motion to amend or supplement, the district court put Saint Anthony at risk of serious and unfair prejudice. To the extent the district court might have thought that the due process claim should be presented in a separate lawsuit, Saint Anthony could face serious problems with claim preclusion. See *Arrigo v. Link*, 836 F.3d 787, 798–800 (7th Cir. 2016).[6]

**\*21** At this stage of the proceedings, the only arguable ground for denying Saint Anthony's request to supplement its complaint would have been futility on the merits. The district court did say that it "ha[d] doubts about the legal sufficiency of Saint Anthony's proposed new claim." As noted above, the denial of a plaintiff's first attempt at leave to amend or supplement "will be reviewed rigorously on appeal." *Runnion*, 786 F.3d at 519. Doubts on the merits do not show futility. See, e.g., *id.* at 519–20; *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the

---

[6] In *Arrigo*, the first district court denied plaintiff's motion to amend the complaint to add a related claim, and we affirmed. Then, when the plaintiff tried to bring the claim in a new action, the second district court dismissed it. We upheld that decision, asserting that "allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the denial of the untimely amendment, which we upheld, was intended to avoid." 836 F.3d at 800. We also stressed that "[t]o rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend." *Id.* In that sense, by prohibiting the supplemental claim here, the district court might have also prevented Saint Anthony from bringing that claim in a future case, all without the opportunity for Saint Anthony to defend the merits of the claim. HFS argues that Saint Anthony's concerns are misplaced because the district court implied that Saint Anthony could bring its due process claim in a future action. It is true that a district court can expressly reserve a claim for future adjudication, see, e.g., *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015); 18 Wright & Miller § 4413, but such an exception requires the second court to conclude the first court adequately preserved the claim. One could understand why such assurances from HFS, including its post-argument letter promising to forgo a claim preclusion defense in a separate lawsuit, might provide Saint Anthony limited comfort, especially since the district court's stated rationale was based at least in part on a supposed lack of merit.

prospects for success."). We thus reverse the denial of Saint Anthony's motion to supplement its complaint.


   B. *Arbitration*

The remaining issue is whether we should stay the case in favor of arbitration, as the intervening MCOs have requested. A necessary aspect of Saint Anthony's claim against HFS is showing that the MCOs systematically miss the 30/90 pay schedule. The MCOs dispute that allegation, however. They argue that under the contracts, each allegedly late claim presents a factual dispute that must be resolved in arbitration before Saint Anthony's case against HFS can proceed on the merits.

The district court did not address this issue. We declined to address it in the first instance when this appeal was first before us, and we do so again now. Both HFS and the MCOs have their distinct obligations to ensure timely payment for providers. While factual issues related to the MCOs appear intertwined with Saint Anthony's claim against HFS, they do not foreclose Saint Anthony's section 1983 action. Faced with chronic late payments, Saint Anthony is entitled to seek relief against HFS as well as against the MCOs.

* * *

To sum up, Saint Anthony has alleged a viable right under 42 U.S.C. § 1396u-2(f) to have HFS act to try to ensure timely payments from MCOs, and that right is enforceable in this section 1983 action against the HFS director. We REVERSE the dismissal of Count One. We AFFIRM the dismissal of Count Two, which sought to use section 1983 to assert rights under section 1396a(a)(8). We REVERSE the denial of Saint Anthony's motion to supplement, we DECLINE to stay the proceedings in favor of arbitration, and we REMAND for proceedings consistent with this opinion.


Brennan, Circuit Judge, dissenting.

The Supreme Court recently underscored when a private right of action is cognizable under 42 U.S.C. § 1983: a statute must contain explicit rights-creating, individual-centric language. *Health and Hosp. Corp. of Marion Cty. v. Talevski*, 599 U.S. 166,

182–84, 143 S. Ct. 1444, 1457, 216 L.Ed.2d 183 (2023). The provision of the Medicaid Act at issue here, 42 U.S.C. § 1396u-2(f), contains no such language. Even more, conferring a privately enforceable right under this statute would conflict with and defeat the contractual enforcement scheme Congress created for state monitoring and sanction of managed care organizations. Medicaid's timely-payment provision does not enable Saint Anthony and other providers to sue Illinois to enforce it, so I respectfully dissent.

# I

Much of this case's relevant factual background has not changed since our court's last decision. *St. Anthony Hosp. v. Eagleson*, 40 F.4th 492 (7th Cir. 2022). Saint Anthony maintains that it has not received timely Medicaid payments from multiple managed care organizations (MCOs). Yet, the hospital wants to address this dispute outside the means set forth in its contracts with those MCOs. Saint Anthony continues to argue that it can sue Illinois under 42 U.S.C. § 1396u-2(f) and 42 U.S.C. § 1983, forcing the state to proactively ensure that MCOs issue timely payments to hospital providers.

**\*22** This dispute returns to us, though, with the applicable rules emphasized. The Supreme Court granted Illinois's petition for a writ of certiorari, vacated this court's original judgment in this case, and remanded for our reconsideration in light of *Talevski. Eagleson v. St. Anthony Hospital*, ––– U.S. ––––, 143 S. Ct. 2634, 2634, 216 L.Ed.2d 1222 (2023).

In *Talevski*, the Court considered whether certain provisions of the Federal Nursing Home Reform Act (FNHRA) could be enforced via a private right of action under § 1983. Revisiting and explaining the requirements governing whether statutory provisions are enforceable under § 1983, the Court ruled that the two FNHRA provisions at issue "unambiguously create § 1983-enforceable rights." *Talevski,* 143 S. Ct. at 1450. At the jump, the Court noted the particularly "demanding bar" that must be met: "Statutory provisions must *unambiguously* confer individual federal rights." *Id.* at 1455 (emphasis in original). And *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), "sets forth our established method for ascertaining unambiguous conferral." *Id.* at 1457. The Court then described the *Gonzaga* test.

**A 36**

Under *Gonzaga*, courts must use "traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Id.* (quoting *Gonzaga*, 536 U.S. at 283, 285–86, 122 S.Ct. 2268). The statute in question must be "phrased in terms of the persons benefited and contain[ ] rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Id.* (quotations marks omitted). If a statute contains the requisite language to mount this "significant hurdle," the statute "secures § 1983-enforceable rights." *Id.* (cleaned up).

Applying this test, the Court in *Talevski* concluded that the provisions of FNHRA at issue contained unambiguous, rights-creating, individual-centric language. Those provisions—concerning unnecessary restraint of nursing home residents and predischarge notice—"reside in 42 U.S.C. § 1396r, which expressly concerns requirements *relating to residents' rights*." *Id.* (emphasis in original) (cleaned up).

The Court began with the unnecessary-restraint provision, which "requires nursing homes 'to protect and promote ... [*t*]*he right* to be free from ... any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat *the resident's* medical symptoms.' " *Id.* at 1458 (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(1)(A)). The exceptions within that provision contain additional language "sustain[ing] the focus on individual residents," including permissive use of restraints "to ensure the physical safety *of the resident or other residents*." *Id.* (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)(I)).

FNHRA's predischarge-notice provision, the Court noted, contains "more of the same." *Id.* That provision, included in a paragraph "concerning 'transfer and discharge *rights*,' " *id.* (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(2)), mandates that nursing homes "must not transfer or discharge [a] *resident*," prior to fulfillment of certain preconditions. 42 U.S.C. § 1396r(c)(2)(A) (emphasis added). Any exceptions to the predischarge-notice provision maintain the required "unmistakable focus on the benefited class" that *Gonzaga* demands. *Talevski*, 143 S. Ct. at 1457. For example, discharges or transfers of nursing home residents must be "necessary to meet *the resident's* welfare." *Id* at 1458. (emphasis in original) (quoting 42 U.S.C. § 1396r(c)(2)(A)). Because "[t]he unnecessary-restraint and predischarge-notice provisions use clear 'rights-creating language,' speak 'in terms of the persons benefited,' and have an 'unmistakable focus on the benefited class,' " the Court concluded that those particular provisions are presumptively enforceable under §

1983. *Id.* at 1458–59 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290, 122 S.Ct. 2268).

**\*23** But "[e]ven if a statutory provision unambiguously secures rights, a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *Id.* at 1459 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005)). Such an intention can be expressed (1) explicitly in the text of the statute creating the right, or (2) implicitly by showing that Congress "creat[ed] 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.' " *Id.* (quoting *Rancho Palos Verdes*, 544 U.S. at 120, 125 S.Ct. 1453). To determine whether Congress implicitly intended to prevent enforcement through § 1983, the relevant "question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983." *Id.* That is, do the statute's text and context evince congressional intent for "a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert his claims.' " *Id.* (emphasis in original) (citation omitted).

Applying these precepts, the Court in *Talevski* "discern[ed] no incompatibility between the FNHRA's remedial scheme and § 1983 enforcement of the rights that the unnecessary-restraint and predischarge-notice provisions unambiguously secure." *Id.* at 1460. This was because FNHRA "lacks any indicia of congressional intent to preclude § 1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent." *Id.* Rather, the Court deemed FNHRA unlike other statutes it had previously examined, which "required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme" before filing suit. *Id.* at 1461 (quotation marks omitted) (discussing *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Rancho Palos Verdes*; and *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). "[I]n all three cases, § 1983's operation would have thwarted Congress's scheme ... circumvented the statutes' presuit procedures, and would have also given plaintiffs access to tangible benefits as remedies that were unavailable under the statutes." *Id.* (quotation marks omitted).

The Court concluded, "the test that our precedents establish leads inexorably to the conclusion that the FNHRA secures the particular rights that Talevski invokes without otherwise signaling that enforcement of those rights via § 1983 is precluded as

**A 38**

incompatible with the FNHRA's remedial scheme." *Id.* at 1462.[1]

## II

Applying this *Gonzaga* framework here, § 1396u-2(f) is not enforceable under § 1983. The text and context of the provision do not unambiguously confer an individually enforceable right. *See Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (holding that Congress must speak "unambiguously ... with a clear voice" in Spending Clause legislation—like the Medicaid Act—before imposing obligations on the states). Even if it did, such a right is inconsistent with the Medicaid Act's contractual enforcement scheme.

## A

Section 1396u-2(f), referred to as the timely-payment provision, governs contracts between states and MCOs. It states in relevant part:

> A contract under section 1396b(m) of this title with a Medicaid managed care organization shall provide that the organization shall make payment to health care providers ... on a timely payment basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the healthcare provider and the organization agree to an alternate payment schedule ....

**\*24** Section 1396a(a)(37)(A) provides a default payment schedule to be included in contracts between states and MCOs, requiring MCOs to furnish payment to providers

---

[1] The majority opinion in *Talevski* cites *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), only once, and without further discussion, for the proposition that some statutes will permit § 1983 enforcement alongside a detailed enforcement regime so long as they are not incompatible. 143 S. Ct. at 1460.

The only other mention of *Blessing* in *Talevski* is in a dissenting opinion, agreeing with the majority "that there is no room for 'a multifactor balancing test to pick and choose which federal requirements may be enforced by § 1983 and which may not.'" *Id.* at 1484 (Alito, J., dissenting) (quoting *Gonzaga*, 536 U.S. at 286, 122 S.Ct. 2268).

**A 39**

for 90% of clean claims within 30 days and 99% of clean claims within 90 days.

Section 1396u-2(f) does not grant providers like Saint Anthony an individual enforcement right. Neither § 1396u-2(f) nor § 1396a(a)(37)(A) contains the clear, rights-creating language necessary to show that Congress "manifests an 'unambiguous' intent to confer individual rights" upon providers to pursue private enforcement of the timely-payment provision under § 1983. *Gonzaga*, 536 U.S. at 273–74, 122 S.Ct. 2268 (quoting *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531).

Unlike the unnecessary-restraint and predischarge-notice provisions in *Talevski*, which expressly granted nursing home residents specific rights, § 1396u-2(f) and § 1396a(a)(37)(A) do not mention rights. Nor does the timely-payment provision impose any duty on states (or grant providers a corresponding right) to guarantee that MCOs consistently make prompt payments. The provision requires only that a state's contract with an MCO contain language that payments will comply with either § 1396a(a)(37)(A)'s 30-day/90-day payment schedule or some agreed upon alternative.

Saint Anthony responds by citing to the only two Supreme Court cases since *Pennhurst* to hold that a Spending Clause statute confers a § 1983-enforceable right. *See Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

*Wright* addressed whether a rent ceiling statute for low-income housing appended by amendment to the Housing Act of 1937 was § 1983-enforceable. 479 U.S. at 419, 107 S.Ct. 766. The dispute arose when the Housing Authority allegedly overcharged for utilities, which the statute defined as part of a tenant's rent. *Id.* at 420–21, 107 S.Ct. 766. The relevant statute read, "[a] family shall pay as rent for a dwelling unit assisted under this chapter" amounts defined by statute. *Id.* at 420 n.2, 107 S.Ct. 766. As *Gonzaga* acknowledged, the Court held in *Wright* that the rent ceiling statute was enforceable under § 1983 because "Congress spoke in terms that 'could not be clearer' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights.' " 536 U.S. at 280, 122 S.Ct. 2268 (quoting *Wright*, 479 U.S. at 432, 107 S.Ct. 766). The Court also found persuasive the Housing Act's lack of procedure "by which tenants could complain to [Housing and Urban Development] about the alleged failures of [a public housing authority] to abide by [the Act's rent-ceiling provision]." *Wright*, 479 U.S. at 426, 107 S.Ct. 766.

**A 40**

In *Wilder*, the Court set out to answer whether the Boren Amendment to the Medicaid Act—a reimbursement provision—could be enforced by a private cause of action under § 1983. 496 U.S. at 501–02, 110 S.Ct. 2510. As *Gonzaga* recognized, the Court in *Wilder* analogized the Boren Amendment to *Wright*'s rent-ceiling provision, as both "explicitly conferred specific monetary entitlements upon the plaintiffs." *Gonzaga*, 536 U.S. at 280, 122 S.Ct. 2268. In addition, regulations requiring states to adopt an appeals procedure for individual providers to obtain review of reimbursement rates was not "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." *Wilder*, 496 U.S. at 522, 110 S.Ct. 2510.

**\*25** Saint Anthony argues that the statutes at issue in *Wright* and *Wilder*—which contain less precise language than § 1396u-2(f) and omit the term "rights" altogether—still conferred a § 1983-enforceable right. But *Wright* and *Wilder* predate *Gonzaga's* requirement that a statute must contain explicit "rights-creating" language to unambiguously confer a private cause of action under § 1983. *Gonzaga*, 536 U.S. at 284, 287, 122 S.Ct. 2268. The two cases also predate the Court's "reject[ion of] attempts to infer enforceable rights from Spending Clause statutes." *Gonzaga*, 536 U.S. at 281, 122 S.Ct. 2268; *see also Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (holding that a provision in the Adoption Assistance and Child Welfare Act of 1980 is not § 1983-enforceable); *Rancho Palos Verdes*, 544 U.S. at 127, 125 S.Ct. 1453 (holding that limitations on local zoning authority included in the Telecommunications Act of 1996 do not confer an individual enforcement right under § 1983). These more recent cases reaffirm that "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga*, 536 U.S. at 280, 122 S.Ct. 2268 (quoting *Pennhurst*, 451 U.S. at 28, 101 S.Ct. 1531).

Without any rights-creating, individual-centric language in § 1396u-2(f), the majority opinion turns to three other provisions of the Medicaid Act, looking for an unambiguous conferral of a § 1983-enforceable right. But if other statutes are needed to show that the timely-payment provision is not ambiguous, how did Congress "unambiguously confer" the claimed individual right within "the provision in question?" *Talevski*, 143 S. Ct. at 1457. These three other provisions—§ 1396u-2(c)(2)(A)(i), § 1396u-2(h)(2)(B), and § 1396b(m)(2)(A)(iv)—also do not extend as far as the majority option concludes.

*Saint Anthony Hospital v. Whitehorn, ___ F.4th ___ (7th Cir. 2024)*

The first, § 1396u-2(c)(2)(A)(i), requires certain language in state contracts with MCOs. The contracts must "provide for an annual ... external independent review ... of the quality of outcomes and timeliness of, and access to, the items and services for which the organization is responsible under the contract." 42 U.S.C. § 1396u-2(c)(A)(i). This says nothing about rights, much less anything about the focus of this suit: MCO payments to providers.[2]

The second, § 1396u-2(h)(2)(B), is a timely-payment provision that applies to contracts between states and MCOs concerning managed-care programs for Indian health care providers. It requires that MCOs "agree to make prompt payment" to Indian health care providers "consistent with" § 1396u-2(f)'s rule for prompt payment. 42 U.S.C. § 1396u-2(h)(2)(B). So, it operates exactly as § 1396u-2(f), just in the Indian health care context. It requires contracts between states and MCOs to contain language dictating that MCO payments to providers will comply with the 30-day/90-day payment schedule or with some other agreed upon schedule.

The majority opinion also notes that this second statute, § 1396u-2(h)(2)(B), refers to § 1396u-2(f) as the "rule for prompt payment of providers." For my colleagues, such a title supports a conclusion that Congress intended § 1396u-2(f) to guarantee timely payment to providers by imposing a binding obligation on states to enforce MCO payment schedules. "But headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). This title is especially unhelpful because it does not clarify whether § 1396u-2(f) is an administrative requirement that a managed contract included deadlines, or a rule that imposes a privately enforceable, managerial duty on states to guarantee all MCO payments are timely.[3] A passing reference in §

---

[2]  An argument that "items and services" can be construed to mean payments is defeated by language elsewhere. That phrase refers to the medical services and supplies provided by providers to the individuals they treat. *See, e.g.*, 42 U.S.C. §§ 1396u-2(a)(5)(B)(4), 1396u-2(d)(1)(A)(ii), 1396u-2(e)(1)(A)(i), 1396u-2(h)(4)(D).

[3]  The same critique applies to the majority opinion's reliance on the title of § 4708(c) of the Balanced Budget Act of 1997—"Assuring Timeliness of Provider Payments." Pub. L. No. 105-33, 111 Stat. 251, 506. In fact, reliance on section titles in the Balanced Budget Act may point towards a determination that § 1396u-2(f) is merely an administrative requirement. Section 4708 itself is entitled "Improved Administration." *Id.*

1396u-2(h)(2)(B) to the provision in dispute fails to alter the plain meaning of the text in § 1396u-2(f).

**\*26** The third, § 1396b(m)(2)(A)(iv), mandates specific provisions in state contracts with MCOs. It requires these contracts to "provide[ ] that ... the State ... shall have the right to audit and inspect any books and records" of MCOs "pertain[ing] ... to services performed or determinations of amounts payable under the contract." 42 U.S.C. § 1396b(m)(2)(A)(iv). This provision expressly mentions a "right." But it is *Illinois's* right—not any individual provider's—to audit and inspect MCO books and records. And as discussed below, this provision is more congruent with the Congressionally created, contract-based enforcement scheme through which states may monitor MCO compliance and sanction bad actors.

Relying on these three other Medicaid provisions proves too much. Granting states oversight of MCOs could serve several purposes, but one of them is not to legislatively require Illinois to enforce the prompt payment provision through anything other than the contractual enforcement mechanisms provided in the Medicaid Act. *See infra* II.B. Imposing reporting and oversight responsibilities does not show that Congress prescribes a privately enforceable duty on states to guarantee that healthcare providers are timely paid. None of these statutes contains any language meeting the requirements of *Gonzaga*.

The majority opinion also turns to circuit precedent interpreting another Medicaid statute, § 1396a(a)(10)(A). That provision requires state plans for medical assistance to "provide ... for making medical assistance available ... to [ ] all individuals" who meet certain eligibility requirements. Twice this court has concluded that that provision confers a right enforceable under § 1983. In *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir. 1993), this court held that Medicaid recipients have a right of action to "challenge the reasonableness of a state's decision regarding the medical necessity of a life saving procedure." After *Blessing* and *Gonzaga*, the holding in *Miller* was reaffirmed in *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012).

But these precedents do not bear the weight the majority opinion would have them carry. Though *Bontrager* reaffirmed *Miller*, the *Blessing* test was top of mind. *See id.* ("Generally, we consider three factors to determine if a statute creates an enforceable right."). And *Miller* relied on *Wilder* and the same three factors that became the

*Blessing* test. 10 F.3d at 1319–20. But we now know—not just generally, but after a vacate and remand of our previous decision in this same case—that *Gonzaga*'s text-rooted approach is to be applied to identify whether a statute grants a § 1983-enforceable right. *Talevski*, 143 S. Ct. at 1457. So, *Miller* and *Bontrager* do not help the hospital.

Rather than apply the *Gonzaga* test as explained in *Talevski*, Saint Anthony argues that (1) *Talevski* did not overrule *Blessing*, and (2) our court's original ruling, particularly its application of the *Blessing* factors to find an individually enforceable right in § 1396u-2(f), is consistent with *Talevski*.[4] The majority opinion agrees with the first proposition. And though it now supplies a *Gonzaga* analysis, the majority opinion accedes to the second by continuing to apply the *Blessing* factors.

Saint Anthony's first point is correct—*Talevski* does not say that *Blessing* is no longer good law.[5] But Saint Anthony's second assertion falters. Even if a marginalized *Blessing* survives, *Talevski* expressly and repeatedly looks to and applies *Gonzaga* and its principles—not *Blessing*—to decide whether a federal statute confers a § 1983-enforceable right. "*Gonzaga* sets forth our established method for ascertaining unambiguous conferral." *Talevski*, 143 S. Ct. at 1457. After *Talevski, Blessing* and its factors are severely diminished as a means to determine whether there is a privately enforceable right. In *Gonzaga* the Court named *Blessing* as an example of past Supreme Court opinions "suggest[ing] that something less than an unambiguously conferred right is enforceable by § 1983." 536 U.S. at 282, 122 S.Ct. 2268. *Gonzaga* "reject[ed] the notion" that the law "permit[s] anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283, 122 S.Ct. 2268; *see also id.* at 286, 122 S.Ct. 2268 (addressing separation of powers concerns and stating, "we fail to see how relations between the branches are served by having courts apply a multifactor balancing test to pick and choose which federal

---

[4]  Saint Anthony now asserts in its Supplemental Reply Brief that this court's original decision "applied the same rule as *Talevski*." If that was correct, there would have been no need for a GVR.

[5]  Doubts exist about *Blessing*'s continued validity post-*Talevski*. *Fed. L. Enf't Officers Ass'n v. New Jersey*, 93 F.4th 122, 128–130, n.4 (3d Cir. 2024) (applying Gonzaga and holding that the Law Enforcement Officers Safety Act of 2004 confers an individually enforceable right to qualified retired law enforcement officers under § 1983, conducting Blessing analysis in a footnote, and noting that "recent Supreme Court authority casts doubt upon the continued application of the *Blessing* factors.").

requirements may be enforced by § 1983 and which may not.").

**\*27** Saint Anthony also characterizes *Talevski* and *Gonzaga* as "best understood as reformulating *Blessing* factors 1–2 into a single statement that captures the plaintiff benefit and clear right factors" and "clarifies that the *Blessing* standard requires the court to find that Congress granted a 'right' and not just a 'benefit.' " The majority opinion views the *Blessing* standard otherwise, as my colleagues "do not see a fundamental difference between the *Talevski/Gonzaga* standard … and the first and third *Blessing* factors." Regardless of what may survive of *Blessing*, neither the text nor context of § 1396u-2(f) grants a § 1983-enforceable right.

The inquiry should end here. The timely-payment provision does not satisfy the *Gonzaga* requirements, reaffirmed in *Talevski*. Section 1396u-2(f)'s text does not contain "rights-creating, individual-centric language" from which to conclude that Congress unambiguously conferred a privately enforceable right under § 1983.

**B**

Even if the text of § 1396u-2(f) unambiguously secures rights actionable under § 1983, those rights would be incompatible with the comprehensive, contractual enforcement scheme of the Medicaid Act. That Act contains no express prohibition against enforcement of the timely-payment provision under § 1983. So, the relevant "question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983." *Talevski*, 143 S. Ct. at 1459. That is, do the statute's text and context evince congressional intent for "a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert his claims.' " *Id.* (emphasis in original) (citation omitted).

As noted above, Congress grounded the state-MCO relationship in contract. Under its Spending Clause power, Congress imposes many requirements that must be included in state contracts with MCOs. Along with those requirements, Congress provides states with an enforcement mechanism that requires MCO compliance with those contracts. This mechanism gives states broad discretion in how they enforce the contractual obligations of MCOs.

**A 45**

The mechanism for this discretionary enforcement is § 1396u-2(e). It requires states to establish certain "intermediate sanctions" before entering into a contract with any MCO. 42 U.S.C. §§ 1396u-2(e)(1)(A), (e)(2)(A)–(E). A state "may impose" these sanctions when an MCO acts in a manner prohibited under the section 42 U.S.C. § 1396u-2(e)(1)(A)(i)–(v). And where an MCO fails to meet its contractual obligations, states "have the authority to terminate such contract[s]." 42 U.S.C. § 1396u-2(e)(4)(A).

For my colleagues, more is required than § 1396u-2(e)'s contractual enforcement mechanism to rebut the presumption that § 1396u-2(f) confers an enforceable right for prompt payment to providers. That is because, they posit, this mechanism lacks the characteristics that *Talevski* said show incompatibility with § 1983. Those characteristics are the inclusion of "statute-specific private rights of action," requiring compliance with particular administrative remedies before filing suit under that right of action, that "offered fewer benefits than those available under § 1983." *Talevski*, 143 S. Ct. at 1461 (citing *Rancho Palos Verdes*, 544 U.S. at 120–23, 125 S.Ct. 1453; *Smith*, 468 U.S. at 1008–1013, 104 S.Ct. 3457, and *Sea Clammers*, 453 U.S. at 6–7, 19–21, 101 S.Ct. 2615). In those three cases, "§ 1983's operation would have thwarted Congress's scheme coming and going: It would have circumvented the statutes' presuit procedures, and would have also given plaintiffs access to tangible benefits as remedies that were unavailable under the statues." *Id.* (cleaned up).

**\*28** But the Medicaid statutory scheme here includes these characteristics, and § 1983's operation here would thwart Congress's scheme. Section 1396u-2(f) enables a healthcare provider like Saint Anthony to privately enforce their contractual rights against MCOs directly through arbitration or litigation. Recall that Saint Anthony has a direct vehicle to press its arguments about nonpayment of claims. The hospital has contracts with MCOs, each of which contains a bargained-for arbitration clause. And even before the initiation of dispute resolution, either in the courts or before an arbitrator, a state has the Congressionally provided tools described above—intermediate sanctions and, if necessary, termination of its contract with an MCO. To *also* provide a § 1983-enforceable right would give providers a new benefit (a "systemic" remedy, as the majority opinion crafts it) that is not otherwise available.

The contractual enforcement mechanism provided to states cannot stand alongside the § 1983-enforceable right Saint Anthony divines for itself. Such a right would strip the discretion Congress has provided to Illinois to decide for itself when and how it

**A 46**

will enforce an MCO's contractual obligation. To find a § 1983-enforceable right here would render the contractual scheme superfluous. *See Smith,* 468 U.S. at 1011, 104 S.Ct. 3457 (finding "it difficult to believe" that the [Education of the Handicapped Act's] comprehensive procedures and guarantees plus Congress's "express efforts" to give local and state agencies the primary responsibility to provide accommodations to handicapped children rendered a § 1983-enforceable right anything other than "superfluous"); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174–79 (2012) ("If possible ... every provision is to be given effect ... None should needlessly be given an interpretation that causes it ... to have no consequence").

## C

Finding a § 1983-enforceable right within the text of § 1396u-2(f) refuses to accept the burdens this holding will place on Illinois and the judiciary. Creating and conferring this individual right will turn trial courts into "de facto Medicaid claims processors for states," regardless of an attempt to limit the holding to systemic MCO noncompliance—a limit discussed nowhere in § 1396u-2(f) or surrounding provisions. *See St. Anthony Hosp. v. Eagleson*, 40 F.4th 492, 522 (7th Cir. 2022) (Brennan, J., dissenting), *cert. granted, judgment vacated sub nom. Eagleson v. St. Anthony Hosp.*, ––– U.S. ––––, 143 S. Ct. 2634, 216 L.Ed.2d 1222 (2023). Before even reaching the merits of a provider's § 1396u-2(f) claims, district courts will need to decide what is and what is not a "systemic" failure to provide timely payment to providers—without any statutory or judicial directive.

The majority opinion promises district courts that they will not need to "adjudicate issues at the claim-by-claim level"—a task my colleagues concede "would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony." But a district court cannot decide if an MCO has violated this new "systemic" standard if it does not examine claims for untimely payments on the merits. Whether the payment schedule even applies to a group of payment claims cannot be decided without evaluating the nature, timeliness, and merits of those claims, rendering district courts the new Medicaid claims processors for the states.

Moreover, without inspecting whether the individual claims are being paid on time, a district court has no metric by which to gauge the effectiveness of, or a state's compliance with, injunctions designed to ensure timely payment. Pointing to *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), the majority opinion highlights that all the district court must require is that the State do "something." But my colleagues recognize that such a remedy is appropriate only "[i]f Saint Anthony can prove its claims of systemic delay and/or under-payment," which necessarily involves adjudicating the underlying claims on the merits.[6]

**\*29** The majority opinion requires district courts to perform the arduous task of deciphering whether a healthcare provider has met an unclear standard. It is not shy about what success looks like here for Saint Anthony and future litigants: requiring states to "devise systems" to ensure MCO compliance. What those "systems" look like or how they operate is anybody's guess—Congress did not speak to them in the contract-based enforcement scheme it enshrined in statute. As a consequence, "day-to-day" functions and enforcement are returned to the states—the precise type of fee-for-service management that MCOs were designed to avoid.

\* \* \*

In sum, the majority opinion's interpretation of § 1396u-2(f) finds no support in the statute's text, contravenes other provisions of the Medicaid Act, and misapplies governing Supreme Court precedent. In those rare cases in which this court has recognized a private right of action under Medicaid, none has imposed a duty on states as broad in scope, ongoing in nature, and difficult to enforce as here.[7] Nor has any

---

[6] *O.B.* is distinguishable. There, the statutory text of 42 U.S.C. § 1396a(a)(10)(A) imposed a duty on the State to make "medical assistance" available, which this court determined included providing nurses for children. 838 F.3d at 842–43. Here, there is no textual mooring for this holding that states have a privately enforceable duty to ensure healthcare providers are timely paid in instances where MCOs are systemically delaying payments. *See also id.* at 843–44 (Easterbrook, J. concurring) (noting the district court's injunctive order requiring the states to do something to find nurses "does not supply any detail," and "[t]he Supreme Court has reversed injunctions that read like this one").

[7] *See, e.g.*, *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 824 (7th Cir. 2017) (holding that 42 U.S.C. § 1396a(a)(13)(A) creates a privately enforceable duty on states to provide a public process with notice and opportunity to comment as outlined in § 1396a(a)(13)(A)); *O.B.*, 838 F.3d at 842–43 (holding that provisions in the Medicaid Act impose a privately enforceable

other federal circuit ever recognized a state's privately enforceable duty to guarantee timely payment under § 1396u-2(f). Jane Perkins, *Private Enforcement of the Medicaid Act Under Section 1983*, Nat'l. Health L. Program 5–7 (July 16, 2021), https://bit.ly/2XaCtDY. To find such a new and expansive duty under § 1396u-2(f) stretches that statute, doing so in the context of Spending Clause legislation where Congress must "unambiguously" confer an individual right.

## III

I also see no abuse of discretion in the district court's denial of Saint Anthony's motion to supplement its complaint under Federal Rule of Civil Procedure 15(d).

The relevant language of Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Supplemental complaints are meant to "bring[ ] the case up to date." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed.). Our review is for an abuse of discretion, which we find "only if no reasonable person would agree with the decision made by the trial court." *Lange v. City of Oconto*, 28 F.4th 825, 842 (7th Cir. 2022) (quoting *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013)).

Saint Anthony's supplemental complaint sought to do more than bring the case up to date. As discussed previously, *St. Anthony Hosp.*, 40 F.4th at 526–28 (Brennan, J., dissenting), the hospital asked to add an entirely new due process claim centered on the transparency of both the managed care program *and* Illinois's separate fee-for-service program. The latter program was not part of the original case, and this request was raised after the parties had engaged in expedited discovery. Saint Anthony, in its

---

duty on states to take affirmative steps to locate and provide home nurses for children that the Illinois Department of Healthcare and Family Services have approved for home nursing); *Planned Parenthood of Ind., Inc. v. Comm'r of the Indiana State Dept. of Health*, 699 F.3d 962, 974 (7th Cir. 2012) (holding that 42 U.S.C. § 1396a(a)(23) creates a privately enforceable "right to receive reimbursable medical services from any qualified provider"); *Bontrager*, 697 F.3d at 607–08 (reaffirming *Miller*, 10 F.3d at 1318).

original complaint, had previously included an entire section challenging the lack of transparency in the MCOs' dealings with providers, and made no mention of the fee-for-service program.

**\*30** The district court correctly described the state of the case: the addition of this claim would have required expeditions into "whole new frontiers of discovery," including Saint Anthony's claim involving the Medicaid fee-for-service program. "The court not only may but should consider ... whether the claim could have been added earlier; and the burden on the defendant of having to meet it." *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996). The district court did that here. Given this case's already huge scope—the total value of the state's contracts with the seven MCOs is $63 billion, the largest single procurement in Illinois history—and its highly technical subject matter, reasonable persons could agree with its decision not to vastly expand the suit. *Lange*, 28 F.4th at 842. So, the district court did not abuse its discretion in denying Saint Anthony's desire to engage in this expedition.

For these reasons, I respectfully dissent.

Eagleson v. St. Anthony Hospital, 143 S. Ct. 2634 (2023)

Supreme Court of the United States.

Theresa EAGLESON, Director, Illinois Department of Healthcare and Family Services, petitioner,

v.

ST. ANTHONY HOSPITAL, et al.

No. 22-534.
|
June 20, 2023

Case below, 40 F.4th 492.

**Opinion**

On petition for writ of certiorari to the United States Court of Appeals for the Seventh Circuit. Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Seventh Circuit for further consideration in light of *Health and Hospital Corporation of Marion Cty.* v. *Talevski*, 599 U.S. ——, 143 S.Ct. 1444, —— L.Ed.2d —— (2023).

Saint Anthony Hospital v. Eagleson, 48 F.4th 737 (7th Cir. 2022)

United States Court of Appeals, Seventh Circuit.

SAINT ANTHONY HOSPITAL, Plaintiff-Appellant,

v.

Theresa A. EAGLESON, in her official capacity as Director of the Illinois
Department of Healthcare and Family Services, Defendant-Appellee,
and
Meridian Health Plan of Illinois, Inc., et al., Intervening Defendants-Appellees.

No. 21-2325
|
Decided September 8, 2022

Appeal from the United States District Court for the Northern District of Illinois, Eastern
Division. No. 1:20-cv-02561—**Steven Charles Seeger**, *Judge.*

Before Wood, Hamilton, and Brennan, Circuit Judges.

[*]On Petitions for Rehearing and Rehearing En Banc

On consideration of the petitions for rehearing en banc filed August 2, 2022 by Defendant-
Appellee and Intervening Defendants-Appellees, no judge in active service has requested a
vote on the petitions for rehearing en banc.[*] Judges Wood and Hamilton voted to deny panel
rehearing; Judge Brennan voted to grant panel rehearing.

Accordingly, the petitions for rehearing en banc filed August 2, 2022 by Defendant-Appellee
and Intervening Defendants-Appellees are DENIED.

**Opinion**

Hamilton, Circuit Judge, joined by Wood, Circuit Judge.

**\*738** In view of the petitions' exaggerated accounts of the panel's decision, a few comments
are in order. First, the panel opinion imposes no new duties on either State officials or managed

---

[*] Judge St. Eve did not participate in the consideration of these petitions for rehearing en
banc.

**A 52**

care organizations. Nor does the panel opinion offer any path toward monetary liability for the State of Illinois or its officials. Only injunctive relief is at stake here: possible injunctive relief to push State officials to comply with duties already imposed by the Medicaid Act.

The panel recognizes the potential complexity and challenge of this case for the district court, but also its importance for plaintiff and other providers of health care to Medicaid patients, as well as for the patients themselves. The panel concluded that the case should not be dismissed on the pleadings but should proceed toward substantial discovery. That course will allow the district court to consider actual facts rather than just allegations in weighing whether injunctive relief is appropriate and what forms it might take.

Finally, the parties and all members of the panel recognize that the Supreme Court may reshape applicable law in *Talevski v. Health and Hospital Corp.*, 6 F.4th 713 (7th Cir. 2021), *cert. granted*, ⸺ U.S. ⸺, 142 S. Ct. 2673, 212 L.Ed.2d 761 (2022). While that case proceeds in the Supreme Court, however, the stakes of this case and the delay plaintiff has already experienced in the courts weigh in favor of allowing the case to proceed in the district court in parallel with the Supreme Court's consideration of *Talevski.* Hence we are not holding these petitions but issue the mandate with this order denying them.

Brennan, Circuit Judge, dissenting from the denial of rehearing.

I would grant panel rehearing of this case for the reasons stated in my concurrence in part and dissent in part, as well as those argued in the petitions for panel rehearing filed by the State of Illinois and the intervening managed care organizations (MCOs).

### A.

The full context of this dispute shows how far the majority opinion goes.

Saint Anthony has provider contracts with the MCOs in the Illinois managed care program. Those contracts require the Hospital to submit any dispute arising under them to arbitration. So, arbitration is the path for the Hospital to secure relief on its payment terms. Saint Anthony asked to stay the arbitration of its contract and brought this lawsuit, asking that 42 U.S.C. § 1396u-2(f) be interpreted to recognize a new statutory duty. Only then did a route appear

outside of the provider contract and the bargained-for dispute resolution of arbitration.

As seen in literature about private enforcement of the Medicaid Act under 42 U.S.C. § 1983,[1] circuit court enforcement of Medicaid provisions since *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), has never involved § 1396u-2(f). Now, not only has a private right of action been recognized for the first time as to § 1396u-2(f)—a conclusion I agree is compelled under the *Blessing* factors—but the State is obliged under that Medicaid statute to proactively guarantee timely managed care payments to **\*739** healthcare providers. That obligation is meant to be enforced under the arbitration clause pursuant to the MCO provider contracts.

I will not repeat the reasons why an administrative prerequisite that a managed care contract includes deadlines is so different from a privately enforceable statutory duty to proactively guarantee timely managed care payments. To me, the text of § 1396u-2(f), the silence of its neighboring statutes as to a duty requiring state action, and the statutory incongruence created by the majority opinion's interpretation are revealing. They show that the text-based interpretation of § 1396u-2(f), in which the district court and I engage, is at least plausible.

A statute with more than one plausible interpretation of its text is ambiguous. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 419, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). And the Supreme Court requires that before Spending Clause statutes impose duties on states, they must do so "unambiguously," "speak[ing] with a clear voice," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and in statutory language that is "unmistakably clear." *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268 (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Adhering to these Supreme Court pronouncements, I would not conclude that § 1396u-2(f) imposes an enforceable duty.

## B.

These two petitions for rehearing articulate well the burdens, practical problems, and changes in decisionmakers resulting from the majority opinion's interpretation of § 1396u-2(f).

---

[1] Jane Perkins, Nat'l Health L. Program, Private Enforcement of the Medicaid Act Under 42 U.S.C. § 1983 (2021), https://health-law.org/wp-content/uploads/2021/07/Fact-Sheet-1983-Enforcement.pdf.

Saint Anthony Hospital v. Eagleson, 48 F.4th 737 (7th Cir. 2022)

The State points out the heavy burdens this decision will place on various players in the complex world of Medicaid. The interpretation of § 1396u-2(f) presents "a question of first impression ... with immense practical importance for Medicaid managed care programs nationwide, involving dozens of States and hundreds of billions of dollars in spending each year." The State fears the majority opinion will "impose on States a huge and unprecedented obligation to duplicate the administrative functions that Congress intended to be fulfilled by MCOs." The State also notes the impact this decision will have on federal courts to resolve the merits of "payment disputes between MCOs and providers as a predicate to determining whether States are liable for failing to ensure the MCOs are making payments on a timely basis." Medicaid managed care programs "serve more than 50 million individuals and involve annual expenditures of hundreds of billions of dollars." The State is concerned that "state Medicaid directors will have to decide whether to establish an administrative infrastructure to duplicate the claims-processing functions performed by MCOs or risk liability" under § 1396u-2(f).

The MCOs are worried that this decision "funnel[s] a subset of MCO-provider payment disputes into litigation, instead of arbitration, [which] will severely burden all interested parties (including federal courts)." Under this decision, "federal judges will become the arbiters of any MCO-provider disputes that providers can frame as involving 'systemic failure.'" The foundational question of whether providers should address disputes with MCOs through § 1983 claims or arbitration will arise. The MCOs lament the lack of guidance as to "whether and when there is a 'systemic failure' sufficient to justify" a § 1983 claim. Rather than "costly litigation over the nature and scope of claims," the **740** MCOs believe these disputes "could and should have been submitted to cost-effective arbitration."

The MCOs also point out the practical problems with the majority opinion's reading of § 1396u-2(f). For courts to determine if the predicate for State intervention—"systemic failures by MCOs to comply with the 30/90 payment schedule"—is satisfied, they have to determine "which claims (how many? what proportion?) are unpaid, paid late or paid with less transparency." These "determinations fall squarely within the broad arbitration provision in each provider contract," including Saint Anthony's.

To say the majority opinion only provides a new way under § 1983 to enforce existing obligations does not mitigate the substantial changes and alterations to the Medicaid landscape this decision creates. The "new world" of an enforceable duty under § 1396u-2(f) will require a huge amount of adaptation, new systems, and working through unseen problems, as the obligations on various players change and decisionmaking is shifted away from arbitrators to

federal courts.

Because this decision will create tremendous burdens and complex practical problems, and federal courts will now have to consider and decide payment disputes between MCOs and providers that can be framed as involving "systemic failure," the proper interpretation of § 1396u-2(f) is a question of extraordinary significance which we should rehear.

**C.**

So why not hear this case en banc? Because of the imminent possibility this area of law will change markedly.

This case may well merit rehearing en banc. Given the burdens and change in decisionmakers, it poses "a question of exceptional importance" under Federal Rule of Appellate Procedure 35(a)(2). And under the requirements before Spending Clause legislation imposes a duty on a state, "the panel decision conflicts with a decision of the United States Supreme Court" under Federal Rule of Appellate Procedure 35(b)(1)(A).

But since this case was argued in February, and before it was decided in July, the Supreme Court granted certiorari in another case from our court, *Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713 (7th Cir. 2021), *cert. granted*, ––– U.S. ––––, 142 S. Ct. 2673, 212 L.Ed.2d 761 (2022), *argument scheduled for* November 8, 2022. *Talevski* held that nursing home residents have privately enforceable rights under 42 U.S.C. §§ 1396r(c)(1)(A)(ii) and (c)(2)(A) to not be chemically restrained for disciplinary or convenience purposes, and to not be transferred or discharged from a facility unless certain criteria are met. 6 F.4th at 720.

*Talevski* concerned different Medicaid statutes. But one of the two questions presented on which the Supreme Court granted certiorari is broad: "[w]hether, in light of compelling historical evidence to the contrary, the Court should reexamine its holding that Spending Clause legislation gives rise to privately enforceable rights under Section 1983." Petition for a Writ of Certiorari at i, *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, ––– U.S. ––––, 142 S. Ct. 2673, 212 L.Ed.2d 761 (2022). The Court can answer this question in ways that will greatly impact the decision in this case. Even Saint Anthony admits in its response to the petitions for rehearing en banc that "[i]f the Supreme Court significantly changes its precedent on Medicaid private rights of action, those changes could affect the majority's opinion in this case."

**Saint Anthony Hospital v. Eagleson, 48 F.4th 737 (7th Cir. 2022)**

**\*741** If our court heard this case en banc, we would proceed parallel with the Supreme Court's consideration of *Talevski* and expend valuable court time and resources. Given the question presented quoted above, we would need to predict how the Supreme Court thinks that issue should come out, a task broader than the arguments before us in this case. So, en banc rehearing here likely would not be an efficient course given the grant of certiorari in *Talevski.*

In the alternative, as the State suggests, I would hold these petitions for rehearing pending the decision in *Talevski.* The non-prevailing parties here may petition the Supreme Court for a writ of certiorari, and even ask that Court for a stay. The Supreme Court may hold such a petition pending the resolution of *Talevski.* Given the broad and deep impact of the majority opinion, it would be best to resolve these petitions for rehearing with the counsel of *Talevski*, which could significantly change the legal landscape governing the interpretation of § 1396u-2(f).

For these reasons, I respectfully dissent from the denial of panel rehearing. I would grant the petitions for panel rehearing and reconsider this decision, or in the alternative I would hold these petitions for rehearing subject to the outcome of *Talevski.*

**A 57**

Saint Anthony Hospital v. Eagleson, 40 F.4th 492 (7th Cir. 2022)

United States Court of Appeals, Seventh Circuit.

SAINT ANTHONY HOSPITAL, Plaintiff-Appellant,

v.

Theresa A. EAGLESON, in her official capacity as Director of the Illinois
Department of Healthcare and Family Services, Defendant-Appellee,

and

Meridian Health Plan of Illinois, Inc., et al., Intervening Defendants-Appellees.

No. 21-2325

|

Argued February 15, 2022

|

Decided July 5, 2022

Appeal from the United States District Court for the Northern District of Illinois,
Eastern Division. No. 1:20-cv-02561 — **Steven Charles Seeger**, *Judge*.

Before Wood, Hamilton, and Brennan, Circuit Judges.

**Opinion**

Hamilton, Circuit Judge.

In recent years, Illinois has moved its Medicaid program from a fee-for-service model,
where a state agency pays providers' medical bills, to one dominated by managed care,
where private insurers pay medical bills. Most patients of plaintiff Saint Anthony
Hospital are covered by Medicaid, so Saint Anthony depends on Medicaid payments
to provide care to patients. Saint Anthony says it is now in a dire financial state. Over
the last four years, it has lost roughly 98% of its cash reserves, allegedly because
managed-care organizations (MCOs) have repeatedly and systematically delayed and
reduced Medicaid payments to it.

Saint Anthony contends in this lawsuit that Illinois officials owe it a duty under the
federal Medicaid Act to remedy the late and short payments. In a thoughtful opinion,
the district court dismissed the suit for failure to state a claim for relief. *Saint Anthony
Hospital v. Eagleson*, 548 F. Supp. 3d 721 (N.D. Ill. 2021). We see the case differently,

**A 58**

however, especially at the pleadings stage. We conclude that Saint Anthony has alleged a viable claim for relief under 42 U.S.C. § 1396u-2(f) and may seek injunctive relief under 42 U.S.C. § 1983 against the state official who administers the Medicaid program in Illinois. We appreciate the potential magnitude of the case and the challenges it may present. Like the district judge and Judge Brennan, we can imagine forms of judicial relief that would be hard to justify. We can also **\*499** imagine some poor ways to handle this case going forward in the district court. But we need not and should not decide this case by assuming that the worst-case scenarios are inevitable.

The State has tools available to remedy systemic slow payment problems—problems alleged to be so serious that they threaten the viability of a major hospital and even of the managed-care Medicaid program as administered in Illinois. If Saint Anthony can prove its claims, the chief state official could be ordered to use some of those tools to remedy systemic problems that threaten this literally vital health care program. We therefore reverse in part the dismissal of the case and remand for further proceedings.

I. *Factual and Procedural Background*

In reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we accept all well-pleaded allegations as true and draw all reasonable inferences in Saint Anthony's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We are not vouching for the truth of Saint Anthony's account of the facts at this point. Rather, because the defense chose to move to dismiss on the pleadings, it chose to accept for now the truth of Saint Anthony's factual allegations.

A. *The Illinois Medicaid Program*

The federal Medicaid Act established a cooperative arrangement between the federal government and states to provide medical services to poor residents. 42 U.S.C. § 1396 et seq.; *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 380 (7th Cir. 2020); see also *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 541–42, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). By agreeing to participate in Medicaid, a state receives financial assistance to help administer the program in exchange for complying with detailed statutory and regulatory requirements. *Bria Health Services*, 950 F.3d at 380. Those requirements are found in the Medicaid Act itself (Title XIX

of the Social Security Act) and in regulations promulgated by the Secretary of the Department of Health and Human Services (HHS). See *id.* at 382; *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 771 (7th Cir. 2021).

Before discussing the relevant statutory requirements at issue here, it is important to understand how Illinois, specifically the Department of Healthcare and Family Services (HFS), administers its Medicaid program. There are two major ways for states to pay providers for services provided to patients covered by Medicaid: fee for service or managed care. In a fee-for-service program, the state pays providers directly based on a set fee for a particular service. See § 1396a(a)(30)(A); Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989 (June 14, 2002). Under a managed-care program, by contrast, HFS contracts with MCOs (which are private health insurance companies) to deliver Medicaid health benefits to beneficiaries. See 42 U.S.C. § 1396u-2; see also § 1396b(m); 42 C.F.R. § 438 (2020). The state pays the MCO a flat fee per patient per month. The MCO then pays providers for services actually provided to covered Medicaid patients. *Bria Health Services*, 950 F.3d at 381, citing 305 ILCS 5/5-30.1; see also 42 U.S.C. §§ 1396u-2, 1396b(m). Like insurance companies, MCOs are generally entitled to keep the difference between the money they receive from the state and the amounts they pay providers for care of covered patients.

In recent years, Illinois has changed from a fee-for-service system to a system dominated by managed care. Illinois introduced **\*500** managed care in its Medicaid program in 2006. In 2010, the State spent just $251 million on managed care. By 2019, that number had grown to $12.73 billion. In the meantime, the number of MCOs in Illinois has fallen from twelve to seven.

Federal law establishes requirements for timely Medicaid payments for health care providers. When a state pays claims directly, it must pay 90% of so-called "clean claims" within 30 days and 99% within 90 days. See 42 U.S.C. § 1396a(a)(37)(A). (A "clean claim" is one where the provider has given the payor all information needed to determine the proper payments. *Id.*) When a state relies on MCOs to pay providers, federal law requires that the state's contract with an MCO contain a provision that requires the same 30/90 pay schedule for MCO reimbursements to providers. § 1396u-2(f). (MCOs and providers can opt for a different pay schedule, but Saint Anthony has not agreed to a different schedule with any MCOs.)

The focus of this case is the payment schedule provision, § 1396u-2(f). Saint Anthony contends it is also entitled to relief under a separate Medicaid statute requiring a participating state to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." § 1396a(a)(8). As we explain below, however, Saint Anthony is not entitled to relief under that clause.

### B. *Plaintiff Saint Anthony Hospital*

Saint Anthony is a so-called "safety-net hospital" on the southwest side of Chicago. It provides health care regardless of patients' financial means. See 305 ILCS 5/5-5e.1. Most Saint Anthony patients are on Medicaid. As the Illinois Medicaid system has shifted from fee for service to managed care, the hospital has become ever more dependent on timely payments from MCOs. In recent years, according to Saint Anthony, those payments have repeatedly arrived late, if they arrived at all. As of February 2020, payments of at least $20 million were past due. The impact of late payments can be dramatic. In 2015, Saint Anthony had more than $20 million in cash on hand, which was enough to fund 72 days of operation. As the State increased its reliance on managed care, Saint Anthony saw its cash reserves dwindle. By 2019, Saint Anthony had less than $500,000 cash on hand, enough to cover just two days of operation. Saint Anthony's net revenue per patient also dropped more than 20%.

The MCO payments that eventually arrive are often for less than is owed. Making matters even worse from Saint Anthony's perspective, the payment forms it receives from the MCOs lack the details needed to determine just what is being paid and what is not. The delays and lack of clarity benefit the MCOs: since the State pays the MCOs flat fees per patient and permits them to keep the funds they do not pay out to providers, MCOs have a powerful profit incentive to delay and underpay hospitals like Saint Anthony.

Saint Anthony may not be alone in its experience. Mercyhealth is a regional health-care system and the largest Medicaid provider in Illinois outside of Cook County. Illustrating the potential gravity of the MCO payment problems, in April 2020, Mercyhealth announced it would stop accepting Medicaid patients covered by four of the seven MCOs in Illinois. Decl. of Kim Scaccia ¶ 6, Dkt. 50-1, Ex. 12. That was a

drastic step showing the potential threat to the viability of the managed-care model for Medicaid. Mercyhealth said it took this step because those MCOs were delaying and underpaying it to the point **501** that it was losing $30 million per year on Medicaid patients. See also David Jackson & Kira Leadholm, Insurance Firms Reap Billions in Profits While Doctors Get Stiffed for Serving the Poor, Better Government Ass'n (Nov. 8, 2021, 12:00 PM), https://www.bettergov.org/news/insurance-firms-reap-billions-in-profits-while-doctors-get-stiffed-for-serving-the-poor/.[1]

Faced with this dire financial situation, Saint Anthony had two paths to seek legal relief from what it sees as systemic defects in the Illinois Medicaid program. One path would be to sue MCOs individually for violating Saint Anthony's contractual right to timely payment. Arbitration provisions in those contracts would likely require arbitration for each individual claim in dispute, which could easily involve many thousands of individual claims each year. This suit represents the second path, seeking a court order to require Illinois to enforce the MCOs' contractual obligations to make timely and transparent payments.

C. *Procedural History*

Saint Anthony filed a two-count complaint under 42 U.S.C. § 1983 against Theresa A. Eagleson, the Director of HFS, in her official capacity. (We refer to Director Eagleson here as HFS or the State.) As relevant here, Count I alleges that HFS is violating the Medicaid Act, including section 1396u-2(f), by failing to ensure that MCOs meet the timely payment requirements. Count II alleges that HFS is violating section 1396a(a)(8) by failing to ensure that the MCOs furnished medical assistance with reasonable promptness. Saint Anthony seeks injunctive relief directing HFS to require the MCOs to comply with the 30/90 payment rule, to use transparent remittance forms, and if necessary, to require the State to cancel a contract with an MCO that continues to fail to comply with the timely payment requirements.[2]

---

[1] We may consider the Mercyhealth information in evaluating a Rule 12(b)(6) motion, without converting the motion into one for summary judgment, because the information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Mercyhealth also reportedly worked out a compromise with one MCO, Molina, under which it continued to care for Molina-covered Medicaid patients. Decl. of Kim Scaccia ¶ 9, Dkt. 50-1, Ex. 12.

[2] Saint Anthony also moved for a preliminary injunction. The district court granted limited discovery before suspending in part actions related to the preliminary injunction motion while it

HFS moved to dismiss Saint Anthony's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Its chief argument was that none of the statutory provisions grant Saint Anthony any rights enforceable under section 1983, and that even if they did, the factual allegations failed to state a plausible claim for relief. The district court agreed and dismissed the case. 548 F. Supp. 3d 721 (N.D. Ill. 2021).

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint by adding a due process claim. HFS responded to Saint Anthony's request, arguing that the new claim would fail on the merits. The district court denied Saint Anthony the opportunity to file a reply to defend its proposed claim on the merits. Then, four days after granting the motion to dismiss, the district court denied the motion to supplement as futile, and also because the judge thought the entire case should be concluded by the grant of the motion to dismiss.

**\*502** In the district court, four MCOs also sought and were granted leave to intervene in the suit. The MCOs asked the court to stay the lawsuit and compel arbitration. One MCO (Meridian) demanded arbitration with Saint Anthony, but that proceeding was stayed because Meridian had not followed the proper procedures to invoke arbitration. The district court later denied the MCOs' motions as moot after granting the motion to dismiss.

Saint Anthony has appealed the court's dismissal of its section 1396u-2(f) and 1396a(a)(8) claims, as well as the denial of the motion to supplement. We first address Saint Anthony's asserted right to timely payment under section 1396u-2(f). To evaluate Saint Anthony's claim, we walk through each of the so-called *Blessing* factors. Each factor supports Saint Anthony here. We then analyze three remaining issues: Saint Anthony's claim under section 1396a(a)(8), the district court's denial of the motion to supplement, and the intervening MCOs' motion to stay the proceedings in favor of arbitration.

---

resolved a discovery dispute. The court then granted the motion to dismiss and denied the preliminary injunction motion as moot.

II. *A Right to Timely Payment*

The central issue here is whether section 1396u-2(f) grants a right to providers like Saint Anthony that is privately enforceable through section 1983. We conclude that the State's duty is to try to ensure that the MCOs actually pay providers in accord with the 30/90 pay schedule—not merely that the contracts between the MCOs and HFS include clauses that say as much on paper. Providers like Saint Anthony have a right under section 1396u-2(f) that is enforceable under section 1983, at least to address systemic failures to provide timely and transparent payments.

### A. *Legal Standard*

We again emphasize that we are reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, so we begin by accepting all well-pleaded allegations as true and drawing all reasonable inferences in Saint Anthony's favor. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

The analysis for possible enforcement of federal statutory rights under section 1983 is familiar. "Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States ... of any rights, privileges, or immunities secured by the Constitution and laws.'" *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) (omission in original), quoting 42 U.S.C. § 1983. This language "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), and "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

Yet not all statutory benefits, requirements, or interests are enforceable under section 1983. A plaintiff seeking redress for an alleged violation of a federal statute through a section 1983 action "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (remanding for further consideration whether federal statute on child-support obligations created rights enforceable under section 1983); see also *Gonzaga University v. Doe*, 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit."). Congress

**A 64**

must have "*intended* **503** *to create a federal right*," *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268, and "the statute 'must be phrased in terms of the persons benefited' with 'an *unmistakable focus* on the benefited class.' " *Planned Parenthood of Indiana*, 699 F.3d at 973, quoting *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268. It is thus not enough to fall "within the general zone of interest that the statute is intended to protect" to assert a right under section 1983. *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268.

To aid in this analysis, courts apply the three "*Blessing* factors" to the statutory text and structure:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Talevski v. Health & Hospital Corp. of Marion County*, 6 F.4th 713, 717 (7th Cir. 2021) (Federal Nursing Home Reform Act granted individual rights enforceable under section 1983, quoting *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353), cert. granted, No. 21-806, ––– U.S. ––––, 142 S.Ct. 2673, ––– L.Ed.2d –––– (U.S. May 2, 2022).

If these three factors are satisfied, "the right is presumptively enforceable under section 1983." *Id.* at 720. The defendant may overcome this presumption by demonstrating that "Congress shut the door to private enforcement." *Gonzaga*, 536 U.S. at 284 n.4, 122 S.Ct. 2268. Congress may foreclose a remedy under section 1983 "either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (internal quotation marks and citations omitted); see also *Talevski*, 6 F.4th at 721 (collecting just three cases where the Supreme Court determined that a statutory scheme implicitly foreclosed section 1983 liability).

One final background note: The Medicaid Act is an exercise of Congress's power under the Spending Clause. The Supreme Court has found that section 1983 can be used to enforce rights created in the exercise of the spending power. *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 508–12, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (finding

a now-defunct amendment to the Medicaid Act granted plaintiff a private right enforceable under section 1983). Since *Wilder*, the Court has cautioned against finding rights in that context. See *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 330 n*, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) ("[Plaintiffs] do not assert a § 1983 action, since our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified."); see also *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268. We made this observation in *Nasello v. Eagleson*: "In the three decades since *Wilder* [the Court] has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." 977 F.3d 599, 601 (7th Cir. 2020).

But as we clarified most recently in *Talevski*, this trend does not mean that Spending Clause legislation never creates rights enforceable under section 1983. 6 F.4th at 723–26. On the contrary, the Court has not overruled *Wilder*. The later Spending Clause cases in which it has **\*504** declined to find private rights simply did not satisfy the standards we have discussed. *Id.* at 724. As we said in *Talevski*, "[t]he Court could have saved itself a great deal of time [in *Armstrong*] if it had wanted to establish an unbending rule that Spending Clause legislation *never* supports a private action." *Id.* at 725. Spending Clause legislation or not, the relevant question is the same: "do we have the necessary rights-creating language to support a private right of action?" *Id.* To answer that question, apply the *Blessing* factors.[3]

   B. *Rights Analysis*

With this background in mind, here is the text of section 1396u-2(f), the provision central to this appeal:

> A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a

---

[3] While this case involves a right under section 1983, not an implied private right of action, *Gonzaga* clarified that "the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right*." 536 U.S. at 283, 122 S.Ct. 2268.

timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule....

42 U.S.C. § 1396u-2(f). The statutory language cross-references sections 1396b(m) and 1396a(a)(37)(A). Section 1396b(m) describes the State's contract with an MCO. Section 1396a(a)(37)(A) declares that a "State plan for medical assistance must"

(37) provide for claims payment procedures which

(A) ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims.

§ 1396a(a)(37)(A).

We agree with Saint Anthony that section 1396u-2(f) grants providers a right to timely payment from the MCOs that the State must safeguard because the right satisfies all three *Blessing* factors. Also, there is no alternative remedy that would be incompatible with individual enforcement under section 1983. As we explain next in applying the *Blessing* factors, providers are the intended beneficiaries of section 1396u-2(f), enforcing the 30/90 pay schedule would not strain judicial competence, and the statute unambiguously imposes a binding obligation on the State. In addition, while private contract remedies may offer an alternative path to enforcement for individual claims, that path does not foreclose enforcement under section 1983. It is also far from clear that contract remedies, including arbitration, could provide systemic relief that may be sought more sensibly from state officials under section 1983. We address each point in turn.

**\*505** 1. *Factor One: Intended Beneficiaries*

The first *Blessing* factor asks whether Congress intended section 1396u-2(f) to benefit providers like Saint Anthony and whether it intended that benefit to be a *right*, as

**A 67**

distinct from a generalized entitlement. We conclude that both answers are yes.

First, providers are the intended beneficiaries of section 1396u-2(f). The text requires MCOs to contract that they "shall make payment to health care *providers* ... on a timely basis." § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 821 (7th Cir. 2017) ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [State] plan for ... nursing facility services' "? (second alteration and omission in original)).

To resist this conclusion, HFS asserts that the term "health care providers" includes *practitioners* but not *hospitals*. The district judge did not adopt this argument, nor do we. Section 1396u-2(f) cross-references section 1396a(a)(37)(A), which requires that states pay "practitioners" on the 30/90 pay schedule. See *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 306, 308 (7th Cir. 1992). "Practitioners" in that context means individual providers as opposed to institutional ones like Saint Anthony. HFS thus argues that since section 1396u-2(f) requires states to ensure MCOs pay providers "consistent with the claims payment procedures described in section 1396a(a)(37)(A)," section 1396u-2(f) adopts the 30/90 pay schedule requirement only as to "practitioners." In the State's view, holding that section 1396u-2(f) applies to hospitals as well would exceed rather than be consistent with what section 1396a(a)(37)(A) requires.

The argument is not persuasive. HFS reasons that Congress implicitly and indirectly defined "providers" narrowly—just for purposes of section 1396u-2(f)—through a cross-reference to section 1396a(a)(37)(A) that describes a state's payment obligations to practitioners in a fee-for-service program. That is an improbably subtle reading. A more persuasive reading of the statutory text is that Congress invoked only the payment *procedures* in section 1396a(a)(37)(A), not the *beneficiaries* of that provision. The statutory text explains that payment must be made "on a timely basis *consistent with the claims payment procedures* described in section 1396a(a)(37)(A) of this title." § 1396u-2(f) (emphasis added). Those procedures include the 30/90 pay schedule.

Congress knows how to use cross-references for a definitional purpose in the Medicaid Act. See, e.g., § 1396u-2(a)(1)(B)(i) ("[A] medicaid managed care organization, as

**A 68**

defined in section 1396b(m)(1)(A) of this title...."); § 1396u-2(b)(2)(A)(i) ("[T]o provide coverage for emergency services (as defined in subparagraph (B))...."). That is not what occurred here. The language is sufficiently plain here, *United States v. Melvin*, 948 F.3d 848, 851–52 (7th Cir. 2020), and the plain meaning of "health care provider" includes hospitals. Cf. 42 U.S.C. § 1395w–25(d)(5) (enacted as part of the Balanced Budget Act of 1997).

HFS's position is also inconsistent with the provision's purpose as shown in additional statutory language. Section 1396u-2(f) was part of the same Balanced Budget Act of 1997. See Pub. L. No. 105-33, 111 Stat. 251 § 4708(c) (1997). Section 4708(c) is entitled: "Assuring Timeliness of Provider Payments." This language signals that Congress intended section 1396u-2(f) to assure, **\*506** i.e., to guarantee, timely payment to providers. That understanding is consistent with later congressional action. In 2009 Congress enacted 42 U.S.C. § 1396u-2(h) as part of the American Recovery and Reinvestment Act of 2009. See Pub. L. No. 111-5, 123 Stat. 115, § 5006(d) (2009). That subsection established special rules for "Indian enrollees, Indian health care providers, and Indian managed care entities." § 1396u-2(h). Relevant to our purposes, section 1396u-2(h)(2)(B) cross-references section 1396u-2(f) and describes it as the "rule for prompt payment of providers":

> (2) Assurance of payment to Indian health care providers for provision of covered services
>
> Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:
>
> ...
>
> (B) Prompt payment
>
> To agree to make prompt payment (*consistent with rule for prompt payment of providers under section 1396u–2(f) of this title*) to Indian health care providers that are participating providers with respect to such entity....

§ 1396u-2(h)(2)(B) (emphasis added).

Given this evidence, it would seem odd to construe a provision Congress intended to assure timeliness of provider payment as not applying to many providers, as HFS advocates. That would appear to defeat the statute's evident purpose in most cases. We decline to read the text in such a manner. *Quarles v. United States*, ––– U.S. –––––, 139 S. Ct. 1872, 1879, 204 L.Ed.2d 200 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute."). If the text required such a result, that would be one thing, but we should not adopt such an improbable reading of the text to reach such an odd result.

In applying the first *Blessing* factor, we next conclude that section 1396u-2(f) grants providers a right, not merely a generalized benefit. It is here that we disagree with the district court. In granting the motion to dismiss, the court determined that section 1396u-2(f) failed the first *Blessing* factor. The court invoked *Gonzaga*, asserting that providers received only "a generalized 'benefit' " from section 1396u-2(f), which "isn't good enough" to constitute a right enforceable under section 1983. *Saint Anthony Hospital*, 548 F. Supp. 3d at 734, quoting *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268. The district court concluded that section 1396u-2(f) "itself does not entitle providers to much of anything, and does not contain any 'explicit rights-creating terms.' " *Id.*, quoting *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268.

We read the statute differently. *Gonzaga* provides a useful contrast regarding rights-creating language. In *Gonzaga*, a former student sued Gonzaga University and an employee under section 1983 for allegedly violating his rights under the Family Educational Rights and Privacy Act (FERPA). Part of the statutory language at issue directed the Secretary of Education that "[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice' " of permitting the release of education records without parents' written consent. *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268 (alteration in original), quoting 20 U.S.C. § 1232g(b)(1); see also § 1232g(b)(2). That prohibited activity is allegedly what occurred in the case.

The Supreme Court concluded that Congress did not grant an individual whose **\*507** interests were violated under FERPA a right enforceable through section 1983. Because the statutory provisions did not have an individualized focus, they failed *Blessing* factor one: "[The] provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, as in *Blessing*, they have an 'aggregate' focus, they are not concerned with 'whether the needs of any

particular person have been satisfied,' and they cannot 'give rise to individual rights.' " *Gonzaga*, 536 U.S. at 287–88, 122 S.Ct. 2268 (internal citation omitted), quoting *Blessing*, 520 U.S. at 343–44, 117 S.Ct. 1353. The Court also highlighted that the Secretary of Education could take away funds only if the university did not *substantially* comply with the statutory requirements. This fact contributed to the understanding that the focus was on systemwide performance rather than individual instances of improper disclosure. Finally, since FERPA's provisions spoke only to the Secretary and directed him to withdraw funding from schools that had a "prohibited 'policy or practice,' " the Court determined that their focus was "two steps removed from the interests of individual students and parents." *Id.* at 287, 122 S.Ct. 2268 (citation omitted). The provisions therefore failed to confer an individual right enforceable under section 1983.

The opposite is true here. Section 1396u-2(f) is concerned with whether the needs of particular persons and entities—providers like Saint Anthony—have been satisfied. The statutory text specifies that the State "shall provide" that MCOs "shall make payment to health care providers ... on a timely basis." 42 U.S.C. § 1396u-2(f). The focus of section 1396u-2(f) is not "two steps removed" from the interest of providers. Its focus is directly on the interest Saint Anthony asserts here: ensuring that providers receive timely payment from MCOs. And the provision is not concerned only with whether MCOs in the aggregate pay providers on the 30/90 pay schedule, but whether *individual* providers are receiving the payments in the timeframe promised.

We see this in the provision's close attention to provider-specific exemptions from the 30/90 pay schedule. Section 1396u-2(f) says that its mandate applies "unless the health care provider and the organization agree to an alternate payment schedule." It establishes a personal right to timely payment, which all providers are entitled to insist upon. Cf. *Planned Parenthood of Indiana*, 699 F.3d at 974 (Medicaid state plan requirement permitting all eligible recipients to receive medical assistance from the provider of their choice established a personal right "to which all Medicaid patients are *entitled*" but, implicitly, need not accept (emphasis added)). Either way, the focus is on the individual provider. The focus is not on whether MCOs in the aggregate substantially comply with the timely payment requirement. Section 1396u-2(f) is thus not just a benchmark for aggregate performance.

That conclusion finds support in our precedents under the Medicaid statutes. Section 1396a(a)(10)(A) provides that "[a] State plan for medical assistance must ... provide

... for making medical assistance available ... to all [eligible] individuals." We have held that the provision confers private rights to individuals enforceable under section 1983. See *Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993); accord, *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (reaffirming *Miller*'s rights analysis after *Blessing* and *Gonzaga*). In *Miller*, we found it significant that the State was *required* to provide medical assistance to all eligible individuals. The same is true here, but with respect to timely payments to providers that do not **\*508** opt out of the 30/90 pay schedule. And in *Wilder*, the statute, like the statute here, required states to provide for payment to health care providers: "a state plan" must ensure " 'payment ... of the *hospital* services, *nursing facility* services, and services in an *intermediate care facility* for the [recipients] under the plan.' " 496 U.S. at 510, 110 S.Ct. 2510 (omission in original), quoting 42 U.S.C. 1396a(a)(13)(A) (1982 ed., Supp. V). The Supreme Court concluded that this statutory language granted rights to health care providers enforceable under section 1983. See *id.* at 524. *Wilder* may lie close to the outer edge of the line for section 1983 cases under Spending Clause legislation, but recognizing the rights-creating language in section 1396u-2(f) does not push that logic any further.

At bottom, section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268, unmistakably "phrased in terms of the persons benefited," *id.* at 284, 122 S.Ct. 2268, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and satisfies *Blessing* factor one.

### 2. *Factor Two: Administration*

*Blessing* factor two requires a plaintiff to show that "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Talevski*, 6 F.4th at 719. HFS does not appear to contest whether section 1396u-2(f) satisfies this standard, nor could it. Saint Anthony argues that the State violated its right to timely payment by failing to abide by section 1396u-2(f)'s statutory mandate of trying to ensure that the MCOs are paying providers in line with the 30/90 pay schedule. Determining whether payments met the 30/90 pay schedule is "administrable," "fully capable of judicial resolution," and "falls comfortably within

the judiciary's core interpretative competence." *Planned Parenthood of Indiana*, 699 F.3d at 974.


### 3. *Factor Three: Obligation*

The third *Blessing* factor asks whether section 1396u-2(f) unambiguously imposes a binding obligation on HFS. This requires answering two questions: (1) what is HFS's duty under the statute, and (2) is that duty mandatory?

In a typical private right dispute, the emphasis is on the second question. See, e.g., *BT Bourbonnais Care*, 866 F.3d at 822. Section 1396u-2(f) contains mandatory language, however: "A [State contract] … with a medicaid managed care organization *shall* provide that the organization *shall* make payment to health care providers … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). The double use of "shall" rebuts the notion that the State's obligation is anything less than mandatory. But what exactly is the State's obligation here?

Section 1396u-2(f) requires the State's contracts with the MCOs to require that the MCOs pay providers on the 30/90 pay schedule. HFS asserts, and the partial dissent agrees, that section 1396u-2(f) does not impose a duty on the State even to try to ensure that MCOs actually do what their contracts say. HFS's theory is that the statute requires only that a provision in the paper contract specify the timely payment obligation. The State can then sue MCOs for breach of contract if they fail to pay providers according to the 30/90 pay schedule, and providers are entitled to enforce their own contractual rights as they see fit. In HFS's view, nothing in section 1396u-2(f) requires the State itself do anything more to ensure prompt payment. **\*509** Put differently, if the contract between an MCO and the State contains a clause ensuring timely payment for providers on the 30/90 pay schedule, the State contends it has met its duty under section 1396u-2(f), regardless of actual performance.

We do not read section 1396u-2(f) as permitting such a hands-off approach. Nor would a reasonable state official deciding whether to accept federal Medicaid money have expected she could take that hands-off approach to MCO payments to providers. When interpreting statutes, often the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S.

473, 486, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). We must read texts "in their context and with a view to their place in the overall statutory scheme." *Id.*, quoting *Brown & Williamson*, 529 U.S. at 133, 120 S.Ct. 1291; see also *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And to the extent possible, we must "ensure that the statutory scheme is coherent and consistent." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008).

Interpreting section 1396u-2(f) as only a "paper" requirement conflicts with these principles of statutory interpretation. HFS is correct that Congress intended MCOs to "assume day-to-day functions previously performed by States under a traditional fee-for-service model." Appellee's Br. at 30. But Congress did not intend for MCOs to go unsupervised. It has long been obvious to all that under the managed-care system of Medicaid, MCOs have a powerful incentive to delay payment to providers for as long as possible and ultimately to underpay to maximize their own profits. It's a classic agency problem: MCOs are expected to act in the providers' interests, but their interests are not the same. Regarding timely payments, they are in direct conflict. The Medicaid Act contains several provisions to counteract that problem in addition to section 1396u-2(f). They help inform our understanding of the particular provision in dispute here.

The statute also imposes reporting and oversight responsibilities on states. For example, section 1396b(m)(2)(A)(iv) requires a state's contract with an MCO to permit the state "to audit and inspect any books and records" of an MCO related to "services performed or determinations of amounts payable under the contract." Section 1396u-2(c)(2)(A)(i) further specifies that a state's contract with an MCO must provide for an "annual (as appropriate) external independent review" of the "timeliness" of MCO "services for which the organization is responsible," including payments. The Medicaid Act thus requires HFS to take steps to monitor MCO payment activities to gather performance data and to understand how the system is functioning.

**A 74**

The Medicaid Act further specifies actions a state can take when an MCO underperforms. See § 1396u-2(e). The State can put an MCO on a performance plan, for example. As discovery in this case revealed, HFS took this step recently with CountyCare, an MCO, after CountyCare paid only 40% of claims within 30 days and only 62% of claims within 90 days. The CountyCare case turned up evidence of the agency problem in action. The State found **510** that CountyCare's Medicaid money was improperly diverted from the Medicaid program to pay other county government bills rather than health care providers.[4]

In such a case, if an MCO has "repeatedly failed to meet the requirements" of its contract with the State and the requirements in section 1396u-2, "the State shall (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2)." § 1396u-2(e)(3). Subparagraph (B) details the appointment of temporary management to oversee the MCO, and subparagraph (C) permits individuals enrolled with the MCO to terminate enrollment without cause. § 1396u-2(e)(2)(B)–(C).

Federal Medicaid regulations add to the State's responsibilities here. For instance, 42 C.F.R. § 438.66(a) (2016) provides: "The State agency must have in effect a monitoring system for all managed care programs." Section 438.66(b)(3) specifies that the State's monitoring system "must address all aspects of the managed care program, including the performance of each MCO ... in ... [c]laims management." It's hard to imagine a more central aspect of claims management than timely payments. Saint Anthony alleges here that HFS is simply failing to collect the required data on the timeliness of MCO payments.

These responsibilities support the conclusion that Congress intended for states to try to ensure that the right to timely payment in section 1396u-2(f) is honored in real life. The timely payment rule is more than a paper requirement. The more coherent reading of the statute as a whole is that Congress intended the State to engage in these reporting and oversight responsibilities, and if it becomes evident that MCOs are systematically not paying providers on a timely basis, then the State would have an obligation to act under section 1396u-2(f) to secure providers' rights. These

---

[4]  As with the information mentioned above about Mercyhealth, we may also consider the CountyCare information in evaluating the Rule 12(b)(6) motion without converting the motion into one for summary judgment. The information elaborates on (and illustrates) factual allegations in the complaint. E.g., *Geinosky*, 675 F.3d at 745 n.1.

mandatory oversight responsibilities would make little sense if that were not the case. The provision's mandatory language, coupled with the additional oversight and reporting responsibilities, supports the reading that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in practice.

HFS counters, and the partial dissenting opinion agrees, that the duty imposed by section 1396u-2(f) is at the very least ambiguous. HFS points to *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which taught that Congress can impose conditions on grants of federal money only if it does so "unambiguously" and "with a clear voice." In HFS's view, if Congress wanted to impose the significant duty on states that Saint Anthony advocates, it should have done so more explicitly. Section 1396u-2(f) is not a clear statement, it's ambiguous, and therefore cannot carry the weight Saint Anthony gives it. So says HFS.

We appreciate the point, but we think Congress spoke sufficiently clearly here. The clear-statement rule explains that "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.' " *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 296, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006), **\*511** quoting *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. To determine whether Congress spoke clearly in this case, we "must view [section 1396u-2(f) and the Medicaid Act] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds." *Id.* Any state official planning to launch a managed-care program would have understood that the state would have to try to ensure that providers receive prompt payment from MCOs. Such an official would not reasonably have concluded that Congress intended that the "rule for prompt payment of providers" would be only a proverbial paper tiger. See § 1396u-2(h)(2)(B) (describing section 1396u-2(f) as the "rule for prompt payment of providers"). That position conflicts with the State's oversight and reporting obligations and its enforcement duties under the Medicaid Act.

HFS also argues that section 1396u-2(f) cannot impose this duty on the State because it "would negate[ ] section 1396u-2(e)'s express grant to States of discretion to seek termination of an MCO's contract for violating section 1396u-2[f] or its contract with the State." Appellee's Br. at 27. The argument highlights a key issue in this appeal and one that helps explain our disagreement with the district court and the partial dissent.

**A 76**

Saint Anthony requested several forms of relief in its complaint. One of those was canceling a contract with an MCO that fails to pay on time after State intervention. HFS argues that forcing it to cancel a contract with an MCO because it did not meet the 30/90 pay schedule would infringe on the State's discretion to decide when it will terminate such a contract, which is expressly preserved by the statute. See § 1396u-2(e)(4)(A) ("In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract...."). In HFS's view, that means section 1396u-2(f) cannot impose a duty on the State to ensure providers receive timely payment because it might require the State to take action that is expressly reserved to its discretion.

We are inclined to agree with HFS that a district court could not force the State to cancel a contract with an MCO. Canceling a contract with any one of the seven MCOs in Illinois might well cause a "massive disruption" to the State's Medicaid program. Appellee's Br. at 28. HFS and only HFS has the discretion to decide when and why it will invite that type of disruption. Section 1396u-2(e)(4)(A) is clear on that point. See also 42 C.F.R. §§ 438.708 (when states can terminate an MCO contract), 438.730 (CMS can sanction an MCO by denying payment). To the extent that Saint Anthony requests such relief, we doubt the district court has authority to impose it, though we need not answer that question definitively at this stage, on the pleadings. Perhaps sufficiently egregious facts might convince us otherwise, but that question about a worst-case scenario can be addressed if and when it actually arises and matters.

Continuing with the theme of assuming the worst, HFS and the partial dissent also argue that reading this duty into section 1396u-2(f) would lead to the district court acting effectively as the Medicaid claims processor for the State. In a parade of horribles, that's the prize-winning float. Given the practical difficulties in judicial enforcement that would come with recognizing a duty here, HFS contends, such a duty could not be what Congress intended. We agree that any form of retail-level relief, i.e., requiring the district court to adjudicate issues at the claim-by-claim level, would strain judicial resources and **512** seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony. A process that required a district judge to micro-manage claims would be inappropriate here.

These two limits on remedies in a section 1983 action do not persuade us, however, that we should affirm dismissal on the theory that the State has no duty at all to ensure

**A 77**

timely payment under section 1396u-2(f). HFS can take other steps at the system level to address chronic late and/or short payments by MCOs. Those actions would neither force the State to cancel an MCO contract nor turn the district court into a claims processor. If Saint Anthony can prove its claims of systemic delay and/or underpayment, we are confident that the district court could craft injunctive relief to require HFS to do *something* to take effective action.

We draw helpful guidance on these issues of potential equitable relief from *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016). There, we affirmed a preliminary injunction against Illinois officials in a suit brought by Medicaid beneficiaries who sought to enforce different sections of the Medicaid Act requiring the State to find nurses to provide home nursing for children enrolled in Medicaid. HFS argued in *O.B.* that it had no obligation to find nurses (or to act at all). We rejected that argument:

> Certainly the defenses thus far advanced by HFS are weak. The primary defense is that nothing in the Medicaid statute "required [HFS] to ensure that Plaintiffs would receive medical care from nurses in their homes." But it was HFS that decided that home nursing was the proper treatment for O.B., the other named plaintiffs, and the other members of the class.

*Id.* at 840 (alteration in original).

We recognized in *O.B.* the difficulties state officials faced in providing the needed nurses. There was no guarantee that compliance with the injunction would solve the plaintiffs' problems. In affirming the preliminary injunction, though, we explained that the injunction "should be understood simply as a first cut: as insisting that the State do *something* rather than nothing to provide in-home nursing care for these children." *Id.* at 842; see also *id.* at 844 (Easterbrook, J., concurring) ("All a district court can do in a situation such as this is require [the State] to start trying."). If Saint Anthony can prove its claims of systemic delay and/or underpayment, the same is true here. The State decided to switch to a Medicaid program dominated by managed care. The State cannot now claim it has no obligation to ensure that Medicaid providers serving patients under that program receive timely payment. *O.B.* instructs that where HFS has a duty, a district court may order it to do something when that duty is not being met, at the first cut. The court may then need to supervise the effects of the injunction and the State's response and adjust the court's orders as circumstance and equity may require. The district court should not let the perfect become the enemy of

the good, nor should the possibility that a first cut at an injunction might not work sufficiently justify a denial of any relief at all.

To be clear, we are not suggesting that an injunction ordering the State officials literally to do only "something" would be sufficient. Federal Rule of Civil Procedure 65(d)(1) requires an injunction to "describe in reasonable detail … the act or acts restrained or required." At the same time, we have often recognized that district courts have substantial equitable discretion in crafting injunctions so that they are both understandable by those enjoined and effective to accomplish their purposes. **\*513** *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384–85 (7th Cir. 2018); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012), citing *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). If Saint Anthony can prove systemic failures by MCOs to comply with the 30/90 payment schedule with reasonably transparent payment information, we would expect the district court to explore with the parties what steps the State officials could reasonably be expected to take to correct those systemic failures before framing an appropriate and effective injunction. And if such an injunction later needed to be modified based on experience, the district court would have ample power to do so at the request of a party or on its own motion.

*O.B.* also makes clear that a district court can craft injunctive relief within its equitable powers and discretion even in circumstances where some more drastic remedial measures may be off the table. See *O.B.*, 838 F.3d at 844 (Easterbrook, J., concurring) (identifying certain forms of relief that were off limits while also instructing the district judge to try different things and to "keep tabs on what is happening and adjust the injunction as appropriate" to secure relief for plaintiffs); accord, *Rizzo v. Goode*, 423 U.S. 362, 376–77, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (internal quotations and citation omitted)). Federal Rule of Civil Procedure 54(c) offers relevant guidance here, providing that any final judgment other than a default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The converse is also true, of course. If a party demands relief in its pleadings that is not available, such a demand does not poison the well to defeat relief to which the party is otherwise entitled. If Saint Anthony succeeds on the merits of its claims, we believe the district court here will be able to craft a remedy to push the State toward complying with its duty to provide for

timely and transparent payments to Saint Anthony.

We recognize that part of the rationale for adopting the managed-care model was to ease the State's administrative burden. Measures that would force HFS to take a more aggressive oversight role could reduce some of the administrative benefits the State hoped to gain by the switch to managed care. As we have explained, however, the Medicaid Act permits states to shift major Medicaid duties to MCOs but does not allow States to wash their hands of effective oversight. On the contrary, the Medicaid Act shows that Congress recognized the troubling financial incentives inherent in a managed-care system and the need for effective oversight. Recall that the Medicaid Act requires the State to audit and inspect MCO books and records, to perform annual external reviews of payment timeliness, and to implement sanctions if an MCO is underperforming.

Saint Anthony alleges here that HFS is falling far short on those oversight and monitoring duties. HFS cannot avoid those duties altogether on the theory that Saint Anthony also asked for certain remedies that might not be available in this section 1983 action. If the State cannot manage to carry out those oversight and monitoring duties, an effective remedy to enforce the requirements would honor the bargain struck when Illinois accepted funding for Medicaid in the first place.

The partial dissent also criticizes our focus on systemic failures and judicial relief to address such failures, arguing that **514 there is no textual basis for that focus. The partial dissent portrays the choice as an either-or: either the district court must prepare to take over day-to-day claims management, or no judicial relief is available at all. The case is difficult, but the judicial options are not so limited. First, the Medicaid statute and the relevant contracts recognize that perfection is not required. That much is clear from the 30/90 pay schedule itself: pay 90% of clean claims within 30 days and 99% within 90 days. Second, HFS itself seems to be able to tell the difference between minor problems and systemic ones, and there is reason to think it can identify systemic measures that can be effective without having HFS (let alone the district court) take over day-to-day claims management. As noted above, for example, HFS took action against CountyCare based on data showing that CountyCare "was not regularly meeting" the 30/90 pay schedule. Decl. of Robert Mendonsa ¶ 16, Dkt. 86-10. HFS investigated, demanded that CountyCare adopt a "Corrective Action Plan," and reported that a few months after adopting such a plan, CountyCare "significantly reduced the number of outstanding claims that [were] older than 90 days." *Id.* ¶¶ 17–

21. We need not and should not adopt a mathematical definition of "systemic" failures at the pleadings stage. That problem can await further factual development. (To use a metaphor often used in the law, a person can *usually* tell the difference between being in mountains, in foothills, or on a plain even if there are no sharp boundaries between mountains, foothills, and plains.)

For these reasons, we conclude that section 1396u-2(f) satisfies the third *Blessing* factor because the State has a binding obligation to try to ensure prompt payment for providers from MCOs.


### 4. *Alternative Remedial Scheme*

Since section 1396u-2(f) satisfies the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983. *Talevski*, 6 F.4th at 720. HFS can rebut this presumption by "showing that Congress specifically foreclosed a remedy under § 1983 ... expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983[.]" *Id.* (alteration and omission in original), quoting *Gonzaga*, 536 U.S. at 284 n.4, 122 S.Ct. 2268. HFS has not identified any express language in the Medicaid Act foreclosing private rights enforcement. HFS relies instead on the implicit approach, which is a "difficult showing." *Blessing*, 520 U.S. at 346, 117 S.Ct. 1353.

If the MCOs are failing to abide by the contractual terms, says HFS, Saint Anthony should just enforce its own contracts with them. And providers like Saint Anthony are "in the best position" to "enforce their right to timely payment directly under their contracts with MCOs." Appellee's Br. at 29. As HFS sees the matter, there is no need to permit section 1983 actions to "achieve Congress's goal of enabling Medicaid providers to receive timely payment." *Id.*

A contractual remedy may offer some prospect of relief to a provider like Saint Anthony. But HFS has not convinced us that "allowing [section 1983] actions to go forward in these circumstances 'would be inconsistent with' " a "carefully tailored [Congressional] scheme.' " *Blessing*, 520 U.S. at 346, 117 S.Ct. 1353, quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107

**A 81**

L.Ed.2d 420 (1989). Rather, Congress intended the State's Medicaid plan to ensure timely payment to providers. If, as Saint Anthony alleges, the plan has been failing **\*515** to meet this requirement, repeatedly and systematically, we would not be surprised if provider-MCO arbitrations would do little to correct that problem on a systemic basis.

There is good reason to doubt that contractual remedies alone can vindicate the provider's right to prompt payment. Saint Anthony files many thousands of Medicaid claims each year. If most claims are not paid on time, Saint Anthony's option under the contract is to sue the MCO and/or to submit each claim for arbitration. Many other Medicaid providers across Illinois might need to do the same with each of the seven MCOs. That avenue represents a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations. It's not immediately obvious that this dispute-resolution system would even be manageable, let alone superior to a systemic solution implemented by HFS. At the very least, we are not persuaded that Congress, implicitly through the contractual model, created "a comprehensive enforcement scheme that is incompatible with individual enforcement under [section 1983]." *Gonzaga*, 536 U.S. at 285 n.4, 122 S.Ct. 2268.

For these reasons, we conclude that section 1396u-2(f) satisfies *Blessing* and contains a right to timely payment that is enforceable under section 1983. Saint Anthony has plausibly alleged a violation of such a right that would support a claim for relief. We therefore reverse the district court's dismissal of this claim.

We emphasize that this decision is based on the pleadings. This is a hard case with high stakes for the State, Medicaid providers, and Medicaid beneficiaries. We also recognize the potential magnitude of the case and the challenges it may present to the district court. If it turns out that resolving this dispute would actually require the district court to analyze each late claim, effectively taking on the role of the State's Medicaid claims processors, or that effective relief could come only by canceling a contract with an MCO, then we may face a different situation. But we do not know at this point what direction the course of this litigation will take. HFS has not convinced us that we must decide whether Saint Anthony has alleged a viable claim today by assuming only the worst-case scenarios will emerge down the line. If Saint Anthony can support its factual allegations about systematically late and inadequate payments, we believe the district court could exercise its equitable discretion to fashion effective

**A 82**

relief. The corrective action plan that HFS demanded from CountyCare may provide a starting point, adaptable to the circumstances of different MCOs.

III. *Additional Issues*

We have three issues left to discuss: Saint Anthony's claim in Count Two under section 1396a(a)(8), the district court's denial of Saint Anthony's motion to supplement the complaint, and a possible stay in favor of arbitration. We address each in turn.

A. *Count Two*

Unlike Saint Anthony's claim under section 1396u-2(f), its claim under section 1396a(a)(8) is not viable. Section 1396a(a)(8) does not provide Saint Anthony any enforceable rights under section 1983 because it does not contain any rights-creating language for *providers*. In the jargon of this niche in the law, it fails to satisfy *Blessing* factor one.

Recall that the first *Blessing* factor requires Congress to have intended the plaintiff to be the beneficiary of the provision in question. *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. Section 1396a(a)(8) requires **\*516** a state to "provide that all individuals wishing to make application for medical assistance under [the state's Medicaid system] shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). The key language in this provision is "individuals," used in two places. At the beginning, the text specifies that "all *individuals* wishing to make application for medical assistance" must have the opportunity to do so. At the end, it says that "all eligible *individuals*" must receive that assistance promptly. We agree with other circuits that have concluded that individuals are the intended beneficiaries of this provision. See, e.g., *Romano v. Greenstein*, 721 F.3d 373, 378–79 (5th Cir. 2013) (concluding that individuals were the "clearly" intended beneficiaries of section 1396a(a)(8) and that the provision gave individuals a private right of action); *Doe v. Kidd*, 501 F.3d 348, 356–57 (4th Cir. 2007) (same); see also *Nasello*, 977 F.3d at 602 (collecting cases).[5]

---

[5] We declined to decide this issue in *Nasello* but accepted the premise for the sake of argument. 977 F.3d at 602.

Saint Anthony asserts that "individuals" could also include providers. It argues that dictionary definitions of "individual" include a "single ... thing, as opposed to a group," which includes a single provider. Appellant's Br. at 39, quoting *Individual*, Black's Law Dictionary (11th ed. 2019). Medical assistance is also defined in the statute to include "payment." 42 U.S.C. § 1396d(a). Saint Anthony puts these pieces together to argue that section 1396a(a)(8) includes requiring MCOs to furnish "medical assistance" (defined as including "payment" for medical services) to "individuals" (defined as including "hospitals") with "reasonable promptness."

The argument is not convincing. For one, interpreting "individual" to include a "hospital" is a long stretch of the language. Saint Anthony's argument is also inconsistent with other parts of section 1396a(a)(8) and surrounding statutory provisions. Section 1396a(a)(8) says that states must "provide that all individuals wishing to make *application* for medical assistance" can do so. (Emphasis added.) Providers do not make application for medical assistance; individuals do. See 42 C.F.R. § 435.4 (2015) ("Applicant means an individual who is seeking an eligibility determination for himself or herself through an application submission or a transfer from another agency or insurance affordability program."). As the district court correctly identified, the texts surrounding section 1396a(a)(8) use "individuals" repeatedly to refer to natural persons. See *Saint Anthony Hospital*, 548 F. Supp. 3d at 738 (collecting provisions).

Given this statutory evidence, Congress did not speak "with a clear voice" and manifest an "unambiguous[ ]" intent to confer rights to providers like Saint Anthony under section 1396a(a)(8) through the word "individuals." See *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. Section 1396a(a)(8) thus fails the first *Blessing* factor and does not confer a private right to providers that can be enforced under section 1983.

B. *Saint Anthony's Motion to Supplement the Complaint*

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint with a claim for deprivation of property without due process of law. Saint Anthony alleged HFS violated its due process rights in two ways, both related to payment transparency: (1) by failing **\*517** to notify Saint Anthony of the amounts being paid for services provided to Medicaid beneficiaries in the fee-for-service program; and (2) by failing to require MCOs to provide such notice in the managed-

**A 84**

care program. Four days after the district court dismissed the existing complaint, the court denied Saint Anthony's motion to supplement.

As a preliminary matter, there is an academic question whether this request should be construed as a motion to supplement under Federal Rule of Civil Procedure 15(d) or a motion to amend under Rule 15(a). Saint Anthony's motion sought to add allegations concerning both post-complaint events (most appropriate as a 15(d) supplement) and some pre-complaint events that came to light in discovery (most appropriate under 15(a)). The distinction between 15(a) amendments and 15(d) supplements is not important here. District courts have essentially the same responsibilities and discretion to grant or deny any motions under either subsection. See *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996) ("[T]he standard is the same."); see also 6A Wright & Miller, Federal Practice and Procedure § 1504 (3d ed.) (explaining that a lack of formal distinction between the two is "of no consequence," and that leave should be freely granted when doing so will promote economic and speedy disposition of entire controversy and will not cause undue delay or unfair prejudice to other parties).

Ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases). The decision to deny the plaintiff such an opportunity "will be reviewed rigorously on appeal." *Id.* "Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Id.* at 519–20, quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). Reasons for denying leave to amend include "futility, undue delay, prejudice, or bad faith." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 417 (7th Cir. 2019).

The district court used a procedure here that ran a high risk of error. Saint Anthony requested leave to add the due process claim after minimal discovery and before the court ruled on the pending motion to dismiss. The court entered a minute order recognizing that "Rule 15(a)(2) provides that the 'court should freely give leave when justice so requires.' " It then ordered HFS to respond, even permitting an oversized brief. HFS responded by arguing the merits of the due process claim, saying in essence

**A 85**

that the proposed amendment or supplement would be futile. Futility could be a good reason to deny the amendment or supplement, but then the district court took a wrong turn. It denied Saint Anthony an opportunity to file a reply defending the merits of its proposed due process claim. The court then denied Saint Anthony's motion on futility grounds. This unusual procedure thus denied Saint Anthony a fair opportunity to defend the merits of its supplemental claim—only to lose on the supposed lack of merit. That procedure amounted to an abuse of discretion.

Other aspects of the district court's decision on that motion also point toward reversal. For instance, Saint Anthony's request to supplement the complaint occurred early in the lawsuit. See **\*518** *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018) ("The usual standard in civil cases is to allow defective pleadings to be corrected, *especially in early stages*, at least where amendment would not be futile." (emphasis added)). The district court did not find bad faith by Saint Anthony or prejudice to HFS.

The district court denied the motion in part because it concluded the new claim would expand the scope and nature of the case, which the court thought was "otherwise over." We do not find this rationale persuasive, especially after we have concluded that the case is not otherwise over. The due process claim against the State pertains to the lack of transparency in the Medicaid remittances, based at least in part on new information produced in the limited discovery. Saint Anthony alleged problems with the remittances in its original complaint, as HFS acknowledges. The new claim added issues related to the fee-for-service aspects of Illinois Medicaid, but that fact alone was not reason enough to deny leave so early in the life of a case and before discovery was in full swing. Courts should not be surprised, and should not respond rigidly, when discovery in a complex case turns up evidence to support a new theory for relief or defense.

In addition, by denying the motion to amend or supplement, the district court put Saint Anthony at risk of serious and unfair prejudice. To the extent the district court might have thought that the due process claim should be presented in a separate lawsuit, Saint Anthony could face serious problems with claim preclusion. See *Arrigo v. Link*, 836 F.3d 787, 798–800 (7th Cir. 2016).[6]

---

[6] In *Arrigo*, the first district court denied plaintiff's motion to amend the complaint to add a related claim, and we affirmed. Then, when the plaintiff tried to bring the claim in a new action, the second district court dismissed it. We upheld that decision, asserting that "allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the denial of the untimely

At this stage of the proceedings, the only arguable ground for denying Saint Anthony's request to supplement its complaint would have been futility on the merits. The district court did say that it "ha[d] doubts about the legal sufficiency of Saint Anthony's proposed new claim." As noted above, the denial of a plaintiff's first attempt at leave to amend or supplement "will be reviewed rigorously on appeal." *Runnion*, 786 F.3d at 519. Doubts on the merits do not show futility. See, e.g., *id.* at 519–20; *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, **\*519** even if the court is skeptical about the prospects for success."). We thus reverse the denial of Saint Anthony's motion to supplement its complaint.

C. *Arbitration?*

The remaining issue is whether we should stay the case in favor of arbitration, as the intervening MCOs request. A necessary aspect of Saint Anthony's claim against HFS is showing that the MCOs systematically miss the 30/90 pay schedule. The MCOs dispute that allegation, however. They argue that under the contracts, each allegedly late claim presents a factual dispute that must be resolved in arbitration before Saint Anthony's case against HFS can proceed on the merits.

The district court did not address this issue, and we decline to do so here as well. Both HFS and the MCOs have their distinct obligations to ensure timely payment for providers. While factual issues related to the MCOs appear intertwined with Saint

---

amendment, which we upheld, was intended to avoid." 836 F.3d at 800. We also stressed that "[t]o rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend." *Id.* In that sense, by prohibiting the supplemental claim here, the district court might have also prevented Saint Anthony from bringing that claim in a future case, all without the opportunity for Saint Anthony to defend the merits of the claim. HFS argues that Saint Anthony's concerns are misplaced because the district court implied that Saint Anthony could bring its due process claim in a future action. It is true that a district court can expressly reserve a claim for future adjudication, see, e.g., *Sklyarsky v. Means-Knaus Partners*, L.P., 777 F.3d 892, 896 (7th Cir. 2015); 18 Wright & Miller § 4413, but such an exception requires the second court to conclude the first court adequately preserved the claim. One could understand why such assurances from HFS, including its post-argument letter promising to forgo a claim preclusion defense in a separate lawsuit, might provide Saint Anthony limited comfort, especially since the district court's stated rationale was based at least in part on a supposed lack of merit.

Anthony's claim against HFS, they do not foreclose Saint Anthony's section 1983 action. Faced with chronic late payments, Saint Anthony is entitled to seek relief against HFS as well as against the MCOs.

\* \* \*

To sum up, Saint Anthony has alleged a viable right under 42 U.S.C. § 1396u-2(f) to have HFS act to try to ensure timely payments from MCOs, and that right is enforceable in this section 1983 action against HFS Director Eagleson in her official capacity. We REVERSE the district court's dismissal of Count One. Saint Anthony does not have any rights under section 1396a(a)(8). We AFFIRM the district court's dismissal of Count Two. We REVERSE the district court's denial of Saint Anthony's motion to supplement, decline to stay the proceedings in favor of arbitration, and REMAND for proceedings consistent with this opinion.

Brennan, Circuit Judge, concurring in part and dissenting in part.

I join my colleagues in concluding that 42 U.S.C. § 1396a(a)(8) does not support a private right of action for healthcare providers. And while I agree that under the *Blessing* factors, 42 U.S.C. § 1396u-2(f) creates a private right of action, I part ways with them on the breadth and substance of the State's duty under that statute. An administrative prerequisite that a managed care contract includes deadlines is fundamentally different from a privately enforceable statutory duty to proactively guarantee timely managed care payments to healthcare providers. I also conclude that the district court did not abuse its discretion in denying Saint Anthony's Federal Rule of Civil Procedure 15(d) motion to supplement its complaint.

## I

Saint Anthony is a hospital in Chicago serving impoverished patients that relies heavily on Medicaid for its funding. Saint Anthony maintains that it has not received timely Medicaid payments from multiple managed care organizations ("MCOs"). Rather than pursue any claims against the MCOs directly through arbitration or

litigation as provided for in the Hospital's contracts,[1] Saint Anthony has attempted to bypass the MCOs altogether by suing Illinois under 42 U.S.C. § 1396u-2(f).

Section 1396u-2(f) governs contracts between states and managed care organizations **\*520** under a managed care system. The provision states in relevant part:

> A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers ... on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule.

42 U.S.C. § 1396u-2(f). The provision that § 1396u-2(f) incorporates—42 U.S.C. § 1396a(a)(37)(A)—lists the payment procedures which apply to a state's fee-for-service system, requiring payment for 90% of clean claims within 30 days and 99% of clean claims within 90 days.

The parties substantially disagree about § 1396u-2(f)'s requirements. They agree that states have a duty to include contractual provisions with MCOs, and there is no dispute that such provisions exist in the underlying contracts here.[2] They also agree that states have a right to enforce that provision. But the parties diverge as to whether states have a privately enforceable *duty* to guarantee that all MCO payments are timely paid to healthcare providers. According to the State, § 1396u-2(f) mandates only that MCO contracts with healthcare providers include payment schedules that conform to § 1396a(a)(37)(A)'s 30-day/90-day payment requirement. Saint Anthony believes the statute requires more: states must proactively enforce MCO payments to ensure they are issued on a timely basis.

Before determining the extent of a state's duty under § 1396u-2(f), it is crucial to remember, "if Congress intends to impose a condition on the grant of federal moneys,

---

[1] Saint Anthony has contracts with all seven MCOs in the Illinois managed care program. Each of the four MCOs that intervened in this case has a contract with the Hospital that contain arbitration provisions, three of which are binding.

[2] Saint Anthony might have had an actionable claim under § 1396u-2(f) if it had pleaded that the State's MCO contracts failed to include the required 30-day/90-day payment schedule. But the Hospital admits that the State's contracts do include the necessary payment provisions.

**A 89**

it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Because Medicaid is legislation under the Constitution's Spending Clause, Congress must "speak with a clear voice" before imposing obligations on the states. *Id.* This ensures states exercise their choice to participate in Medicaid knowingly, "cognizant of the consequences of their participation." *Id.* "A state cannot knowingly accept the conditions of the federal funding if that state is unaware in advance of the conditions or unable to ascertain what is expected of it, and therefore we insist that Congress must speak with a clear voice." *City of Chi. v. Barr*, 961 F.3d 882, 907 (7th Cir. 2020). We have described this requirement, which is rooted in federalism concerns, as "rigorous." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 973 (7th Cir. 2012). Indeed, the Court has shown great reluctance to recognize private rights of action under 42 U.S.C. § 1983 for beneficiaries of federally funded state programs. Since *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), decided over three decades ago, the Court "has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." *Nasello v. Eagleson*, 977 F.3d 599, 601 (7th Cir. 2020); *see Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 718 (7th Cir. 2021), *cert. granted sub nom. Health & Hosp. Corp. v. Talevski*, No. 21-806, ––– U.S. ––––, 142 S.Ct. 2673, ––– L.Ed.2d –––– (U.S. May 2, 2022) **\*521** ("[N]othing 'short of an unambiguously conferred right ... phrased in terms of the persons benefited' can support a section 1983 action." (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002))); *see, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 332, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015).

With this legal backdrop, consider the text of § 1396u-2(f). Congress mandated that a state's "contract" with an MCO "shall provide" that the MCO make payments to healthcare providers on a timely basis consistent with § 1396a(a)(37)(A)'s 30-day/90-day payment schedule, unless healthcare providers and MCOs agree to an alternate payment schedule. But it is clear that is all the text requires. Section 1396u-2(f) is silent on any ongoing governmental duty to monitor MCO payments or otherwise guarantee that MCOs consistently make prompt payments. As other neighboring statutory provisions show, Congress knows how to impose duties requiring state action.[3] Section § 1396u-2(f) contains no such language. Rather, its text describes the

---

[3] *See*, *e.g.*, 42 U.S.C. § 1396u-2(a)(3)(A) ("A State must permit an individual to choose a managed care entity from not less than two such entities...."); 1396u-2(a)(4)(B) ("The State shall provide for notice to each such individual of the opportunity to terminate (or change) enrollment under

**A 90**

contract provision that must be included—for timely payments consistent with deadlines set out in a different statute—not the State's ongoing enforcement duty. This is not surprising given that § 1396u-2(f) pertains to managed care systems, rather than traditional fee-for-service arrangements. As the majority opinion notes, the managed care structure was designed to alleviate the burden on states of managing the "day-to-day" functions previously performed by states under a fee-for-service system.

Review of the Medicaid Act as a whole confirms this reading of § 1396u-2(f). *See* Antonin Scalia & Bryan A. Garner, Reading Law 167 (2012) ("The text must be construed as a whole."); *id.* at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). In 42 U.S.C. § 1396u-2(e)(4)(A), the statute sets forth "[s]anctions for noncompliance" that states can impose against MCOs who commit enumerated offenses. Among the tools at a state's disposal is the power to terminate a contract with a noncompliant MCO. As the majority opinion admits, the text of § 1396u-2(e)(4)(A) reserves this punitive measure to the discretion of the states. Yet under Saint Anthony's reading of the statute, if an MCO fails to make timely payments to healthcare providers, a state could be *required* to terminate the MCO's contract as a last resort if, as the majority opinion rules, the state has a duty to ensure compliance with the contractual payment schedule. Saint Anthony's only response is that states can "choose the tools to generate compliance" with the payment **\*522** schedule. But even the Hospital admits—as it must—that terminating an MCO's contract may become "necessary" as a "final draconian remedy" if other remedial measures prove ineffective.[4]

In addition to lacking a textual basis in § 1396u-2(f), and creating statutory incongruences within the Medicaid Act, Saint Anthony's interpretation threatens to put a tremendous burden on states and the judiciary. Unsuspecting states will be

---

such conditions."); § 1396u-2(a)(4)(C) ("[T]he State shall establish a method for establishing enrollment priorities in the case of a managed care entity that does not have sufficient capacity to enroll all such individuals seeking enrollment...."); § 1396u-2(a)(4)(D) ("[T]he State shall establish a default enrollment process...."); § 1396u-2(a)(5)(C) ("A State that requires individuals to enroll with managed care entities under paragraph (1)(A) shall annually (and upon request) provide ... to such individuals a list identifying the managed care entities...."); § 1396u-2(c)(1)(A) ("[T]he State shall develop and implement a quality assessment and improvement strategy...."); § 1396u-2(d)(1)(B)(i) ("[T]he State ... shall notify the Secretary of such noncompliance."); § 1396u-2(d)(6)(A) ("[A] State shall require that ... the provider is enrolled consistent with section 1396a(kk) of this title with the State agency administering the State plan under this subchapter.").

[4] Oral Arg. at 43:51–44:22.

surprised to learn that now they must manage MCOs to guarantee that all payments to healthcare providers are made on a timely basis—the same "day-to-day" administration that a managed care system was supposed to avoid. The duty the Hospital would read into § 1396u-2(f) would obligate trial courts to become de facto Medicaid claims processors for states. Courts will be charged with resolving disputes about which claims are clean and which are not, as well as substantial litigation over the timeliness of paying claims.

Aware of these problems, the majority opinion endorses a third reading of § 1396u-2(f), distinct from either of the interpretations for which the parties advocate. Healthcare providers "have a right under section 1396u-2(f) that is enforceable under section 1983, at least to address systemic failures to provide timely and transparent payments," per the majority opinion. My colleagues hope that qualifying the state's duty to ensure timely payment only when MCO's are *systemically* late in paying healthcare providers will lessen the burden on the states and district courts.

But the majority opinion's interpretation is even further removed from the text of § 1396u-2(f). That provision never mentions—let alone defines—"systemic" failures to make timely payments. While Saint Anthony's position that states must always ensure timely payment is incorrect, its reading at least acknowledges that the statutory text contains no limiting principle—that is, states either have a privately enforceable duty to ensure prompt payment, or they do not. By contrast, the majority opinion introduces a new standard under which victims of the worst MCO offenders may pursue federal claims, but disputes not deemed "systemic"—presumably about a comparatively small number of untimely payments—are not actionable. There is no textual basis for such a conditional duty under § 1396u-2(f), let alone text that is "unambiguous[ ]" and spoken with a "clear voice." *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531.

Instead of grounding its interpretation in the text of § 1396u-2(f), the majority opinion looks elsewhere. For example, it states that "Congress did not intend for MCOs to go unsupervised." But that is a false dilemma. By requiring contractual provisions that MCOs make timely payments, § 1396u-2(f) enables a healthcare provider like Saint Anthony to privately enforce their contractual rights against MCOs directly through arbitration or litigation. Recall that Saint Anthony is not without a vehicle to press its arguments about nonpayment of claims. The Hospital has contracts with MCOs, each of which contains a bargained-for arbitration clause. The arbitration with one of the

MCOs, Meridian, is currently stayed at the Hospital's request. Further, it is undisputed that states have the authority to intervene and to penalize noncompliant MCOs. The question is not whether Congress intended that MCOs go unsupervised, but whether Congress intended in § 1396u-2(f) that MCOs be supervised via a privately enforceable legal duty, found in that statute, and now recognized in the majority opinion.

**\*523** As evidenced throughout § 1396u-2, Congress knows how to impose duties requiring state action when it wants to. But language imposing a duty is absent from § 1396u-2(f). "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005). And as referenced above, unspoken Congressional intent should be an oxymoron when examining whether Spending Clause legislation contains a private right of action.

When the majority opinion does turn to the actual language of the statute, tellingly, it looks only to unrelated provisions in the Medicaid Act, rather than "start[ing] with the specific statutory language in dispute"—here, the text of § 1396u-2(f). *Murphy v. Smith*, ––– U.S. ––––, 138 S. Ct. 784, 787, 200 L.Ed.2d 75 (2018); *see King v. Burwell*, 576 U.S. 473, 500–01, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting) ("[S]ound interpretation requires paying attention to the whole law" as "a tool for understanding the terms of the law, not an excuse for rewriting them"). My colleagues note that elsewhere in the Act, Congress authorized states to audit MCOs and to conduct annual reviews, some of which relate to MCO payment activities. The Medicaid Act also specifies remedial measures a state can take against noncompliant MCOs, such as putting them on performance plans and imposing sanctions. These "reporting and oversight responsibilities" are proof positive, according to the majority opinion, that states are legislatively required to enforce prompt payment provisions.

This rationale proves too little. State oversight of MCOs serves a wide array of purposes, any one of which could plausibly explain Congress's imposition of managerial responsibilities. For example, as the majority opinion highlights, these oversight measures recently served to unearth an MCO's misallocation of funds. But the imposition of reporting and oversight responsibilities does not show that Congress imposed a privately enforceable duty on states to guarantee healthcare providers are timely paid. The majority opinion's rationale also proves too much. If Congress's only

purpose in authorizing state audits and oversight was to require states to guarantee timely payments by MCOs to healthcare providers, why is that purpose limited to *systemic* MCO noncompliance? No reason is offered for limiting the state's mandatory enforcement duties to only the widest or worst offenders.

As a final measure, the majority opinion notes that elsewhere in the Medicaid Act, § 1396u-2(f) is referenced as the "rule for prompt payment of providers." 42 U.S.C. § 1396u-2(h)(2)(B). My colleagues suppose that such a title implies a binding obligation on states to enforce MCO payment schedules. "But headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Brotherhood of R. R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). This title is especially unhelpful because it does not clarify whether § 1396u-2(f) is an administrative requirement that a managed contract include deadlines, or a rule that imposes a privately enforceable, managerial duty on states to guarantee all MCO payments are timely (or at least when there is "systemic" untimeliness). A passing reference in § 1396u-2(h)(2)(B) to the provision in dispute fails to alter the plain meaning of § 1396u-2(f)'s text.

**\*524** The broader structure of Medicaid also shows how the majority opinion's approach conflicts with § 1396u-2(e)(4)(A). If a state is unable to resolve an MCO's "systemic" failure to timely pay healthcare providers using lesser measures, the state *must* terminate its contract with the MCO because the majority opinion holds that states "have an obligation to act under section 1396u-2(f) to secure providers' rights." My colleagues state that "a district court could not force the State to cancel a contract with an MCO." But that attempts to have it both ways, as that is the unavoidable consequence of this holding. If states have a privately enforceable duty to ensure prompt payment—at least when MCOs have systemically failed to comply with the provided payment schedule—states would be obligated to terminate MCO contracts as a measure of last resort.[5] My colleagues acknowledge as much by suggesting that "sufficiently egregious facts" could warrant such extreme measures. In other words, the majority opinion nods to the statutory tension that its broad rule creates, but then moves on without resolving it, content with the knowledge that the statutory conflict is not realized here because Saint Anthony has not *yet* sought termination of MCO contracts. That is not a tenable solution for the statutory conflict created. Even if the

---

[5] Again, as the Hospital's counsel conceded repeatedly at oral argument. Oral Arg. at 43:51–44:22.

"worst-case scenario" existed only in the abstract, the fact that § 1396u-2(e)(4)(A) cannot be reconciled with my colleagues' construction of § 1396u-2(f) shows this is not a sound approach to statutory interpretation.

Overall, the majority opinion passes over the actual language of § 1396u-2(f) in favor of factors outside the statute and references to Congress's overall intent. But "[i]t is not a proper use of the [whole act] canon to say that since the overall purpose of the statute is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored." Scalia & Garner, *supra*, at 168. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curiam). The majority opinion suggests Congress's chosen tools for ensuring prompt payment—private suits and arbitration by healthcare providers against MCOs, along with discretionary enforcement by states—are inadequate. *See e.g.*, Majority Op. at 509, 511 (referencing § 1396u-2(f)'s mandate that state contracts include prompt payment schedules with MCOs as a " 'paper' requirement" and "a proverbial paper tiger"). But "it is not for us to substitute our view of ... policy for the legislation which has been passed by Congress." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (quoting *In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 256 (3d Cir. 2003)).

Paradoxically, the attempt to limit this holding to systemic MCO noncompliance, designed to alleviate the burden on district courts, will add to it. Now courts will have to make preliminary determinations on whether healthcare providers have pleaded "systemic" failures by MCOs to determine if claims are actionable. That determination must be made without statutory or judicial guidance, because "systemic" remains undefined both as a metric (for example, total number of unpaid claims, or a percentage of such claims) and the point at which that numeric threshold is crossed.

The majority opinion suggests this determination is intuitive, as evidenced by a solitary instance of the State acting **\*525** against one noncompliant MCO, CountyCare. This example, my colleagues posit, shows that the State "seems to be able to tell the difference between minor problems and systemic ones." As an initial matter, if Saint Anthony's allegations of State inaction in the face of rampant untimeliness by MCOs are true, this case proves the State cannot intuit the difference between "systemic" and "minor" failures. Even more, before the majority opinion, labels like "systemic" and "minor" were without legal significance. So, an example of the State

**A 95**

acting against an MCO does not show that the State—much less district courts—can determine which MCOs are systemically underperforming, and which are not. Tens of thousands of untimely payments might signal a "systemic" problem while a handful of unpaid claims might not, but between these extremes lies a vast expanse of undefined terrain.

District courts are also promised that they will not need to "adjudicate issues at the claim-by-claim level"—a task my colleagues concede "would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony." But a district court can hardly decide if an MCO has systemically underperformed if it does not examine claims for untimely payment on the merits, and then determine whether the "systemic" threshold has been reached. And a district court cannot decide whether the payment schedule even applies to a group of payment claims without reaching the requisite question of whether the disputed claims are clean. Moreover, without inspecting whether individual claims are being paid on time, a district court has no metric by which to gauge the effectiveness of, or a State's compliance with, injunctions designed to ensure timely payment. Pointing to *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016), the majority opinion insists that all the district court must do is require the State to do "something." But my colleagues recognize that such a remedy is appropriate only "[i]f Saint Anthony can prove its claims of systemic delay and/or underpayment," which necessarily involves adjudicating the underlying claims on the merits.[6]

In sum, the majority opinion's interpretation of § 1396u-2(f) finds no support in that statute's text and contravenes other provisions of the Medicaid Act. The attempt to limit a privately enforceable duty to "systemic" untimeliness by MCOs appears nowhere in that statute. This interpretation requires district courts to perform the arduous task of deciphering whether a healthcare provider has proved systemic abuse. That evaluation will involve some level of adjudicating the nature, timeliness, and merits of payment claims, rendering district courts the new Medicaid claims

---

[6] *O.B.* is also distinguishable. There, the statutory text of 42 U.S.C. § 1396a(a)(10)(A) imposed a duty on the State to make "medical assistance" available, which this court determined included providing nurses for children. 838 F.3d at 842–43. Here, there is no textual mooring for this holding that states have a privately enforceable duty to ensure healthcare providers are timely paid in instances where MCOs are systemically delaying payments. See also id. at 843–44 (Easterbrook, J., concurring) (noting the district court's injunctive order requiring the states to do something to find nurses "does not supply any detail," and "[t]he Supreme Court has reversed injunctions that read like this one").

processors for the states. And as a consequence, "day-to-day" functions and enforcement are returned to the states—the precise type of fee-for-service management that MCOs were designed to avoid. This court has not previously read an implied right of action against the states under Medicaid so expansively. Of this court's few cases recognizing a private right of action under Medicaid, none has **\*526** imposed a duty on the states as broad in scope, ongoing in nature, and difficult to enforce as the duty the majority opinion concludes exists here.[7] Nor has any other federal circuit ever recognized a state's privately enforceable duty to guarantee timely payment under § 1396u-2(f). Jane Perkins, *Private Enforcement of the Medicaid Act Under Section 1983*, Nat'l. Health L. Program 5–7 (July 30, 2021), https://bit.ly/2XaCtDY. To find such an expansive duty under § 1396u-2(f), without any textual support—in the context of Spending Clause legislation, where Congress must speak "unambiguously" with a "clear voice"—is a watershed moment.

## II

I also part ways with my colleagues on whether the district court abused its discretion in denying Saint Anthony's motion to supplement its complaint.

Federal Rule of Civil Procedure 15(d), which governs motions to supplement pleadings, provides in relevant part that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any

---

[7] *See*, *e.g.*, *Talevski*, 6 F.4th at 720 (holding that nursing home residents have privately enforceable rights under 42 U.S.C. §§ 1396r(c)(1)(A)(ii) and (c)(2) to not be chemically restrained for disciplinary or convenience purposes, and to not be transferred or discharged from a facility unless certain criteria are met); *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 824 (7th Cir. 2017) (holding that 42 U.S.C. § 1396a(a)(13)(A) creates a privately enforceable duty on states to provide a public process with notice and opportunity to comment as outlined in § 1396a(a)(13)(A)); *O.B.*, 838 F.3d at 842–43 (holding that provisions in the Medicaid Act impose a privately enforceable duty on states to take affirmative steps to locate and provide home nurses for children that the Illinois Department of Healthcare and Family Services have approved for home nursing); *Planned Parenthood of Ind., Inc.*, 699 F.3d at 974 (holding that 42 U.S.C. § 1396a(a)(23) creates a privately enforceable "right to receive reimbursable medical services from any qualified provider"); *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 607–08 (7th Cir. 2012) (reaffirming *Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir. 1993), which held that Medicaid recipients have a right of action to "challenge the reasonableness of a state's decision regarding the medical necessity of a life saving procedure" under 42 U.S.C. § 1396a(a)(10)(A)).

transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). This court has emphasized "that there is no absolute right to expand the case in this way," and that "the district court has substantial discretion either to permit or to deny such a motion." *Chi. Reg'l Council of Carpenters v. Vill. of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011); *see In re Wade*, 969 F.2d 241, 250 (7th Cir. 1992) (noting that a Rule 15(d) motion is reviewed for abuse of discretion); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985) (same). Under an abuse of discretion standard of review, we will reverse "only if no reasonable person would agree with the decision made by the trial court." *Lange v. City of Oconto*, 28 F.4th 825, 842 (7th Cir. 2022) (quoting *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013)).

On appeal Saint Anthony points to Rule 15(a), which governs a motion to amend pleadings. Rule 15(a) includes the familiar language that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). But Saint Anthony did not file a motion to amend under Rule 15(a); rather, it expressly filed a motion to supplement under Rule 15(d).[8] That the Hospital *could* have filed a motion under Rule 15(a) is not relevant. Rule 15(d) does not **\*527** contain or otherwise invoke Rule 15(a)(2)'s mandate that courts freely grant motions to amend.

The difference between Rule 15(a) and Rule 15(d) is substantive.[9] A supplemental complaint filed under Rule 15(d) is to embrace only events that have happened since the original complaint; that is, to "bring[ ] the case up to date." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed.) Saint Anthony argues its supplemental complaint alleged facts discovered after the filing of the original complaint. But that is only partially correct. The Hospital states in its supplemental complaint that its allegations are only "based *in part* on events that have occurred since" the original complaint. (emphasis added). The supplemental complaint references Saint Anthony's earlier allegations about lack of transparency on MCO payments from January and February 2020, predating the April 2020 original complaint. Indeed, the original complaint included an entire section challenging the lack of transparency in the MCOs dealing with providing hospitals.

---

[8] Dist. Ct. D.E. 101 ("Motion for Leave to File Supplemental Complaint").

[9] *Contra* Oral Arg. at 45:20–25.

Saint Anthony also added a new claim in its supplemental complaint. The original complaint alleged statutory violations for the State's failure to ensure timely payments from MCOs. The supplemental complaint alleged violation of the Fourteenth Amendment's Due Process Clause and requested transparency in the calculations and variables used in making payments under the managed care program *and* Illinois's separate fee-for-service program—the latter of which was not previously part of this action.

Given this case's subject matter, scope, and procedural posture, the district court was well within its discretion to decide against a massive increase in the scale of this litigation. Saint Anthony's original complaint was limited to the State's managed care program—an enormous undertaking itself. The supplemental complaint, filed nine months later after the parties had engaged in expedited discovery, added a new due process count which, as the district court correctly observed, would have entailed "whole new frontiers of discovery." That characterization is modest. The case would have expanded to include the Hospital's claim involving, for the first time, the $7 billion Medicaid fee-for-service program.[10] When a proposed supplemental complaint seeks to add a claim that will unduly delay and alter the scope of litigation, a district court may deny leave to supplement the complaint. *See Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 84–85 (D.D.C. 2018).

For my colleagues, if the district court's decision denying the motion to supplement is affirmed, "Saint Anthony could face serious problems with claim preclusion." But shortly after oral argument in our court, the State submitted a post-argument memorandum in which it stated:

> [I]f the Court affirms the district court's orders denying [Saint Anthony] leave to file its proposed supplemental complaint and [Saint Anthony] seeks to assert that additional claim in a separate action, **\*528** [the State] will not

---

[10] For FY 2020, Illinois paid nearly $15 billion to managed care organizations, and nearly $6.9 billion in fee-for-service payments, according to statistics compiled by the Medicaid and CHIP Payment and Access Commission, a non-partisan legislative branch agency that provides policy and data analysis and makes recommendations to Congress, the Secretary of the U.S. Department of Health and Human Services, and the states on a wide array of issues affecting Medicaid and related programs. Medicaid and Chip Payment and Access Commission, MACStats: Medicaid and Chip Data Book 48 (2021), https://bit.ly/3NbGn3P. The Commission's authorizing statute is 42 U.S.C. § 1396.

> assert, and accordingly waives, the defense of claim preclusion as to the additional claim alleged in plaintiff-appellant's proposed supplemental complaint.[11]

So, Saint Anthony would have been able to assert its additional claim against the State in a separate case. The State affirmatively waived any argument to the contrary.

As the district court reasoned and concluded—a decision that warrants deference under our standard of review—allowing this supplementation would not promote the economic and speedy disposition of the controversy between the parties and would cause undue delay. A reasonable person could take the view that the Hospital's motion to supplement, coming when it did, expanding the litigation to the scale that it would, and including facts Saint Anthony previously knew, should be denied. Therefore, I cannot join my colleagues in their conclusion that the district court abused its discretion in denying that motion.

For these reasons, I respectfully concur in part and dissent in part.

---

[11] D.E. 59.

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

United States District Court, N.D. Illinois, Eastern Division.

SAINT ANTHONY HOSPITAL, Plaintiff,

v.

Theresa EAGLESON, in her official capacity as Director of the Illinois Department of Health and Family Services, Defendant.

Case No. 20-cv-2561

|

Signed 07/09/2021

## **MEMORANDUM OPINION AND ORDER**

Steven C. Seeger, United States District Judge

Plaintiff Saint Anthony Hospital is a charitable hospital located on the west side of Chicago. It cares for a disproportionately poor patient population, so it relies heavily on Medicaid for its funding. But **\*725** the Hospital has encountered all sorts of problems receiving payments from managed care organizations ("MCOs"), which are private healthcare insurance companies that administer the bulk of the Medicaid program in Illinois. All too often, the payments arrive late, or not at all.

Saint Anthony filed suit and asserted a right to payment under the Medicaid Act. But it didn't sue the MCOs. Instead, the Hospital filed a complaint against Theresa Eagleson, the Director of the Illinois Department of Health and Family Services ("HFS"). HFS is the state agency that is responsible for overseeing Medicaid in Illinois.

The theory of the complaint is that the state is failing to oversee the MCOs as required by federal law. The Hospital claims that the state's Medicaid system involving the MCOs is plagued by "dysfunction." *See* Cplt., at ¶ 38. The lack of oversight has allowed the MCOs to run rampant and shirk their responsibility to pay providers like Saint Anthony in full and in a timely manner. Saint Anthony seeks an injunction to force the state to compel the MCOs to do better.

The state moved to dismiss on a number of grounds. For the reasons stated below, the motion to dismiss is granted.

**A 101**

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

## Background

Saint Anthony Hospital opened its doors in 1898. *See* Cplt., at ¶ 16 (Dckt. No. 1). For over a century, the Hospital has provided medical care and social services to the communities on the west side of Chicago. *Id.* at ¶¶ 1, 12, 16. The patient population at Saint Anthony is disproportionately poor. *Id.* at ¶¶ 10, 16.

The patients may not have the means to pay for what they need, but that does not stop the Hospital from caring for them. Saint Anthony is a "safety net" hospital, meaning that it cares for the needy without regard for their ability to pay. *Id.* at ¶¶ 2, 16; *see also* 305 ILCS 5/5-5e.1. Saint Anthony cares for everyone, and "turn[s] away no one." *See* Cplt., at ¶ 10 (Dckt. No. 1).

The Hospital relies heavily on Medicaid to carry out its mission. *Id.* at ¶¶ 1, 16. Medicaid is a program funded by the federal and state governments to pay for health care for low-income families. *Id.* at ¶ 22; *see generally* 42 U.S.C. § 1396 *et seq*. The federal government provides funds to the states, and the states then contribute funds and administer the program within their borders. *See* Cplt., at ¶ 22.

States can elect whether to participate in the Medicaid program. But if states elect to participate, the federal government requires them to comply with certain conditions as expressed in the Medicaid Act. For example, states must submit a plan to the federal government for approval, and the plan must describe how they intend to administer their Medicaid program. *See* 42 U.S.C. § 1396a.

There is an enforcement mechanism on the back end. States must comply with the conditions in the statute, or else risk the possibility of losing federal funding. *See Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012); *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003) ("[O]nce a state elects to participate [in Medicaid], it must abide by all federal requirements and standards set forth in the Act."); 42 U.S.C. § 1396c.

The Illinois Department of Healthcare and Family Services is the agency that administers this state's Medicaid program. *Id.* at ¶ 13. Defendant Theresa Eagleson is the Director, and is responsible for ensuring that the state program complies with federal law. *Id.* at ¶¶ 13, 24.

**A 102**

**\*726** Medicaid patients in Illinois can enroll in one of two programs: the "fee for service" program, or the "managed care" program. *Id.* at ¶¶ 25–26; *see also Aperion Care, Inc. v. Norwood*, 2018 WL 10231154, at \*1 (N.D. Ill. 2018), *aff'd sub nom Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378 (7th Cir. 2020). When a patient is enrolled in the "fee for service" program, the state pays for the patient's medical care directly. *See Midwest Emergency Assocs.-Elgin Ltd. v. Harmony Health Plan of Illinois, Inc.*, 382 Ill. App. 3d 973, 975, 321 Ill. Dec. 175, 888 N.E.2d 694 (2008). So, when Saint Anthony treats a patient in the fee for service program, it sends the bill to the state.

The other program is the "managed care" program, and that's the program at issue in this case. Under that program, the state pays a private insurance company a flat monthly fee, on a per member basis. *Id.* at 975–76, 321 Ill. Dec. 175, 888 N.E.2d 694. And in exchange, the private insurance company agrees to pay for each patient's medical care. *Id.* The private insurance companies that participate in the Medicaid program are known as managed care organizations (again, "MCOs"). *Id.* When Saint Anthony treats a patient insured through the managed care program, it sends the bill to an MCO.

Illinois introduced the managed care program in 2006. *See* Cplt., at ¶ 31 (Dckt. No. 1). At first, the program was a small part of the state's Medicaid spending, representing less than 3% of the state's total expenditures. *Id.* But the program has expanded significantly in recent years. *Id.* Illinois spent $251 million on MCOs in 2010, and by 2019, the expenditures shot up to $12.73 billion. *Id.* As of January 2020, over 2.1 million people are enrolled in the state's managed care program. *Id.* at ¶ 35. That's roughly 80% of the state's Medicaid enrollees. *Id.*[1]

Meanwhile, the state reduced the number of MCOs from twelve to seven in 2017. *Id.* at ¶¶ 32–35. So fewer MCOs are providing an ever-growing amount of services. The total value of the state's contracts with the seven MCOs is $63 billion, the largest single procurement in Illinois history. *Id.* at ¶ 34.

---

[1] For additional background, see Illinois' Massive Shift to Managed Care at \*1, 5, Illinois Comptroller, available at https://illinoiscomptroller.gov/news/fiscal-focus/illinois-massive-shift-to-managed-care/ (last visited July 1, 2021). Saint Anthony cited this article in the complaint. See Cplt., at ¶ 31 n.8 (Dckt. No. 1).

As Saint Anthony tells it, the radical expansion came with significant growing pains. According to the complaint, the state presided over a "hasty roll-out" of the managed care program that was "haphazardly-planned and poorly-executed." *Id.* at ¶¶ 36–37. The Hospital claims that the state fails to provide sufficient oversight of the MCOs, who take advantage of the fact that the state is asleep at the wheel.

The complaint recounts the many problems that Saint Anthony has experienced when it attempts to receive payment from the MCOs. In the Hospital's view, the MCOs have an incentive to pay nothing, or pay as little as possible, or pay as late as possible. *Id.* at ¶¶ 26, 65. And that's exactly what the MCOs are doing. According to the complaint, the MCOs are dragging their feet, and the state isn't doing anything about it. *Id.* at ¶ 65.

Saint Anthony points to four bad practices in particular. *Id.* at ¶ 43. In a nutshell, the MCOs deny many of the claims, or don't pay in full, or put up roadblocks, or don't make it clear what they are paying and what they're denying. "The MCOs have systematically delayed and denied claims without justification, failed to pay **\*727** undisputed claims, and when payments are made, they refuse to provide the detail necessary for Saint Anthony to determine if it is receiving proper payment or, if not, why not." *Id.* at ¶ 6.

First, the MCOs deny Saint Anthony's claims much more often than in the past. Specifically, claims are denied at a rate that is "four times greater" than "under the previous system." *Id.* at ¶ 46. As a result, the Hospital "is not paid for a substantial amount of services it provides." *Id.* at ¶ 48. A denial means that Saint Anthony must foot the bill. *Id.*

Many of the denials involve ticky-tack issues and "technical 'gotchas.' " *Id.* at ¶ 47. For example, "Illinicare MCO denied $92,000 in charges submitted by Saint Anthony because the patient label was placed on a State-mandated consent form for the procedure instead of the patient's name being handwritten on the form." *Id.*

Second, when the MCOs do approve claims, they make Saint Anthony wait a long time for the funds. Today, Saint Anthony "has to wait anywhere from 90 days to 2 years to be paid by the MCOs." *Id.* at ¶ 51; *see also id.* at ¶¶ 72–73. But in the meantime, Saint Anthony has bills of its own to pay. Without receiving payment from the MCOs, Saint Anthony has trouble paying its vendors. *Id.* at ¶ 51.

**A 104**

Third, the process for requesting payment from the MCOs is unduly cumbersome. *Id.* at ¶¶ 52–54. Each MCO has its own policies and procedures for how to request payment, creating a "labyrinth" that is difficult to navigate. *Id.* at ¶ 52.

Fourth, when the MCOs do tender payment, it's difficult to tell what they're paying for. That is, the "MCOs do not provide itemized claims data showing a breakdown of how it calculated the total amount of payment for a claim, leaving Saint Anthony to guess whether it received the full amount due to it." *Id.* at ¶ 57.

Overall, Saint Anthony is facing "unjustified denials, unwarranted delays ... and increased costs to try to navigate this broken system." *Id.* at ¶ 54. The Hospital has to devote resources to try to get paid, and any money spent on reimbursement efforts is money that it can't spend on patient care. *Id.* The lack of payment creates a risk of cutting services, and may put the Hospital itself in jeopardy. *Id.*

All of those bad practices, but especially the delays in payment, have had disastrous financial consequences for Saint Anthony. *Id.* at ¶¶ 10, 70. For one, late payments have resulted in a precipitous decline in cash on hand. "From 2015 to 2019, Saint Anthony's cash on hand has fallen 98%: from over $20 million (enough to fund 72 days of operation) to less than $500,000 (less than 2 days)." *Id.* at ¶ 21. By Saint Anthony's calculations, MCOs currently owe Saint Anthony north of $20 million in Medicaid payments. *Id.* at ¶ 4. Saint Anthony has also suffered a 20% decline in net revenue per patient. *Id.* at ¶ 71.

According to the complaint, the MCOs know that they have leverage over vulnerable hospitals like Saint Anthony. And they are taking full advantage of it. Saint Anthony has attempted to resolve disputes with the MCOs, but has encountered "delay, unreasonable requests for additional information, and a general lack of responsiveness." *Id.* at ¶ 64. The Hospital is forced to endure a "time-consuming, resource-intensive, [and] often futile appeals process." *Id.* at ¶ 48. The MCOs subject Saint Anthony to months of haggling, and all too often, the end result is a settlement offer at a "substantial discount." *Id.* at ¶ 64.

The "bottom line" is that Saint Anthony "is being paid much less than before the Medicaid managed care expansion under **\*728** the prior administration [of Governor

Rauner].” *Id.* at *Id.* at ¶ 61. And the financial situation of the Hospital has hit a “crisis point.” *Id.* at ¶ 70; *See also id.* at ¶ 10.

At this point, a reader could be forgiven for thinking that Saint Anthony filed suit against the MCOs. But that's not the case at all. The contracts between Saint Anthony and the MCOs include an arbitration provision, so presumably the Hospital didn't sue the MCOs because it can't sue the MCOs (in federal court, anyway).[2] Instead, Saint Anthony brought this lawsuit against Theresa Eagleson in her capacity as the Director of the Illinois Department of Health and Family Services.

The theory of the case is that the Medicaid Act requires states to oversee the MCOs. Saint Anthony basically claims that the Medicaid Act requires the state to ensure that the MCOs pay providers in a timely manner. But instead of doing its job and providing oversight, the state “has given MCOs *carte blanche* to delay and deny claims and payments.” *Id.* at ¶ 65. And by falling down on the job, the state is violating federal law, and placing the Hospital in peril. *Id.* at ¶¶ 70, 78.

Saint Anthony filed a two-count complaint. Each Count alleges that provisions of the Medicaid Act give providers rights that are enforceable under section 1983. The provisions differ, but the gist of each Count is the same. The Hospital claims that it has a statutory right to prompt payment, and that the state has a duty to enforce the payment obligations of the MCOs.

Count I rests largely on section 1396u-2(f), a statutory provision about the content of a contract between the state and an MCO. That section provides that a “contract” between the state and an MCO “shall provide” that the MCO “shall make payment to health care providers ... on a timely basis consistent with the claims payment

---

[2] Saint Anthony could have taken up these issues directly with the MCOs through arbitration. Saint Anthony has contracts with all seven MCOs in the Illinois managed care program, and those contracts detail which services each entity covers, how much they'll reimburse the Hospital, and how the claims approval process works. See Joint Reply Brief in Support of the MCOs' Mtns.' to Compel Arbitration and Stay Action, at 3 (Dckt. No. 93); Cplt. at ¶ 72 (Dckt. No. 1). The agreements also state the timeline when the MCOs must process certain claims. Id. But the contracts also contain binding arbitration clauses, which require both parties to litigate any disputes in front of an arbitrator instead of a court. Id. A number of the MCOs intervened in this action and filed motions to compel arbitration. As they see it, Saint Anthony's lawsuit against the state is a round-about, back-door way to get around the arbitration provisions.

procedures described in section 1396a(a)(37)(A) of this title," unless the MCO and the provider make a different deal. *See* 42 U.S.C. § 1396u-2(f).

That section ropes in section 1396a(a)(37)(A). And section 1396a(a)(37)(A), in turn, requires a state's plan to have procedures that ensure prompt payment. "A State plan for medical assistance must … provide for claims payment procedures which … ensure" that a certain percentage of claims are paid by a certain period of time. *See* 42 U.S.C. § 1396a(a)(37)(A). Specifically, the "procedures" must "ensure" that 90% of claims are paid within 30 days, and 99% of claims are paid within 90 days. *Id.*

Count I also cites a statutory provision that creates a remedy for non-compliance. *See* Cplt., at ¶ 81. The federal government can withhold funds from a state if the MCOs do not comply with section 1396u-2, and by extension 1396u-2(f). "[N]o payment shall be made under this subchapter to a State … unless … the entity complies **\*729** with the applicable requirements of section 1396u-2." *See* 42 U.S.C. § 1396b(m)(2)(A)(xii).

Viewing those provisions as a whole, Saint Anthony claims that the state has a duty to ensure that MCOs pay providers in a timely manner. The Hospital alleges that the state is falling down on the job, by shirking its responsibility to ensure payment to providers. The state's lax approach toward payment, in the Saint Anthony's view, violates federal law.

Count II rests primarily on section 1396a(a)(8), which is about the state's Medicaid plan. The state plan must provide that "medical assistance … shall be furnished with reasonable promptness to all eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). The definition of "medical assistance" includes payment for medical care. *See* 42 U.S.C. § 1396d(a). Reading those provisions together, Saint Anthony claims that the reference to "reasonable promptness" creates a right to be paid on the 30-day/90-day schedule set out in section 1396a(a)(37)(a), the section discussed above. *See* Cplt., at ¶ 90 (Dckt. No. 1).

Saint Anthony seeks declaratory and injunctive relief. The Hospital seeks a declaratory judgment that the state has violated federal law by failing to ensure that the MCOs meet the requirements for timely payment. *Id.* at ¶¶ 87, 96.

The Hospital also requests an injunction to force the state to "caus[e]" the MCOs to pay claims by set deadlines. *Id.* The sought-after injunction also would require the

**A 107**

state to collect monthly reports on the payment of claims by the MCOs, and would compel the state to force the MCOs to use a standard format for the payment of all claims. *Id.* So the Hospital wants an injunction to force the *state's* hand to twist the *MCOs'* arms.

If the MCOs still do not comply, Saint Anthony seeks an injunction requiring the state to "terminate its MCO contracts," and "retake responsibility for payment of claims." *Id.* That relief would, in effect, end a program that currently serves 80% of the state's Medicaid enrollees, totaling more than 2.1 million people. *Id.* at ¶ 35.

The state moved to dismiss on a number of grounds. *See* Def.'s Mem. (Dckt. No. 24). The lead argument is that the Medicaid Act does not impose a 30-day/90-day payment schedule for hospitals like Saint Anthony. In its view, that timetable applies to practitioners, not providers. Next, the state argues that the provisions in question do not give rise to a private of action. The state also invokes the Eleventh Amendment.

The Court concludes that the statutory provisions in question do not give rise to a private right of action, because they do not create rights that are enforceable under section 1983. And even if a plaintiff could bring a claim, Saint Anthony has failed to state a claim for which relief can be granted.


## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial **\*730** plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

## Discussion

The motion to dismiss raises a number of issues. The Court will first address whether there is a private right of action, and then will turn to whether Saint Anthony's complaint states a claim. Step one is deciding whether Congress authorized claimants to enter the courthouse at all.

## I. The Existence of a Private Right of Action

"Medicaid is a cooperative program through which the federal government reimburses certain expenses of states that promise to abide by the program's rules." *See Nasello v. Eagleson*, 977 F.3d 599, 601 (7th Cir. 2020); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (noting that the Medicaid Act requires states to "comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services"); *see also Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012). The Medicaid Act is an example of Congress exercising its power under the Spending Clause. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 2, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The federal government provides funds, with strings attached.

Saint Anthony believes that the state is not living up to its end of the bargain. As the Hospital tells it, the MCOs are shirking their payment obligations, and the state is letting them get away with it.

A threshold issue is whether Saint Anthony can bring a claim at all. That is, the first step is deciding whether Congress created a private right of action. It is one thing to create substantive federal law; it is another to create a private right of action to enforce it in the federal courthouse. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.... Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy

**A 109**

matter, or how compatible with the statute."); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.") (Scalia, J., concurring).

The Medicaid Act is chock-full of requirements for the states. But it does not create a private cause of action for providers like Saint Anthony to enforce the payment obligations. The Hospital has not pointed to any foothold in the text of the statute that authorizes a claim against the state. In fact, Saint Anthony doesn't even argue that the Medicaid Act itself green-lights a private right of action.

Instead, the Hospital relies on section 1983 as the springboard for bringing a claim. The text of the statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the *__731__ District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any *rights*, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

*See* 42 U.S.C. § 1983 (emphasis added).

Section 1983 "means what it says." *See Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The statute "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

For present purposes, the key word in the statute is "rights." *See* 42 U.S.C. § 1983. The text of the statute authorizes suits to enforce "*rights*, not the broader or vaguer 'benefits' or 'interests.' " *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (emphasis in original); *see also Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) ("In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."). The statute "does not provide an avenue for relief every

**A 110**

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

time a state actor violates a federal law." *City of Rancho Palos Verdes*, 544 U.S. at 119, 125 S.Ct. 1453.

To enforce a federal statute under section 1983, a plaintiff must demonstrate that the "federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *Id.* Three factors come into play when deciding whether a statute creates a right that is enforceable under section 1983: (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) the asserted right must not be "so vague and amorphous that its enforcement would strain judicial competence;" and (3) the statute must "unambiguously impose a binding obligation on the States," meaning that the "provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353.

Those factors "are meant to set the bar high." *See Planned Parenthood of Indiana*, 699 F.3d at 973; *see also BT Bourbonnais Care LLC v. Norwood*, 866 F.3d 815, 820–21 (7th Cir. 2017) (noting that the test is "strict"). A plaintiff must come forward with an "unambiguously conferred right to support a cause of action brought under § 1983." *See Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268; *see also id.* at 290, 122 S.Ct. 2268 ("In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms ...."); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 332, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) ("Our precedents establish that a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.' ") (quoting *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268).

This "rigorous" approach reflects concerns about federalism, by ensuring that courts do not allow states to become embroiled in litigation based on conditions not clearly expressed in the statutory text. *See Planned Parenthood of Indiana*, 699 F.3d at 973; *Pennhurst*, 451 U.S. at 24, 101 S.Ct. 1531. It promotes the separation of powers, too, by ensuring that courts do not give the green light to suits not authorized by Congress. *See Hernandez v. Mesa*, ––– U.S. ––––, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020); *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017); *Alexander*, 532 U.S. at 287, 121 S.Ct. 1511 **\*732** ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."); *Nasello*, 977 F.3d at 601 ("Creating new rights of action is a legislative rather than a judicial task."). It is the role of Congress, not courts, to open the courthouse doors to claimants.

**A 111**

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268. But the presumption is rebuttable. *See Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. The state can rebut the presumption by showing that Congress "shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.' " *See Gonzaga*, 536 U.S. at 284 n.4, 122 S.Ct. 2268 (quoting *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353).

In *Wilder v. Virginia Hospital*, 496 U.S. 498, 508–12, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court allowed plaintiffs to use section 1983 to bring a claim to enforce a now-defunct provision of the Medicaid Act known as the Boren Amendment. That provision permitted the federal government to reduce a state's Medicaid funding unless it paid hospitals for their services at certain rates. The Supreme Court held that the plaintiffs could bring their claim under section 1983. *Id.* at 508, 110 S.Ct. 2510.

But the *Wilder* approach to section 1983 seems to have reached the end of the line. In the ensuing decades, the Supreme Court has shown little enthusiasm for using section 1983 as a gateway for claims involving Spending Clause legislation. The Supreme Court itself has acknowledged that its "later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified." *See Armstrong*, 575 U.S. at 330 n.*, 135 S.Ct. 1378; *see also Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (holding that section 1396a(a)(19) "cannot be interpreted to create a private right of action, given the Supreme Court's hostility, most recently and emphatically expressed in *Gonzaga* ... to implying such rights in spending statutes").

In a string of cases, the Seventh Circuit has addressed whether various provisions of the Medicaid Act create a right that is enforceable under section 1983. The outcomes are a mixed bag, meaning that the Court of Appeals has sometimes found a private right of action, and sometimes not. Each case turned on the unique statutory provisions at issue. *See Bontrager v. Indiana Family and Social Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (recognizing a private right of action under section 1396a(a)(10)(A)); *Planned Parenthood of Indiana*, 699 F.3d at 974 (holding that section 1396a(a)(23) creates a federal right vested in Medicaid-eligible individuals); *BT Bourbonnais Care*, 866 F.3d at 820–23 (holding that section 1396a(a)(13) creates

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

a federal right vested in nursing homes); *Nasello*, 977 F.3d at 601 (holding that section 1396a(r)(1)(A) does not create a federal right vested in nursing home residents).

The Seventh Circuit recently surveyed the state of the law in this area in *Nasello v. Eagleson*, 977 F.3d 599 (7th Cir. 2020). *Nasello* involved a claim under section 1983 to enforce a provision of the Medicaid Act requiring states to pay more for "medically needy" individuals. *Id.* at 600–01. Plaintiffs argued that the statute required the state to reimburse them for past bills. *Id.*

The Seventh Circuit held that the provision in question did not create a right **\*733** enforceable under section 1983. "Medicaid does not establish anyone's entitlement to receive medical care (or particular payments); it requires only compliance with the terms of the bargain between the state and federal governments." *Id.* at 601. The Court of Appeals noted the steady flow of cases from the Supreme Court finding no private right of action under Spending Clause legislation. "In the three decades since *Wilder* it has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." *Id.*; *see also Armstrong*, 575 U.S. 320, 135 S.Ct. 1378; *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011); *Gonzaga*, 536 U.S. 273, 122 S.Ct. 2268.

Courts have no power to "enlarge the list of implied rights of action when the statute sets conditions on states' participation in a program, rather than creating direct private rights." *See Nasello*, 977 F.3d at 601. Creating a private right of action is the business of the legislature, not the judiciary. *Id.* If the state is falling down on the job under the Medicaid Act, an interested person can resort to the "administrative process – and if that fails they could ask the responsible federal officials to disapprove a state's plan or withhold reimbursement." *Id.* at 601–02.

So the question here is whether the provisions of the Medicaid Act create a right that is enforceable by providers like Saint Anthony under section 1983. Based on the standards laid down in *Blessing* and *Gonzaga*, Saint Anthony has no private right of action against the state. The Court will take up the relevant statutory provisions by Count.

#### A. Section 1396u-2(f) (Count I)

In Count I, Saint Anthony claims that the state has an obligation to ensure that the MCOs pay providers in a timely manner. The Hospital rests its claim on section 1396u-2(f) of the Medicaid Act, which sets requirements for a contract between a state and MCOs. Section 1396u-2(f) provides:

> A *contract* under section 1396b(m) of this title with a medicaid managed care organization *shall provide that the organization shall make payment to health care providers* for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization *on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A)* of this title, unless the health care provider and the organization agree to an alternate payment schedule and, in the case of primary care services described in section 1396a(a)(13)(C) of this title, consistent with the minimum payment rates specified in such section (regardless of the manner in which such payments are made, including in the form of capitation or partial capitation).

*See* 42 U.S.C. § 1396u-2(f) (emphasis added). The "contract under section 1396b(m)" means a "contract between the State and the entity," meaning the an MCO. *Id.*; 42 U.S.C. § 1396b(m)(2)(A)(iii).

Section 1396u-2(f) expressly invokes the "claims payment procedures" in section 1396a(a)(37)(A). That section, in turn, sets requirements for claims payment procedures in a state's plan. Specifically:

> A State plan for medical assistance must ... provide for *claims payment procedures which ... ensure* that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under **\*734** the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims.

*See* 42 U.S.C. § 1396a(a)(37)(A) (emphasis added).

**A 114**

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

Applying the *Blessing* factors, the Court concludes that sections 1396u-2(f) and 1396a(a)(37)(A) do not create rights that are enforceable under 1983. Simply put, there is no private right of action.

The first factor under *Blessing* is whether "Congress ... intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. Nothing "less than an unambiguously conferred right is enforceable by § 1983." *Gonzaga*, 536 U.S. at 282, 122 S.Ct. 2268.

At first blush, the provisions might give the impression that they are designed to benefit providers like Saint Anthony. After all, the provisions are about timely payment. In life, the people most interested in timely payment are the people getting paid.

But that's not the sort of entitlement that can give rise to an enforceable right. The Supreme Court made clear in *Gonzaga* that a generalized "benefit" isn't good enough. *See id.* at 283, 122 S.Ct. 2268. Falling within the "general zone of interest" is not enough to have a right. *Id.* To create judicially enforceable rights, the statute's text "must be 'phrased in terms of the persons benefited,' " and have " 'an *unmistakable focus* on the benefited class.' " *Id.* at 284, 122 S.Ct. 2268 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)) (emphasis in original).

That sort of rights-creating language is missing in the provisions at hand. Section 1396u-2(f) is about the content of contracts between the state and MCOs. A "contract" with MCOs "shall provide" that the MCOs "shall make payment" on a "timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A)." *See* 42 U.S.C. § 1396u-2(f). Instead of creating rights to payment, section 1396u-2(f) requires the contracts to do the heavy lifting. *Id.* The provision itself does not entitle providers to much of anything, and does not contain any "explicit rights-creating terms." *See Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268.

In other words, section 1396u-2(f) requires the state to include certain provisions in its contracts with MCOs. It does not require the state to enforce those provisions, or otherwise ensure that MCOs pay providers promptly.

**A 115**

Saint Anthony is not claiming that the contracts between the state of Illinois and the MCOs are missing provisions required by the statute. In other words, Saint Anthony is not attempting to change the contractual arrangement between the state and the MCOs to bring it into compliance with section 1396u-2(f). The issue isn't whether a provider has an enforceable right to require the state to include certain provisions in its contract with MCOs. Instead, the Hospital asserts that it has a right to prompt payment, and that the state has a duty to make sure that the MCOs pay as they should. And when reading the statute, that right simply isn't there.

Section 1396u-2(f) loops in section 1396a(a)(37)(A), but the result is the same. That section is about the content of a state's plan. "A State plan for medical assistance must ... provide for claims payment procedures ...." *See* 42 U.S.C. § 1396a(a)(37)(A). Those "procedures" **\*735** must "ensure" that 90% of claims are paid within 30 days, and 99% of claims are paid within 90 days. *Id.*

The statute sets prompt payment as a goal, but it stops short of creating a right to prompt payment for the providers. In fact, section 1396a(a)(37)(A) does not mention providers at all. There's no "individually focused terminology" because there's no mention of the providers. *See Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268. It's hard to see how section 1396a(a)(37)(A) could "unambiguously create[ ] an 'individual entitlement' " in the hands of the providers when it does not mention the providers at all. *See Planned Parenthood of Indiana*, 699 F.3d at 973 (citation omitted).

Taken together, the provisions create a general benchmark, not an individual right. The sections set an "aggregate plan requirement," without establishing a "personal right." *Id.* at 974. So they cannot support the weight of a claim under section 1983.

Saint Anthony relies heavily on *BT Bourbonnais Care*, but it does not lend much of a hand. *See* Pl.'s Resp., at 11–14 (Dckt. No. 26). That case involved an express procedural right, that is, a right to notice and comment before the state changed reimbursement rates. *See BT Bourbonnais Care*, 866 F.3d at 821 ("[T]he Operators are not arguing that the current version of section 1396a(a)(13)(A) creates a substantive right to any particular level of reimbursement. Instead, they contend, it creates a procedural right to certain information, as well as a procedural right to notice and comment."). The Court of Appeals addressed the "narrow question" whether section 1396a(a)(13)(A) created an "enforceable right to a public process." *Id.* at 820.

The Medicaid Act required the state to "provide ... providers ... reasonable opportunity for review and comment on the proposed rates." *See* 42 U.S.C. § 1396a(a)(13)(A). Based on the plain language of the text, the Seventh Circuit held that the statute created an enforceable right. The provisions at issue in *BT Bourbonnais Care* expressly required the state to do something for the providers, to wit, give them notice and an opportunity to chime-in before changing rates.

The provisions at hand in this case, in sharp contrast, contain no comparable language. There is no language giving providers an unmistakable right to prompt payment. *BT Bourbonnais Care* involved statutory language creating "unambiguous private rights," but this case does not. *See BT Bourbonnais Care*, 866 F.3d at 821. So it is not enough to argue that this case, like *BT Bourbonnais Care*, involves "procedures." *See* Pl.'s Resp., at 13 (Dckt. No. 26). This case does involve *procedures*, but it does not involve a claim that the state violated anyone's procedural *rights*. *See* 42 U.S.C. § 1396a(a)(37) ("A State plan for medical assistance must ... provide for claims payment procedures ....").

The statute does contemplate a right of the providers in one sense. The Medicaid Act contemplates two tiers of contracts: a contract between a state and the MCOs, and a contract between the MCOs and the providers. *See Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 137 (2d Cir. 2014) ("Under this system generally, the state does not directly reimburse health service providers that serve Medicaid recipients. Rather, the state enters into a contract with an MCO. The state then pays the MCO for each Medicaid patient enrolled with it. The MCO, in turn, contracts with a health service provider ... to provide medical services to its enrollees."); *see also* 42 U.S.C. § 1396u-2(a)(1)(A)(ii) (referring to "provider agreements with managed care entities"); 42 U.S.C. § 1396u-2(f) (creating a carve-out if **736** a "health care provider and the organization agree to an alternate payment schedule"). The state provides funds to the MCOs, and the MCOs provide funds to the providers, with each link of the chain forged by contract.

So Congress had in mind that providers would have contractual rights. And contractual rights come with an ability to enforce the contract if there is a breach. Congress legislates against the backdrop of the common law, and undoubtedly knew that contractual rights could give rise to breach-of-contract claims. *See Minerva Surgical, Inc. v. Hologic, Inc.*, ––– U.S. ––––, 141 S.Ct. 2298, 2306–07, 210 L.Ed.2d 689 (2021); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct.

**A 117**

2166, 115 L.Ed.2d 96 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").

Instead of imposing a statutory obligation of prompt payment, Congress decided that providers would enter into contracts with MCOs, and that the contracts would carry the load. Providers like Saint Anthony who believe that they are not receiving timely payment can assert whatever rights they may have under those agreements. But the remedy is contractual in nature, not a statutory claim against the state to compel the MCOs to do what they promised to do.

Saint Anthony could have asserted whatever rights it may have under its agreements with the MCOs. But the contracts also include arbitration provisions, and the MCOs (who intervened) rightly argue that any dispute between Saint Anthony and the MCOs about their payments belongs in front of an arbitrator. For whatever reason, the Hospital elected not to go that route. But having taken a pass on the opportunity to pursue contractual rights – rights contemplated by the statute – Saint Anthony cannot be heard to argue that this Court should open a backdoor to the courthouse.

The second *Blessing* factor is whether the asserted right is "so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353 (citation omitted). This factor is closer to the line. If the statute simply required payment on a "timely basis" without more, it would stretch the ability of the judiciary to apply that standard in a particular case. *See* 42 U.S.C. § 1396u-2(f). Payors and payees may have much different views of what a "timely" payment is.

But here, the statute does place markers for what it means to be "timely." Under section 1396a(a)(37)(A), the procedures must ensure that 90% of so-called "clean claims" for payment (*i.e.,* claims that don't require more information) are paid within 30 days, and that 99% of such claims are paid within 90 days. *See* 42 U.S.C. § 1396a(a)(37)(A). Applying that standard to a busy hospital with who-knows-how-many claims could be a herculean task, but it is not vague or amorphous, either. It might strain judicial *resources*, but it would not strain "judicial competence." *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353. Applying a fixed standard to a lot of claims for payment is not easy, but it's not the same thing as applying a nebulous standard that no one can pin down.

The problem for this second factor is not so much that the standard is loosey-goosey. The problem is that the statute does not create an individual right to payment by a fixed deadline at all (*i.e., Blessing* factor one). But if the statute hypothetically *did* entitle providers to receive a certain percentage of payments by a certain period of time, courts could use that yardstick to measure compliance.

**\*737** The third and final *Blessing* factor is whether the statute "unambiguously impose[s] a binding obligation on the States" using "mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353. "[T]he statute cannot leave any room for discretion on the part of the state ...." *See BT Bourbonnais Care*, 866 F.3d at 822.

The provisions do contain mandatory language, as exemplified by the use of the words "shall" and "must." *See Maine Cmty. Health Options v. United States*, ––– U.S. –––, 140 S. Ct. 1308, 1320, 206 L.Ed.2d 764 (2020). The statute provides that contracts "shall" contain provisions about payment procedures. *See* 42 U.S.C. § 1396u-2(f). The statute also provides that a state plan "must" have claims payment procedures. *See* 42 U.S.C. § 1396a(a)(37).

But once again, § 1396u-2(f) simply requires the state to include certain provisions in its contracts with the MCOs. It does not require the state to ensure that the MCOs are complying with those provisions. That is, the Medicaid Act does not "require the State to ensure that the MCOs timely and properly" make payments to providers. *See* Cplt., at ¶ 5 (Dckt. No. 1); *See also id.* at ¶ 9 ("Saint Anthony brings this action ... to order [the state] to comply with the federal and state statutory and regulatory mandate to safeguard Medicaid money and oversee and manage the MCOs ...."). The mandatory language is about the content of the contracts. It does not contain mandatory language that compels the state to make sure that the MCOs pay up.

If Congress had wanted to compel prompt payment to the providers, it could have easily done so. Congress could have guaranteed that providers must receive a certain amount of payments in a certain period of time. And it could have written a provision requiring the state to enforce those obligations. But it didn't. Instead, Congress elected to create requirements for contracts, and requirements for a state's plan. Those aren't rights for providers.

In sum, under the standards set out in *Blessing* and *Gonzaga*, sections 1396u-2(f) and 1396a(a)(37)(A) do not create rights that are enforceable under section 1983.

**A 119**

### B. Section 1396a(a)(8) (Count II)

The claim under Count II fails for many of the same reasons. Saint Anthony relies on other statutory provisions, but they do not give rise to a private right of action, either.

Saint Anthony invokes section 1396a(a)(8), which sets requirements for a state's Medicaid plan. "A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). The definition of "medical assistance" includes payment for medical care. *See* 42 U.S.C. § 1396d(a) ("The term 'medical assistance' means payment of part or all of the cost of the following care and services or the care and services themselves ....").

Saint Anthony believes that those provisions create a statutory entitlement to payment with "reasonable promptness." *See* 42 U.S.C. § 1396a(a)(8). And the Hospital contends that it can bring suit to enforce it. But once again, the *Blessing* factors stand in the way.

First, the statute does not contain the type of rights-vesting language required to give rise to a right of action. The statute establishes requirements for a "State plan." *Id.* It sets conditions for a state's participation in the Medicaid program. It does not create direct private rights and **\*738** entitle providers to receive payment by any fixed period of time. *Cf. Nasello*, 977 F.3d at 601–02.

In fact, the provision in question does not even mention providers at all. The statute refers to "*individuals* wishing to make application for medical assistance." *See* 42 U.S.C. § 1396a(a)(8) (emphasis added). It would be unnatural to refer to a provider like a hospital as an "individual." Individuals go to hospitals, but few of them think that the hospital *itself* is an "individual."

Saint Anthony argues that the term "eligible individuals" applies to both providers and patients. *See* Pl.'s Resp., at 10–11 (Dckt. No. 26). That reading sits uncomfortably with the sentence as a whole. Section 1396a(a)(8) uses the word "individuals" twice. *See* 42 U.S.C. § 1396a(a)(8) ("A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."). That word first appears in connection with

an application – "all individuals wishing to make application for medical assistance under the plan." *Id.* An "application" is the form that an individual patient submits when applying to the Medicaid program. *See* 42 C.F.R. § 435.4 ("*Applicant* means an individual who is seeking an eligibility determination for himself or herself through an application submission or a transfer from another agency or insurance affordability program ... *Application* means the single streamlined application described at § 435.907(b) of this part or an application described in § 435.907(c)(2) of this part submitted by or on behalf of an individual.") (emphasis added).

So the statutory phrase "individuals wishing to make application" refers to patients who apply to participate in Medicaid. And when the sentence later states that "such assistance shall be furnished *with reasonable promptness* to all *eligible individuals*," the phrase "all eligible individuals" refers to eligible patients who applied for Medicaid benefits and who were deemed eligible. *See* 42 U.S.C. § 1396a(a)(8) (emphasis added). It doesn't mean providers.

Neighboring provisions reinforce the point. The surrounding text repeatedly uses the word "individual" to refer to natural persons, not providers. *See, e.g.*, 42 U.S.C. § 1396a(a)(4) (referring to "any individual employed," and "each individual who formerly was such an officer, employee, or contractor"); *id.* at § 1396a(a)(10)(A)(i) (referring to "all individuals" who are "qualified pregnant women or children," or "whose family income" falls below the cutoff, or who are "qualified family members," and so on); *id.* at § 1396a(a)(10)(A)(ii)(XII) (referring to "TB-infected individuals"); *id.* at § 1396a(a)(10)(A)(ii)(XVI) (referring to "employed individuals with a medically improved disability"); *id.* at § 1396a(a)(10)(C)(ii) (referring to "individuals under the age of 18").

Even if it's *possible* to interpret the provision to include providers, Congress did not "speak with a clear voice, and manifest an unambiguous intent to confer individual rights" on them. *See Gonzaga*, 536 U.S. at 286, 122 S.Ct. 2268. To create a right enforceable under section 1983, Congress must speak loud and clear. And here, it didn't.

Second, section 1396a(a)(8) is too murky and amorphous to create enforceable rights. *See Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353. The statute refers to providing medical assistance with "reasonable promptness." *See* 42 U.S.C. § 1396a(a)(8). **\*739** But the text does not set any standards for what is "reasonable," and what is "prompt[

Saint Anthony Hospital v. Eagleson, 548 F. Supp. 3d 721 (N.D. Ill. 2021)

].” *Id.* Without a measuring stick, courts would be ill-equipped to evaluate compliance. *See Blessing*, 520 U.S. at 345, 117 S.Ct. 1353 (holding that a requirement of "sufficient" staff was "far too tenuous" to support a claim because of the "undefined standard"); *Suter v. Artist M.*, 503 U.S. 347, 359–60, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (holding that a statute that required "reasonable efforts" did not give rise to a private right of action). Maybe a court could borrow the yardstick of section 1396a(a)(37)(A) (that is, the 30-day/90-day provision), but if that's what Congress had in mind, Congress could have said so.

Third, the statute does contain some mandatory language. Individuals can apply for medical assistance, and "such assistance shall be furnished with reasonable promptness to all eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). But again, the mandatory language is geared toward "eligible individuals," not providers. *Id.* The provision does not contain language creating an unmistakable mandate on the part of the state to do anything for providers. And it does not compel the state to enforce the payment obligations of MCOs.

Overall, section 1396a(a)(8) does not contain language that creates unmistakable rights in the hands of the providers. So it cannot support a claim under section 1983.


## II. Failure to State a Claim

Even if, for the sake of argument, providers could bring a private right of action under the provisions in question, Saint Anthony would not have a claim. The complaint fails to state a claim for which relief can be granted, because the statute does not say what the Hospital thinks it says. So, even if a provider could *bring* a claim, the complaint in question doesn't *state* a claim.

The reasons echo some of the reasons why there is no private right of action. Section 1396u-2(f) is about the content of a contract between the state and the MCOs. *See* 42 U.S.C. § 1396u-2(f). Again, a "contract" with MCOs "shall provide" that the MCOs must make payment on a timely basis consistent with the "procedures" of section 1396a(a)(37)(A). *Id.*

So the statute is about the content of contracts. And here, Saint Anthony does not allege that the contracts with the MCOs lack the necessary provisions. The complaint

**A 122**

stops short of alleging that the state's contracts failed to include what they *must* include. So the complaint fails to state a claim.

Saint Anthony believes that the statute requires the state to "ensure" that MCOs pay their bills in a timely manner. *See* Cplt., at ¶ 80 (Dckt. No. 1) ("The State, through HFS, has an obligation to hospitals and other providers to ensure their Medicaid claims are timely paid by Illinois' MCOs."). But that's not what the statute says at all.

Section 1396a(a)(37)(A) provides that the state plan must have "claims payment procedures which ... ensure" payment of a certain percentage of claims in a certain period of time. *See* 42 U.S.C. § 1396a(a)(37)(A). The "*procedures*" will "ensure" payment, not the state. *Id.* (emphasis added). Nothing in that provision says that states have an ongoing obligation to ensure prompt payment by the MCOs.

The second claim fares no better. As a refresher, section 1396a(a)(8) lays down requirements for a state's Medicaid plan. "A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity **\*740** to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." *See* 42 U.S.C. § 1396a(a)(8). Saint Anthony does not allege that the Illinois Medicaid plan lacks that requisite language.

The bottom line is that the complaint fails to allege a claim against the state. The Medicaid Act sets requirements for the content of contracts with MCOs, and the content of a state's plan. The complaint does not allege that the contract and the plan lack the necessary provisions. So, even if the statute could give rise to a private right of action, Saint Anthony Hospital has failed to state a claim.

## III. Enforcement Generally

The Court adds one final word about where the parties go from here. The gist of the complaint is that the MCOs aren't paying as they should. Maybe Saint Anthony is right about that – the Court does not reach that issue. But if Saint Anthony wants to pursue that issue, suing the state isn't the way to go. Saint Anthony brought the wrong claim in the wrong forum.

Saint Anthony entered into contracts with each of the MCOs, and has the ability to press its contractual rights under those agreements. The MCOs rightly point out that the agreements require mandatory arbitration. So, if Saint Anthony wants to assert its right to timely payment from the MCOs, there is a brightly lit path for doing so. Saint Anthony can file for arbitration. Maybe Saint Anthony is reluctant to do so for some reason. But that reluctance is not a reason to tunnel into the federal courthouse by suing the state.

The federal government has enforcement powers, too. The federal government provides funds to states with the understanding that they will comply with certain conditions. And if they don't comply, the federal government can take funds away. The typical remedy for violating the terms of Spending Clause legislation is no more spending. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.").

The provisions in question illustrate the point. If an MCO doesn't comply with section 1396u-2, the federal government is prohibited from funding the state's managed care program. *See* 42 U.S.C. § 1396b(m)(2)(A)(xii). If a state doesn't comply with section 1396a(a), the Secretary of Health and Human Services "may" withhold Medicaid funding "in whole or in part." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012); *see also* 42 U.S.C. § 1396c; 42 C.F.R. § 430.12(c).

If the MCOs failed to live up to their obligations, then the state can do something about it, too. The state can cancel a contract if an MCO fails to comply with the terms of a contract with a provider. *See* 42 U.S.C. § 1396u-2(e)(4)(A) ("In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract ...."). But that power to terminate the contract rests with the state, not the judiciary. *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal **\*741** process, is a decision generally committed to an agency's absolute discretion.").

**A 124**

In sum, there are well-defined contractual and statutory routes to follow if the MCOs and the state are not living up to their obligations. But suing the state in federal court is not one of them.


## Conclusion

For the reasons stated above, the Court grants the motion to dismiss.

42 U.S.C.A. § 1396u-2

§ 1396u-2. Provisions relating to managed care

## (a) State option to use managed care

### (1) Use of medicaid managed care organizations and primary care case managers

#### (A) In general

Subject to the succeeding provisions of this section, and notwithstanding paragraph (1), (10)(B), or (23)(A) of section 1396a(a) of this title, a State--

(i) may require an individual who is eligible for medical assistance under the State plan under this subchapter to enroll with a managed care entity as a condition of receiving such assistance (and, with respect to assistance furnished by or under arrangements with such entity, to receive such assistance through the entity), if--

(I) the entity and the contract with the State meet the applicable requirements of this section and section 1396b(m) of this title or section 1396d(t) of this title, and

(II) the requirements described in the succeeding paragraphs of this subsection are met; and

(ii) may restrict the number of provider agreements with managed care entities under the State plan if such restriction does not substantially impair access to services.

#### (B) "Managed care entity" defined

In this section, the term "managed care entity" means--

(i) a medicaid managed care organization, as defined in section 1396b(m)(1)(A) of this title, that provides or arranges for services for enrollees under a contract pursuant to section 1396b(m) of this title; and

**(ii)** a primary care case manager, as defined in section 1396d(t)(2) of this title.

### (2) Special rules

#### (A) Exemption of certain children with special needs

A State may not require under paragraph (1) the enrollment in a managed care entity of an individual under 19 years of age who--

**(i)** is eligible for supplemental security income under subchapter XVI;

**(ii)** is described in section 701(a)(1)(D) of this title;

**(iii)** is described in section 1396a(e)(3) of this title;

**(iv)** is receiving foster care or adoption assistance under part E of subchapter IV; or

**(v)** is in foster care or otherwise in an out-of-home placement.

#### (B) Exemption of medicare beneficiaries

A State may not require under paragraph (1) the enrollment in a managed care entity of an individual who is a qualified medicare beneficiary (as defined in section 1396d(p)(1) of this title) or an individual otherwise eligible for benefits under subchapter XVIII.

#### (C) Indian enrollment

A State may not require under paragraph (1) the enrollment in a managed care entity of an individual who is an Indian (as defined in section 4(c) of the Indian Health Care Improvement Act of 1976 (25 U.S.C. 1603(c)) unless the entity is one of the following (and only if such entity is participating under the plan):

**(i)** The Indian Health Service.

**(ii)** An Indian health program operated by an Indian tribe or tribal organization pursuant to a contract, grant, cooperative agreement, or compact with the Indian Health Service pursuant to the Indian Self-Determination Act.

**A 127**

**(iii)** An urban Indian health program operated by an urban Indian organization pursuant to a grant or contract with the Indian Health Service pursuant to title V of the Indian Health Care Improvement Act.

## (3) Choice of coverage

### (A) In general

A State must permit an individual to choose a managed care entity from not less than two such entities that meet the applicable requirements of this section, and of section 1396b(m) of this title or section 1396d(t) of this title.

### (B) State option

At the option of the State, a State shall be considered to meet the requirements of subparagraph (A) in the case of an individual residing in a rural area, if the State requires the individual to enroll with a managed care entity if such entity--

**(i)** permits the individual to receive such assistance through not less than two physicians or case managers (to the extent that at least two physicians or case managers are available to provide such assistance in the area), and

**(ii)** permits the individual to obtain such assistance from any other provider in appropriate circumstances (as established by the State under regulations of the Secretary).

### (C) Treatment of certain county-operated health insuring organizations

A State shall be considered to meet the requirement of subparagraph (A) if--

**(i)** the managed care entity in which the individual is enrolled is a health-insuring organization which--

**(I)** first became operational prior to January 1, 1986, or

**(II)** is described in section 9517(c)(3) of the Omnibus Budget Reconciliation Act of 1985 (as added by section 4734(2) of the Omnibus Budget Reconciliation Act of 1990), and

**(ii)** the individual is given a choice between at least two providers within such entity.

### (4) Process for enrollment and termination and change of enrollment

As conditions under paragraph (1)(A)--

#### (A) In general

The State, enrollment broker (if any), and managed care entity shall permit an individual eligible for medical assistance under the State plan under this subchapter who is enrolled with the entity under this subchapter to terminate (or change) such enrollment--

**(i)** for cause at any time (consistent with section 1396b(m)(2)(A)(vi) of this title), and

**(ii)** without cause--

**(I)** during the 90-day period beginning on the date the individual receives notice of such enrollment, and

**(II)** at least every 12 months thereafter.

#### (B) Notice of termination rights

The State shall provide for notice to each such individual of the opportunity to terminate (or change) enrollment under such conditions. Such notice shall be provided at least 60 days before each annual enrollment opportunity described in subparagraph (A)(ii)(II).

#### (C) Enrollment priorities

In carrying out paragraph (1)(A), the State shall establish a method for establishing enrollment priorities in the case of a managed care entity that does not have sufficient capacity to enroll all such individuals seeking enrollment under which individuals already enrolled with the entity are given priority in continuing enrollment with the entity.

#### (D) Default enrollment process

In carrying out paragraph (1)(A), the State shall establish a default enrollment process--

**(i)** under which any such individual who does not enroll with a managed care entity during the enrollment period specified by the State shall be enrolled by the State with such an entity which has not been found to be out of substantial compliance with the applicable requirements of this section and of section 1396b(m) of this title or section 1396d(t) of this title; and

**(ii)** that takes into consideration--

**(I)** maintaining existing provider-individual relationships or relationships with providers that have traditionally served beneficiaries under this subchapter; and

**(II)** if maintaining such provider relationships is not possible, the equitable distribution of such individuals among qualified managed care entities available to enroll such individuals, consistent with the enrollment capacities of the entities.

## (5) Provision of information

### (A) Information in easily understood form

Each State, enrollment broker, or managed care entity shall provide all enrollment notices and informational and instructional materials relating to such an entity under this subchapter in a manner and form which may be easily understood by enrollees and potential enrollees of the entity who are eligible for medical assistance under the State plan under this subchapter.

### (B) Information to enrollees and potential enrollees

Each managed care entity that is a medicaid managed care organization shall, upon request, make available to enrollees and potential enrollees in the organization's service area information concerning the following:

### (i) Providers

The identity, locations, qualifications, and availability of health care providers that participate with the organization.

### (ii) Enrollee rights and responsibilities

The rights and responsibilities of enrollees.

### (iii) Grievance and appeal procedures

The procedures available to an enrollee and a health care provider to challenge or appeal the failure of the organization to cover a service.

### (iv) Information on covered items and services

All items and services that are available to enrollees under the contract between the State and the organization that are covered either directly or through a method of referral and prior authorization. Each managed care entity that is a primary care case manager shall, upon request, make available to enrollees and potential enrollees in the organization's service area the information described in clause (iii).

## (C) Comparative information

A State that requires individuals to enroll with managed care entities under paragraph (1)(A) shall annually (and upon request) provide, directly or through the managed care entity, to such individuals a list identifying the managed care entities that are (or will be) available and information (presented in a comparative, chart-like form) relating to the following for each such entity offered:

### (i) Benefits and cost-sharing

The benefits covered and cost-sharing imposed by the entity.

### (ii) Service area

The service area of the entity.

### (iii) Quality and performance

To the extent available, quality and performance indicators for the benefits under the entity.

## (D) Information on benefits not covered under managed care arrangement

A State, directly or through managed care entities, shall, on or before an individual enrolls with such an entity under this subchapter, inform the enrollee in a written and prominent manner of any benefits to which the enrollee may be entitled to under this subchapter but which are not made available to the enrollee through the entity. Such information shall include information on where and how such enrollees may access benefits not made available to the enrollee through the entity.

## (b) Beneficiary protections

### (1) Specification of benefits

Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall specify the benefits the provision (or arrangement) for which the entity is responsible.

### (2) Assuring coverage to emergency services

#### (A) In general

Each contract with a medicaid managed care organization under section 1396b(m) of this title and each contract with a primary care case manager under section 1396d(t)(3) of this title shall require the organization or manager--

**(i)** to provide coverage for emergency services (as defined in subparagraph (B)) without regard to prior authorization or the emergency care provider's contractual relationship with the organization or manager, and

**(ii)** to comply with guidelines established under section 1395w-22(d)(2) of this title (respecting coordination of post-stabilization care) in the same manner as such guidelines apply to Medicare+Choice plans offered under part C of subchapter XVIII.

The requirement under clause (ii) shall first apply 30 days after the date of promulgation of the guidelines referred to in such clause.

(B) "Emergency services" defined

In subparagraph (A)(i), the term "emergency services" means, with respect to

**A 132**

an individual enrolled with an organization, covered inpatient and outpatient services that--

> **(i)** are furnished by a provider that is qualified to furnish such services under this subchapter, and

> **(ii)** are needed to evaluate or stabilize an emergency medical condition (as defined in subparagraph (C)).

(C) "Emergency medical condition" defined

In subparagraph (B)(ii), the term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in--

> **(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

> **(ii)** serious impairment to bodily functions, or

> **(iii)** serious dysfunction of any bodily organ or part.

**(D) Emergency services furnished by non-contract providers**

Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

### (3) Protection of enrollee-provider communications

#### (A) In general

Subject to subparagraphs (B) and (C), under a contract under section 1396b(m) of this title a medicaid managed care organization (in relation to an individual enrolled under the contract) shall not prohibit or otherwise restrict a covered health care professional (as defined in subparagraph (D)) from advising such an individual who is a patient of the professional about the health status of the individual or medical care or treatment for the individual's condition or disease, regardless of whether benefits for such care or treatment are provided under the contract, if the professional is acting within the lawful scope of practice.

#### (B) Construction

Subparagraph (A) shall not be construed as requiring a medicaid managed care organization to provide, reimburse for, or provide coverage of, a counseling or referral service if the organization--

**(i)** objects to the provision of such service on moral or religious grounds; and

**(ii)** in the manner and through the written instrumentalities such organization deems appropriate, makes available information on its policies regarding such service to prospective enrollees before or during enrollment and to enrollees within 90 days after the date that the organization adopts a change in policy regarding such a counseling or referral service.

Nothing in this subparagraph shall be construed to affect disclosure requirements under State law or under the Employee Retirement Income Security Act of 1974.

#### (C) "Health care professional" defined

For purposes of this paragraph, the term "health care professional" means a physician (as defined in section 1395x(r) of this title) or other health care professional if coverage for the professional's services is provided under the contract referred to in subparagraph (A) for the services of the professional. Such term includes a podiatrist, optometrist, chiropractor, psychologist,

**A 134**

dentist, physician assistant, physical or occupational therapist and therapy assistant, speech-language pathologist, audiologist, registered or licensed practical nurse (including nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, and certified nurse-midwife), licensed certified social worker, registered respiratory therapist, and certified respiratory therapy technician.

## (4) Grievance procedures

Each medicaid managed care organization shall establish an internal grievance procedure under which an enrollee who is eligible for medical assistance under the State plan under this subchapter, or a provider on behalf of such an enrollee, may challenge the denial of coverage of or payment for such assistance.

## (5) Demonstration of adequate capacity and services

Each medicaid managed care organization shall provide the State and the Secretary with adequate assurances (in a time and manner determined by the Secretary) that the organization, with respect to a service area, has the capacity to serve the expected enrollment in such service area, including assurances that the organization--

**(A)** offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area, and

**(B)** maintains a sufficient number, mix, and geographic distribution of providers of services.

## (6) Protecting enrollees against liability for payment

Each medicaid managed care organization shall provide that an individual eligible for medical assistance under the State plan under this subchapter who is enrolled with the organization may not be held liable--

**(A)** for the debts of the organization, in the event of the organization's insolvency,

**(B)** for services provided to the individual--

**(i)** in the event of the organization failing to receive payment from the State for such services; or

**(ii)** in the event of a health care provider with a contractual, referral, or other arrangement with the organization failing to receive payment from the State or the organization for such services, or

**(C)** for payments to a provider that furnishes covered services under a contractual, referral, or other arrangement with the organization in excess of the amount that would be owed by the individual if the organization had directly provided the services.

## **(7) Antidiscrimination**

A medicaid managed care organization shall not discriminate with respect to participation, reimbursement, or indemnification as to any provider who is acting within the scope of the provider's license or certification under applicable State law, solely on the basis of such license or certification. This paragraph shall not be construed to prohibit an organization from including providers only to the extent necessary to meet the needs of the organization's enrollees or from establishing any measure designed to maintain quality and control costs consistent with the responsibilities of the organization.

## **(8) Compliance with certain maternity and mental health requirements**

Each medicaid managed care organization shall comply with the requirements of subpart 2 of part A of title XXVII of the Public Health Service Act insofar as such requirements apply and are effective with respect to a health insurance issuer that offers group health insurance coverage. In applying the previous sentence with respect to requirements under paragraph (8) of section 2726(a) of the Public Health Service Act, a Medicaid managed care organization (or a prepaid inpatient health plan (as defined by the Secretary) or prepaid ambulatory health plan (as defined by the Secretary) that offers services to enrollees of a Medicaid managed care organization) shall be treated as in compliance with such requirements if the Medicaid managed care organization (or prepaid inpatient health plan or prepaid ambulatory health plan) is in compliance with subpart K of part 438 of title 42, Code of Federal Regulations,

and section 438.3(n) of such title, or any successor regulation.

## (c) Quality assurance standards

### (1) Quality assessment and improvement strategy

#### (A) In general

If a State provides for contracts with medicaid managed care organizations under section 1396b(m) of this title, the State shall develop and implement a quality assessment and improvement strategy consistent with this paragraph. Such strategy shall include the following:

##### (i) Access standards

Standards for access to care so that covered services are available within reasonable timeframes and in a manner that ensures continuity of care and adequate primary care and specialized services capacity.

##### (ii) Other measures

Examination of other aspects of care and service directly related to the improvement of quality of care (including grievance procedures and marketing and information standards).

##### (iii) Monitoring procedures

Procedures for monitoring and evaluating the quality and appropriateness of care and services to enrollees that reflect the full spectrum of populations enrolled under the contract and that includes requirements for provision of quality assurance data to the State using the data and information set that the Secretary has specified for use under part C of subchapter XVIII or such alternative data as the Secretary approves, in consultation with the State.

##### (iv) Periodic review

Regular, periodic examinations of the scope and content of the strategy.

#### (B) Standards

The strategy developed under subparagraph (A) shall be consistent with standards that the Secretary first establishes within 1 year after August 5, 1997.

**A 137**

Such standards shall not preempt any State standards that are more stringent than such standards. Guidelines relating to quality assurance that are applied under section 1396n(b)(1) of this title shall apply under this subsection until the effective date of standards for quality assurance established under this subparagraph.

### (C) Monitoring

The Secretary shall monitor the development and implementation of strategies under subparagraph (A).

### (D) Consultation

The Secretary shall conduct activities under subparagraphs (B) and (C) in consultation with the States.

## (2) External independent review of managed care activities

### (A) Review of contracts

#### (i) In general

Each contract under section 1396b(m) of this title with a medicaid managed care organization shall provide for an annual (as appropriate) external independent review conducted by a qualified independent entity of the quality outcomes and timeliness of, and access to, the items and services for which the organization is responsible under the contract. The requirement for such a review shall not apply until after the date that the Secretary establishes the identification method described in clause (ii).

#### (ii) Qualifications of reviewer

The Secretary, in consultation with the States, shall establish a method for the identification of entities that are qualified to conduct reviews under clause (i).

#### (iii) Use of protocols

The Secretary, in coordination with the National Governors' Association, shall contract with an independent quality review organization (such as the National Committee for Quality Assurance) to develop the protocols to be

**A 138**

used in external independent reviews conducted under this paragraph on and after January 1, 1999.

### (iv) Availability of results

The results of each external independent review conducted under this subparagraph shall be available to participating health care providers, enrollees, and potential enrollees of the organization, except that the results may not be made available in a manner that discloses the identity of any individual patient.

### (B) Nonduplication of accreditation

A State may provide that, in the case of a medicaid managed care organization that is accredited by a private independent entity (such as those described in section 1395w-22(e)(4) of this title) or that has an external review conducted under section 1395w-22(e)(3) of this title, the external review activities conducted under subparagraph (A) with respect to the organization shall not be duplicative of review activities conducted as part of the accreditation process or the external review conducted under such section.

### (C) Deemed compliance for medicare managed care organizations

At the option of a State, the requirements of subparagraph (A) shall not apply with respect to a medicaid managed care organization if the organization is an eligible organization with a contract in effect under section 1395mm of this title or a Medicare+Choice organization with a contract in effect under part C of subchapter XVIII and the organization has had a contract in effect under section 1396b(m) of this title at least during the previous 2-year period.

## (d) Protections against fraud and abuse

### (1) Prohibiting affiliations with individuals debarred by Federal agencies

#### (A) In general

A managed care entity may not knowingly--

(i) have a person described in subparagraph (C) as a director, officer,

partner, or person with beneficial ownership of more than 5 percent of the entity's equity, or

**(ii)** have an employment, consulting, or other agreement with a person described in such subparagraph for the provision of items and services that are significant and material to the entity's obligations under its contract with the State.

### (B) Effect of noncompliance

If a State finds that a managed care entity is not in compliance with clause (i) or (ii) of subparagraph (A), the State--

**(i)** shall notify the Secretary of such noncompliance;

**(ii)** may continue an existing agreement with the entity unless the Secretary (in consultation with the Inspector General of the Department of Health and Human Services) directs otherwise; and

**(iii)** may not renew or otherwise extend the duration of an existing agreement with the entity unless the Secretary (in consultation with the Inspector General of the Department of Health and Human Services) provides to the State and to Congress a written statement describing compelling reasons that exist for renewing or extending the agreement.

### (C) Persons described

A person is described in this subparagraph if such person--

**(i)** is debarred, suspended, or otherwise excluded from participating in procurement activities under the Federal Acquisition Regulation or from participating in nonprocurement activities under regulations issued pursuant to Executive Order No. 12549 or under guidelines implementing such order; or

**(ii)** is an affiliate (as defined in such Regulation) of a person described in clause (i).

### (2) Restrictions on marketing

**(A) Distribution of materials**

**(i) In general**

A managed care entity, with respect to activities under this subchapter, may not distribute directly or through any agent or independent contractor marketing materials within any State--

**(I)** without the prior approval of the State, and

**(II)** that contain false or materially misleading information.

The requirement of subclause (I) shall not apply with respect to a State until such date as the Secretary specifies in consultation with such State.

**(ii) Consultation in review of market materials**

In the process of reviewing and approving such materials, the State shall provide for consultation with a medical care advisory committee.

**(B) Service market**

A managed care entity shall distribute marketing materials to the entire service area of such entity covered under the contract under section 1396b(m) of this title or section 1396d(t)(3) of this title.

**(C) Prohibition of tie-ins**

A managed care entity, or any agency of such entity, may not seek to influence an individual's enrollment with the entity in conjunction with the sale of any other insurance.

**(D) Prohibiting marketing fraud**

Each managed care entity shall comply with such procedures and conditions as the Secretary prescribes in order to ensure that, before an individual is enrolled with the entity, the individual is provided accurate oral and written information sufficient to make an informed decision whether or not to enroll.

**(E) Prohibition of "cold-call" marketing**

Each managed care entity shall not, directly or indirectly, conduct door-to-

door, telephonic, or other "cold-call" marketing of enrollment under this subchapter.

### (3) State conflict-of-interest safeguards in medicaid risk contracting

A medicaid managed care organization may not enter into a contract with any State under section 1396b(m) of this title unless the State has in effect conflict-of-interest safeguards with respect to officers and employees of the State with responsibilities relating to contracts with such organizations or to the default enrollment process described in subsection (a)(4)(C)(ii) that are at least as effective as the Federal safeguards provided under chapter 21 of Title 41, against conflicts of interest that apply with respect to Federal procurement officials with comparable responsibilities with respect to such contracts.

### (4) Use of unique physician identifier for participating physicians

Each medicaid managed care organization shall require each physician providing services to enrollees eligible for medical assistance under the State plan under this subchapter to have a unique identifier in accordance with the system established under section 1320d-2(b) of this title.

### (5) Contract requirement for managed care entities

With respect to any contract with a managed care entity under section 1396b(m) or 1396d(t)(3) of this title (as applicable), no later than July 1, 2018, such contract shall include a provision that providers of services or persons terminated (as described in section 1396a(kk)(8) of this title) from participation under this subchapter, subchapter XVIII, or subchapter XXI shall be terminated from participating under this subchapter as a provider in any network of such entity that serves individuals eligible to receive medical assistance under this subchapter.

### (6) Enrollment of participating providers

#### (A) In general

Beginning not later than January 1, 2018, a State shall require that, in order to participate as a provider in the network of a managed care entity that provides services to, or orders, prescribes, refers, or certifies eligibility for services for, individuals who are eligible for medical assistance under the State

**A 142**

plan under this subchapter (or under a waiver of the plan) and who are enrolled with the entity, the provider is enrolled consistent with section 1396a(kk) of this title with the State agency administering the State plan under this subchapter. Such enrollment shall include providing to the State agency the provider's identifying information, including the name, specialty, date of birth, Social Security number, national provider identifier, Federal taxpayer identification number, and the State license or certification number of the provider.

### (B) Rule of construction

Nothing in subparagraph (A) shall be construed as requiring a provider described in such subparagraph to provide services to individuals who are not enrolled with a managed care entity under this subchapter.

## (e) Sanctions for noncompliance

### (1) Use of intermediate sanctions by the State to enforce requirements

#### (A) In general

A State may not enter into or renew a contract under section 1396b(m) of this title unless the State has established intermediate sanctions, which may include any of the types described in paragraph (2), other than the termination of a contract with a medicaid managed care organization, which the State may impose against a medicaid managed care organization with such a contract, if the organization--

**(i)** fails substantially to provide medically necessary items and services that are required (under law or under such organization's contract with the State) to be provided to an enrollee covered under the contract;

**(ii)** imposes premiums or charges on enrollees in excess of the premiums or charges permitted under this subchapter;

**(iii)** acts to discriminate among enrollees on the basis of their health status or requirements for health care services, including expulsion or refusal to reenroll an individual, except as permitted by this subchapter, or engaging

in any practice that would reasonably be expected to have the effect of denying or discouraging enrollment with the organization by eligible individuals whose medical condition or history indicates a need for substantial future medical services;

**(iv)** misrepresents or falsifies information that is furnished--

**(I)** to the Secretary or the State under this subchapter; or

**(II)** to an enrollee, potential enrollee, or a health care provider under such subchapter; or

**(v)** fails to comply with the applicable requirements of section 1396b(m)(2)(A)(x) of this title.

The State may also impose such intermediate sanction against a managed care entity if the State determines that the entity distributed directly or through any agent or independent contractor marketing materials in violation of subsection (d)(2)(A)(i)(II).

### (B) Rule of construction

Clause (i) of subparagraph (A) shall not apply to the provision of abortion services, except that a State may impose a sanction on any medicaid managed care organization that has a contract to provide abortion services if the organization does not provide such services as provided for under the contract.

### (2) Intermediate sanctions

The sanctions described in this paragraph are as follows:

**(A)** Civil money penalties as follows:

**(i)** Except as provided in clause (ii), (iii), or (iv), not more than $25,000 for each determination under paragraph (1)(A).

**(ii)** With respect to a determination under clause (iii) or (iv)(I) of paragraph (1)(A), not more than $100,000 for each such determination.

**A 144**

**(iii)** With respect to a determination under paragraph (1)(A)(ii), double the excess amount charged in violation of such subsection (and the excess amount charged shall be deducted from the penalty and returned to the individual concerned).

**(iv)** Subject to clause (ii), with respect to a determination under paragraph (1)(A)(iii), $15,000 for each individual not enrolled as a result of a practice described in such subsection.

**(B)** The appointment of temporary management--

**(i)** to oversee the operation of the medicaid managed care organization upon a finding by the State that there is continued egregious behavior by the organization or there is a substantial risk to the health of enrollees; or

**(ii)** to assure the health of the organization's enrollees, if there is a need for temporary management while--

**(I)** there is an orderly termination or reorganization of the organization; or

**(II)** improvements are made to remedy the violations found under paragraph (1),

except that temporary management under this subparagraph may not be terminated until the State has determined that the medicaid managed care organization has the capability to ensure that the violations shall not recur.

**(C)** Permitting individuals enrolled with the managed care entity to terminate enrollment without cause, and notifying such individuals of such right to terminate enrollment.

**(D)** Suspension or default of all enrollment of individuals under this subchapter after the date the Secretary or the State notifies the entity of a determination of a violation of any requirement of section 1396b(m) of this title or this section.

**(E)** Suspension of payment to the entity under this subchapter for individuals

**A 145**

enrolled after the date the Secretary or State notifies the entity of such a determination and until the Secretary or State is satisfied that the basis for such determination has been corrected and is not likely to recur.

### (3) Treatment of chronic substandard entities

In the case of a medicaid managed care organization which has repeatedly failed to meet the requirements of section 1396b(m) of this title and this section, the State shall (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2).

### (4) Authority to terminate contract

#### (A) In general

In the case of a managed care entity which has failed to meet the requirements of this part or a contract under section 1396b(m) or 1396d(t)(3) of this title, the State shall have the authority to terminate such contract with the entity and to enroll such entity's enrollees with other managed care entities (or to permit such enrollees to receive medical assistance under the State plan under this subchapter other than through a managed care entity).

#### (B) Availability of hearing prior to termination of contract

A State may not terminate a contract with a managed care entity under subparagraph (A) unless the entity is provided with a hearing prior to the termination.

#### (C) Notice and right to disenroll in cases of termination hearing

A State may--

**(i)** notify individuals enrolled with a managed care entity which is the subject of a hearing to terminate the entity's contract with the State of the hearing, and

**(ii)** in the case of such an entity, permit such enrollees to disenroll immediately with the entity without cause.

### (5) Other protections for managed care entities against sanctions imposed by State

Before imposing any sanction against a managed care entity other than termination of the entity's contract, the State shall provide the entity with notice and such other due process protections as the State may provide, except that a State may not provide a managed care entity with a pre-termination hearing before imposing the sanction described in paragraph (2)(B).

## (f) Timeliness of payment; adequacy of payment for primary care services

A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule and, in the case of primary care services described in section 1396a(a)(13)(C) of this title, consistent with the minimum payment rates specified in such section (regardless of the manner in which such payments are made, including in the form of capitation or partial capitation).

## (g) Identification of patients for purposes of making DSH payments

Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require the entity either--

**(1)** to report to the State information necessary to determine the hospital services provided under the contract (and the identity of hospitals providing such services) for purposes of applying sections 1395ww(d)(5)(F) and 1396r-4 of this title; or

**(2)** to include a sponsorship code in the identification card issued to individuals covered under this subchapter in order that a hospital may identify a patient as being entitled to benefits under this subchapter.

## (h) Special rules with respect to Indian enrollees, Indian health care providers, and Indian managed care entities

**(1) Enrollee option to select an Indian health care provider as**

**primary care provider**

In the case of a non-Indian Medicaid managed care entity that--

**(A)** has an Indian enrolled with the entity; and

**(B)** has an Indian health care provider that is participating as a primary care provider within the network of the entity,

insofar as the Indian is otherwise eligible to receive services from such Indian health care provider and the Indian health care provider has the capacity to provide primary care services to such Indian, the contract with the entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require, as a condition of receiving payment under such contract, that the Indian shall be allowed to choose such Indian health care provider as the Indian's primary care provider under the entity.

## (2) Assurance of payment to Indian health care providers for provision of covered services

Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:

### (A) Demonstration of access to Indian health care providers and application of alternative payment arrangements

Subject to subparagraph (C), to--

**(i)** demonstrate that the number of Indian health care providers that are participating providers with respect to such entity are sufficient to ensure timely access to covered Medicaid managed care services for those Indian enrollees who are eligible to receive services from such providers; and

**(ii)** agree to pay Indian health care providers, whether such providers are participating or nonparticipating providers with respect to the entity, for covered Medicaid managed care services provided to those Indian enrollees who are eligible to receive services from such providers at a rate equal to the rate negotiated between such entity and the provider involved or, if such a rate has not been negotiated, at a rate that is not less than the level and

**A 148**

amount of payment which the entity would make for the services if the services were furnished by a participating provider which is not an Indian health care provider.

The Secretary shall establish procedures for applying the requirements of clause (i) in States where there are no or few Indian health providers.

**(B) Prompt payment**

To agree to make prompt payment (consistent with rule for prompt payment of providers under section 1396u-2(f) of this title) to Indian health care providers that are participating providers with respect to such entity or, in the case of an entity to which subparagraph (A)(ii) or (C) applies, that the entity is required to pay in accordance with that subparagraph.

**(C) Application of special payment requirements for federally-qualified health centers and for services provided by certain Indian health care providers**

**(i) Federally-qualified health centers**

**(I) Managed care entity payment requirement**

To agree to pay any Indian health care provider that is a federally-qualified health center under this subchapter but not a participating provider with respect to the entity, for the provision of covered Medicaid managed care services by such provider to an Indian enrollee of the entity at a rate equal to the amount of payment that the entity would pay a federally-qualified health center that is a participating provider with respect to the entity but is not an Indian health care provider for such services.

**(II) Continued application of State requirement to make supplemental payment**

Nothing in subclause (I) or subparagraph (A) or (B) shall be construed as waiving the application of section 1396a(bb)(5) of this title regarding the State plan requirement to make any supplemental payment due under such section to a federally-qualified health center for services furnished by such center to an enrollee of a managed care entity (regardless of

**A 149**

whether the federally-qualified health center is or is not a participating provider with the entity).

### (ii) Payment rate for services provided by certain Indian health care providers

If the amount paid by a managed care entity to an Indian health care provider that is not a federally-qualified health center for services provided by the provider to an Indian enrollee with the managed care entity is less than the rate that applies to the provision of such services by the provider under the State plan, the plan shall provide for payment to the Indian health care provider, whether the provider is a participating or nonparticipating provider with respect to the entity, of the difference between such applicable rate and the amount paid by the managed care entity to the provider for such services.

### (D) Construction

Nothing in this paragraph shall be construed as waiving the application of section 1396a(a)(30)(A) of this title (relating to application of standards to assure that payments are consistent with efficiency, economy, and quality of care).

### (3) Special rule for enrollment for Indian managed care entities

Regarding the application of a Medicaid managed care program to Indian Medicaid managed care entities, an Indian Medicaid managed care entity may restrict enrollment under such program to Indians in the same manner as Indian Health Programs may restrict the delivery of services to Indians.

### (4) Definitions

For purposes of this subsection:

### (A) Indian health care provider

The term "Indian health care provider" means an Indian Health Program or an Urban Indian Organization.

### (B) Indian Medicaid managed care entity

The term "Indian Medicaid managed care entity" means a managed care entity that is controlled (within the meaning of the last sentence of section 1396b(m)(1)(C) of this title) by the Indian Health Service, a Tribe, Tribal Organization, or Urban Indian Organization, or a consortium, which may be composed of 1 or more Tribes, Tribal Organizations, or Urban Indian Organizations, and which also may include the Service.

### (C) Non-Indian Medicaid managed care entity

The term "non-Indian Medicaid managed care entity" means a managed care entity that is not an Indian Medicaid managed care entity.

### (D) Covered Medicaid managed care services

The term "covered Medicaid managed care services" means, with respect to an individual enrolled with a managed care entity, items and services for which benefits are available with respect to the individual under the contract between the entity and the State involved.

### (E) Medicaid managed care program

The term "Medicaid managed care program" means a program under sections 1396b(m), 1396d(t), and 1396u-2 of this title and includes a managed care program operating under a waiver under section 1396n(b) or 1315 of this title or otherwise.

## (i) Drug utilization review activities and requirements

Beginning not later than October 1, 2019, each contract under a State plan with a managed care entity (other than a primary care case manager) under section 1396b(m) of this title shall provide that the entity is in compliance with the applicable provisions of section 438.3(s)(2) of title 42, Code of Federal Regulations, section 483.3(s)(4))[1] of such title, and section 483.3(s)(5)[2] of such title, as such provisions were in effect on March 31, 2018.

## CREDIT(S)

(Aug. 14, 1935, c. 531, Title XIX, § 1932, as added and amended Pub.L. 105-33, Title IV, §§ 4701(a), 4704(a), 4705(a), 4707(a), 4708(c), Aug. 5, 1997, 111 Stat. 489, 495, 498, 501, 506; Pub.L. 106-113, Div. B, § 1000(a)(6) [Title VI, § 608(w)], Nov.

29, 1999, 113 Stat. 1536, 1501A-398; Pub.L. 106-554, § 1(a)(6) [Title VII, § 701(b)(1)], Dec. 21, 2000, 114 Stat. 2763, 2763A-570; Pub.L. 109-171, Title VI, § 6085(a), Feb. 8, 2006, 120 Stat. 121; Pub.L. 111-5, Div. B, Title V, § 5006(d)(1), Feb. 17, 2009, 123 Stat. 507; Pub.L. 111-152, Title I, § 1202(a)(2), Mar. 30, 2010, 124 Stat. 1053; Pub.L. 114-255, Div. A, Title V, § 5005(a)(2), (b)(2), Dec. 13, 2016, 130 Stat. 1192, 1193; Pub.L. 115-271, Title I, § 1004(a)(3), Oct. 24, 2018, 132 Stat. 3911; Pub.L. 116-260, Div. BB, Title II, § 203(a)(4)(A), Dec. 27, 2020, 134 Stat. 2917.)

# Footnotes

[1]     So in original. Probably should be section "438.3(s)(4)" and the second parenthesis probably should not appear.

[2]     So in original. Probably should be section "438.3(s)(5)".

42 U.S.C.A. § 1396u-2, 42 USCA § 1396u-2

Current through P.L. 118-46. Some statute sections may be more current, see credits for details.

### Certificate of Filing and Service

I hereby certify that on May 30, 2024, I electronically filed the foregoing

Separate Appendix to Petition for Rehearing or Rehearing *En Banc* with the Clerk of

Court for the United States Court of Appeals for the Seventh Circuit by using the

CM/ECF system, which will effect service on other participants in the case, all of

whom are registered CM/ECF users.


        /s/  *Richard S. Huszagh*